UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
                                                              :
NATIONAL UTILITY SERVICE, INC.,                               :   07-CV-3345 (RJS) (GWG)
                                                              :
                Plaintiff,                                    :   **STATEMENT OF MATERIAL FACTS**
                                                              :   **PURSUANT TO LOCAL RULE 56.1**
          -vs-                                               :
                                                              :
TIFFANY & CO. and TIFFANY AND                                 :
COMPANY,                                                      :
                                                              :
                Defendants.                                   :
------------------------------------------------------------- x

      Pursuant to Local Rule 56.1, defendants Tiffany & Co. and Tiffany and Company (collectively, "Tiffany") submit the following Statement of Material Facts as to which there is no genuine issue to be tried:

**A.    Background**

      1. NUS holds itself out on its website as "the world's leading utility cost management consulting firm . . . dedicated to providing the firm's clients unparalleled cost reduction solutions, service and support." Ex. 32.

      2. Tiffany retained NUS by written contract in April, 1992 to "analyze *our costs* and advise where refunds and reductions can be obtained" on such utility services as electricity (emphasis added). Ex. 1 (the "Contract").

      3. Pursuant to the terms of the Contract, Tiffany was required to send copies of its electric bills to NUS "each month during the term of the agreement." *Id.*

      4. Plaintiff was to be paid a "performance fee" of "(i) fifty (50%) percent of each refund realized [and] (ii) fifty (50%) percent of each savings realized for a period of sixty (60) months" as a result of any recommendation made that was "subsequently implemented." *Id.*

5. For 15 years, the parties never had any dispute under the Contract, and during that time, Tiffany paid NUS fees, almost exclusively arising from electricity rate reductions or beneficial purchase arrangements for power, ranging in the aggregate from approximately $50 to $32,500 over 60 months. Ex. 13; Frankel Dep. Tr. at 34:3-7; Amundsen Dep. Tr. at 42:5-44:12.

6. In February 1996, the parties separately executed a Data Management Services agreement pursuant to which plaintiff was paid to input data from Tiffany electric bills into a computer database (Ex. 12, T155-T165), which information was then made directly accessible to Tiffany managers. Palfini Dep. Tr. at 63:12-21

### B. The Contract

7. The first paragraph of the Contract states:

> We [Tiffany] hereby authorize you [NUS] to submit recommendations for savings and refunds on our costs of electricity, gas, oil and petroleum products, water, sewerage, steam and telecommunications. You will analyze our costs and advise where refunds and reductions can be obtained.

8. The Tiffany officer who executed the Contract testified that the intent of the parties was that NUS "would identify opportunities for us for savings in all of our – in all our electricity bills, either through rate changes or through better usage." Strohl Dep. Tr. at 31:22-24, 56: 3-19.

9. Paragraph 2 of the Contract provides that:

> Your [NUS] initial analysis will cover our [Tiffany] most recent (12) months' bills. Where applicable, you will review old bills as far back as possible for refunds. Your continuing analysis will cover our current bills, which we will send to you each month during the term of this agreement.

Ex. 1.

10. The next paragraph discusses what is to happen if NUS discovers something from a review. It provides:

> Any recommendation you [NUS] make will be considered by us [Tiffany] and shall be subject to our approval. If any recommendation made by you is subsequently implemented, we will pay you as outlined below *after such*

>  *savings and refunds are achieved*. All information pertaining to your recommendations, including correspondence with our suppliers, will be sent to you promptly for your evaluation and further advice.

*Id.* (emphasis added).

11. The contingency fee described in paragraph 5 is "a performance fee of (i) fifty (50%) percent of each refund realized; (ii) fifty (50%) percent of each savings realized for a period of sixty (60) months after which the entire savings will be ours [Tiffany]." *Id.*

12. The words "savings" and "refunds" are not separately defined in the contract. *Id.*; Frankel Dep. Tr. at 30:17-23.

13. The purpose of the Contract was to achieve for Tiffany a reduction in its *own* utility costs. *Id.*; Brown Dep. Tr. at 70:24-71:7.[1]

14. NUS admitted during discovery that, as far as anyone knew, a switched meter situation had never before arisen in the company's decades-long history, and it had never before attempted to secure a fee under its form contract by claiming that the correction of a mis-tagged meter resulted in a "refund" and "savings" as it claims here under the Contract. Frankel Dep. Tr. at 32:9-21; Brown Dep. Tr. at 65:7-15; Amundsen Dep. Tr. at 26:14-27:7.

