UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x

NATIONAL UTILITY SERVICE, INC.,

                  Plaintiff,

                -vs-

TIFFANY & CO. and TIFFANY AND
COMPANY,

                  Defendants.

------------------------------------------------------------- x

07-CV-3345 (RJS) (GWG)


# DEFENDANTS' MEMORANDUM OF LAW IN
# SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT


**DREIER LLP**
499 Park Avenue
New York, New York 10022
(212) 328-6100

*Attorneys for Defendants*


Of Counsel:

Jeffrey A. Mitchell
E. Timothy McAuliffe, Jr.

{00376218.DOC;}

## TABLE OF CONTENTS

Table of Authorities ........................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................ 1

FACTS RELEVANT TO THIS MOTION ......................................................................... 2

    A.   Background ......................................................................................................... 2

    B.   The Contract ....................................................................................................... 3

    C.   The Manhasset Store .......................................................................................... 6

    D.   The Purported "Recommendation" ..................................................................... 7

    E.   NUS Tries to Hide the Simple Solution from Tiffany ......................................... 9

    F.   Damages ........................................................................................................... 14

ARGUMENT ................................................................................................................... 18

TIFFANY IS ENTITLED TO SUMMARY JUDGMENT ................................................. 18

    A.   The Contract Interpretation Offered by Plaintiff is Unreasonable ...................... 18

    B.   Correction of a Computer Error on Meter Installation Does Not Lead to a "savings" or "refund" as Contemplated by the Parties' Contract ............................................. 19

    C.   A "Recommendation" to "Investigate" is Too Generic to Qualify as a "Recommendation" Under the Contract ................................................................................................ 22

    D.   Plaintiff Should Not Recover for any Refund ..................................................... 23

    E.   NUS's Alleged Damages Are Speculative .......................................................... 24

CONCLUSION ................................................................................................................ 25

## TABLE OF AUTHORITIES

**Federal Cases**

*Alexander & Alexander Servs., Inc. v. Those Certain Underwriters at Lloyd's*, 136 F.3d 82, 86 (2d Cir. 1998) ................................................................................................................................. 19

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) ..................................................... 18

*Elda Arnhold & Byzantio, L.L.C. v. Ocean Atl. Woodland Corp.*, 284 F.3d 693, 705 (7th Cir.2002) ................................................................................................................................................ 23

*Erie Conduit Corp. v. Mapa*, 102 F.R.D. 877, 880 (E.D.N.Y. 1984) ................................. 24

*K. Bell & Assocs. v. Lloyd's Underwriters*, 97 F.3d 632, 637 (2d Cir.1996) ..................... 18

*Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 906 (2d Cir.1997) .................................. 19

*Seiden Assocs. v. ANC Holdings, Inc.*, 959 F.2d 425, 428-29 (2d Cir.1992) ..................... 19

*United States v. United Eng'g & Constructing Co.*, 234 U.S. 236, 242 (1914) ................. 24

*Utility Audit v. Horace Mann Service Corporation*, 383 F.3d 683 (7th Cir. 2004) ........... 22

*Village of Sylvan Beach v. Travelers Indem. Co.*, 55 F.3d 114, 115 (2d Cir.1995) ........... 18

*Wis-Pak, Inc. v. National Utility Service, Inc.*, No. 01-C-0657-C, 2002 WL 32341818, (W.D. Wis. Sept. 16, 2002) ...................................................................................................................... 20

**State Cases**

*Federal Ins. Co. v. Walker*, 74 A.D.2d 772, 777, 423 N.Y.S.2d 925, 931 (1st Dep't 1980) .............. 24

*Fiederlein v. New York City Health and Hospitals Corp.*, 56 N.Y.2d 573, 575, 450 N.Y.S.2d 180, 181, 435 N.E.2d 398, 399 (1982) .................................................................................................. 24

*Schanbarger v. Edward Dott's Garage, Inc.*, 72 A.D.2d 882, 883, 421 N.Y.S.2d 937 (3d Dep't 1979) ................................................................................................................................. 24

## Preliminary Statement

Plaintiff National Utility Service, Inc. ("NUS" or "plaintiff") claims entitlement to nearly $1-million in damages as a purported service fee for what was little more than a telephone call. Because of a clerical error made by the Long Island Power Authority ("LIPA"), the meter numbers of defendant Tiffany and Company ("Tiffany") and next-door neighbor Polo Ralph Lauren ("Polo" or "Polo Ralph Lauren") were inadvertently switched on its computer systems, so that for a short time, Tiffany received what was later determined by LIPA to be a bill that reflected Polo's usage for its larger store, and Polo received a bill for Tiffany's usage in its smaller space. That mistake was identified by LIPA from a computer screen when the affected accounts were pulled up during the very first telephone call in which inquiry was made, and then corrected by the utility within three weeks. NUS claims that LIPA's correction of that obvious mistake resulted in a "savings" to Tiffany – because it would no longer be paying for Polo's greater usage – and asks this Court to award NUS a fee equal to fifty-percent of what it says has been and will over the next several years be "saved" by Tiffany. Tiffany disputes plaintiff's claim that any action taken by NUS entitles it to a fee or that such action led to a realization of savings.

Adding insult to injury, NUS claims that Tiffany, in addition to paying its own correct bill for the next several years, must also pay NUS an additional $1 million dollars for what it claims is half of Tiffany's anticipated $2 million in savings over 60 months. In calculating those alleged damages, it wasn't enough for NUS to just take Polo's *actual* usage as a baseline. Instead, it created phony LIPA calculations and invoices to represent what it speculates Tiffany would have been billed by the utility if the mistake persisted unnoticed for five years, and then relies on those figures to calculate what it says Tiffany supposedly "saved" and will save in the future. To do so, it uses a multiple of Polo's actual usage, and contrasts that with Tiffany's actual usage, and seeks that

amount as damages.  Relying on technical mumbo jumbo and utility jargon, plaintiff says, for

example, that even though for a particular month Polo's actual usage might only have been

135,955.40 kilowatt hours ("kwh"), it may properly pump up that usage to 304,560 kwh before

deducting Tiffany's actual usage to come up with a difference.  That is what NUS calls "savings" in

this case.  The Polo bill calculated improperly versus the Tiffany bill calculated correctly for 60

months.  It would be bad enough to say that Tiffany saved something when all it got in the end was

its own correct bill, but to then take the *actual* difference and by chicanery double it to create such a

bogus difference, is inexcusable.  The evidence shows that Tiffany historically spent $6,300 on

average each month for electricity in Manhasset, or $378,000 over five years.  A $1-million fee on

top of that, as alleged "shared" savings over 60 months, is equal to 15 years of historic electric

expenditures for Tiffany at that store.  Yet, that is what plaintiff seeks.

