**CT CORPORATION**
A WoltersKluwer Company

**Service of Process Transmittal**
05/01/2007
Log Number 512181449

TO:  PATRICK B DORSEY, Sr. VP, Secy. & Gen. Csl.
Tiffany & Co.
600 Madison Avenue
New York, NY, 10022

PB. DORSEY     5/3/07
DATE RECEIVED _____
FILE _____
FOLLOW-UP DATE _____
FORWARD TO _____
COPY _____
CIRCULATE _____

RE:  **Process Served in Delaware**

FOR:  TIFFANY & CO. (Domestic State: DE)

---

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

**TITLE OF ACTION:** National Utility Service, Inc., Pltf. vs. Tiffany & Co. and Tiffany and Company, Dfts.

**DOCUMENT(S) SERVED:** Summons, Complaint, Exhibit(s), Cover Sheet, Attachment(s), Consent Form, 3rd Amended Instructions, Guidelines, Procedures

**COURT/AGENCY:** New York Southern U.S. District Court, NY
Case # 07 CV 3345

**NATURE OF ACTION:** Breach of Contract - Failed and refused to pay NUS any part of the refund and savings obtained as a result of the recovery of past overcharges and correction of the ongoing billing error to eliminate future overcharges on Tiffany's electric service purchases at the Manhasset Store.

**ON WHOM PROCESS WAS SERVED:** The Corporation Trust Company, Wilmington, DE

**DATE AND HOUR OF SERVICE:** By Process Server on 05/01/2007 at 13:50

**APPEARANCE OR ANSWER DUE:** Within 20 days exclusive of the date of service

**ATTORNEY(S) / SENDER(S):** Peter G. Goodman
Hartman & Craven LLP
488 Madison Avenue
New York, NY, 10022
212-753-7500

**ACTION ITEMS:** SOP Papers with Transmittal, via Fed Ex 2 Day, 798664557800
Email Notification, PATRICK B DORSEY patrick.dorsey@tiffany.com

**SIGNED:** The Corporation Trust Company
**PER:** Scott LaScala
**ADDRESS:** 1209 Orange Street
Wilmington, DE, 19801
**TELEPHONE:** 302-658-7581

**EXHIBIT**
59
3/5/08 EE

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of the package only, not of its contents.

HARTMAN & CRAVEN LLP
Peter G. Goodman (PG 4210)
488 Madison Avenue, 16th Floor
New York, New York 10022
(212) 753-7500

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

## 07 CV  3345

---

NATIONAL UTILITY SERVICE, INC.,

Plaintiff,

-against-

TIFFANY & CO. and TIFFANY AND
COMPANY,

Defendants.

---X

Case No. 07cv3345

SUMMONS

**JUDGE KARAS**

TO:    Tiffany & Co.
       727 Fifth Avenue
       New York, New York 10022

       Tiffany and Company
       727 Fifth Avenue
       New York, New York 10022

    **YOU ARE HEREBY SUMMONED** and required to serve upon plaintiff's attorneys,
Hartman & Craven LLP, 488 Madison Avenue, New York, New York 10022, an answer to the
complaint which is herewith served upon you, within 20 days after service of this summons upon
you, exclusive of the day of service. If you fail to do so, judgment by default will be taken
against you for the relief demanded in the complaint. You must also file your answer with the
Clerk of this Court within a reasonable period of time after service.

## J. MICHAEL McMAHON

CLERK

(BY) DEPUTY CLERK

APR 2 6 2007
_____
DATE

HARTMAN & CRAVEN LLP
Peter G. Goodman (PG 4210)
488 Madison Avenue, 16th Floor
New York, New York 10022
(212) 753-7500

**07 CV 3345**

Attorneys for Plaintiff

**JUDGE KARAS**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------X

NATIONAL UTILITY SERVICE, INC.,        :    Case No.

              Plaintiff,                          :

         -against-                                :

TIFFANY & CO. and TIFFANY AND          :
COMPANY,                                       :

              Defendants.                      :

--------------------------------------------------------X

RECEIVED
07 CV 3345
APR 2 6 2007
U.S.D.C. S.D. N.Y.
COMPLAINT CASHIERS

    Plaintiff, National Utility Service, Inc., as and for its Complaint in this action, alleges the following:

### Preliminary Statement

1.    This is an action based on diversity of citizenship jurisdiction for damages for breach of contract, quantum meruit and unjust enrichment, and for specific performance and declaratory relief, arising from the breach of a utility cost consulting agreement.