15. With respect to collection of any real savings achieved for Tiffany in the form of rate optimization or procurement contracts with third parties (Ex. 13), NUS billed on a monthly basis as savings were realized, consistent with the plain language of paragraph 3 of the Contract. Frankel Dep. Tr. at 22:11-23:7; Brown Dep. Tr. at 168:15-22.

16. If during the passage of 60 months the savings originally achieved either dissipated or was eliminated, NUS would stop billing monthly for that savings altogether, establishing that the provision only required the payment of a fee for 60 months if the savings continued to be realized for that long. Brown Dep. Tr. at 168:23-169:16.

---

[1] All references to "Brown Dep. Tr." are to the March 5, 2008 Brown deposition transcript unless otherwise indicated.

17. LIPA and Con Ed Solutions had no right to bill Tiffany for another party's usage. Schwarting Dep. Tr. at 127:4-16.

### C.   The Manhasset Store

18. In the fall of 2006, unbeknownst to Tiffany, new electric meters were installed during a renovation project in a common area at the high-end Americana shopping center in Manhasset, Long Island. Ex. 16; Mogel Dep. Tr. at 149:9-25; Edson Dep. Tr. at 34:10-35:2; Ensor Dep. Tr. at 17:13-20.

19. Tiffany has a store in Manhasset with basement office and storage that is approximately 10,000 square feet in size. *See, e.g.,* Ex. 11.

20. When the new meters were activated in September 2006, LIPA mis-tagged the meter numbers for Tiffany and Polo Ralph Lauren meters in its computer systems so that following the installation, Tiffany began receiving bills for electricity usage by larger neighbor Polo, and Polo started to receive bills which reflected Tiffany's usage. Exs. 16, 19.

21. Since NUS received copies of all Tiffany electricity bills pursuant to the Contract and the Data Management Services Agreement, it identified to Tiffany the "unusual usage pattern" it observed in the form of a spike in kilowatt hours reflected on the very first erroneous bill, which it reported to Tiffany on November 15, 2006. Exs. 4, 12 at T155-T164.

22. The spike in usage was also observed separately by the Tiffany manager for the Manhasset store from internal store performance reports produced at or around the same time, as the amount of the electric charge was greater than had been budgeted for. Ensor Dep. Tr. at 61:17-63:19; Ex. 27 at T1192.

23. On November 16, 2006, the day after NUS told Tiffany about its observation, the retail facilities director for Tiffany asked plaintiff to "investigate" the cause of the spike in usage

reflected on the bill as there was nothing unusual in the store's actual usage to account for the billing anomaly. Mogel Dep. Tr. at 71:3-18; Ex. 5.

24. At this point, neither Tiffany nor NUS knew what the cause was; only that there was an unaccounted for spike in usage reflected on one bill that was clearly in error. Exs. 3, 5.

25. In fact, the bill at issue reflects an electricity usage for a nine day period in September that was greater than Tiffany's electricity usage for the entire month of August. Ex. 4.

26. NUS did nothing to investigate the matter or tell Tiffany to stop paying its bills for the next five weeks. Ex. 7; Amundsen Dep. Tr. at 278:19-24; Frankel Dep. Tr. at 79:20-80:17, 83:17-84:18.

27. Until told otherwise by NUS to stop paying the electricity bills for Manhasset six weeks later, Tiffany continued to pay its electric bills believing that plaintiff was investigating, which it turns out it was not. *Id.*

**D.     The Purported "Recommendation"**

28. Any claim for a fee under the Contract is conditioned upon a customer's implementation of a NUS "recommendation." Contract ¶ 3.

29. Plaintiff purported to send such a "recommendation" to Tiffany on December 20, 2006, five weeks after first being asked by Tiffany to "investigate the LIPA involvement." Exs. 5, 2.

30. In a three page document captioned "Cost Analysis Report" (the "Report"), plaintiff purported to outline what it did and did not know about the billing error at that time. Ex. 2.

31. NUS admitted that prior to writing the Report it had conducted no "investigation," nor performed any services to learn of the cause of the billing error. Amundsen Dep. Tr. at 114:19-25, 278:19-24; Frankel Dep. Tr. at 79:20-80:17, 83:13-84:18.

32. Much of the Report is from a generic template NUS uses to protect its claim to a fee. Amundsen Dep. Tr. 19:19-21:2; Frankel Dep. Tr. at 69:2-25.