Because NUS's claim is contrived, and its calculation of damages is fictional, Tiffany

respectfully requests that the Court grant its motion and dismiss the Complaint.

## FACTS RELEVANT TO THIS MOTION

### A.    Background

NUS holds itself out on its website as "the world's leading utility cost management

consulting firm . . . dedicated to providing the firm's clients unparalleled cost reduction solutions,

service and support." Ex. 32.  Tiffany retained NUS by written contract in 1992 to "analyze *our*

*costs* and advise where refunds and reductions can be obtained" on such utility services as

electricity (emphasis added). Ex. 1.  Pursuant to the terms of the parties' agreement, Tiffany was

required to send copies of its electric bills to NUS "each month during the term of the agreement."

*Id.*  Working solely on a contingency basis (Frankel Dep. Tr. at 20:12-17), plaintiff was to be paid a

"performance fee" of "(i) fifty (50%) percent of each refund realized [and] (ii) fifty (50%) percent

of each savings realized for a period of sixty (60) months" on account of any recommendation made

that was "subsequently implemented." Ex. 1 (the "Contract"). The intent of the parties was that

NUS "would identify opportunities for us for savings in all of our – in all our electricity bills, either

through rate changes or through better usage." Strohl Dep., Tr. at 31:22-24; 56:3-19.

During the next 15 years, NUS, pursuant to the 1992 contract, did offer

recommendations to Tiffany for utility savings at various stores and other facilities, which aside

from the alleged claims in this case, exclusively arose from electricity rate reductions or beneficial

purchase arrangements for power (a list of all recommendations made by NUS is provided as

Exhibit "13"; Amundsen Dep. Tr. at 42:5-44:12).

> 20    Q.   And isn't it fair to say that if you
> 21   put aside the dispute in this lawsuit, all of the
> 22   recommendations contained on this document are
> 23   recommendations that were made by NUS for Tiffany
> 24   to lower its cost of a utility?
> 25          A.   I have to go down the list and just
> 2    verify if I think that's the case.
> 3             Yes.  The recommendations were to
> 4    lower the cost.

Amundsen Dep. Tr. at 42:20-43:4.  The parties never had any dispute under the Contract until now.

Frankel Dep. Tr. at 34:3-7.  The total fee for each prior recommendation ranged from $50 on the

low end, to approximately $32,500 on the high end. *Id.*; Amundsen Dep. Tr. at 42:5-44:12.  In

February 1996, the parties separately executed a Data Management Services agreement pursuant to

which plaintiff was paid to input data from Tiffany electric bills into a computer database (Ex. 12,

T155-T164), which information was then made directly accessible to Tiffany managers. Palfini

Dep. Tr. at 63:12-21.

### B.    The Contract

The Contract was executed in April of 1992. Ex. 1.  Though an NUS form, it was drafted

by plaintiff as if a letter from Tiffany.  *Id.*  At the time and continuing through today, Tiffany's

principal offices were located at its flagship store on Fifth Avenue, the business address it listed in

the Contract. *Id.* The first paragraph, which sets forth its purpose, states:

> We [Tiffany] hereby authorize you [NUS] to submit recommendations for
> savings and refunds on *our costs* of electricity, gas, oil and petroleum products,
> water, sewerage, steam and telecommunications. You will analyze *our costs*
> and advise where refunds and reductions can be obtained. (emphasis added)

At the outset, it is clear that the stated intent was for NUS to make recommendations "for savings

and refunds" on Tiffany's own costs of electricity. *Id.*

During the period of time Tiffany was being improperly billed for the Polo Ralph Lauren

usage, the charges for electricity reflected on the bills it received were objectively not "our costs"

under the contract, but instead, were those of Polo Ralph Lauren. Indeed, LIPA and Con Ed

Solutions had no right to even bill Tiffany for another party's usage. Schwarting Dep. Tr. at 127:4-

16. However, the claim for a fee is without basis for other reasons as well. Paragraph 2 provides

that:

> Your [NUS] initial analysis will cover our [Tiffany] most recent (12) months'
> bills. Where applicable, *you will review old bills as far back as possible for*
> *refunds*. Your continuing analysis will cover our current bills, which we will
> send to you each month during the term of this agreement. (emphasis added)

Ex. 1.

The next paragraph discusses what is to happen if NUS actually discovers something

from a review. It provides:

> Any recommendation you [NUS] make will be considered by us [Tiffany] and
> shall be subject to our approval. If any recommendation made by you is
> subsequently implemented, we will pay you as outlined below *after such*
> *savings and refunds are achieved*. All information pertaining to your
> recommendations, including correspondence with our suppliers, will be sent to
> you promptly for your evaluation and further advice. (emphasis added).

*Id.*

The contingency fee set out in paragraph 5 is "a performance fee of (i) fifty (50%) percent of each refund realized; (ii) fifty percent of each savings realized for a period of sixty (60) months after which the entire savings will be ours [Tiffany]." *Id.* The words "savings" and "refunds" are not specifically defined, nor is there any language that says a pure and ultimately obvious billing mistake by a utility is even covered by the Contract at all. *Id.*; Frankel Dep. Tr. at 30:17-23. There can be no doubt that the purpose of the Contract was to achieve for Tiffany a reduction in its *own* utility costs (Brown Dep. Tr. at 70:24-71:7), which was by reduction of rates or better usage. Strohl Dep., Tr. at 31:22-24; 56: 3-19. NUS admitted during discovery that, as far as anyone knew, a switched meter situation had never before arisen in the company's decades-long history, and it had never before attempted to charge an account by claiming that the correction of a mis-tagged meter resulted in a "refund" and "savings". Frankel Dep. Tr. at 32:15-21; Brown Dep. Tr. at 65:7-15; Amundsen Dep. Tr. at 26:14-27:7. Arnold Frankel, Executive Vice President of NUS, testified as follows:

```
11      Q.   As you are sitting here today, you
12   don't recall in 1992 that you were aware of NUS
13   having ever been confronted with the correction of
14   a switched meter situation, right?
15      A.   I have no specific recollection of
16   that, no.
```

Frankel Dep. Tr. at 31:11-16. The "correction of a switched meter" also never happened with another NUS customer during the life of the Tiffany Contract. Frankel Dep. Tr. at 32:15-21. Accordingly, there could not have been a "meeting of the minds" that correction of a mis-tagged meter constituted a "savings." The issue was not within anyone's contemplation. Strohl Dep. Tr. at 55:6-56:19.