## Parties-Jurisdiction-Venue

**A.**    *National Utility Service, Inc.*

2.    National Utility Service, Inc. ("NUS") is a corporation organized and existing under the laws of the State of New Jersey, with its principal place of business at One Maynard Drive, Park Ridge, New Jersey 07656.

3.    At all times relevant hereto, NUS was, and continues to be, in the business of providing audit, analysis, procurement, data management and consulting services with regard to electricity, gas, oil and petroleum products, water, sewerage, steam (collectively "**Energy**") and telecommunications ("**Telecom**") expenditures for industrial and commercial organizations.

4.    As part of its business, NUS identifies opportunities for savings and refunds on Energy and Telecom expenditures for such industrial and commercial organizations.

**B.**    *The Defendants.*

5.    Upon information and belief, Tiffany & Co. is a corporation organized and existing under the laws of the State of Delaware.

6.    Upon information and belief, Tiffany and Company is a corporation organized and existing under the laws of the State of New York.

7.    Upon information and belief, Tiffany & Co. and Tiffany and Company both maintain their principal place of business at 727 Fifth Avenue, New York, New York 10022.

8.    Upon information and belief, at all times relevant hereto, Tiffany and Company was, and continues to be, in the business of jewelry and specialty product design, manufacturing and retailing.

9.    Upon information and belief, at all times relevant hereto, Tiffany and Company was, and continues to be, a subsidiary of Tiffany & Co.

10.    Tiffany & Co. and Tiffany and Company are referred to herein collectively as "Tiffany."

**C.    Jurisdiction and Venue**

11.    The amount in controversy exceeds the sum of $75,000 exclusive of interest and costs.

12.    This Court has jurisdiction over this action, founded upon diversity of citizenship, pursuant to 28 U.S.C. §1332(a)(1).

13.    Venue is properly laid in this district pursuant to 28 U.S.C. §1391(a)(1) and 1391(c), inasmuch as defendant is subject to personal jurisdiction in this district at the time this action is commenced.

## The Agreement

14.    On or about April 7, 1992, Tiffany, by Dale Strohl ("Strohl"), executed an agreement (the "Agreement"), a copy of which is annexed hereto as Exhibit "1."

15.    Upon information and belief, at the time of the execution of the Agreement, Strohl had authority to execute the Agreement on behalf of Tiffany & Co. and Tiffany and Company.

16.    On or before April 13, 1992, Tiffany forwarded the Agreement to the offices of NUS at One Maynard Drive, Park Ridge, New Jersey, to be accepted.

17.    On or about April 13, 1992, NUS executed the "Accepted By:" portion of the Agreement by its Vice President, Arnold Frankel.

18.    Tiffany intended that, upon execution of the Agreement by NUS, the Agreement would become a binding contract between NUS and Tiffany.

19.    Upon its execution by NUS, the Agreement became a binding contract between NUS and Tiffany.

20.    Pursuant to the Agreement, Tiffany paid NUS a service fee in the amount of $12,000 ("Service Fee"), which was to be recaptured by Tiffany, in full, from the first gross savings and refunds realized. [See Exhibit 1, para. 5, including the addendum].

21.    Prior to its receipt of the recommendation which is the subject of this action, Tiffany recaptured the Service Fee in full.

22.    By its execution of the Agreement, Tiffany obligated itself to send Energy bills to NUS each month during the term of the Agreement.  [See Exhibit 1, para. 2].

23.    By its execution of the Agreement, Tiffany authorized NUS to analyze the Energy expenditures of certain facilities, including its retail store located at 1980 Northern Blvd., Manhasset, New York (the "Manhasset Store").

24.    By its execution of the Agreement, Tiffany authorized NUS to submit recommendations regarding possible savings and refunds on its Energy costs.  [See Exhibit 1, para. 1].

25.    By its execution of the Agreement, Tiffany obligated itself to promptly forward to NUS all information pertaining to NUS' recommendations for evaluation and further advice. [See Exhibit 1, para. 3].

26.    By its execution of the Agreement, Tiffany obligated itself to pay NUS fifty (50%) percent of each refund realized and "fifty (50%) percent of each savings realized for a period of sixty (60) months" as a result of the implementation of any course of action recommended by NUS.  [See Exhibit 1, paras. 3, 5].