33. The Report effectively recounts information about the Manhasset store which the parties already knew, and concludes that it appears Tiffany was either being billed in error currently, or, perhaps, had been billed in error previously because "the former meter for this account may have been under-recording your previous usage." Ex. 2.

34. The Report then makes what it calls a "recommendation" in a separately captioned section headed with that word, which states:

> NUS Consulting Group recommends investigating this potential ongoing overcharge. As detailed above, we estimate that in addition to a refund of approximately $93,000 for past overcharges, a correction of this ongoing overcharge will result in annual savings of approximately $372,000.

*Id.*

35. Effectively, plaintiff recommended that Tiffany authorize it to do what Tiffany already asked it to do five weeks earlier – investigate the overcharge. *Id.*, Ex. 5.

36. The "recommendation" did not suggest a specific course of action likely to achieve a resolution. Ex. 2.

37. When he saw the Report, the retail facilities director at Tiffany responsible for the Manhasset store questioned NUS's theoretical claim that Tiffany would achieve a going forward "savings" based on what the parties knew to that point, a fact that NUS itself memorialized in a memorandum captioned "Report on Client Contact" dated December 22, 2006. Ex. 15.

38. However, as the foregoing report states, "for the time being, he did not want us to delay contacting the utility suppliers and getting the problem corrected. I stated that I would be contacting both LIPA and Con Ed Solutions immediately and keep hi[m] advised of the results." Ex. 15.

39. The NUS representative admitted that Tiffany did not agree that it would owe such a fee for "savings." Amundsen Dep. Tr. at 179:19-180:12.

40. On December 22, 2006, the Friday before a three-day Christmas weekend, NUS attempted to call LIPA, but was told the utility's billing department was closed for the holiday. Ex. 7, e-mail at 3:29 PM.

41. Because of the holiday, plaintiff's "investigation" would have to wait until Tuesday, December 26, 2006, when people returned from the Christmas holiday. Amundsen Dep. Tr. at 190:12-22.

### E.    NUS Tries to Hide the Simple Solution from Tiffany

42. NUS called LIPA on December 26, 2006 and was told that the Tiffany and Polo meter numbers appeared to have been inadvertently switched on the LIPA computer system when the new meters were installed in September 2006. Amundsen Dep. Tr. at 192:19-194:19.

43. LIPA maintained a diary of notes for both the Tiffany (Ex. 16) and Polo (Ex. 26) accounts.

44. The Tiffany account notes show that the new meter was activated on September 18, 2006, and that on December 26, 2006, the date NUS first spoke with a representative of LIPA, the notation says that the "billing does not appear correct since meter change" and that the utility would check for "possible switched meters." Ex. 16, entries dated 10-04-06 and 12-26-06.

45. Internally at NUS, Ms. Amundsen distributed by email an internal report memorializing the telephone conversation she had with the LIPA representative to not only her direct supervisor, David Brown, but alsoto the second-most senior executive in the company in the United States, Arnold Frankel. Exs. 17, 24; Brown Dep. Tr. at 93:15-17; Frankel Dep. Tr. at 4:23-6:16.

46. Neither Mr. Brown nor Mr. Frankel had any prior involvement with the Tiffany account until the date of that email. Brown Dep. Tr. at 125:16-126:13; Frankel Dep. Tr. at 45:23-46:25.

47. Ms. Amundsen's e-mail dated December 26, 2006, time stamped 1:34 PM, says in pertinent part:

> I spoke with the Billing Supervisor at LIPA, Kathy Schwarting. When I gave her the details of the [T]iffany acct. she looked at her screen and then advised that she would call right back. Subsequently, she called and relayed the following:
>
> - It appears that two stores in Manhasset are next to each other, Ralph Lauren and Tiffany and Co.
> - The billing for Ralph Lauren seems unusually low; the billing for Tiffany and Co. seems unusually high
> - She has put a hold on both accounts – no collections, no late charges
> - LIPA needs to verify all information via a field investigation
> - She cannot get any field personnel today because it is a company holiday for that department
>
> * * *
>
> - While it usually takes two to three weeks to get an investigation done, she has put a rush on the request and said that we may be able to get an answer in one or two weeks

Ex. 17.