When NUS collected its fee where "rate" reductions were in fact achieved, it billed Tiffany on a monthly basis as savings were realized, consistent with the plain language of paragraph

3 of the Contract. Frankel Dep. Tr. at 22:11-23:7; Brown Dep. Tr. at 168:15-22. If during the

passage of 60 months the rate increased, NUS stopped billing monthly for that savings altogether,

establishing that NUS believed the provision only required payment of a fee for 60 months if the

*savings* actually continued to be realized for that long. Brown Dep. Tr. at 168:23-169:16. LIPA

corrected the error here in January 2007, so from that point forward, whether the mistake would

have persisted for sixty months is pure speculation.

### C. The Manhasset Store

In the fall of 2006, unbeknownst to Tiffany, several electric meters located in a common

area of the Americana shopping center in Manhasset, Long Island were changed during a renovation

project. Ex. 16; Mogel Dep. Tr. at 149:9-25; Edson Dep. Tr. at 34:10-35:2; Ensor Dep. Tr. at 17:13-

20. Tiffany has a 10,000 square foot store in the center that includes basement office and storage

space. *See, e.g.,* Ex. 11. When the new meters were activated on September 18, 2006, LIPA mis-

tagged the Tiffany and Polo Ralph Lauren meters in its computer systems so that following

activation, Tiffany began receiving bills for electricity usage by larger neighbor Polo, and Polo

started to receive lower bills which reflected Tiffany's usage. Exs. 16, 19. Since NUS received

copies of all Tiffany electricity bills pursuant to both the Contract and the separate Data

Management Services agreement (Ex. 12, T155-T164), a clerk in Plaintiff's billing department

observed an "unusual usage pattern" in the form of a spike in kilowatt hours reflected on the very

first erroneous bill and brought it to the attention of the NUS account representative (Amundsen

Dep. Tr. 58: 2-9), which she then reported to Tiffany on November 15, 2006.[1] Ex. 4. The spike in

usage was also observed separately a week or two earlier by the Tiffany manager for Manhasset

---

[1] Since NUS was not only reviewing bills on a contingent fee basis pursuant to the Contract, but it was also being paid to do so under the Data Management Services agreement, the fact that NUS claims to have observed the spike in usage first is not relevant to its claim for a fee.

from internal store performance reports, as the amount of the erroneous electric charge was greater than had been budgeted for. Ensor Dep. Tr. at 61:17-63:19; Ex. 27 at T1192.

On November 16, 2006, the day after NUS told Tiffany about its observation, the retail facilities director for Tiffany instructed plaintiff to "investigate" the cause of the spike as there was nothing unusual in the store's own usage to account for the billing anomaly. Mogel Dep. Tr. at 71:3-18; Ex. 5. At this point, neither Tiffany nor NUS knew the source of the billing error; only that there was an unaccounted for spike in usage reflected on one bill that was clearly in error.[2] Exs. 3, 5. Since the face of the bill in question expressly said that "we recently changed your meter" (Ex. 14), one might expect that a utility expert like plaintiff would have immediately suspected that the likely source of the mistake was the new meter. NUS, instead, said and did nothing for the next five weeks, ostensibly adopting a "wait and see" approach, and did not even tell Tiffany to stop paying its bill until six weeks later. Ex. 7; Amundsen Dep. Tr. at 278:19-24; Frankel Dep. Tr. at 79:20-80:17, 83:17-84:18.

**D.    The Purported "Recommendation"**

Any claim to a fee under the Contract is conditioned upon a customer's implementation of an NUS "recommendation." Contract ¶ 3. Rather than take any immediate action to correct the obvious billing error, plaintiff purported to send such a "recommendation" to Tiffany on December 20, 2006, five weeks after first being asked by Tiffany to "investigate the LIPA involvement." Ex. 5. In a three page document captioned "Cost Analysis Report" (the "Report"), plaintiff outlined what it said it knew about the billing error first identified in November. *Id.* NUS admitted that prior to writing the Report, it had conducted no "investigation" as had been requested by Tiffany nor performed any services to learn of the cause of the mistake despite the lapse of time. Amundsen

---

[2] In fact, the bill at issue showed that for a nine day period at the end of September 2006, Tiffany's electric usage in Manhasset was greater than for the entire month of August, which is a high usage period because of the need to run air conditioning. Ex. 4.

Dep. Tr. at 114:19-25, 278:19-24; Frankel Dep. Tr. at 79:20-80:17, 83:17-84:18.  Much of the

Report is from a generic template NUS uses to protect its claims to fees. Amundsen Dep. Tr. 19:19-

21:2; Frankel Dep. Tr. at 69:2-25.

The Report, in a manner far more prolix than was necessary, merely recounts

information about the Manhasset store which the parties already knew, and concludes that it appears

Tiffany was either being billed in error now, or, perhaps, had been billed in error before because

"the former meter for this account may have been under-recording your previous usage." Ex.2.  The

Report then makes what it calls a "recommendation" in a separately captioned section headed with

that word. *Id.* It states:

> *NUS Consulting Group recommends investigating this potential ongoing*
> *overcharge*. As detailed above, we estimate that in addition to a refund of
> approximately $93,000 for past overcharges, a correction of this ongoing
> overcharge will result in annual savings of approximately $372,000. (emphasis
> added)

*Id.* Mr. Frankel testified that NUS did not know at the time it issued the Report whether the error

was ongoing or not, and "[t]he cost analysis report in its entirety is our recommendation and it was

to investigate the potential overcharges and recovery of any refunds."  Frankel Dep. Tr. at 79:3-10.