27.    Pursuant to the Agreement, if a recommendation submitted by NUS is still pending or a savings is in effect at the expiration of the Agreement, then Tiffany's liability to NUS to share the savings and refunds remains in effect until the same is completed, and Tiffany will pay NUS as outlined in the Agreement; and for this purpose, Tiffany will permit NUS to continue to examine and audit its utility bills and will provide bills and information pertaining to NUS' recommendations. [See Exhibit 1, para. 6].

28.    Pursuant to the Agreement, the term of the Agreement was "five (5) years from the date of [NUS'] acceptance, and shall continue thereafter ... for consecutive five (5) year terms unless cancelled by written notice at least thirty (30) days prior to the beginning of any new term." [See Exhibit 1, para. 7].

29.    Tiffany had not provided any written notice of cancellation of the Agreement until February 23, 2007.

30.    At the time Tiffany executed the Agreement, the parties believed that the Agreement is clear and unambiguous.

31.    The Agreement is clear and unambiguous.

32.    The Agreement implicitly required that Tiffany would deal with NUS fairly and perform its obligations thereunder in good faith.

33.    Tiffany's obligation to perform in good faith precluded it from engaging in conduct to deprive NUS of the benefits of the Agreement by acting to evade paying NUS its share of the refunds or savings obtained after a course of action recommended by NUS was implemented.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract)

34.    NUS repeats and realleges the allegations set forth in paragraphs 1 through 33 above as if fully set forth herein.

35.    At all times relevant hereto, Tiffany purchased the commodity portion of its electricity supply for the Manhasset Store from Con Edison Solutions ("CE Solutions").

36.    At all times relevant hereto, Tiffany also incurred charges from Long Island Power Authority ("LIPA") for the transmission and distribution portion of its electricity supply to the Manhasset Store.

37.    Pursuant to the Agreement, Tiffany furnished NUS with certain data relating to the costs of electric supply, transmission and distribution purchased from CE Solutions and LIPA for the Manhasset Store (the "Manhasset Electric Data").

38.    Tiffany furnished the Manhasset Electric Data to NUS to enable NUS to audit and analyze the data and submit recommendations authorized by the Agreement regarding refunds and savings at its Manhasset Store.

39.    NUS thereafter analyzed the data set forth in the Manhasset Electric Data, and other data in its possession.

40.    As part of the process, NUS extracted vital billing data (i.e., kW demand, kWh usage) from Tiffany's monthly electric bills included with the Manhasset Electric Data and entered the information into its proprietary energy management system.

41.    As part of its analysis, NUS examined Tiffany's current electric consumption and load profile as reflected in its energy management system and undertook a comparison of the current information to Tiffany's historical usage for a period of at least 12 months.  NUS also

compared the information to Tiffany stores with comparable square footage and operating characteristics.

42.    NUS' energy management system contains information on the square footage of each Tiffany store as well as its operating characteristics.

43.    As a result of NUS' analysis, it identified a potential overcharge as well as ongoing billing errors that were being billed to Tiffany for the period after September 19, 2006, when the Manhasset Electric Data reflected consumption and demand usage far in excess of previous levels. NUS' review of the Manhasset Electric Data also identified that the usage surge occurred when the electric meter for the Manhasset Store was replaced.

44.    NUS therefore concluded that LIPA and thereafter CE Solutions should be contacted to further investigate the recovery of overcharges stemming from the potential overcharge as well as a correction of ongoing billing errors unless Tiffany as a result of some changes in its operating profile actually created such usage modifications.

45.    On or about December 20, 2006, NUS sent to Tiffany a Cost Analysis Report (the "**Report**") by electronic mail. A copy of the e-mail and the Report is annexed hereto as Exhibit "2."

46.    The Report was received by Tiffany.

47.    The Report was received by Bruce Mogel ("**Mogel**"), Tiffany's Director Retail Facilities.

48.    Mogel was an official of Tiffany duly authorized by Tiffany to receive recommendations and related communications from NUS.

49.    The Report advised Tiffany of NUS' analysis and conclusions, including that a potential overcharge and ongoing billing error in Tiffany's electric service bills at the Manhasset

store had resulted in monthly overcharges of approximately $31,000, and recommended the investigation of the potential overcharge to obtain a refund and the correction of the ongoing billing error to obtain a savings.