48. Based on the foregoing, plaintiff knew after just one phone call that the crux of the billing error was most probably the result of switched meters, and the problem would be fixed by the utility itself within weeks. *Id.*

49. Ms. Amundsen reported far less information to Tiffany:

> I spoke with the Billing Supervisor at LIPA today regarding the billing discrepancy on your account for Manhassset, NY that we reported to you last week. Her name is Kathy Schwarting.
>
> At first glance, she definitely saw that a possible billing error exists but said they would have to do a field investigation in order to get the details. Even with a Rush request, it could take one or two weeks to get the results. She also advised that for the time being, she has put a hold on the account – no collections; no late charges. Thus, if the next bill arrives before a resolution is achieved, you do not want to make a payment pending a satisfactory response from LIPA.
>
> I'll keep you advised of any progress.

Ex. 8, email at 4:39 p.m.

50. NUS did not disclose to Tiffany until approximately three weeks later that its meter had been mistakenly switched with Polo Ralph Lauren's. Ex. 21.

51. In order to correct the mistake, the utility had to do two things; change the meter multiplier so it accurately calculated electric usage on the new meters, and switch the meter numbers on its computer system so Tiffany and Polo would receive their own bills. Ex. 21.

52. When the meters were changed at Manhasset, in addition to mis-tagging the meters on its computer system, the utility also neglected to change something called a "meter multiplier" on its system, which was lower for the new meters, so Tiffany and Polo received bills for each other that reflected usage that was higher than what was accurate for either account. *Id.*; Ex. 16.

53. Electric meters for commercial customers do not themselves click off in "real" readable numbers the kwh usage of a customer. Rather, they track usage by showing a numeric value for a period, which is then multiplied by a figure (the "meter multiplier") unique to that particular meter, the product of which is the kwh usage for the month (e.g. – A meter may show usage of 150 units for a month. If that meter has a meter multiplier of 80, the kwh usage for the month would be 12,000 kwh [150 x 80]). Frankel Dep. Tr. at 25:7-15.

54. NUS knew from the outset that resolving only one problem and not the other would not fix things. Exs. 20, 25.

55. If only the meter multiplier was changed and not the meter numbers, the bill for Tiffany would still reflect Polo's electricity usage which was considerably higher since Polo had a much larger space and generally used close to three times more power than Tiffany each month. Ex. 31.

56. Since the utility made the corrections over the next several weeks in stages – during which period there was a "hold" on both the Tiffany and Polo accounts – plaintiff took that

opportunity to falsely make it appear during that period like it was constructively working on issues while LIPA was fixing the problem. Exs. 18-22.

57. For example, on January 2, 2007, NUS wrote to Tiffany to say that "LIPA is sending an investigator (who is familiar with the location) to determine what the problem is with the electric meter..." Ex 14.

58. The LIPA investigator reported that the multiplier for the new meters was 80, and not 180, as had mistakenly been carried over from the meters that had been replaced. Ex. 16 at KS13, entry dates 1/2/07 – 1/10/07.

59. Accordingly, both the Tiffany and Polo Ralph Lauren usage was being overstated. Ex. 31.

60. An expert like NUS should have known immediately that changing the multiplier was not enough, since it knew Tiffany's historic usage at the Manhasset store, and that a switched meter was likely because "the billing for Ralph Lauren seems unusually low; the billing for Tiffany and Co. seems unusually high." Brown Dep. Tr. at 98:3-14; Ex. 17.

61. In "an update on the overall investigation" sent by e-mail to Tiffany on January 11, 2007, Ms. Amundsen reported that the "investigation revealed that the wrong meter constant [multiplier] was being applied to the calculation of the bill each month, subsequent to the installation of the new meter in September." Ex. 10, e-mail at bottom of p. 1 to top of p. 2.

62. She also said:

> We are not yet convinced that the matter has been totally resolved. Specifically, although there will be a significant reduction in the charges as a result of the initial investigation, based on your bills prior to the changeover, the readings (i.e. – kWh and KW) still seems high. Of course, it is possible that readings prior to the change in meters were too low, therefore, we would like to know if Tiffany maintains any load data on its stores, and more specifically, for the store in question (i.e. – Manhasset, NY)....

*Id.*

63. In response, Tiffany forwarded a one-page schematic showing how much power its Manhasset store is set up to use. Ex. 11.

64. On January 15, 2007, Ms. Amundsen's boss, David Brown, took over the account. Ex. 20.

65. On January 16, 2007, he wrote a report to Tiffany referencing a conversation he had on Friday, January 12, 2007 with Albertson Electric, the electrical contractor for the mall owner. Ex. 21.