All plaintiff recommended was that Tiffany authorize it to do what it was already asked

to do a month and a half earlier – *investigate* the overcharge. *Id.*, Ex. 5.  By crafting something so

generic as this, plaintiff sought to foreclose Tiffany from ever being able to resolve the error itself

because, according to NUS, all it would take is an inquiry by Tiffany or someone else for the

recommendation to allegedly be "implemented."  Amundsen Dep. Tr. at 122:9-16.  This alleged

"recommendation" is nothing more than a general suggestion, and does not offer a specific course

of action likely to achieve a resolution, a far more commonly understood definition of the word

*recommendation.*

Indeed, when he saw the Report, the retail facilities director at Tiffany responsible for the Manhasset store did not believe Tiffany would achieve a going forward "savings" based on what the parties knew to that point and questioned the claim to such a fee, a fact that NUS itself memorialized in a memorandum captioned "Report on Client Contact" dated December 22, 2006. Ex. 15. The NUS representative admitted in that report that Tiffany did not agree to the fee. Amundsen Dep. Tr. at 179:19-180:12. However, as the report states, "for the time being, he did not want us to delay contacting the utility suppliers and getting the problem corrected. I stated that I would be contacting both LIPA and Con Ed Solutions immediately and keep hi[m] advised of the results." Ex. 15. December 22nd was the Friday before the three day 2006 Christmas weekend. Amundsen Dep. Tr. at 187:23-25. A letter was sent out that day by NUS to LIPA (Ex. 6), and a telephone call was attempted, but plaintiff was told the utility's billing department was closed. Ex. 7, e-mail at 3:29 PM. Plaintiff's "investigation" would have to wait until Tuesday, when people returned after the holiday. Amundsen Dep. Tr. at 190:12-22.

### E.    NUS Tries to Hide the Simple Solution from Tiffany

NUS found out in its first telephone call after the Christmas weekend that it appeared the Tiffany and Polo accounts had inadvertently been switched on the LIPA computer system when the new meters were installed in September 2006. Amundsen Dep. Tr. at 192:19-194:19. LIPA produced to the parties during discovery its diary of notes for both the Tiffany (Ex. 16) and Polo (Ex. 26) accounts. The Tiffany account notes show that the new meter went live on September 18, 2006 (Ex. 16, entry dated 10-04-06), and that on December 26, 2006, the date NUS first spoke with a representative at LIPA, the notation says that the "billing does not appear correct since meter change" and that the utility would check for "possible switched meters." *Id.*

Internally at NUS, account representative Christine Amundsen, the person supposedly spearheading the "investigation" for plaintiff, provided considerable detail to her superiors about

what she learned in the call. Exs. 17, 24; Brown Dep. Tr. at 93:15-17; Frankel Dep. Tr. at 4:23-6:16.

Her e-mail time stamped 1:34 PM of that same day (Ex. 17) says:

> I spoke with the Billing Supervisor at LIPA, Kathy Schwarting. When I gave
> her the details of the [T]iffany acct. she looked at her screen and then advised
> that she would call right back. Subsequently, she called and relayed the
> following:
>
> - It appears that two stores in Manhasset are next to each other, Ralph Lauren
>   and Tiffany and Co.
> - The billing for Ralph Lauren seems unusually low; the billing for Tiffany
>   and Co. seems unusually high
> - She has put a hold on both accounts – no collections, no late charges
> - LIPA needs to verify all information via a field investigation
> - She cannot get any field personnel today because it is a company holiday
>   for that department
>                               *   *   *
> - While it usually takes two to three weeks to get an investigation done, she
>   has put a rush on the request and said that we may be able to get an answer
>   in one or two weeks

*Id.* So, reading the LIPA records in conjunction with this NUS e-mail, it is clear that plaintiff,

which touts itself as "the world's leading" utility consultant, knew after just one phone call that this

was a billing error, plain and simple, primarily the result of switched meters, and the problem would

be fixed by LIPA within weeks. *Id.*

Rather than tell Tiffany that, Ms. Amundsen instead began to drag things out by

reporting far less. Ex. 8, email at 4:39 p.m. This is all plaintiff said it learned from LIPA:

> I spoke with the Billing Supervisor at LIPA today regarding the billing
> discrepancy on your account for Manhassset, NY that we reported to you last
> week. Her name is Kathy Schwarting.
>
> At first glance, she definitely saw that a possible billing error exists but said they
> would have to do a field investigation in order to get the details. Even with a
> Rush request, it could take one or two weeks to get the results. She also advised
> that for the time being, she has put a hold on the account – no collections; no late
> charges. Thus, if the next bill arrives before a resolution is achieved, you do not
> want to make a payment pending a satisfactory response from LIPA.
>
> I'll keep you advised of any progress.

*Id.*

The difference between what Ms. Amundsen told her supervisors and what she reported to Tiffany is striking. Ex. 17. Her earlier detailed internal report which mentioned likely switched meters between Tiffany and Polo went not only to her direct supervisor, David Brown, but also to his boss, Arnold Frankel, who is the second most senior United States-based executive in the company. *Id.* Both Mr. Brown and Mr. Frankel had no prior direct involvement with the Tiffany account until then. Brown Dep. Tr. at 125:16-126:13; Frankel Dep. Tr. at 45:23-46:25. What to tell Tiffany had obviously become a matter of interest to senior executives as they saw an opportunity to try and position this simple error into a sizeable fee. Brown Dep. Tr. at 47:8-48:23. It would not be until mid-January that NUS would disclose to Tiffany for the first time that its meter had been mistakenly switched with Polo Ralph Lauren, and only then after going through needless gyrations to make it look as if it was doing something meaningful when, in fact, the utility was investigating and resolving the error on its own – *as was its legal duty.* Ex. 21; Schwarting Dep. Tr. at 130:20-131:2.

In order to correct the mistake, the utility had to do two things; switch the meter numbers on its computer system so Tiffany and Polo would receive bills for their own usage, and change the meter multiplier so their bills accurately calculated electric usage on the new meters.[3] Ex. 21. Apparently, when the meters were changed at Manhasset, in addition to mis-tagging, the utility also neglected to change the "meter multipliers" for both meters on its system, which was lower for the new meters, so Tiffany and Polo not only received bills for each other, but the bills reflected usage

---

[3] Electric meters for commercial customers do not themselves click off in "real" readable numbers the kwh usage of a customer. Rather, because usage can be large, the meters track usage by showing a numeric value for a period, which is then multiplied by a figure (the "meter multiplier") unique to that particular meter which is generally imprinted on the faceplate, the product of which is the kwh usage for the month (*e.g.* – A meter may show usage of 150 units for a month. If that meter has a meter multiplier of 80, the kwh usage for the month would be 12,000 kwh [150 x 80]). Frankel Dep. Tr. at 25:7-15. (*See also*, Ex. 29 printed from LIPA's website).

that was higher than what was accurate for either account. *Id.*; Ex. 16. NUS knew this from the

outset, as resolving only one problem and not the other would not fix things. Exs. 20, 25. For

example, if only the meter multiplier was changed, the bill for Tiffany would still reflect more than

its own usage since Polo had a considerably larger space and generally used almost three times

more power each month. Since the utility made the corrections over the next three weeks in stages

– during which period there was a payment "hold" on both the Tiffany and Polo accounts – plaintiff

used that time to make it look like it was constructively working on issues. Exs. 18, 19, 20, 21, 22.