50.     Mogel approved the recommendation contained in the Report.

51.     Mogel confirmed that there was no change in Tiffany's operating profile and, as permitted by the Agreement, he authorized NUS to investigate the recovery of the potential overcharge and correction of the ongoing billing error and to contact LIPA and CE Solutions on behalf of Tiffany as part of such investigation.  [See Exhibit 1, para. 4].

52.     NUS followed up on the Report and investigated the potential overcharge and cost savings by contacting LIPA, CE Solutions and other individuals and entities with letters, e-mails and telephone calls.

53.     As its follow-up on the Report and investigation of the potential overcharge and cost savings detailed in the Report, NUS took the following actions, among other things:

a)      Contacted LIPA to discuss the potential overcharge and cost savings.

b)      Determined that the next monthly invoice was ready to be issued and obtained agreement from LIPA that no payment would be due for the invoice until an investigation was conducted.

c)      Obtained a commitment from LIPA to have a field survey done for the electric meter.

d)      Determined that LIPA had installed a new meter at the Manhasset Store and had been misapplying the old meter multiplier of 180 instead of the new meter multiplier of 80.  The meter multiplier is used to calculate the monthly demand kW and energy kWh used for billing purposes.

e) Contacted CE Solutions to advise it of the LIPA billing error and began discussions regarding the correction of CE Solutions' billing.

f) Reviewed the results of LIPA's misapplication of the wrong meter multiplier and determined that the application of the incorrect meter multiplier accounted for only about one-half of the total billing error and ongoing increased charges.

g) Obtained a connected load study for the Manhasset Store which showed the equipment (i.e., lighting, etc.) in the store so that NUS could calculate the maximum levels of kW (demand) and kWh (consumption) that could be created by such equipment.

h) Reviewed the connected load study, which confirmed NUS' findings contained in its Report and subsequent investigation that (i) there had been a billing error which resulted in monthly overcharges and (ii) the original findings of LIPA did not correct the entire problem. Specifically, the connected load study showed that the level of kW and resulting kWh billed to the Manhasset Store could not be reached with the equipment being used by Tiffany.

i) Contacted LIPA to further investigate the recovery of past overcharges and correction of ongoing billing errors on future bills and discuss NUS' findings on LIPA's initial conclusions. As a result, NUS determined that the next step would be to contact the landord's representative for the mall where the Manhasset Store was located.

j) Contacted Tiffany's landlord's representative about the possibility that during recent work at the mall where the Manhasset Store was located ("Mall") there were cross-wired circuits resulting in the overcharges and higher billing to

Tiffany and determined that the next step would be to speak to the Mall's electrical contractor.

k)    Contacted the electrical contractor for the Mall and advised it of the electric service billing error, the facts which NUS had discovered to date and NUS' suggestions as to possible causes of the billing error.

l)    Arranged for an inspection of the site by the electrical contractor who determined that LIPA had "mis-tagged or mis-labeled" the newly installed meters for the Manhasset Store and a neighboring store in the Mall so that the recorded usage/demand for Tiffany was actually usage for the neighboring, and much larger, store.

m)    Reported to LIPA that the electrical contractor had confirmed the incorrect labeling of the meters.

n)    Arranged for another site survey to be taken by LIPA, which confirmed that the demand and usage billed to Tiffany since September 19, 2006 was erroneous based on the circumstances as detailed above.

o)    Confirmed that LIPA would rebill Tiffany for the billings issued subsequent to September 19, 2006, with interest, and correct future billings so they reflected the lower, and appropriate, demand and usage readings and associated charges.

p)    Contacted CE Solutions to advise that LIPA would be rebilling the erroneous invoices and that it should expect information from LIPA, which would allow it to correct its invoices and future billings.

q)    Followed-up with LIPA and CE Solutions to ensure that the proper refunds were given and future bills would be calculated accordingly.

54. As a result of NUS' efforts as set forth above, it obtained refunds for Tiffany totaling approximately $67,021.58 for overcharges on its electric service at the Manhasset Store.

55. As a result of NUS' efforts as set forth above, NUS had the ongoing billing error corrected on Tiffany's electric service at the Manhasset Store resulting in cost savings of approximately $400,000 annually.

56. Until NUS advised Tiffany that it should not pay any further electric service bills pending the investigation of the overcharges and the ongoing billing error, Tiffany paid six electric service bills with the significantly higher charges; three each to LIPA and CE Solutions.

57. Upon information and belief, at no time prior to receipt of the Report was Tiffany aware of the overcharges or the ongoing billing error for electric service purchases at the Manhasset Store.