66. Mr. Brown stated that the contractor told him that it appears "that LIPA had 'mis-tagged or mis-labeled' the newly installed electricity meters for your store and the neighboring store – Ralph Lauren Polo. Accordingly, the recorded usage/demand for Polo has been placed on the Tiffany bills and vice versa." *Id.*

### F.   Damages

67. Plaintiff seeks damages of approximately $1-million. Ex. 28.

68. The Contract itself does not define the term "savings," nor is there any mention that the correction of a mis-tagged meter error by a utility constitutes an ongoing savings. Ex. 1.

69. NUS also admitted during discovery that a mis-tagged meter error never before arose in its history, and that this circumstance was not within the contemplation of the parties nor discussed when the Contract was made. Frankel Dep. Tr. at 32:15-21; Brown Dep. Tr. at 65:7-15; Amundsen Dep. Tr. at 26:14-27:7; Strohl Dep. Tr. at 55:6-56:19.

70. NUS did not even purport to provide a calculation of its alleged damages to Tiffany until May, 2008, when it delivered what looked like a "Statement of Account" dated May 6, 2008 supposedly addressed to Tiffany. Ex. 28.[2]

---

[2] Tiffany reserves its right to object at trial (i) to the calculation of damages, and (ii) any offer by plaintiff of David Brown as an expert to testify about the calculation of damages. Nonetheless, since the foregoing

71. Using the first billing period for which damages are calculated, December 27, 2006 to January 25, 2007, which appears as the second and third pages of Exhibit 28 (Bates stamped NUS 887 to 888), the total kwh used by Polo during the subject time period is shown in the column under the heading "meter multiplier 80," and when those figures are totaled, reflects actual usage of 77,772.5 kwh. *Id.*

72. To calculate the alleged "savings" to Tiffany, NUS increased the actual kwh usage of Polo by 225% by intentionally applying the wrong multiplier of 180 instead of 80 under the column heading "meter multiplier 180." *Id.*, Ex. 31.

73. NUS then crafted a fictional "bill" for Polo of $27,948.72 using 174,420 kwh for that period when Polo's actual electricity usage was only just 77,772.5 kwh. Ex. 28.

74. The second page of the calculation (Bates stamped NUS 887) contains information directly from Tiffany's own bill, which for that month reflected an actual usage of 27,480 kwh, and actual charges of just $4,412.39. *Id.*

75. The difference between the fictional Polo charges and the actual Tiffany charges is what plaintiff claims was the monthly savings for that period ($23,536.33), half of which is shown as "due NUS" in what is made to look like an invoice on the top portion of the first page of the document. *Id.*

76. This same process is repeated month by month from December 27, 2006 to February 26, 2008. *Id.*

77. During the hot summer months when electricity usage is greater, the fictional savings are amplified. For the period July 25, 2007 to August 28, 2007 (pages Bates Stamped NUS 902-

---

calculation is the only one offered by plaintiff in this case, for purposes of this Motion, Tiffany is required to address the calculation here.

903), Polo Ralph Lauren actually used 135,955.40 kwh in its store, yet plaintiff calculates its fictional bill as if Polo used 304,560 kwh. *Id.*

78. During that same period, Tiffany used only 51,600 kwh in its own smaller store (page Bates stamped NUS 903). *Id.*

79. So, even though the actual difference between Tiffany's and Polo's electrical usage during that period was 84,355.40 kwh, NUS claimed Tiffany enjoyed a "savings" of 252,960 kwh, or $51,604.81 for those 34 days. *Id.*

80. For the entire year from December 27, 2006 to December 22, 2007, Tiffany incurred only $77,396.73 in electricity costs, yet for the one month of July 25, 2007 to August 28, 2007, NUS claims that it saved Tiffany $52,000. Exs. 31, 28.

81. Plaintiff's own damage calculation shows that for one year, Polo actually used 2.7 times more power than Tiffany in Manhasset (1,174,556.30 kwh versus 440,280 kwh). Ex. 28.

82. The damages NUS claims as "savings" are based on fictional usage of Polo, which is falsely reported as times greater than that of Tiffany (2,631,240 kwh versus 440,280 kwh). *Id.*

Dated: New York, New York
July 31, 2008

          DREIER LLP

          By: _____
              Jeffrey A. Mitchell, Esq.
              E. Timothy McAuliffe, Jr., Esq.
         *Attorneys for Defendants*
         499 Park Avenue
         New York, New York 10022
         (212) 328-6100

TO:    Peter G. Goodman, Esq.
        Dana V. Syracuse, Esq.
        **HARTMAN & CRAVEN LLP**
        *Attorneys for Plaintiff*
        488 Madison Avenue
        New York, New York 10022
        (212) 753-7500