It was not.

For example, on January 2nd, NUS wrote to Tiffany to say that "LIPA is sending an

investigator (who is familiar with the location) to determine what the problem is with the electric

meter..." Ex 9. The investigator reported that the multiplier should have been 80, and not 180, as

had been carried over from the meters that had been replaced. Ex. 16 at KS13, entry dates 1/2/07 –

1/10/07. Stated simply, that meant that both the Tiffany and Polo Ralph Lauren usage was also

being overstated. An expert like NUS, doing just a simple mathematical calculation (new multiplier

times meter reading = new kwh calculation), should have known that change was not enough. It

long knew Tiffany's customary usage in Manhasset.

Nevertheless, in "an update on the overall investigation" sent by e-mail to Tiffany on

January 11th – written like a sound bite for quotation in this lawsuit – Ms. Amundsen reported that

the "investigation revealed that the wrong meter constant [multiplier] was being applied to the

calculation of the bill each month, subsequent to the installation of the new meter in September."

Ex. 10, e-mail at bottom of p. 1 to top of p. 2. Then, she disingenuously added:

> We are not yet convinced that the matter has been totally resolved.
> Specifically, although there will be a significant reduction in the charges
> as a result of the initial investigation, based on your bills prior to the
> changeover, the readings (i.e. – kWh and KW) still seems high. Of

course, it is possible that readings prior to the change in meters were too
low, therefore, we would like to know if Tiffany maintains any load data
on its stores, and more specifically, for the store in question (i.e. –
Manhasset, NY) . . . .

The fancy phrase *load data* simply means an electrical schematic that shows how much

power the store is designed to use. Ex. 11. Other than confirming that Tiffany's old bills from its

replaced meter were correct, which NUS had received and supposedly reviewed for more than a

decade anyway, the request for load data was worthless. Again, still missing from this "report" is

any mention that in the first phone call, LIPA observed that Polo's bill was unusually low for the

same period that Tiffany's was unusually high, indicating a likely switched meter. Exs. 16, 17.

Nevertheless, Tiffany forwarded the load data information by fax that very day. Ex. 11. The

following day, Ms. Amundsen copied Tiffany on an e-mail to the landlord which said that "LIPA

concurs with our belief that the problem suggests that the wiring into the electric panel needs to be

checked." Ex. 17. She went on to say, "We want to insure that Tiffany and Co. is wired for their

usage only and not being charged for any usage of their neighboring stores." *Id.* In fact, it was

LIPA that advised Ms. Admundsen of that belief on December 26, 2006 in her first telephone call

with the utility, and not she who identifed the issue as reported here. Ex. 16, entry dated 10-04-06.

On January 15th, Ms. Amundsen's boss, David Brown, took over the account. Ex. 20.

On January 16th, he wrote a report to Tiffany outlining the situation, and referenced a conversation

he said he had on the previous Friday, January 12th with Albertson Electric, the electrical contractor

for the mall owner. Ex. 21. He said the contractor concluded that the source of the problem was

"that LIPA had 'mis-tagged or mis-labeled' the newly installed electricity meters for your store and

the neighboring store – Ralph Lauren Polo. *Id.* Accordingly, the recorded usage/demand for Polo

has been placed on the Tiffany bills and vice versa." *Id.*

That was that. Precisely what Mr. Brown knew NUS had learned from LIPA in its very

first telephone call was now being reported to Tiffany weeks later as a revelation from the mall's

electrical contractor. Plaintiff was trying to make it look as if all of its expertise and knowledge had

been brought to bear on resolving what clearly from inception was the most simple of problems. Of

course, any customer would notice an erroneous six-fold increase in electric usage on a bill, and

could call "customer service" itself and get the problem fixed. That is all plaintiff did here – albeit,

after going through unnecessary busywork to justify the self-important position it takes in this case.

However, even the person who runs its North American operations admitted that it took no

particular genius to observe and obtain a correction of the account errors here – any homeowner

would recognize a mistake of such a magnitude. Frankel Dep. Tr. at 100:10-101:10.[4]

```
11      Q.   I am just trying to establish the
12   level of expertise it really took to observe that
13   your bill went up six times.  It doesn't take that
14   much expertise, does it?
15              MR. GOODMAN: Objection.
16      Q.   Right?
17      A.   (No response.)
18      Q.   Correct?
19      A.   Fine.  It doesn't take that much
20   expertise.
```

Frankel Dep. Tr. at 123:11-20.

### F.   Damages

Plaintiff seeks damages of approximately $1-million.  Central to its claim is the theory

that Tiffany reaped a huge "savings" under the Contract in being relieved of its burden to pay for

Polo's usage.  NUS did not even purport to provide a calculation of its damages until May 2008,

---

[4] NUS has argued that whether or not "any homeowner" would have noticed the error, here, Tiffany did not. However, the evidence is that Tiffany did observe the error on internal reports from the very first bill (Ensor Dep. Tr. at 62:18-64:3; Ex. 27), even before NUS, but within days a clerk also observed the spike from bills NUS was being paid to review.  Since Tiffany asked NUS to investigate immediately, it was relying on NUS to inquire, as it had been Tiffany's utility consultant for nearly 14 years.  Until told otherwise by NUS five weeks later, it continued to pay its bills believing that plaintiff was investigating, which it turns out it was not.  Ex. 7; Amundsen Dep. Tr. at 278:19-24, 79:20-80:17, 83:17-84:18.

when it delivered what looked like a "Statement of Account" dated May 6, 2008 supposedly

addressed to Tiffany. Ex. 28. Before then, no "bill" for the alleged "savings" was prepared or

delivered to Tiffany in the nearly 1 ½ years after the Contract was terminated, nor was Tiffany

provided with a calculation of what NUS said were its damages.[5] The components of the damage

claim, which are summarized on the first page of the document, are:

> Alleged "savings" actually realized
>   from 12/27/06 to 2/26/08...........................................$216,293.24
>
> Projected alleged "savings" on going forward basis
>   from 2/27/08 for 46 months......................................$710,677.92
>
> Alleged "refunds" ...................................................…...…....…...$33,510.79
>
> ***Total***........................................................................…...***$960,481.95***

Attached to the cover page are NUS's calculations from which these figures derive. *Id.*

The Contract does not provide for recovery of speculative "projected" savings. NUS is expressly

only entitled to a fee "after such savings…are achieved." Contract ¶ 3. Indeed, the undisputed

evidence is that if during the 60 month period the savings stop, the fee stops as well as the savings

are no longer being "achieved." Brown Dep. Tr. at 168:23-169:16. Plaintiff incorrectly assumes,

contrary to the evidence, that the mis-tagged meters would have remained undetected by all parties

for more than five years. It ignores that once the Tiffany and Polo accounts were corrected by

LIPA, there were no "savings" to be realized. Any calculation that purports to show such savings is

purely speculative.