58. Upon information and belief, at no time prior to receipt of the Report had Tiffany taken any action to obtain a refund of the overcharges for electric service purchases or a correction of the electric service bills for the Manhasset Store to avoid future overpayments.

59. Upon information and belief, at no time prior to receipt of the Report was Tiffany aware that its electric service meter at the Manhasset Store had been replaced by LIPA.

60. The foregoing refund for overcharges received by Tiffany constituted a "refund" under the Agreement.

61. The foregoing correction of the ongoing billing error constituted a "savings" under the Agreement.

62. Pursuant to the Agreement, NUS is entitled to be paid fifty (50%) percent of the refund realized by Tiffany for the electric service overcharges ("Refund").

63.     Pursuant to the Agreement, NUS is entitled to be paid fifty (50%) percent of the savings realized by Tiffany for a period of sixty (60) months as a result of the correction of the ongoing billing error on Tiffany's electric service purchases at the Manhasset Store ("Savings").

64.     Despite demand therefor, Tiffany has failed and refused to pay NUS any part of the Refund or Savings obtained as a result of the recovery of past overcharges and correction of the ongoing billing error to eliminate future overcharges on Tiffany's electric service purchases at the Manhasset Store.

65.     Tiffany has breached the express and implied provisions of the Agreement by, among other things, failing to pay NUS fifty (50%) percent of the Refund and fifty (50%) percent of the Savings realized by Tiffany for a period of sixty (60) months as a result of the correction of the ongoing billing error on Tiffany's electric service purchases at the Manhasset Store.

66.     NUS has performed its obligations under the Agreement, including all conditions precedent to Tiffany's performance, and is entitled to Tiffany's performance of its obligations under the Agreement.

67.     By reason of the foregoing, Tiffany is indebted to NUS for an amount which is to be determined at the time of trial and that is equal to fifty (50%) percent of the Refund and fifty (50%) percent of the first sixty (60) months' Savings realized as a result of the correction of the ongoing billing error on Tiffany's electric service purchases at the Manhasset Store, which, upon information and belief, is in excess of $75,000.00, plus interest as provided by law.

## SECOND CLAIM FOR RELIEF
### (Quantum Meruit)

68.     NUS repeats and realleges the allegations set forth in paragraphs 1 through 67 above as if fully set forth herein.

69.    NUS rendered its services and work to Tiffany in good faith.

70.    NUS rendered its services and work to Tiffany with the expectation that it would be paid for its services and work.

71.    Tiffany requested and accepted the services and work provided by NUS.

72.    By accepting the services and work provided by NUS, Tiffany has received a significant economic benefit and value.

73.    Tiffany has wrongfully retained the proceeds and benefits derived from the services and work of NUS as set forth above, and it would be unjust under the circumstances for Tiffany to receive such services and work without compensating NUS.

74.    By reason of the foregoing, NUS has been damaged in an amount at least equal to the reasonable value of the services and work.

75.    By reason of the foregoing, Tiffany is indebted to NUS for the reasonable value of the services and work, plus interest as provided by law.

### THIRD CLAIM FOR RELIEF
### (Unjust Enrichment)

76.    NUS repeats and realleges the allegations set forth in paragraphs 1 through 75 above as if fully set forth herein.

77.    By reason of the foregoing, NUS has conferred a significant economic benefit and value on Tiffany, and Tiffany was thereby enriched.

78.    Tiffany received the significant economic benefit and value, and was enriched, at NUS' expense.

79.    Tiffany has wrongfully retained the proceeds and benefits derived from the services and work of NUS as set forth above, and by failing to pay NUS in full for its services

and work, has been unjustly enriched by the value of the services and work for which payment has not been made.

80.    By reason of the foregoing, NUS has been damaged in an amount at least equal to the unpaid value of the services and work.

81.    By reason of the foregoing, and in equity and good conscience, Tiffany should be required to compensate NUS for the unpaid value of its services and work, plus interest as provided by law.

### FOURTH CLAIM FOR RELIEF
### (Declaratory Judgment and Specific Performance)

82.    NUS repeats and realleges the allegations set forth in paragraphs 1 through 81 above as if fully set forth herein.