However, the problem with plaintiff's supposed damage calculation goes far deeper than

that. Fact witness David Brown was offered after delivery of this calculation as an "expert" on

---

[5] While Tiffany does not concede that this Statement of Account qualifies as a legitimate bill since it was prepared so long after the Contract was terminated, since it outlines what NUS claims are its damages, it will be treated as such for purposes of this motion.

damages, and thereafter testified again, this time about how the calculation of damages was actually made.[6]

Using the first billing period for which damages are calculated, December 27, 2006 to January 25, 2007, which appears as the second and third pages of Exhibit 28 (Bates stamped NUS 887 to 888), the deceitfulness of the damage claim becomes readily apparent. On the page stamped NUS 887, Mr. Brown put a box around the information that was obtained directly from the Polo bills and reflects its "actual usage" in kwh for the billing period. *Id.* That section is marked in his handwriting with an "RL." *Id.* The total kwh used by Polo during the subject time period is shown in the column under the heading "meter multiplier 80" and comes from the "actual" Polo bill. When those figures are totaled, they reflect actual usage of 77,772.5 kwh. *Id.* However, that is not the usage relied upon by NUS to calculate the supposed "savings" to Tiffany. Plaintiff instead increased the usage figure by 225%. It did so by intentionally applying the wrong multiplier of 180 instead of 80 under the column heading "meter multiplier 180." Using that exaggerated usage − that bears no relationship to reality − it then crafts a fictional "bill" for Polo of $27,948.72 as if its usage was really 174,420 kwh for that period and not just 77,772.5 kwh. The second page of the calculation (Bates stamped NUS 887) contains information directly from Tiffany's own bill, which for that month showed actual usage of 27,480 kwh, and real charges of just $4,412.39. *Id.*. The difference between the fictional Polo bill and the actual Tiffany charge ($4,412.39 for that month) is what plaintiff says was the monthly savings for that period ($23,536.33), half of which is shown as "due NUS" on the first page of the document made to look like an invoice. *Id.* This same process is

---

[6] Mr. Brown is not an accountant, nor has he ever held any position in his decades-long career where his primary responsibility was financial. Tiffany believes he does not qualify as an expert to testify in this case, and reserves all of its rights to object to him being offered at trial for such purpose. However, since he is the only witness offered by NUS to testify on the calculation of its damages, for purposes of this Motion, Tiffany has no choice but to accept his testimony for whatever it is worth in order to challenge that calculation on this Motion.

repeated month after month from December 27, 2006 to February 26, 2008. *Id.*[7]

During the hot summer months, when air conditioning is running 24 hours a day, the phony "savings" are amplified since usage is greater. For example, for the period July 25, 2007 to August 28, 2007 (pages Bates Stamped NUS 902-903), NUS claims Tiffany enjoyed a "savings" of 252,960 kwh, or $51,604.81 for those 34 days, even though it actually only used 51,600 kwh of power. *Id.* For the entire year from December 27, 2006 to December 22, 2007, Tiffany paid just $77,396.73 for electricity, yet NUS has the audacity to tell this Court that it saved Tiffany $52,000 in a single month alone (a chart prepared by Tiffany for purposes of this Motion which shows the totals reflected on plaintiff's damage calculation is provided as Exhibit "31"). Plaintiff simply speculates that Tiffany would have blindly paid six times its *actual* historic electricity costs without question. Indeed, plaintiff's own damage calculation shows that for one year, Polo actually used 2.7 times more power than Tiffany in its space (1,174,556.30 kwh versus 440,280 kwh). *Id.* However, the damages NUS claims as "savings" are based on fictional usage of Polo that is six times greater than Tiffany (2,631,240 kwh versus 440,280 kwh). Mr. Brown testified about the contrived nature of the damages calculation:

```
9      Q.  How did you calculate the gross savings
10   of $23,536.33?
11      A.  What was first done was taking the Polo
12   meter readings, and then taking those meter
13   readings and recalculating it off a meter
14   multiplier of 180 to come up with what Tiffany
15   would have been billed both in a consumption and
16   demand as a result of those meter multipliers.
17      Q.  Are you saying for Polo's usage?
18      A.  It's not Polo's usage, it's Tiffany's
19   usage. It's Polo's meter readings. And those
20   meter readings are placed against the Tiffany meter
21   multiplier of 180 which was in effect during the
```

---

[7] Since NUS admits that if a savings previously achieved stops during the 60 month period, the fee stops as well (Brown Dep. Tr. at 168:23-169:16), it crafted a fictional bill to make it look as if the savings had not stopped even though the Tiffany and Polo accounts had been fixed.

22      affected period, if you will, in late 2006.  And in
23      that, we come up with the KWH, which is the
24      consumption, and we also come up with the KW both
25      on, off and mid-peak.  Taking that information
2       then, and applying it to the Tiffany rate of 285
3       with LIPA and calculating against that rate, and
4       also taking it against the Con Ed Solution charges
5       to come up with the commodity portion of that, you
6       come up with the former billing, if you will, as to
7       what they would have paid had the NUS
8       recommendations not have been implemented.  The
9       second page of the bill demonstrates how they are
10      presently being billed by both LIPA and Con Ed
11      Solutions.  And then taking that total, you put it
12      to the first page, which is the present, and the
13      difference between the total former charges and the
14      present charges would give you the net savings of
15      $23,536.33 for which one-half of that would be due
16      NUS.

Brown, 6/19/08 Dep. Tr. at 26:9-27:16.

There is no support in the record for offering such a calculation as "savings" under the

Contract.