83.    Pursuant to the Agreement, Tiffany is obligated to provide NUS with Energy bills, contracts, and other information covering all of its operations including, without limitation, the Manhasset Store, which will allow NUS to determine the dates and compute the amounts of Tiffany's savings and refunds and the amounts owed to NUS based upon such savings and refunds. [See Exhibit 1, paras. 2, 3, 5, 6 and 8].

84.    As a result of Tiffany's refusal to comply with its obligations under the Agreement to provide NUS with Energy bills and pay NUS its share of the Refund and the Savings realized for electric service purchases at the Manhasset Store, NUS has been unable to compute the amounts of Savings realized by Tiffany at its Manhasset Store and the amounts owed to NUS based upon such Savings.

85.    An actual controversy exists as to whether Tiffany breached its obligations and remains obligated to forward Energy bills and other information to NUS, and as to whether NUS is entitled to additional amounts from Tiffany pursuant to the Agreement, for the

recommendation identified in this Complaint and for savings and refunds resulting from other NUS recommendations.

86.   NUS has no adequate remedy at law.

87.   By reason of the foregoing, and pursuant to 28 U.S.C. §2201, NUS is entitled to a declaration of the rights and obligations of the parties under the Agreement and specific performance of the Agreement.

WHEREFORE, plaintiff, National Utility Service, Inc., demands judgment against defendants, Tiffany & Co. and Tiffany and Company, as follows:

a.    On the First Claim for Relief, for damages to be determined at the time of trial which are equal to fifty (50%) percent of the Refund and fifty (50%) percent of the first sixty (60) months' Savings realized as a result of the correction of the ongoing billing error on Tiffany's electric service purchases at the Manhasset Store, which, upon information and belief, is in excess of $75,000.00, plus interest as provided by law;

b.    On the Second Claim for Relief, for the reasonable value of the services and work rendered by NUS, plus interest as provided by law;

c.    On the Third Claim for Relief, for the reasonable value of the services and work rendered by NUS, plus interest as provided by law;

d.    On the Fourth Claim for Relief, declaring the rights of the parties under the Agreement, including NUS' entitlement to monies by reason of energy cost savings, together with an order compelling specific performance of Tiffany's obligations under the Agreement, including the obligation to provide energy bills and other information relating to or reflecting actual energy costs incurred as relevant to NUS' recommendations;

e.    For the costs, expenses, fees and disbursements incurred by plaintiff in this action to the maximum extent allowed by law; and

f.    For such other and further relief as is just and proper.

Dated: New York, New York
       April 26, 2007

HARTMAN & CRAVEN LLP

By: _____
       Peter G. Goodman (PG-4210)
       488 Madison Avenue
       New York, New York 10022
       (212) 753-7500

Attorneys for Plaintiff
National Utility Service, Inc.

**National Utility Service, Inc.**
**NUS Corporate Plaza**
**One Maynard Drive - P.O. Box 712**
**Park Ridge, New Jersey 07656-0712**

DATE _4/7/92_

Gentlemen:

1. We hereby authorize you to submit recommendations for savings and refunds on our costs of electricity, gas, oil and petroleum products, water, sewerage, steam and telecommunications. You will analyze our costs and advise where refunds and reductions can be obtained.

2. Your initial analysis will cover our most recent twelve (12) months' bills. Where applicable, you will review old bills as far back as possible for refunds. Your continuing analysis will cover our current bills, which we will send to you each month during the term of this agreement.

3. Any recommendation you make will be considered by us and shall be subject to our approval. If any recommendation made by you is subsequently implemented, we will pay you as outlined below after such savings and refunds are achieved. All information pertaining to your recommendations, including correspondence with our suppliers, will be sent to you promptly for your evaluation and further advice.

4. All negotiations with suppliers are to be conducted through us unless it is mutually agreed otherwise.

5. We agree to pay you as follows:
   a. A service fee of $ _12,000.00_ is due to you on acceptance of this agreement, and is payable only once for the term of this agreement and all consecutive renewals.
   b. A performance fee of: (i) fifty (50%) percent of each refund realized; (ii) fifty (50%) percent of each savings realized for a period of sixty (60) months after which the entire savings will be ours.
   c. Payment will be made upon receipt of your invoice showing computation of savings and/or refunds.

6. At the expiration of this agreement if your participation in a savings is not complete as per paragraph 5b above, or a recommendation(s) submitted by you has not been implemented, then we will continue to send you information and our invoices covering the locations where recommendations are outstanding and/or savings are in effect, until completed, and we will pay you as outlined above in paragraphs 5b and 5c.