## ARGUMENT

### TIFFANY IS ENTITLED TO SUMMARY JUDGMENT[8]

#### A.    The Contract Interpretation Offered by Plaintiff is Unreasonable

Under New York law, a "contract is interpreted to give effect to the intent of the parties

as expressed in the clear language of the contract." *Village of Sylvan Beach v. Travelers Indem. Co.*,

55 F.3d 114, 115 (2d Cir.1995).  "[T]he initial interpretation of a contract 'is a matter of law for the

court to decide.'" *K. Bell & Assocs. v. Lloyd's Underwriters*, 97 F.3d 632, 637 (2d Cir.1996)

(quoting *Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295, 299 (2d Cir.1996)).  Part of this

---

[8] The standard for summary judgment is well known to this Court: under Rule 56(c) of the Federal Rules of
Civil Procedure, the Court must grant summary judgment if the evidence offered shows that there is no
genuine issue with respect to any material fact and the movant is entitled to judgment as a matter of law.  *See*
Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

threshold interpretation is the question of whether the terms of the contract are ambiguous. *See Alexander & Alexander Servs., Inc. v. Those Certain Underwriters at Lloyd's*, 136 F.3d 82, 86 (2d Cir. 1998). An ambiguity exists where the terms of a contract could suggest "more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 906 (2d Cir.1997) (citation and internal quotation marks omitted). Once a court concludes that a provision is ambiguous, "the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract." *Alexander & Alexander*, 136 F.3d at 86; *see also Seiden Assocs. v. ANC Holdings, Inc.*, 959 F.2d 425, 428-29 (2d Cir.1992). If the extrinsic evidence does not yield a conclusive answer as to the parties' intent, the court may construe the ambiguity against the drafter. *See Federal Ins. Co. v. PGG Realty, LLC*, 538 F. Supp.2d 680, 701 (S.D.N.Y. 2008).

Plaintiff's interpretation of the Contract and its claim for entitlement to a fee thereunder is unreasonable as a matter of law.

### B.   Correction of a Computer Error on Meter Installation Does Not Lead to a "savings" or "refund" as Contemplated by the Parties' Contract

The Contract expressly provides that NUS was to submit to Tiffany recommendations for refunds and savings on "our costs." Ex. 1, ¶1. Beginning in 1992, NUS reviewed on a monthly basis all Tiffany utility bills for numerous premises around the United States. It therefore knew, because it was required to know, the usual and customary electric costs incurred by Tiffany at its various locations. More particularly, NUS knew what the historical electric usage and cost for power was at the Manhasset store, most especially because any contingency fee it would hope to make there would be dependent upon reducing those charges. It was therefore obvious to an expert

like NUS that the first bill which showed usage six times greater than normal for nine days in September 2006 was wrong.[9]

As it turned out, the "costs" for electricity for those nine days were not "our costs," as contemplated by the Contract, but rather, were the costs of neighbor Polo Ralph Lauren. Providing assistance to long-time client Tiffany by notifying LIPA of this obvious mistake, and assuring that the utility made the necessary corrections, did not reduce for Tiffany any of its own costs, the only "savings" contemplated by the Contract. In the end, after LIPA confirmed the error in its computer systems, the mistake was corrected, and both accounts were credited and rebilled from the date of the mistake for their actual usage properly calculated.

A similar issue was previously touched upon in another case brought by NUS, where under a substantively similar contract, it claimed entitlement to a "savings" fee which it said arose from a recommendation to investigate whether the client was being properly billed by a city for sewer usage. *Wis-Pak, Inc. v. National Utility Service, Inc.*, No. 01-C-0657-C, 2002 WL 32341818, (W.D. Wis. Sept. 16, 2002); *aff'd Wis-Pak, Inc. v. National Utility Service, Inc.*, 65 Fed. Appx. 84, 2003 WL 21130017 (7th Cir. 2003) (the "Wis-Pak Case"). Wis-Pak is a soft drink bottler. At a new plant it built in Quincy, Illinois, it installed a *deduct meter* (which measures the volume of water used in its products) "to calculate the amount of discharge from the plant to the City's sewer system in order to accurately compute the company's municipal sewer bill." 65 Fed. Appx. at 86. "Wis-Pak assumed, incorrectly, that the City would read the deduct meter and adjust the Quincy Plant's water and sewer bills in accordance with such meter ratings." Instead, the City of Quincy failed to take into account the deduct meter and billed NUS for sewer usage "as if all of the water coming into the plant was being discharged into the City's sewer system." *Id.*

---

[9] That first bill also showed on its face that a new meter had just been installed, so the source of the mistake should also have been obvious. Ex. 14.

As here, NUS "recommended" that Wis-Pak "investigate" whether it was being properly charged. Though the case ultimately turned on a finding that the NUS recommendation was never actually implemented by Wis-Pak when it obtained from the city a correction of its own sewer bills, the District Court in its decision nevertheless made a significant observation about what "savings" means in the NUS contract. At page 7 of its decision, the District Court said:

> Once the city recognized the problem in its billing, it had to adjust the past bills it had sent to [Wis-Pak] and develop a reliable method for charging [Wis-Pak] in the future. It could have chosen a meter reading or an average based on the meter readings that it took during the investigation stage or, presumably, simply made some sort of estimate. *Nothing in the record indicates that the method of averaging that it chose produced savings for [Wis-Pak] greater than regular and correct meter readings would have produced.  Without proof of savings, there is nothing for defendant to split with [Wis-Pak].*" (emphasis added)

It did not view the correction of an erroneous utility bill as falling within the contract's scope. The Seventh Circuit similarly noted in its affirmance that the recommendation of NUS to investigate the potential overcharge was of "no value" with respect to "prospective savings," citing the foregoing language of the District Court opinion as support for that statement.  65 Fed. Appx. at 86

While perhaps not controlling, the observations of both the District Court and Seventh Circuit in *Wis-Pak* are certainly persuasive, most especially because NUS argues here, as it did in that case, that the correction of a utility error gives rise to an ongoing "savings" for the customer under its form contract. Indeed, in this case, the claim is even more tenuous. The mistake happened because a utility meter was changed without Tiffany's knowledge. The effect of the mistake was identified on the first bill when six times greater than normal usage was observed. The magnitude of the mistake was so significant that it could not go undetected for long. And, the evidence is that Tiffany also observed the error on its own internal reports even before NUS brought certain details to its attention. There is simply no basis for NUS to claim that the correction of such a "mistake" constitutes a "savings" under the contract, or that the parties ever agreed that it should.

**C.    A "Recommendation" to "Investigate" is Too Generic to Qualify as a "Recommendation" Under the Contract**

NUS claims that the Report (Ex. 2) contains a "recommendation" under the Contract that was "implemented" by Tiffany.  The only "recommendation" made in the Report was that the "NUS Consulting Group recommends *investigating this potential ongoing overcharge*."  That is simply not the kind of recommendation contemplated by the Contract because it is far too generic to have any meaning.