7. The term of this agreement shall be five (5) years from the date of acceptance, and shall continue thereafter, at no additional service fee, for consecutive five (5) year terms unless cancelled by written notice at least thirty (30) days prior to the beginning of any new term.

8. This agreement and service fee covers all present and additional operations we acquire in the United States. Our present subsidiaries can take advantage of your service without an additional service fee by signing a duplicate agreement within three (3) months from date hereof. If any of our present subsidiaries or operations delay taking advantage of your service beyond three (3) months from the date of this agreement, or, in the case of new subsidiaries three (3) months from the date of acquisition, and subsequently decide to participate, they will be required to enter into a separate agreement and pay a service fee.

See reverse ⟵

**nus**

ACCEPTED BY:        APR 1 3 1992

**NATIONAL UTILITY SERVICE, INC.**

_Axel Fahl_
(AUTHORIZED SIGNATURE)

_Vice President_         APR 1 3 1992
(TITLE)                  (DATE)

Tiffany & Company
(COMPANY NAME)

727 Fifth Avenue, 6th Floor
(ADDRESS)

New York, NY  10022

X _Dale S. Stahl_
(AUTHORIZED SIGNATURE)        (TITLE)

NUS 1/91-1

The service fee will be recaptured by us in full from the first gross savings and refunds realized. After such recapture, we will pay you as per clause 5b and 5c.

**FOREIGN LOCATIONS:**

This agreement and service fee also covers all present and additional foreign operations we acquire. You will submit recommendations for all possible savings and refunds on our cost of electricity, gas, oil and petroleum products, water, sewerage, and steam. Our present foreign subsidiaries must sign a separate agreement (NIL service fee) within three (3) months from date hereof. Any of our present subsidiaries which delay taking advantage of your service beyond three (3) months from the date of this agreement, or in the case of new subsidiaries three (3) months from the date of acquisition, will be required to enter into a separate agreement and pay a service fee.


SIGNED:   TIFFANY & COMPANY

title  DIRECTOR OF STORE PLANNING & FACILITIES MGMT.


ACCEPTED:   NATIONAL UTILITY SERVICE, INC.

title       **Executive Vice President**

Page 1

## Amundsen, Christine

| | |
|---|---|
| **From:** | Amundsen, Christine |
| **Sent:** | Wednesday, December 20, 2006 5:37 PM |
| **To:** | 'Bruce Mogel (bruce.mogel@tiffany.com)' |
| **Subject:** | Cost Analysis Report for Manhasset, NY |
| **Importance:** | High |

Bruce,

Attached please find our Cost Analysis Report for your store in Manhasset, NY. Please review our recommendation and let us know if you have any comments or questions.

We appreciate your cooperation.

Regards,
Chris

Chris Amundsen
Senior Consultant
NUS Consulting Group
1 Maynard Drive
Park Ridge, NJ 07656
T: 201-391-4300 x 109
F: 201-391-8158

# nus consulting
## G R O U P

## COST ANALYSIS REPORT

| | |
|---|---|
| LOCATION: | 1980 Northern Blvd , Manhasset, NY |
| SERVICE: | Electric |
| CLIENT: | Tiffany and Company |
| DATE: | December 20, 2006 |
| EST. SAVINGS/ REFUND: | $372,000 per year savings and $93,000 refund |
| SUGGESTED ACTION(S): | NUS To Initiate Action |

## SUMMARY

Our review of your invoices for the above referenced location indicates that you are currently purchasing your electricity supply from Con Edison Solutions (the "Marketer"). This marketer provides service for the purchase of the generation component of your electric requirements. Additional charges are incurred from the local utility company, Long Island Power Authority (the "Provider") for the transmission and distribution of your electricity requirements. We find you are receiving service in accordance with your Provider's Large General And Industrial Service With Multiple Rate Periods, designated Rate 285. At this location you currently have the following account #: 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-5 (Meter # 099791344).

As part of our analysis, we have compared your consumption and load profile (which we compiled from your electricity invoices) against other available rate options currently being offered by the Provider. **Our analysis, based upon your recent consumption patterns and load profile, reveals that while your present rate is the most cost effective, a billing error which appears to be ongoing in nature, is resulting in monthly overcharges of approximately $31,000. Therefore, in addition to a refund of approximately $93,000 for past overcharges, we project a correction of this ongoing overcharge on your account will result in annual savings of approximately $372,000.**

Specifically, your invoices subsequent to the period ending September 19, 2006 reflect consumption as well as demand usage far in excess of previous levels. We believe this may be the result of an error by the Provider (*e.g.*, meter reading error, meter malfunction, computer error, administrative error, *etc.*). We note that this usage surge occurred when the meter for this service was replaced effective with the period ending September 27, 2006. Accordingly, in addition to savings you would incur resulting from the correction of these erroneous usage measurements, you should also be entitled to a refund for all past overcharges.