The United States Court of Appeals for the Seventh Circuit found similarly in *Utility Audit v. Horace Mann Service Corporation*, 383 F.3d 683 (7th Cir. 2004).  Utility Audit was a telecommunications consultant which, like NUS, made recommendations to clients for potential savings on telephone bills.  It contracted with Horace Mann to share in the savings achieved by the client from recommendations Utility Audit might make.  At issue was a claim of entitlement to share in $1.2-million in savings Horace Mann allegedly achieved by switching telephone providers from MCI to Global Crossing.  While Utility Audit "recommended" to Horace Mann that it might be able to reduce costs by switching providers, it never specifically recommended Global Crossing. Nevertheless, it contended:

> …that the undisputed evidence establishes that by accepting Global Crossing's proposal, Horace Mann was following its general recommendation to contract with a cheaper telephone service provider.

The Seventh Circuit found that a generic "recommendation" that left the customer with no real option to reject it was not within the scope of the meaning of that word in the parties contract.  It said:

> Utility Audit contends that a "recommendation" need not suggest a particular course of action, and that the definition of the word is broad enough to encompass any "advice or counsel," quoting BLACK'S LAW DICTIONARY (6th ed.1990).  Therefore, it argues, its general advice to Horace Mann to remain with MCI unless it found cheaper rates elsewhere was a "recommendation" under the terms of the contract.  But because Utility Audit's advice was so broad that it

included the entire universe of options available to Horace Mann — in short, to either switch or not switch — its interpretation leads to an irrational result. It is not reasonable to conclude that Horace Mann bargained to pay Utility Audit the hundreds of thousands of dollars it seeks for advice no more particular than to either find cheaper rates or renew its current contract...

* * *

Furthermore, Utility Audit's interpretation of the contract would render meaningless the term that allowed Horace Mann to reject any of Utility Audit's recommendations. *Elda Arnhold & Byzantio, L.L.C. v. Ocean Atl. Woodland Corp.*, 284 F.3d 693, 705 (7th Cir.2002). Because Utility Audit had recommended every possible course of action to Horace Mann, any course Horace Mann would have chosen would have been encompassed by one of Utility Audit's broad recommendations.

*Id*, at 677-78

NUS's recommendation to Tiffany is equally overbroad. After being asked by Tiffany to "investigate" on November 16, 2006 when the mistake was first identified, five weeks later it issued the Report which contained the very same recommendation back to Tiffany – to *investigate*. If plaintiff's suggestion that the problem should be investigated is treated as a "recommendation" under the Contract, then Tiffany had no way out. It could either ignore the problem and continue to pay six times more for electric usage than was accurate, or it could investigate, and thereby become, according to plaintiff, liable to pay a $1-million fee to NUS for simply getting what it was entitled to in the first place – a bill that properly reflected its own usage. Such broad common sense advice does not qualify as a legitimate *recommendation* under the Contract.

### D.   Plaintiff Should Not Recover for any Refund

At most, NUS could possibly claim entitlement to whatever refund was due for the 9 day period reflected on the first erroneous bill, which it identified to Tiffany on November 15, 2006. It was asked to investigate the very next day, which had it done so, would have resulted in a payment hold on the account far earlier, and gotten LIPA to resolve the problem long before January. Plaintiff should not be entitled to benefit from its own inaction, and then recover additional

damages because it did nothing when asked to find out what was wrong. *See United States v. United Eng'g & Constructing Co.*, 234 U.S. 236, 242 (1914) (holding that liquidated delay damages clause waived in contract where delay attributed to government and not contractor); *Federal Ins. Co. v. Walker*, 74 A.D.2d 772, 777, 423 N.Y.S.2d 925, 931 (1st Dep't 1980) (Murphy, P.J., dissenting) (noting that surety was not entitled to damages based on its own delay). In addition, the Contract only provides that NUS will share in refunds generated by its initial review of bills that predated the 1992 Contract. Ex. 1, ¶ 2. That is not the case here.

### E.    NUS's Alleged Damages Are Speculative

An award of damages may not be based upon evidence which is merely speculative. Mere conjecture, surmise or speculation is not enough to sustain a claim for damages. *See, e.g., Fiederlein v. New York City Health and Hospitals Corp.*, 56 N.Y.2d 573, 575, 450 N.Y.S.2d 180, 181, 435 N.E.2d 398, 399 (1982). Damages simply cannot be awarded on the basis of conjecture and guesswork. *Schanbarger v. Edward Dott's Garage, Inc.*, 72 A.D.2d 882, 883, 421 N.Y.S.2d 937 (3d Dep't 1979). In addition, if the testimony of an expert witness is based on surmise and inadequate data, it may not serve as the basis for an award of damages. *Erie Conduit Corp. v. Mapa*, 102 F.R.D. 877, 880 (E.D.N.Y. 1984), *judgment aff'd*, 765 F.2d 135 (2d Cir. 1985); *People v. Roff*, 67 A.D.2d 805, 413 N.Y.S.2d 43 (4th Dep't 1979); *People v. Donohue*, 123 A.D.2d 77, 79, 510 N.Y.S.2d 722, 723 (3d Dep't 1987); *Jackson v. Corgan & Balestiere, P.C.*, 132 A.D.2d 960, 962, 518 N.Y.S.2d 530, 531 (4th Dep't 1987).

NUS's damage calculations are grounded in the assumption that without its intervention, the billing mistake of the magnitude at issue here would have gone undetected for 60 months, and that neither Polo nor LIPA, not to mention Tiffany, would have taken action on their own. In addition, the presumption that Polo's actual usage would and should be increased by 225% to calculate a "savings" assumes that the switched meter mistake, compounded by the meter multiplier

error, would have persisted for five years as well. The evidence is that in January 2007, the mistake was fully corrected by the utility. From that date forward, NUS simply assumes that the billing error would have continued. There is no evidence to support that assumption, and as a result, the damages it seeks are purely speculative.

## CONCLUSION

For the foregoing reasons, Tiffany respectfully requests that the Court grant its motion for summary judgment and dismiss the Complaint in its entirety.

Dated: New York, New York
       July 31, 2008

                                        DREIER LLP

                                        By: _____
                                            Jeffrey A. Mitchell, Esq.
                                            E. Timothy McAuliffe, Jr., Esq.
                                            *Attorneys for Defendants*
                                            499 Park Avenue
                                            New York, New York 10022
                                            (212) 328-6100

TO:    Peter G. Goodman, Esq.
       Dana V. Syracuse, Esq.
       **HARTMAN & CRAVEN LLP**
       *Attorneys for Plaintiff*
       488 Madison Avenue
       New York, New York 10022
       (212) 753-7500