Unless you are aware of the reason(s) for the abnormally high usage recordings taking place after the meter was changed, i.e. an expansion, the Provider should be contacted to further investigate this matter. You may want to also confer with the appropriate personnel at this facility to determine

if these new usage readings are out of line as we cannot rule out the possibility that your Provider's former meter for this account may have been under-recording your previous usage.

The following commentary details our recommendation and the suggested action to further investigate/implement this recommendation. For your reference, we have attached a chart of your consumption, load profile and other important billing data concerning this location to this report. Should you have any questions or comments concerning this report, please contact your Consultant for further assistance.

## CURRENT USAGE DETAILS AND CHARGES

Based upon the twelve months' electricity invoices you have submitted for our review up through the period ending September 19, 2006 (prior to the periods when the usage increase occurred), the consumption and demand profile and charges under Rate 285 (i.e., your current rate) were as follows:

|  |  |
|---|---|
| Total Annual Consumption (kWh): | 429,300 |
| * Annual Peak Demand (kW): | 122.4 |
| Average Annual Load Factor: | 40.0% |
| Total Charges: | $80,688 |

*The average peak demands based on the two bills we received for this service subsequent to the period ending September 19, 2006, was 621.3 kW.*

## RECOMMENDATION

NUS Consulting Group recommends investigating this potential ongoing overcharge. As detailed above, we estimate that in addition to a refund of approximately $93,000 for past overcharges, a correction of this ongoing overcharge will result in annual savings of approximately $372,000.

## SUGGESTED ACTION

NUS will initiate action to investigate potential overcharge as detailed above. We will initially approach the Provider to review this matter and correct your billings. We will then also contact your Marketer to adjust their invoices and rebill you based on the corrected usage as well.

# Tiffany & Company

**Service Address:** 1980 Northern Blvd, Manhasset, NY
**Utility Supplier:** Long Island Power Authority
**Service Account #:** 5307222205

**Meter #:** 099791344

## Electric Billing Data

| Date: | kWh |
|---|---|
| 10/05 | 34,020 |
| 11/05 | 31,140 |
| 12/05 | 39,060 |
| 1/06 | 27,720 |
| 2/06 | 26,640 |
| 3/06 | 30,240 |
| 4/06 | 33,300 |
| 5/06 | 30,780 |
| 6/06 | 47,160 |
| 7/06 | 47,340 |
| 8/06 | 54,720 |
| 9/06 | 27,180 |
| Total: | 429,300 |



Monthly Consumption (kWh)

| Date: | kW |
|---|---|
| 10/05 | 89.3 |
| 11/05 | 98.5 |
| 12/05 | 92.0 |
| 1/06 | 83.9 |
| 2/06 | 81.0 |
| 3/06 | 86.0 |
| 4/06 | 100.1 |
| 5/06 | 96.1 |
| 6/06 | 116.8 |
| 7/06 | 122.4 |
| 8/06 | 122.4 |
| 9/06 | 105.8 |
| Total | 1,194.3 |

Annual Load Factor: 40%





Monthly Demand (kW)

| Date: | Cost ($) | Unit Price (¢) |
|---|---|---|
| 10/05 | 5,875.69 | 17.27 |
| 11/05 | 5,252.07 | 16.87 |
| 12/05 | 6,613.31 | 16.93 |
| 1/06 | 4,688.56 | 16.91 |
| 2/06 | 4,500.17 | 16.89 |
| 3/06 | 5,125.82 | 16.95 |
| 4/06 | 5,630.43 | 16.91 |
| 5/06 | 5,177.98 | 16.82 |
| 6/06 | 9,841.57 | 20.87 |
| 7/06 | 10,316.37 | 21.79 |
| 8/06 | 11,673.50 | 21.33 |
| 9/06 | 5,992.75 | 22.05 |
| Total | 80,688.22 | 18.80 |

Monthly Cost / Unit Price (¢)

Prepared by

46-1