Index of Deposition Transcripts

| 1 | Christine Amundsen | March 4, 2008 |
|---|---|---|
| 2 | David Brown | March 5, 2008 |
| 3 | David Brown | June 19, 2008 |
| 4 | Bruce Edson | February 27, 2008 |
| 5 | Brian Ensor | May 14, 2008 |
| 6 | Arnold Frankel | April 11, 2008 |
| 7 | Bruce Mogel | February 26, 2008 |
| 8 | Lawrence Palfini | February 27, 2008 |
| 9 | Kathleen Schwarting | May 6, 2008 |
| 10 | Dale Strohl | May 7, 2008 |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -x
NATIONAL UTILITY SERVICE, INC.,          :

    Plaintiff,          :

          :

    -against-          :

TIFFANY & CO. and          :
TIFFANY AND COMPANY,          :

    Defendants.          :

- - - - - - - - - - - - - - - - - - -x


    DEPOSITION of National Utility Service, Inc.,

by CHRISTINE AMUNDSEN, taken by Defendants at the

offices of Dreier LLP, 499 Park Avenue, New York,

New York on Tuesday, March 4, 2008, commencing at

10:13 a.m., before Elizabeth Santamaria, a Certified

Shorthand (Stenotype) Reporter and Notary Public

within and for the State of New York.

Page 18

Amundsen

2 A. Towards the beginning.
3 Q. Are you the most senior consultant
4 of the six consultants?
5 A. Yes.
6 Q. Do you train other consultants in
7 how to perform their services?
8 A. Yes.
9 Q. What types of things do you train
10 these consultants in?
11 A. Well, throughout my career I have
12 done that. If you mean -- I mean lately I have
13 been visiting clients and I will have a junior
14 person with me.
15 Q. In the production of documents by
16 NUS there was some memoranda to the file that I
17 saw you wrote. Is that something that you do as
18 part of your job?
19 A. Yes.
20 Q. Did someone tell you that it was a
21 good idea to create these memoranda to the files
22 to memorialize certain things?
23 A. It's policy.
24 Q. And you say it's policy. Where does
25 that policy come from?

Page 19

Amundsen

2 A. I use the word "policy." I couldn't
3 pull out a policy that I can think of.
4 Q. Is there a policy manual?
5 A. I'm not sure.
6 Q. Have you ever seen one?
7 A. Not exactly.
8 Q. Have you ever seen a book that
9 contains form documents that you should use in
10 your consulting services?
11 A. In the past, the long past.
12 Q. What do you recall seeing as forms
13 that you should use in providing the services?
14 A. I wouldn't call it a form. A sample
15 letter. That's the type of thing.
16 Q. Where did you see that?
17 A. Early in my career someone had a
18 book of sample letters.
19 Q. How about a sample report and
20 recommendation? Is there such a thing?
21 A. There is templates.
22 Q. Does that still exist, these
23 templates?
24 A. Yes.
25 Q. Where are those templates?

Page 20

Amundsen

2 A. In the computer system.
3 Q. And what templates are you aware of
4 that exist in the computer system?
5 A. Various ones, numerous ones
6 pertaining, you know, to begin a report on many of
7 the types of recommendations we make.
8 Q. So on your system you are aware of
9 the existence of various templates that are used
10 at NUS to communicate with clients; is that right?
11 A. To begin drafting a specific
12 recommendation.
13 Q. Did anyone ever tell you why there
14 existed templates on the NUS system to guide the
15 drafting of materials to clients?
16 A. No one told me why.
17 Q. Do you have an understanding about
18 why they are used at NUS?
19 A. My understanding, yes.
20 Q. What is your understanding?
21 A. Is because they chose wording that
22 was the most appropriate, the best wording to
23 explain what we were recommending. So once they
24 had finalized that this was a very good wording,
25 that was, you know, chosen as the template or

Page 21

Amundsen

2 designated the template.
3 Q. Are there also templates for
4 reporting progress to clients?
5 A. No.
6 Q. When you said the best wording, was
7 that because that wording corresponded with
8 language with contracts that NUS had with clients?
9 A. No, it wasn't -- to my knowledge, it
10 wasn't based on that.
11 Q. Did the templates contain words like
12 "savings"?
13 A. No doubt.
14 Q. Did they contain words like
15 "refund"?
16 A. Sometimes.
17 Q. Did they contain words that would
18 assist you in communicating to the client what NUS
19 believes projected savings in the future might be
20 in connection with something you might be doing?
21 A. Sometimes.
22 Q. And those would be categories of
23 types of things that NUS might seek to recover a
24 fee for, correct? Savings and refunds?
25 A. Could you say that one more time?

Page 26

Amundsen

1
2  implemented by that customer?
3      A.   Yes.
4      Q.   Give me a -- more than five?
5      A.   No.
6      Q.   Approximately how many?
7      A.   Three. Three.
8      Q.   Does that include this case?
9      A.   No.
10     Q.   Did any of those cases where you
11  were involved in, the three cases, arise from a
12  billing mistake by the power company?
13     A.   No.
14     Q.   Have you ever been involved at NUS
15  in any other lawsuit that arose from a claim for a
16  fee because of a billing mistake?
17     A.   Well -- no.
18     Q.   Have you ever been involved in
19  another case at NUS where a new meter was
20  installed by the power company and mistakenly
21  mistagged to another customer?
22     A.   No.
23     Q.   So is it fair to say that the first
24  time you have ever personally been involved in a
25  case at NUS which concerned a mistagged meter

Page 27

Amundsen

1
2  would be this case?
3      A.   Yes.
4      Q.   And are you aware of NUS ever having
5  sued any other customer before to recover a fee
6  based upon a mistagged meter?
7      A.   I'm not aware.
8      Q.   Is your compensation dependent
9  upon -- withdrawn.
10         Do you receive the equivalent of a
11  commission compensation?
12     A.   As part of my salary?
13     Q.   Yes.
14     A.   Yes.
15     Q.   So if and to the extent NUS has a
16  recovery in this case, do you get a percentage of
17  the recovery?
18     A.   To the best of my knowledge, no.
19     Q.   Why would that be?
20     A.   Because once we incur legal costs,
21  the consultant is no longer entitled to
22  commission.
23     Q.   Prior to joining NUS 22 years ago,
24  what did you do?
25     A.   I worked customer service for

Page 28

Amundsen

1
2  Minolta Corporation.
3      Q.   In New Jersey?
4      A.   Yes. And I prepared income taxes
5  for H & R Block.
6      Q.   Anything else you did after college
7  and before joining NUS?
8      A.   I had a six-month position with IBM.
9  It was just a temporary position. And I spent
10  many years just raising my two children.
11     Q.   And was NUS the first time you had
12  been involved in the energy business?
13     A.   Yes.
14     Q.   Is there a standard percentage that
15  you generally are compensated based upon your
16  generation of revenue?
17     A.   Yes.
18     Q.   What is that percentage?
19     A.   .1 percent.
20     Q.   .1 percent?
21     A.   Yes.
22     Q.   One-tenth of 1 percent?
23     A.   Yes.
24         Wait, excuse me. I might have
25  misstated that.

Page 29

Amundsen

1
2      .01. 1 percent.
3      Q.   You are saying 1 percent?
4      A.   Yes, 1 percent.
5      Q.   1 percent of revenue?
6      A.   Yes.
7      Q.   So $10,000 for every million dollars
8  of revenue; is that right?
9      A.   Yes.
10     Q.   Do you get a commission report on a
11  regular basis?
12     A.   No.
13     Q.   Is it part of a year-end bonus?
14     A.   No.
15     Q.   How are you compensated for
16  commission?
17     A.   Once a month, dependent on reaching
18  target levels.
19     Q.   The other thing, the other -- you
20  said a percentage of NUS's fees are generated from
21  shared savings. You said the other was from
22  revenue-producing activities.
23     A.   Yes.
24     Q.   What would those be?
25     A.   Third-party supply broker

Page 42

Amundsen

1
2  "R/C." right?
3       A.   Right.  But by that type of R/C, I
4  believe that's more of a designation.
5       Q.   In looking at Exhibit 43 for
6  identification --
7            First of all, have you ever seen
8  this before?
9       A.   Yes.
10      Q.   Does this document provide a history
11  of the recommendations made by NUS to Tiffany
12  during the life of the parties' relationship with
13  each other?
14      A.   I believe so.
15      Q.   And it would show both
16  recommendations that were made and then of those
17  recommendations which ones were implemented,
18  right?
19      A.   Yes.
20      Q.   And isn't it fair to say that if you
21  put aside the dispute in this lawsuit, all of the
22  recommendations contained on this document are
23  recommendations that were made by NUS for Tiffany
24  to lower its cost of a utility?
25      A.   I have to go down the list and just

Page 43

Amundsen

1
2  verify if I think that's the case.
3            Yes.  The recommendations were to
4  lower the cost.
5       Q.   Am I correct in understanding the
6  column "Estimated Savings," that would be the
7  annual estimated savings, is that right, that was
8  projected by NUS?
9       A.   It would be the estimated annual
10  savings or if it were a one-time savings.
11      Q.   And if you look at the column
12  "Estimated Savings" there is not in any of the
13  implemented recommendations other than Manhasset,
14  any implemented recommendation that is even a
15  six-figure estimated savings.  Isn't that right?
16      A.   I'll just verify that.
17            On an annual basis.
18      Q.   That's correct, right?
19      A.   Right.
20      Q.   Many of the estimated savings
21  figures are four figures on an annual basis.  Is
22  that right?
23      A.   Some are four, some are three, some
24  are five.
25      Q.   So until this dispute arose with NUS

Page 44

Amundsen

1
2  concerning the Manhasset store, there had not been
3  an instance where NUS had made a claim that there
4  was an estimated savings as a result of a
5  recommendation that was even in a six-figure
6  amount.  Isn't that right?
7       A.   Right.
8       Q.   So from 1992 to 2006 an estimated
9  annual savings of the magnitude that is at issue
10  in this case had never arisen between the parties.
11  Is that right?
12      A.   Right.
13            MR. MITCHELL:  Please mark
14       this as Exhibit 44.
15            (Exhibit 44, two-page document
16       bearing Bates numbers T-1 - T-2,
17       marked for identification, as of this
18       date.)
19            THE WITNESS:  May I take a
20       restroom break?
21            MR. MITCHELL:  Sure.
22            (Recess taken.)
23      Q.   Ms. Amundsen, you said in order to
24  get commission you have to hit a target number?
25      A.   Yes.

Page 45

Amundsen

1
2       Q.   What was your target number for
3  2006, 2007?
4       A.   Target for collections for myself?
5       Q.   Yes.
6       A.   Fifty -- $52,000 a month.
7       Q.   What does that mean?  Collected
8  revenues for NUS?
9       A.   Yes.
10      Q.   Did you hit your target for 2006?
11      A.   Yes.
12      Q.   How many accounts are you assigned
13  to, approximately?
14      A.   Approximately 135.
15      Q.   And the precise situation that arose
16  here, which was mistagging of meters at the
17  Manhasset store, you had never seen that before in
18  all of your years working at NUS, right?
19      A.   Right.
20      Q.   Now, I would like to hand you what
21  we have marked as Exhibit 44 for identification.
22            Ms. Amundsen, I have handed you what
23  has been marked as Exhibit 44 for identification.
24  Is this an e-mail you wrote to Bruce Mogel on or
25  about December 29, 2003?

Page 58

Amundsen

1
2  Q.  Can you describe for me how this
3  error was caught by NUS?
4      A.  A woman who works in the clerical
5  department was -- brought it to my attention. She
6  was looking at the bills.
7      Q.  Was it her responsibility to look at
8  those bills?
9      A.  Yes.
10     Q.  And you say she was in the clerical
11 department. What were her job responsibilities at
12 NUS?
13     A.  Primarily she would do billing. She
14 would create -- she worked in creating invoices
15 for billing.
16     Q.  And what is it that she saw on the
17 records of NUS to alert her to this issue?
18            MR. GOODMAN: Objection.
19            MR. MITCHELL: Withdrawn.
20     Q.  Did she tell you what she saw when
21 she discovered this issue?
22     A.  Yes.
23     Q.  What did she tell you?
24     A.  She said she -- it looked like there
25 was much higher usage than usual for this

Page 59

Amundsen

1
2  particular account.
3      Q.  And was this something that was
4  discovered because NUS monitors for its customers
5  information that's contained on utility bills?
6      A.  I would say it was discovered as a
7  result of monitoring, yes, the bills.
8      Q.  And you monitor the bills because
9  that's part of the services you provide to your
10 customers, right?
11     A.  We monitor them for many reasons.
12     Q.  That's one of the reasons?
13     A.  That's one of the reasons.
14     Q.  As part of performing your normal
15 and customary services for Tiffany, someone in the
16 clerical department brought to your attention what
17 appeared to be an abnormal spike in usage at the
18 Manhasset store, right?
19     A.  Yes.
20     Q.  Did you take a look at the bills
21 yourself?
22     A.  I believe she brought them over to
23 my desk.
24     Q.  So you actually saw the physical
25 bills, correct?

Page 60

Amundsen

1
2      A.  Yes.
3      Q.  And the chart which is attached to
4  Exhibit 4 for identification reflects certain
5  usage information, correct?
6      A.  Yes.
7      Q.  And it indicates that for the
8  eight-day period of September 19, 2006 through
9  September 27, 2006, the Manhasset store for
10 Tiffany used 61,920 hours of kilowatt-hours,
11 right?
12     A.  Yes.
13     Q.  And if I read this correctly, for
14 the entire month of July 26, 2006 to August 28,
15 2006, which is 33 days, the Manhasset store used
16 only 54,720 kilowatt-hours of power, right?
17     A.  Right.
18     Q.  So for an 8-day period in September,
19 the store was reflected as having used more power
20 than it used for an entire 33-day period between
21 July 26 and August 28, 2006, right?
22     A.  Right.
23     Q.  In your experience, that would
24 appear to be odd, wouldn't it?
25     A.  Unusual.

Page 61

Amundsen

1
2      Q.  And unless something unusual was
3  going on at the store to cause there to be such a
4  significant increase in the use of power, it would
5  likely be a mistake of some kind, right?
6      A.  Yes.
7      Q.  So you knew that already on
8  November 15, 2006, that unless there was some
9  explanation for using that much power, probably
10 somewhere along the line there was a mistake,
11 right?
12     A.  Yes.
13            MR. MITCHELL: Let me have the
14         court reporter mark as Exhibit 45 for
15         identification a document Bates
16         stamped T968 and 969, which is a LIPA
17         bill to Tiffany and Company, bill date
18         10/6/2006.
19            (Exhibit 45, document bearing
20         Bates numbers T968 - T969, marked for
21         identification, as of this date.)
22     Q.  Ms. Amundsen, I am handing you what
23 has been marked as Exhibit 45 for identification.
24 Is this a bill for Tiffany that you looked at
25 at or around the time you were advised of the

21 (Pages 78 to 81)

Page 78

Amundsen

1
2 investigate forward, your initial thought was to
3 treat it as a rate issue, right?
4      A.   No.
5      Q.   You took it to the rate department,
6 right?
7      A.   They handle everything that has to
8 do with recommendations, reports, analysis.
9 They're the people that don't leave the office.
10      Q.   But if I understood you correctly,
11 you had never had a situation of a mistagged meter
12 before. Right?
13      A.   Right.
14      Q.   And as far as you're aware, NUS had
15 never had this situation before, right?
16           MR. GOODMAN: Objection.
17      Q.   To your knowledge, you are not aware
18 of it ever having happened at NUS?
19      A.   A mistagged meter?
20      Q.   Yes.
21      A.   To my knowledge, that's right.
22      Q.   So you were operating at the outset
23 as if this was something that was more within what
24 you would normally and usually see in your
25 day-to-day activities working for NUS, right?

Page 79

Amundsen

1
2      A.   We're talking about a spike in
3 usage? That's a scene in my day-to-day
4 activities.
5      Q.   And your assumption as you are
6 proceeding at the beginning is that at least the
7 meter is recording usage for the premises that's
8 getting the bill, right? That's your assumption?
9      A.   Yes.
10      Q.   So you did not operate from the
11 assumption at the outset that Tiffany was actually
12 receiving a bill for usage of another premises,
13 correct?
14      A.   Correct.
15      Q.   So your mind set was this could be a
16 problem with the rate that's being applied to
17 Tiffany's usage, correct?
18      A.   No. That wasn't my mind set.
19      Q.   Did you have any mind set at all
20 about what you thought it might be when you go and
21 speak with Mr. —
22      A.   Mr. Hoffman.
23      Q.   — Mr. Hoffman?
24      A.   No. I didn't have — I thought this
25 is something for the rate department to lock into.

Page 80

Amundsen

1
2      Q.   Now, if we jump forward to the
3 resolution, the resolution of the problem was
4 handled by an investigation that was conducted by
5 LIPA, right?
6           MR. GOODMAN: Objection.
7      A.   Numerous people were involved in the
8 investigation.
9      Q.   Well, you never went to the
10 premises, correct?
11      A.   Correct.
12      Q.   Did anyone for NUS ever look at the
13 meters?
14      A.   Not to best of my knowledge. We
15 offered, I believe.
16      Q.   But you didn't go, correct?
17      A.   Yes.
18      Q.   There were representatives of LIPA
19 that looked at the meter, correct?
20      A.   Yes, based on our asking them to do
21 so.
22      Q.   Just people that went. Okay?
23      A.   Yes.
24      Q.   The people that went was somebody
25 from LIPA, right?

Page 81

Amundsen

1
2      A.   Yes.
3      Q.   And there was someone from the
4 electrical contractor who was hired by the
5 landlord, correct?
6      A.   Yes.
7      Q.   Albertson Electric?
8      A.   Yes.
9      Q.   Those are the people that physically
10 inspected the boxes, correct?
11      A.   Based on our asking them to look at
12 it.
13      Q.   Right. You communicated to the
14 power company that we have observed something
15 unusual and the power company sent someone out to
16 look at it, right?
17      A.   Yes.
18      Q.   That's what happened?
19      A.   Yes.
20      Q.   And in addition the landlord's
21 contractor took a look at it?
22      A.   Yes.
23      Q.   And ultimately it was the
24 observations of the people who took a look at this
25 that concluded that there was a problem in the

Page 82

Amundsen

1
2 tagging of the meters, correct?
3           MR. GOODMAN: Objection.
4      A.   There is an element in there of our
5 rate department discerning that it wasn't just the
6 multiplier being responsible for the spike, so
7 that caused the ultimate investigation and result.
8      Q.   Ms. Amundsen, what prevented you
9 from contacting the power company on November 16,
10 2006 and saying to the power company, "We have a
11 client that has a very unusual bill for last
12 month. Could you take a look at that, please"?
13 What stopped you from doing that?
14     A.   That would have been premature on my
15 part.
16     Q.   Well, Mr. Mogel simply said
17 investigate it on November 16th, right?
18     A.   Right.
19     Q.   And then he left it to your judgment
20 to determine the manner in which you would
21 investigate it, right?
22     A.   Yes.
23     Q.   And I'm asking you now, what
24 prevented you from just picking up the phone,
25 contacting someone at the power company and

Page 83

Amundsen

1
2 saying "This bill looks strange. The client
3 tells me they haven't done anything unusual. Why
4 is there so much usage reflected"? Why couldn't
5 you do that?
6      A.   I wouldn't normally do that. I
7 would consult with the NUS rate department first.
8      Q.   Ms. Amundsen, by this period of time
9 you have been in this business for 20 years,
10 right?
11     A.   Right.
12     Q.   And you have already concluded,
13 based upon your communication with your client,
14 that it is likely that there is some mistake here,
15 right?
16     A.   Right.
17     Q.   The place where the mistake probably
18 happened is at the power company, right?
19     A.   Right.
20     Q.   So wouldn't it have been simple to
21 simply call someone, use your contacts at the
22 power company, pick up the phone and say, "Would
23 you please take a look at this bill"? That seems
24 to be very simple.
25           MR. GOODMAN: Objection.

Page 84

Amundsen

1
2      Q.   Isn't it?
3      A.   It seems simple, but it's not the
4 way we handle cases procedurally. We rely on our
5 rate department for analysis.
6      Q.   To build up the file?
7      A.   Build up?
8           MR. GOODMAN: Objection.
9      Q.   I'm just asking. To build up the
10 file?
11     A.   No, not to the build up. For advice
12 and review and insight.
13     Q.   Isn't it what you ultimately did?
14 Didn't you ultimately call LIPA? That's what you
15 did.
16           MR. GOODMAN: Objection.
17     A.   Not before we did our own group
18 review and study of what possibilities could be,
19 sought to make sure we had complete historical
20 data. It's a process, it isn't a quick pick up
21 the phone, talk to the utility.
22     Q.   Well, that's what you did, right?
23     A.   Eventually.
24     Q.   And when you picked up the phone and
25 talked to the utility, in that first conversation

Page 85

Amundsen

1
2 the utility told you it looks like the meters were
3 switched. Right?
4           MR. GOODMAN: Objection.
5      Q.   They didn't tell you that?
6      A.   Oh, switched. When you said
7 switched, I had the wrong interpretation. They
8 said a new meter was installed, I believe.
9      Q.   Didn't they also tell you that they
10 looked at the Polo meter at the same time?
11     A.   Not that I recall.
12     Q.   You don't recall that?
13     A.   No.
14     Q.   Isn't it true that when you talked
15 to the power company on December 26, 2006, that
16 the representative for LIPA pulled up on her
17 screen both the usage for Tiffany and Polo? You
18 don't remember that?
19     A.   Not perfectly clearly, no.
20     Q.   And you don't remember the person
21 telling you that when she looked at the screen,
22 she saw not only a spike in the Tiffany usage but
23 a similar decrease in the Polo usage at the same
24 time?
25     A.   I remember hearing that, but I don't

Page 114

Amundsen

1
2 the rate department yet, right?
3     A.   Correct.
4     Q.   And your testimony earlier was that
5 this was something that the rate department would
6 look into, right?
7     A.   Right.
8     Q.   So between November 15th and
9 December 12th, this had not yet been turned over
10 to anyone else, right?
11     A.   Right.
12     Q.   Then on the 13th, December 13th, you
13 leave information, invoices on Paul Hoffman's
14 desk, right?
15     A.   Yes.
16     Q.   And he turns it over to Stephen
17 Schnaer on December 19th, right?
18     A.   Right.
19     Q.   So between November 15th and
20 December 19th you are not aware of any
21 investigation having been conducted internally at
22 NUS into the Manhasset situation, right?
23     A.   I'm not aware of anything that
24 transpired between those dates as far as
25 investigation.

Page 115

Amundsen

1
2     Q.   And now we get to the 20th, which is
3 the following day, December 20, 2006, as reflected
4 in Exhibit 2 for identification. So at most --
5 withdrawn.
6     Are you aware of any investigation
7 that was conducted at NUS on December 20, 2006?
8     A.   By "investigation" do you mean
9 outside contact with the utility company?
10     Q.   Well, my question to you is: What
11 was going on at NUS?
12     And if I understand you correctly,
13 you are not aware of any internal investigation
14 going on at NUS either. You don't know that,
15 right?
16     MR. GOODMAN: Objection.
17     A.   Many times the rate analysts confer
18 with one another and they meet with Paul and
19 discuss that.
20     Q.   I don't want possibilities. I want
21 to know what you know.
22     You are the account executive here,
23 correct?
24     A.   Yes.
25     Q.   So you do not know of any

Page 116

Amundsen

1
2 investigation internally at NUS through
3 December 19, 2006, right?
4     A.   Right.
5     Q.   Okay. So do you know of any
6 investigation internally at NUS on December 20,
7 2006?
8     A.   Yes.
9     Q.   Okay.
10     A.   Because it was the date that I was
11 given the cost analysis report.
12     Q.   So whatever investigation had taken
13 place internally at NUS is reflected in Exhibit 2
14 for identification; is that correct?
15     MR. GOODMAN: Objection.
16     A.   No. There could have been other --
17     Q.   Let me rephrase it. Let me withdraw
18 and rephrase the question. I will ask a different
19 one.
20     The only investigation about which
21 you are aware that would have taken place at NUS
22 is what is shown in Exhibit 2 for identification,
23 correct?
24     A.   No.
25     Q.   You know of other investigations?

Page 117

Amundsen

1
2 You can testify with personal knowledge about
3 other investigations going on internally at NUS
4 between November 15th and December 19th, 2006?
5     A.   Well, I was not privy to what went
6 on. So, okay, I cannot.
7     Q.   And nothing was turned over to the
8 rate department by you until December 13, 2006,
9 correct?
10     MR. GOODMAN: Objection.
11     Asked and answered.
12     Q.   Yes?
13     A.   Yes.
14     Q.   And then Mr. Hoffman turns it over
15 to Mr. Schnaer on the close of business on the
16 19th, correct?
17     MR. GOODMAN: Objection.
18     Asked and answered.
19     A.   Yes.
20     Q.   So is it fair to say that it is your
21 understanding that the information contained in
22 Exhibit 2 for identification was compiled by
23 Mr. Schnaer on December 20, 2006?
24     A.   Yes.
25     Q.   Now, what was the purpose of this

Page 122

Amundsen

1
2  needed to be taken. I don't see how our business
3  could survive if we were just recommencing
4  investigating.
5      Q.  Well, let's look at the heading. I
6  assume that the heading "Recommendation" is on the
7  template that you have at NUS; is that right?
8      A.  Right.
9      Q.  So that's a section of your reports
10 that is the section that contains what it is you
11 are advising the client to do, right?
12     A.  Yes.
13     Q.  And because your contract is written
14 that way, if the customer implements your
15 recommendation, whether NUS does it or not, the
16 customer owes a fee, right?
17     MR. GOODMAN:  Objection.
18     Q.  That's your understanding, isn't it?
19     MR. GOODMAN:  Objection.
20     A.  Yes.
21     Q.  Okay. The first sentence under
22 recommendation says, "NUS Consulting Group
23 recommends investigating this potential ongoing
24 overcharge." That's the recommendation, isn't it?
25     A.  No. The recommendation is

Page 123

Amundsen

1
2  everything that's bolded and underlined in that
3  section.
4      Q.  If you read on, Ms. Amundsen, and
5  the rest of it doesn't recommend anything, it just
6  says, "As detailed above, we estimate that in
7  addition to a refund of approximately $93,000 for
8  past overcharges, a correction of this ongoing
9  overcharge will result in annual savings of
10 approximately $372,000."
11     That sentence does not recommend any
12 action, does it?
13     A.  Yes. It recommends a correction.
14     Q.  Well, if there was an investigation
15 that found an error the correction would come
16 automatically, right?
17     A.  No, not always.
18     Q.  Let's take it step by step.
19     Your testimony is that the
20 recommendation here was not simply to investigate.
21 That's what you say?
22     A.  Yes.
23     Q.  Okay. The cost analysis report does
24 not identify the cause of the spike in usage at
25 the Manhasset store, correct?

Page 124

Amundsen

1
2      A.  Correct.
3      Q.  And, in fact, the day or the week --
4  withdrawn.
5      In fact, the week before
6  December 20, 2006 you were still asking the rate
7  department to look at this, right?
8      A.  Yes.
9      Q.  So at this stage you really didn't
10 know what an investigation would show, right?
11     A.  Right.
12     Q.  You hadn't investigated yet, right?
13     A.  Right.
14     Q.  So if Tiffany had opted to
15 investigate itself to look into the overcharge it
16 would be implementing NUS's recommendation, right?
17     A.  You mean subsequent to their receipt
18 of our report?
19     Q.  Correct.
20     A.  Yes.
21     Q.  So once Mr. Mogel was in possession
22 of Exhibit 2 for identification, Tiffany was no
23 longer free to investigate itself, correct?
24     MR. GOODMAN:  Objection.
25     MR. MITCHELL:  Let me rephrase

Page 125

Amundsen

1
2  it.
3      Q.  After the receipt of Exhibit 2 for
4  identification, your report, if Tiffany
5  investigated itself and received a refund, NUS to
6  your understanding would claim entitlement to a
7  fee because its recommendation had been
8  implemented, correct?
9      A.  Yes.
10     Q.  Now, in fact, isn't it true that on
11 November 16, 2006, when Mr. Mogel asked NUS to
12 investigate, that had you simply investigated then
13 and found out what the problem was, you still
14 would have been entitled to a fee? Right? Didn't
15 change anything, the report, did it?
16     MR. GOODMAN:  Objection to the
17 form.
18     A.  We hadn't formally made our
19 recommendation.
20     Q.  Well, Mr. Mogel is the one who asked
21 you to investigate on November 16th, right?
22     A.  Right. After we asked him if he
23 could give us a reason for the unusual spike in
24 consumption.
25     Q.  Right. He said, "Please

Page 178

```
1              Amundsen
2    volunteering it. She made a statement
3    and I was cautioning her and I was
4    instructing her not to make statements
5    regarding what she reviewed with me.
6         And I think she answered your
7    question, but go ahead. Go ahead. If
8    you have more questions about when she
9    read it, then be my guest.
10        MR. MITCHELL: Thank you.
11   Q.   This document contains headings
12   "Objective" and "Results." Are those part of the
13   template?
14   A.   It's the standard format of all
15   these Report On Client Contact memos.
16   Q.   When someone joins NUS, how do they
17   know to use this standard form of memorializing
18   client contacts or creating reports and
19   recommendations to clients?
20   A.   They are instructed.
21   Q.   By whom?
22   A.   Well, whoever trains them how to be
23   a consultant or how to be an account manager.
24   Q.   Did anybody ever tell you why you do
25   this, why you follow these standard forms for
```

Page 179

```
1              Amundsen
2    these kinds of things?
3    A.   It's company policy.
4    Q.   Did anybody ever tell you where the
5    policy came from or where there is such a policy?
6    A.   No.
7    Q.   Nobody ever told you. Did you ever
8    ask?
9    A.   No.
10   Q.   Was it done to assist in lawsuits?
11   A.   I never asked.
12   Q.   Is it your understanding that it's
13   done to help lawsuits?
14   A.   It's not my understanding that
15   that's the purpose of this.
16   Q.   It's not.
17   A.   The purpose of this is to keep an
18   exact record of what happens with the client.
19   Q.   In your Report On Client Contact,
20   this document does not say that Mr. Mogel agreed
21   to the payment of the estimated savings amount
22   that was contained in Exhibit 2 for
23   identification, correct?
24   A.   Correct.
25   Q.   And I assume if he had agreed and he
```

Page 180

```
1              Amundsen
2    had said, "I agree to pay that amount," you would
3    have reported that in your client contact, right?
4    A.   We don't -- It would have been very
5    unusual to -- for the conversation to be like
6    that.
7    Q.   Your Report On Client Contact, in
8    fact, says that he questioned the amount. Right?
9    A.   Right.
10   Q.   So, in fact, he did not agree to it.
11   Right?
12   A.   Right.
13   Q.   And you indicated in your report
14   that Mr. Mogel did not agree to the shared savings
15   on a going-forward basis, right?
16   A.   He asked us, "How is this going to
17   be handled going forward?" He was concerned.
18   Q.   Right. And he actually did not
19   indicate agreement to you, right?
20        MR. GOODMAN: Objection.
21   Q.   You would have said so if he had,
22   right?
23        MR. GOODMAN: Objection.
24   Asked and answered.
25   A.   I said what he said from what I
```

Page 181

```
1              Amundsen
2    recollected.
3    Q.   In fact, he says, quote --
4         Now, you have a sentence in here.
5    "I advised Bruce" -- referring to the onward
6    savings -- "that this was our standard business
7    model. That is, when a billing discrepancy
8    occurred and was corrected, we shared in any
9    refund to which the client was entitled and
10   subsequently billed for shared savings that
11   resulted with correcting the billing discrepancy."
12        You testified earlier that you had
13   never seen at NUS a circumstance where meters had
14   been mistagged, so what was the standard business
15   model that you are referring to here?
16   A.   When I referred to standard business
17   model I meant our contract.
18   Q.   So you did not know actually as you
19   wrote this memo whether in fact correction of a
20   mistagged meter for another customer constituted a
21   shared savings as a business model, right? You
22   didn't know that?
23        MR. GOODMAN: Objection.
24   A.   The business model I was talking
25   about was our contract terms.
```

Page 186

Amundsen

1
2  confused when you said "close quote."
3      Q.    And you do not say anywhere that he
4  agreed with you on the shared savings concept,
5  right?
6      A.    Right.
7      Q.    Now, you note in your memo --
8          Skimming down a sentence where the
9  sentence begins "However" you say -- your memo
10  says, "However, for the time being, he did not
11  want us to delay contacting the utility suppliers
12  and getting the problem corrected."
13          Was it your understanding that he
14  wanted you at least to get the problem corrected
15  and "We'll deal with the bill later"?
16      A.    Yes.
17      Q.    "Let's see what the problem is and
18  then we'll talk about it afterwards." Right?
19      A.    That's -- I wouldn't necessarily
20  agree to your exact words.
21      Q.    Generally is that it?
22      A.    Let's work on getting the problem
23  corrected, that was my priority.
24      Q.    And "We'll talk about the bill after
25  it's corrected," right?

Page 187

Amundsen

1
2      A.    Yes.
3      Q.    Yes?
4      A.    Yes.
5      Q.    Now, December 22, 2006 was a Friday.
6  Do you recall that?
7      A.    I believe it was, yes.
8      Q.    And, in fact, you tried to call LIPA
9  that day, right?
10      A.    Do you have a record that I did?
11      Q.    Do you recall?
12      A.    I just -- I probably did. I just --
13  I rely heavily on my own files and records.
14      Q.    Let me show you what has been marked
15  as Exhibit 10 for identification. This is an
16  e-mail at 3:29 p.m. on Friday, December 22, 2006
17  that you sent to Bruce Mogel.
18      A.    Okay. Yes, I confirmed that I
19  called LIPA on that day.
20      Q.    And they were closed for the
21  holiday, right?
22      A.    Yes.
23      Q.    So December 22, 2006 was the Friday
24  before Christmas weekend, right?
25      A.    Yes.

Page 188

Amundsen

1
2      Q.    Let me show you what has been
3  previously marked as Exhibit 7 for identification.
4  It is a letter dated December 22, 2006. Did you
5  send that letter on December 22, 2006?
6      A.    Yes.
7      Q.    Did you send it before or after you
8  made the phone call?
9      A.    I sent it before.
10      Q.    Why --
11      A.    No, excuse me. I'm sorry. I sent
12  it -- when I couldn't get anyone at LIPA I decided
13  to fax the letter over.
14      Q.    You didn't even have the name of
15  someone who was -- who you should talk to on this
16  account?
17      A.    No, not at that time.
18      Q.    So you just sent a letter to a
19  P.O. Box at Long Island Power Authority? That's
20  all you did?
21      A.    I believe I faxed it over to a fax
22  number I had for LIPA, because it takes too long
23  through the mail and I wanted to get something
24  over there.
25      Q.    You are saying it was a fax. I

Page 189

Amundsen

1
2  don't see any indication of a fax there. Do you?
3          MR. MITCHELL:  I don't recall.
4          Is there any document that was
5          produced with a fax cover sheet?
6          MR. GOODMAN:  I have no fax
7          cover sheet.
8      Q.    Is that just --
9      A.    I know how I handle the utility
10  companies and I don't ordinarily send things
11  through the mail to them, because at least with a
12  fax there is some record that it was received.
13      Q.    Well, no record of any sending by
14  fax or receipt by the power company of this letter
15  has been produced.
16      A.    Well, maybe the fact that
17  subsequently there is a response from the utility
18  shows that they received it.
19      Q.    Well, would you agree with me at
20  least that sending a letter to LIPA at a P.O. Box
21  does not indicate any specific, you know,
22  increased knowledge that NUS was bringing about
23  how to get this to the attention of the Power
24  Authority? Would you agree with me?
25      A.    No.

49 (Pages 190 to 193)

Page 190

Amundsen

1
2    Q.    You don't have a person you are
3    sending it to, you are just sending it to a
4    P.O. Box. Anybody can do that, can't they?
5        MR. GOODMAN: Objection.
6    A.    We are making a specific reference
7    to one of the accounts, giving them the account
8    number, the meter number, the address. If I
9    had -- I'm telling you, maybe we can check fax
10   records to see that this was faxed. I don't know
11   how far back the records go.
12   Q.    All right. I presume that you took
13   off for Christmas weekend like everyone else.
14   A.    Yes.
15   Q.    And you didn't work Christmas Day,
16   which was Monday.
17   A.    Right.
18   Q.    So Tuesday, December 26th is the
19   next business day after your conversation with
20   Bruce Mogel that was reflected in your notes,
21   correct?
22   A.    Yes.
23   Q.    And on that day you called LIPA and
24   spoke with a woman by the name of Cathy
25   Schwarting, right?

Page 191

Amundsen

1
2    A.    Yes.
3    Q.    When you were on the phone with
4    Ms. Schwarting, isn't it true that she pulled up
5    the records -- withdrawn.
6        After you contacted Ms. Schwarting,
7    isn't it true that she told you she pulled up the
8    billing records for both Tiffany and Ralph Lauren
9    and noted that Tiffany's usage seemed high and
10   Polo's seemed low?
11   A.    I think initially we were looking at
12   just Tiffany and then she might have also looked
13   at the Polo.
14   Q.    Didn't she also tell you in that
15   phone call that it looked like you might be
16   looking at a switched meter situation?
17       MR. GOODMAN: Objection.
18   A.    I don't recall the exact
19   conversation. I would have to read my own record
20   of it.
21   Q.    Do you remember discussing with
22   Ms. Schwarting the possibility that the meter for
23   Tiffany was switched with Polo in that
24   conversation on December 26, 2006?
25   A.    No.

Page 192

Amundsen

1
2        MR. MITCHELL: Let me have the
3    court reporter mark as Exhibit 50 a
4    printout that we received from LIPA of
5    contacts for information, I guess, on
6    the Tiffany and Company account in
7    Manhasset. These were produced
8    pursuant to subpoena that was
9    delivered to LIPA.
10       (Exhibit 50, document bearing
11   Bates numbers KS11 - KS14, marked for
12   identification, as of this date.)
13   Q.    Ms. Amundsen, I am handing you what
14   has been marked as Exhibit 50 for identification.
15   I presume you haven't seen this before.
16   A.    Right.
17   Q.    Is that correct?
18   A.    Right.
19   Q.    I would like to direct your
20   attention to the page Bates stamped KS14, which is
21   the last page of the document, and there are some
22   entries on December 26, 2006.
23   A.    Yes.
24   Q.    The first entry reading from the
25   bottom up says, "Issued field investigation

Page 193

Amundsen

1
2    billing does not appear correct since meter
3    change. Also checking for possible switched
4    meters on 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-2. Asking tech services to
5    expedite investigation. Contact Christine
6    (201)391-4300, extension 109. SPNB" -- which I
7    assume is suspend -- "billing until resolved."
8        First of all, is that phone number
9    listed there your phone number?
10   A.    Yes.
11   Q.    So did you give Ms. Schvarting your
12   phone number when you spoke with her on the phone?
13   A.    Yes.
14   Q.    And that's your extension?
15   A.    Yes.
16   Q.    Does that refresh your recollection
17   that the subject of the switched meters came up in
18   your conversation at that time?
19   A.    It refreshes my recollection that I
20   spoke with Cathy Schwarting and I remember her
21   telling me she was going to assign Lisa Quinn to
22   handle it.
23   Q.    You see the next entry above it
24   which mentions an L. Quinn?
25   A.    Yes.

50 (Pages 194 to 197)

Page 194

Amundsen
1
2    Q.   It says, "Suspend billing:
3    Elec:" -- which is standing for electric --
4    "Switched MTR" -- which stands for meter --
5    "Investigate C/S - Christine: Phone: KAS/RBS and
6    L. Quinn." Do you see that?
7    A.   Yes.
8    Q.   So does that refresh your
9    recollection that the reason Lisa Quinn was being
10   assigned was to look into a switched meter
11   situation?
12   A.   I thought the first thing they were
13   looking at was the meter multiplier situation, so
14   this seems earlier than my recollection of talking
15   about a switched meter.
16   Q.   Obviously we can get Schwarting in
17   to talk about this. Do you have any reason to
18   dispute that this is accurate?
19   A.   No.
20   Q.   The next entry says, "Correct
21   possible switched meter with R. Lauren Polo
22   account 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-8. Asking tech services to
23   expedite" -- "tech serv to expedite."
24        So there are three entries in LIPA's
25   records which reflect the subject of switched

Page 195

Amundsen
1
2    meters. In looking at that now, does that refresh
3    your recollection that Ms. Schwarting had pulled
4    up the Polo and Tiffany accounts and told you in
5    that conversation it looked like the meters were
6    switched?
7    A.   No. I remember having conversations
8    and I seem to recall the gist of the conversation
9    was the meter multiplier issue, that the wrong
10   multiplier had been applied to the meter.
11        MR. MITCHELL: Let me have the
12        court reporter mark as Exhibit 51 for
13        identification an e-mail from
14        Christine Amundsen to Arnold Frankel,
15        CC'ing David Brown, Paul Hoffman, Sean
16        Graham and Stephen Schnaer, Bates
17        stamped NUS88.
18        (Exhibit 51, document bearing
19        Bates number NUS00088, marked for
20        identification, as of this date.)
21   Q.   Ms. Amundsen, I have handed you what
22   has been marked as Exhibit 51 for identification.
23   Is that an e-mail that you wrote on December 26,
24   2006 at 1:34 p.m.?
25   A.   Yes.

Page 196

Amundsen
1
2    Q.   That was an e-mail that you sent
3    internally at NUS, correct?
4    A.   Yes.
5    Q.   And that was an e-mail you sent at
6    or around the time of your telephone call with
7    Cathy Schwarting of LIPA, correct?
8    A.   Yes.
9    Q.   And this memorandum was written on
10   the same day as the notes that we looked at that
11   are reflected in the LIPA records that are part of
12   Exhibit 50 for identification, correct?
13   A.   Yes.
14   Q.   Now, why were you writing to Arnold
15   Frankel about this?
16   A.   Because I think Arnold became aware
17   of the fact that we were investigating this for
18   Tiffany.
19   Q.   Between Friday the 22nd and Tuesday
20   the 26th you became aware?
21   A.   Yes.
22   Q.   Who made him aware? Did you tell
23   him?
24   A.   I went to talk to him after I had my
25   conversation with Bruce.

Page 197

Amundsen
1
2    Q.   Isn't it unusual for Mr. Frankel to
3    be involved in a resolution of a problem for a
4    customer?
5    A.   No.
6    Q.   Not unusual at all?
7    A.   No.
8    Q.   What was the purpose of your writing
9    this e-mail?
10   A.   To update everyone on what I had
11   discussed with LIPA and what LIPA was going to do
12   Q.   And you say in your e-mail that
13   "When I gave her the details of the Tiffany
14   account she looked at her screen and then advised
15   she would call right back. Subsequently, she
16   called and relayed the following:"
17        Does that refresh your recollection
18   that she pulled up the account for Tiffany on her
19   screen?
20   A.   Yes.
21   Q.   Does it also refresh your
22   recollection, looking at this e-mail, that she
23   pulled up the Ralph Lauren account?
24   A.   Yes.
25   Q.   So you say under your first bullet,

Page 278

Amundsen

1
2  information and belief, at no time prior to
3  receipt of the report was Tiffany aware of the
4  overcharges or the ongoing billing error for
5  electric service purchases at the Manhasset
6  store."
7        The report is defined in this
8  complaint as the report and recommendation dated
9  December 20, 2006. You can see that in
10 Paragraph 45. Go back to Paragraph 45. You will
11 see the definition of "report."
12    A.    45?
13    Q.    Yes.
14    A.    (Witness reviewed document.)
15    Q.    Paragraph 57 is not true. Isn't
16 that right?
17    A.    They were aware that there was a
18 spike in the usage.
19    Q.    Because you told them on
20 November 15, 2006, right?
21    A.    Yes.
22    Q.    And that was five weeks before
23 Tiffany got the report, right?
24    A.    Yes.
25    Q.    Now, when you notified Tiffany in

Page 279

Amundsen

1
2  November -- on November 15, 2006 about the spike
3  in usage, that was the first bill in which a spike
4  had occurred, right?
5    A.    Yes.
6    Q.    So as soon as NUS became aware of
7  the spike you notified Tiffany immediately, right?
8    A.    We asked them about it, yes.
9    Q.    And Tiffany as a regular practice
10 sent its utility bills to NUS be put on the NUS
11 direct system, right?
12    A.    Yes.
13    Q.    So on November 16, 2006, Mr. Mogel
14 asked you to investigate the overcharge, right?
15    A.    Yes.
16    Q.    Paragraph 58 says, "Upon information
17 and belief, at no time prior to the receipt of the
18 report had Tiffany taken any action to obtain a
19 refund of the overcharges for electric service
20 purchases or a correction of the electric service
21 bills for the Manhasset store to avoid future
22 overpays."
23        That's not true either, is it?
24 Mr. Mogel asked you on November 16, 2006 to
25 investigate this for Tiffany, right?

Page 280

Amundsen

1
2    A.    He asked me to investigate it.
3    Q.    Right. So he did take action. As
4  soon as you told him, the next day he said,
5  "Investigate." Right?
6    A.    Yes.
7    Q.    And Paragraph 59 alleges, "Upon
8  information and belief, at no time prior to
9  receipt of the report was Tiffany aware that its
10 electric service meter at the Manhasset store had
11 been replaced by LIPA."
12        Isn't it true that even you weren't
13 aware until the issuance of the report that the
14 meter had been changed at the Manhasset store?
15    A.    Yes.
16    Q.    Now, Paragraph 54 of the complaint
17 alleges "As a result of NUS's efforts as set forth
18 above, it obtained refunds for Tiffany totaling
19 approximately $67,021.58 for overcharges on its
20 electric service at the Manhasset store."
21        Is that true?
22    A.    Yes.
23    Q.    Now, putting aside this unique
24 situation that you had never seen before in any
25 relationship with a NUS customer, can you identify

Page 281

Amundsen

1
2  for me what is a more typical circumstance where
3  NUS would recover from a customer a percentage of
4  a refund and an ongoing savings? What is the most
5  typical way that happens?
6    A.    One of the most typical ways is when
7  we identify a spike in a demand where there is a
8  clause or provision in the utility company rate
9  that should you reach that level, then it's
10 ratchetted, and you have -- going forward, they
11 would bill you at a higher level for a certain
12 period of time.
13        So we would identify the problem,
14 make the recommendation to investigate it and if
15 in fact it was an unusual spike in demand and it
16 was an error, then the utility would provide a
17 refund and then going forward we would bill the
18 client for the ongoing savings.
19    Q.    What would the ongoing savings there
20 be?
21    A.    It would depend on the amount the
22 utility charged per KW. It would depend on how
23 high the spike went. It depended on a few
24 different things.
25    Q.    So there would be a change in rate

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x
NATIONAL UTILITY SERVICE, INC.,          :

        Plaintiff,                        :

                         :

        -against-                          :

TIFFANY & CO. and                        :
TIFFANY AND COMPANY,                     :

        Defendants.                       :
- - - - - - - - - - - - - - - - - -x


       DEPOSITION of National Utility Service, Inc.,
by DAVID M. BROWN, taken by Defendants at the offices
of Dreier LLP, 499 Park Avenue, New York, New York on
Wednesday, March 5, 2008, commencing at 10:11 a.m.,
before Elizabeth Santamaria, a Certified Shorthand
(Stenotype) Reporter and Notary Public within and for
the State of New York.

Page 46

Brown
1
2  of NUS to interface with Tiffany in an issue on
3  the fee as the person who is charged with "primary
4  responsibility in the area of client relations"?
5       A.  I believe my boss took an interest
6  in all of this and he decided that he wanted to
7  lead or head those discussions.
8       Q.  When did that happen?
9       A.  I don't recall it being any kind of
10 a day where he anointed himself as being the
11 person that was going to lead, but three of us
12 went. Arnold attended the meeting as well, and
13 Arnold is my boss.
14      Q.  Was that the first time that you
15 heard that Tiffany objected to the savings
16 component of the fee?
17      A.  I don't recall.
18      Q.  So is it fair to say that the, I'll
19 call it, "client relations" aspect of the dispute
20 between Tiffany and NUS over the savings component
21 of the fee was taken out of your hands by
22 Mr. Frankel?
23      A.  No.
24      Q.  Did you try to understand before
25 that meeting what Tiffany's objection was?

Page 47

Brown
1
2       A.  My recollection is that we were not
3  going to that meeting with the intention of
4  discussing a dispute, but rather we were going to
5  this meeting to discuss, you know, everything that
6  had taken place and, you know, just meeting with a
7  client, if you will.
8       Q.  You knew going into that meeting
9  that NUS was looking for a fee close to
10 $1 million, right?
11      A.  I knew we were going to that meeting
12 with the understanding that we were going to share
13 in the refund and the savings. I don't know
14 whether or not I put it in the frame, "I'm looking
15 for $1 million."
16      Q.  That's what NUS was looking for,
17 right?
18      A.  Yes, I believe in our complaint that
19 is what we are seeking. But your question was
20 what my frame of mind was when I walked into the
21 meeting. I don't recall having that in my mind at
22 that time.
23      Q.  So your testimony is that you're
24 going to a meeting in which NUS is looking to
25 justify the amount it's looking to charge its

Page 48

Brown
1
2  client and you never thought about how much that
3  actually was? Is that what you are saying?
4            MR. GOODMAN:  Objection.
5       A.  I did not testify that I am going to
6  this meeting to justify anything. We're going to
7  this meeting to meet with one of our clients.
8            I mean Tiffany was -- you know, was
9  considered a longer tenured client of ours. It
10 was an important client of ours. We were within
11 30 miles of their office, if you will. And Arnold
12 I believe made the decision that we should go in
13 there as the people that worked on this issue and
14 we should, you know, go over it.
15            It was a big ticket item. I could
16 tell you that. And we didn't feel that, you know,
17 it was just -- it just warranted us to stick a
18 bill in the mail and sending it off to them but
19 rather to go in and meet with them and discuss all
20 the things that we had done and how we were going
21 to proceed from this point on. But it wasn't
22 going in there to have a dispute.
23      Q.  What research did you do to prepare
24 yourself for that meeting?
25      A.  I don't recall.

Page 49

Brown
1
2       Q.  Were you aware when you went to that
3  meeting that the fee NUS was proposing to charge
4  was -- I'll use the word considerably larger than
5  any fee NUS had ever charged Tiffany throughout
6  the prior 15 years of the parties' relationship?
7  Did you know that?
8       A.  I don't recall if I knew it was the
9  largest. It was a large fee. I understood it to
10 be that. I didn't understand it to be the largest
11 fee.
12      Q.  Did you -- so you were not aware
13 that there was never a fee that NUS had charged
14 Tiffany that came anywhere close to the size of
15 the fee that NUS was proposing to charge for the
16 circumstances?
17      A.  If your question is whether or not I
18 reviewed all the savings past and current at that
19 point, no, I did not.
20      Q.  By the time of that meeting, did you
21 know what the billing problem at Manhasset had
22 been that caused NUS to get involved?
23      A.  Yes.
24      Q.  So all of the investigation into
25 what the problem was had been completed, right?

Page 62

Brown

1
2       Q.   And the actual usage amount that
3   ultimately became the baseline for the refund was
4   consistent with the actual usage amount that
5   Tiffany had at the Manhasset store before the
6   error occurred, right?
7       A.   Taking into account seasonal
8   variations, yes.
9       Q.   Now, if we take the usual amount as
10  a baseline and the heightened amount, the
11  heightened erroneous amount, as the top number,
12  the refund of the difference between the
13  heightened amount and the baseline amount would
14  constitute, if I understand it by NUS's
15  allegations in the complaint, the refund component
16  of its claim.  Is that correct?
17              MR. GOODMAN:  Objection.
18      A.   No, not exactly.
19           The January bill that was issued by
20  LIPA, and Con Ed Solutions had issued one, too,
21  was issued but that was an erroneous period, if
22  you will.  But NUS is not claiming that January
23  period as part of the refund period.
24      Q.   Tiffany didn't pay that bill, right?
25      A.   No.  We instructed them not to pay

Page 63

Brown

1
2   that bill.
3       Q.   So the only portion of the claim
4   that NUS identifies as the refund portion is the
5   difference between what Tiffany paid for
6   heightened usage and what it should have paid, had
7   it been getting bills for its own usage; is that
8   correct?
9       A.   Right.  It's for the period of seven
10  bills that Tiffany had received an erroneous bill
11  and Tiffany had made payment on those erroneous
12  bills.  I believe it's seven.
13      Q.   The savings component of NUS's
14  claim, as I understand it, is that NUS is
15  operating under an assumption that by obtaining
16  the refund for Tiffany, it also achieved for
17  Tiffany a going-forward savings.  Isn't that
18  right?
19      A.   Yes.
20      Q.   So the assumption in NUS's claim for
21  a savings component of its fee is that Tiffany
22  would have paid bills reflecting heightened usage
23  at the Manhasset store but for NUS's assistance;
24  is that correct?
25      A.   I don't know if the word

Page 64

Brown

1
2   "assumption" is used.  The going-forward basis of
3   us participating in the savings is as a result of
4   the implementation of a recommendation which has
5   resulted in the lessening of a charge that Tiffany
6   is receiving on a going-forward basis.  I don't
7   know -- I'm just having difficulty with this word
8   "assumption."  Our claim is rooted within the
9   contract that we have.
10      Q.   First of all, the contract doesn't
11  define in any way, shape or form this
12  circumstance.  Would you agree with me?
13      A.   Mistagging of meters?
14      Q.   Correct.
15      A.   No, it doesn't.
16      Q.   And whether in fact the mistagging
17  of meters constitues a savings under the contract
18  is not clearly spelled out in your contract,
19  correct?
20      A.   I believe there is an understanding
21  in the contract that when you achieve a savings
22  for a client wherein they are not paying as much
23  on a going-forward basis as a result of the
24  implementation of a recommendation that we have
25  submitted, we participate in that savings.

Page 65

Brown

1
2       Q.   But whether something constitutes a
3   savings or not is the dispute in this case.  Isn't
4   that what we are fighting over?
5       A.   I believe that's why we are all here
6   today.
7       Q.   So you would concede to me, would
8   you not, that there is nothing expressly written
9   in your contract that would say that correcting an
10  erroneous mistagging of meters is not only a
11  refund, but also a savings?  There is nothing
12  expressly in the contract.
13      A.   I will concede to you that the words
14  "mistagging of meters" does not exist in the
15  agreement.
16      Q.   So would you also agree with me that
17  the word "savings" means that I am providing
18  something to you that causes you to pay less than
19  you otherwise would be paying?
20      A.   Your savings is as a result of the
21  implementation of our recommendation, which causes
22  you to pay less.
23      Q.   Is it your experience, Mr. Brown,
24  that this never would have been caught by anyone?
25  I mean, isn't that silly?

Page 70

```
 1              Brown
 2   the scope of our review and if implement it, we
 3   get paid on it.
 4        Q.  I am going to read you Paragraph 1
 5   of your contract.  It says, "We hereby authorize
 6   you to submit recommendations for savings and
 7   refunds on our costs of electricity, gas, oil and
 8   petroleum products, water, sewage, steam and
 9   telecommunications.  You will analyze our costs
10   and advise us where refunds and reductions can be
11   obtained."
12        Isn't the intent of this agreement
13   that NUS is looking for utility savings that can
14   be achieved by customers on a going-forward basis
15   by obtaining for them better rates or other
16   efficiencies that will lower their cost for power?
17   Isn't that what this contract is really about?
18           MR. GOODMAN: Objection to the
19   form.
20        A.  No.
21        Q.  So you believe this contract is
22   about also --
23        Let me rephrase that.  Withdrawn.
24        You would concede to me, would you
25   not, that this contract does not assume that
```

Page 71

```
 1              Brown
 2   customers are receiving bills for other parties'
 3   usage, right?
 4           MR. GOODMAN: Objection.
 5        Calls for a legal conclusion.
 6        A   This contract does take that into
 7   consideration because it's our cost.
 8        Anything that reflects their cost of
 9   the commodities that you have described that
10   result in them making overpayments that are
11   eliminated or reduced or what have you, but as a
12   result of implementing our recommendation, is
13   subject to our participation under this agreement.
14        Q.  If there is a refund you participate
15   in the refund, right?
16        A.  If there is a one-time refund, if
17   there is a defined period of time wherein an error
18   occurred and did not occur on a going-forward
19   basis and we are able to secure a refund or a
20   credit for a client, we would participate in that
21   refund.
22        Q.  So the key is did not occur on a
23   going-forward basis?  Is that the key?
24        A.  It's what is collected back as far
25   as any erroneous payments are made, as well as any
```

Page 72

```
 1              Brown
 2   forward payments.
 3        Q.  You used a reduction in costs on a
 4   going-forward basis.  That was I think what you
 5   said, right?
 6        A.  That would be a savings, yes.
 7        Q.  Fine.
 8        I know you want to take a break.
 9   Give me two seconds here.
10        You understand that NUS identified
11   to Tiffany the spike in usage on the first bill,
12   right?
13        A.  I believe we also identified there
14   were other periods of time in the report that they
15   were overpaying on their charges.
16        Q.  Please.  I know you want to say what
17   you want to say, but I am going to persist.
18        A.  You are limiting -- the report --
19        Q.  The first notification from NUS came
20   after NUS saw the first bill with the spike.
21   Isn't that right?
22        A.  I believe, yes.  Christine had --
23        Biancho had noticed the spike,
24   communicated that to Christine Amundsen, who
25   inquired with Bruce Mogel as to this potential
```

Page 73

```
 1              Brown
 2   spike in November of 2006.
 3        Q.  And the following day Bruce Mogel
 4   asked Christine Amundsen to investigate.  You know
 5   that, right?  You saw the e-mail?
 6        A.  I believe, yes
 7        Q.  So it was at the time Mr. Mogel
 8   asked Christine to investigate a one-time event,
 9   right?
10        A.  No.
11        Q.  It only became a one-time -- it only
12   became a multi-time event because NUS did not
13   immediately investigate.
14        A.  No.
15           MR. MITCHELL: All right.  We
16   can take a break.
17        (Recess taken.)
18        Q.  Would you please, Mr. Brown, would
19   you take a look at Exhibits 4 and 5 for
20   identification.
21        Mr. Brown, I have handed you what
22   has been marked as Exhibits 4 and 5 for
23   identification.  Those are e-mails in which you
24   are not shown as a recipient but they have been
25   marked previously at other depositions.
```

Page 90

Brown
1
2   services that were provided by NUS under that
3   agreement, right?
4       A.  I believe so, yes.
5       Q.  So putting aside whether this
6   particular investigation falls under the agreement
7   itself, at a minimum Tiffany was a paying customer
8   of NUS for some services during the period of
9   time, November 16, 2006 forward.  Right?
10      A.  Yes.
11      Q.  So as a customer of NUS, it asks its
12  utility consultant to investigate the problem
13  immediately, right?
14          MR. GOODMAN: Objection.
15      Q.  Investigate.  Investigate the
16  unusual usage pattern immediately.
17          MR. GOODMAN: Objection.
18      Q.  Right?
19      A.  No.
20      Q.  The next day?
21          MR. GOODMAN: Objection.
22      A.  Mr. Mogel did not use the word
23  "immediate" or "immediately."  He said, "Please
24  investigate LIPA involvement."  You are
25  mischaracterizing what Mr. Mogel had written back.

Page 91

Brown
1
2       Q.  I'm sorry, Mr. Brown, but I see an
3   e-mail from Ms. Amundsen at 4:28 p.m. on Wednesday
4   November 15, 2006, advising of the "unusual usage
5   pattern" and asking whether there was anything
6   going on at the store that might account for the
7   "unusual usage pattern."  Right?
8       A.  Sure.
9       Q.  Mr. Mogel, Exhibit 5 shows that he
10  received that e-mail.  It was sent by Ms. Amundsen
11  at 4:28 p.m. At 4:34 p.m., Mr. Mogel is
12  canvassing people internally at Tiffany to see
13  whether they can answer Ms. Amundsen's question
14  about whether there was anything unusual going on
15  in the store.  Right?
16      A.  It appears that he did reach out to
17  other people within Tiffany regarding Christine's
18  e-mail, yes.
19      Q.  Within minutes, right?
20      A.  Yes, within minutes.  And it does
21  cover into the next day as well, the next morning.
22      Q.  And by 1:01 p.m. he's responding to
23  Ms. Amundsen that she should investigate the
24  involvement and forwarding to her all of the
25  responses from the people he canvassed to show

Page 92

Brown
1
2   that there was no unusual usage pattern or there
3   was no activity at the store that would account
4   for an unusual usage pattern.  Right?
5       A.  Yes.
6       Q.  So I assume you would at least agree
7   with me that he did not sit on this for a long
8   period of time, right?  Mr. Mogel.
9       A.  I will agree that he responded the
10  next day at 1:01 in the afternoon.
11      Q.  Right.  And he asked NUS to do
12  something.  He asked a -- a customer asked NUS to
13  do something the next day, right?
14          MR. GOODMAN: Objection.
15          MR. MITCHELL:  I will rephrase
16      the question.
17      Q.  The next day when he gets back to
18  NUS, your customer asked your company to do
19  something, correct?
20      A.  Yes.
21      Q.  And you didn't do it right away, did
22  you?
23      A.  Right away?
24      Q.  Well, anywhere close to as quickly
25  as Mr. Mogel got back to Ms. Amundsen with a

Page 93

Brown
1
2   response.
3       A.  Your question is assuming
4   Mr. Mogel's querying of other people within
5   Tiffany is equal to what Christine needed to do
6   thereafter.
7       Q.  The recommendation that NUS
8   ultimately makes to Tiffany on December 20, 2006
9   has a recommendation that the first thing that NUS
10  will do is contact the utility, right?
11      A.  Without having the document in front
12  of me, I believe yes, that is what is said.
13      Q.  And Ms. Amundsen testified --
14  withdrawn.
15          Ms. Amundsen is a direct report to
16  you, right?
17      A.  Yes.
18      Q.  So her day-to-day activities are
19  managed by you, right?
20          MR. GOODMAN: Objection.
21      A.  Not her day-to-day activities.  I
22  mean I'm not reviewing every minute of her day,
23  but she is a direct report to me.
24      Q.  And she testified that you have
25  weekly meetings with the consultants in your

Page 98

Brown

1    Brown
2    remember about these internal discussions.
3        A.    The one that I do remember was when
4    LIPA came back and told us that the problem
5    existed as a result of a meter multiplier, and I
6    remember reviewing the bills with Christine and I
7    believe also Paul Hofmann and I was coming or we
8    were coming to the conclusion that the corrective
9    action that they were suggesting was a
10   misdiagnosis, if I were to use my earlier
11   testimony. I don't think I used the word
12   "misdiagnosis" during the meeting, but it
13   didn't -- it didn't seem right. It wasn't right.
14   It just wasn't adding up.
15       Q.    And how did you get involved in
16   those discussions? Do you recall?
17       A.    I don't recall specifically how I
18   became involved in these discussions, no.
19       Q.    Did Ms. Amundsen or Mr. Hofmann
20   bring you into the discussion to get another set
21   of eyes on the papers or was it something else?
22       A.    Again, I don't recall. I may have
23   approached them, they may have approached me. I
24   don't know.
25       Q.    Well, if you approached them

Page 99

1    Brown
2    wouldn't that assume that you knew something about
3    it before then?
4        A.    And as I testified, I mean I do -- I
5    don't remember the first time that I became
6    involved in it but I do remember this one meeting.
7    So, yes, it would presuppose that I knew about it
8    before. Or I may not have and then just brought
9    it to --
10       No, I did know about it before. I
11   just don't know when.
12       Q.    So what is the first thing you
13   remember having learned about this?
14       A.    I don't recall.
15       Q.    You were not someone throughout most
16   of this period who was dealing directly with this
17   problem, right?
18       A.    I was dealing directly with this
19   problem for a period of time, yes.
20       Q.    We went through that already. The
21   period of time where Ms. Amundsen was sick and you
22   stepped in for those few days, correct?
23       A.    Correct.
24       Q.    Other than that, you were not
25   dealing with the problem and the resolution of the

Page 100

1    Brown
2    problem on a day-to-day basis, right?
3        A.    I don't recall. I may have been
4    dealing with it on a day-to-day --
5        Look, this is an area of my
6    responsibility and I may have wanted to be updated
7    on a day-to-day basis on this. I may have kept in
8    touch on it. I just don't recall how many times I
9    dealt with it or when the first time I became
10   aware of it.
11       Q.    "May have been involved" doesn't say
12   whether you were. Is your answer when you say you
13   may have been involved you don't remember?
14       A.    I was involved in this.
15       Q.    So I want to know everything --
16       We already talked about the dealings
17   with Larry from Albertson's when Christine was
18   out. Other than that, you said that you also
19   recall a meeting and conversation with
20   Ms. Amundsen and Mr. Hofmann looking at the
21   changed multiplier and concluding that that was
22   not the resolution of the problem, right?
23       A.    No. We were looking at the
24   explanation that LIPA was putting forth as the
25   problem and I remember looking at the bills with

Page 101

1    Brown
2    Ms. Amundsen and Mr. Hofmann. As I testified
3    before, I have a rate background or I have worked
4    with utility bills quite extensively within the
5    company.
6        Q.    So other than those two
7    circumstances, what else do you remember
8    specifically doing in connection with the
9    Manhasset problem that Tiffany had?
10       A.    I remember directing Christine
11   that -- after we looked at all of this is -- I
12   asked her to reach out to Tiffany to see whether
13   or not they had any kind of a connected load study
14   or connected load plan for the Manhasset store
15   that may explain the load profile or the load at
16   the store. The explanation that was being
17   provided from LIPA was only addressing the
18   specific amount of the usage. It wasn't
19   explaining the demand.
20       Q.    So other than that, now we have
21   three things. Anything else that you remember
22   specifically?
23       A.    Outside of my conversations when
24   Christine was taken sick?
25       Q.    You have now identified three: The

Page 122

```
1                    Brown
2      looking for?
3         A.   Here we go.
4      No.
5         Q.   "No" what?
6         A.   "No" to your question.
7         Q.   Why is it "No"?
8         A.   It wouldn't have been the first time
9   that she was acting on the comment that she had
10  received back from Mr. Mogel.
11        Q.   Because she had tried to reach them
12  on Friday, the 22nd? Is that why you are saying
13  that?
14        A.   No.
15        Q.   What was the reason?
16        MR. GOODMAN: I think he might
17      have misheard the question. I think
18      he is confused.
19        Q.   The suggested action in the cost
20  analysis report is "We will initially approach the
21  provider to review this matter and correct your
22  billings." That was going to be the first thing.
23  We went through that before.
24        Do you recall that?
25        A.   Yes, that I recall.
```

Page 123

```
1                    Brown
2         Q.   Okay, good.
3         So Ms. Amundsen tried to speak with
4   someone at LIPA on Friday, December 22nd, in the
5   afternoon but they had left early for the holiday.
6   Do you recall that?
7         A.   Yes.
8         Q.   So the first substantive day of
9   communication with LIPA would be Tuesday,
10  December 26, 2006, correct?
11        A.   Correct.
12        Q.   That's the day she first spoke with
13  Ms. Schwarting, right?
14        A.   I believe so, yes.
15        Q.   And this e-mail in which you are
16  CC'd is also dated December 26, 2006 at
17  10:46 a.m., right?
18        A.   Correct.
19        Q.   So on the Tuesday after Christmas
20  weekend at 10:46 a.m. you are now being copied on
21  an e-mail that Ms. Amundsen is sending to
22  Mr. Frankel, right?
23        A.   Yes.
24        Q.   You said earlier that Mr. Frankel
25  became personally involved in the Tiffany matter
```

Page 124

```
1                    Brown
2   at some point, so that it was not — you were not
3   the primary person responsible for the client
4   relationship. Do you remember that?
5         A.   I don't recall those exact words
6   being expressed but I do recall Arnold was
7   involved in this matter, yes.
8         Q.   This e-mail is to Mr. Frankel
9   telling him that NUS had spoken with the billing
10  supervisor at LIPA. Do you see that?
11        A.   Yes.
12        Q.   Why would something like that be
13  sent to Mr. Frankel?
14        A.   You have to ask Mr. Frankel. But --
15        I'm not going to assume anything.
16  Arnold is the general manager within the office.
17  Again, I don't know why Christine would have sent
18  this to Arnold Frankel.
19        Q.   Did you ever ask her?
20        A.   No.
21        Q.   Did you ever tell her that "You'd
22  better send this stuff to Arnold and keep him
23  involved in the Tiffany matter"?
24        A.   No.
25        Q.   She was a direct report to you,
```

Page 125

```
1                    Brown
2   right?
3         A.   As she is currently, yes.
4         Q.   And you do not know, as you sit here
5   today, why she would send this kind of
6   communication to Mr. Frankel on the first
7   substantive communication she was having with LIPA
8   about the Tiffany matter?
9         A.   No. She's free to send an e-mail to
10  whomever she wants within the company.
11        Q.   You are CC'd on this, too. This is
12  the first time I see your name on any e-mail as
13  well. Do you see that?
14        A.   I see that I am copied on this.
15        MR. GOODMAN: Objection.
16        Q.   I am unaware of an earlier
17  communication involving the Manhasset billing
18  issue, which shows you as receiving an e-mail.
19  Are you aware of anything earlier than this?
20        A.   I don't recall.
21        Q.   Why were you CC'd on this?
22        A.   Probably because, you know,
23  Christine reports to me and she wanted to keep me
24  in the loop.
25        Q.   Well, you don't have a specific
```

Page 126

Brown

1
2  recollection of being involved in creating the
3  cost analysis report, but then by the following
4  Tuesday you're in the loop on something that you
5  have no recollection of having been in the loop on
6  before. Can you explain that at all?
7      A.  I don't think there is a need to
8  explain. I mean she was a direct report of mine.
9  I believe I testified that I was aware of this. I
10 don't know when I specifically was aware and I
11 also testified that I may have been involved in
12 the creation of the report. I just don't have a
13 recollection of it, but —
14     Q.  But you are doing the best you can
15 to give me your complete knowledge today of
16 everything you remember.
17     A.  I'm doing the best I can to tell you
18 the truth.
19     Q.  And to give me the benefit of
20 everything you can honestly remember as you are
21 sitting here today, correct?
22     A.  That's correct.
23     Q.  And as you are sitting here today,
24 you have no recollection of why Ms. Amundsen was
25 reporting to Mr. Frankel about her first

Page 127

Brown

1
2  communication with LIPA concerning the Manhasset
3  store, right?
4      A.  I don't know why she sent it to
5  Arnold. I don't see anything usual in her sending
6  it to Arnold either.
7      Q.  Did you ever discuss with Arnold
8  Frankel that he told her, "I want you to keep me
9  fully informed of everything you do for Tiffany in
10 Manhasset"?
11     A.  I don't recall that discussion.
12     Q.  Did you ever have any discussion
13 with Mr. Frankel about him wanting to be
14 personally involved in the resolution of the
15 Tiffany billing issue at Manhasset?
16     A.  I recall that Arnold wanted to
17 attend the meeting in late January, early
18 February. I think it was late January of '07,
19 that he wanted to attend that meeting. I think
20 there was some suggestion that it was just going
21 to be Chris and I to go and Arnold said, "No, I
22 would like to go as well." He wanted to come
23 along.
24        But I don't recall Arnold saying,
25 you know, "I want to know every moment of this

Page 128

Brown

1
2  account as it occurs."
3      Q.  Let me show you what has been
4  previously marked as Exhibit 51 for
5  identification. It's an e-mail also from
6  December 26, 2006, but at 1:34 in the afternoon.
7  Do you see that?
8      A.  Yes.
9      Q.  That's an e-mail that you also
10 received a CC of, right?
11     A.  Yes.
12     Q.  And that's an e-mail from
13 Ms. Amundsen to Mr. Frankel providing more
14 information about what she learned in her
15 conversation with Ms. Schwarting, right?
16     A.  Yes.
17     Q.  Now, and you were —
18        Do you have any explanation of why
19 so many people are in the loop on this situation?
20        MR. GOODMAN: Objection.
21        MR. MITCHELL: I will rephrase
22        it.
23     Q.  Do you have any reason why so many
24 people are being provided with detailed
25 information from Ms. Amundsen about what she was

Page 129

Brown

1
2  doing with LIPA in connection with the Tiffany
3  store in Manhasset?
4      A.  I wouldn't classify this as being so
5  many people. I mean there are five people. There
6  is Arnold, there is myself, Paul Hofmann and Steve
7  Schnaer. I wouldn't characterize this as being so
8  many people or unusual in any way.
9      Q.  Well, we have Mr. Frankel as the
10 person to whom this information is being sent. He
11 is the executive vice president, it says on your
12 website, "with primary responsibility for the
13 general management of the United States
14 operations."
15     A.  Correct.
16     Q.  Right?
17     A.  Correct.
18     Q.  Other than the Soultanians
19 themselves, he is the highest officer in the
20 company, right?
21     A.  No.
22     Q.  The Soultanians are both
23 co-presidents, right?
24     A.  Right.
25     Q.  And he is the only executive vice

Page 166

Brown

1
2    Q.    So you walked out of the meeting and
3  dismissed what Mr. Palfini was saying out of hand.
4  Is that it?
5    A.    I remember walking out of the
6  meeting feeling that, you know, we were at a
7  difference of opinion as to the application of our
8  agreement.
9    Q.    And it was your opinion that the
10  "correction of the ongoing billing error" should
11  result in NUS being paid a fee equal to 50 percent
12  of the amount of that billing error brought out
13  for a period of 60 months by a formula using
14  60 months, correct?
15        MR. GOODMAN: Objection.
16    Q.    Let me rephrase that.  That was
17  inartful.
18        Your contract requires in
19  circumstances where there is a refund a payment of
20  a fee to NUS of 50 percent of the refund, correct?
21    A.    Correct.
22    Q.    And if there is a savings, a payment
23  of 50 percent of the savings calculated over a
24  60-month period, correct?
25    A.    Yeah.  Those two components can

Page 167

Brown

1
2  exist within the agreement, yes.
3    Q.    The savings component would
4  contemplate a fee to NUS based upon an assumption
5  that the client will realize the benefit of the
6  savings for a 60-month period and, therefore,
7  shares half of that amount with NUS as a fee.
8  Correct?
9    A.    As I testified before, I don't
10  consider it to be based upon an assumption.  I
11  base it upon the fact that a correction is made
12  and on a forward basis, if you will, they are not
13  paying the ongoing billing error and as a result
14  that would constitute a savings under the
15  agreement.
16    Q.    What happens in a circumstance where
17  you negotiate a reduced rate for a customer and
18  the rate only remains reduced for a period of
19  12 months and then goes back up after 12 months?
20  How much is NUS paid as a fee in that
21  circumstance?
22        MR. GOODMAN: Objection.
23    A.    Are we speaking entirely under a
24  contingency arrangement?
25    Q.    Under the contract that Tiffany has.

Page 168

Brown

1
2        There is testimony in the record
3  that there were circumstances where rates went
4  back up after they had been reduced and NUS did
5  not recover a full 60 months of reduced fees.  Is
6  it your practice at NUS to collect 60 months of
7  fees on a going-forward basis even if the rate
8  does not remain reduced for the full 60 months?
9    A.    No.
10    Q.    What is your practice in that
11  circumstance?
12    A.    If the result of the recommendation
13  that is implemented goes away, we would not
14  continue to participate in the savings.
15    Q.    So if I understand your answer
16  correctly, you look at what actually happens
17  during that 60-month period in determining whether
18  the entirety of the 60-month period is paid as a
19  fee, 50 percent of that savings as a fee, right?
20    A.    The savings is reviewed on the
21  period in which billing would be issued, in most
22  cases on a monthly basis.
23    Q.    Isn't it fair to say that in the
24  circumstance of NUS's claim in this case to
25  50 percent of the item identified as "savings" in

Page 169

Brown

1
2  Paragraph 61 of the complaint, that the assumption
3  is that this billing error would not have been
4  discovered for 60 months?
5    A.    No.  It assumes that the conditions
6  that measure a savings is still in existence
7  during that month period and whether or not during
8  the specific 60 months --
9        To give you an example is to give
10  you if all of a sudden a year down the line LIPA
11  mistags these meters again and result in Tiffany's
12  increase in their bill as a result, let's say that
13  happens during month 36, we wouldn't participate
14  any more because they are paying based upon Polo's
15  usages or the usage as recorded by that particular
16  meter.
17    Q.    But in making a claim for a fee
18  based on 60 months of projected savings as a
19  result of correcting the mistagged meters here
20  there is no opportunity, because of the fact that
21  now the meter was corrected, to ever know when in
22  fact either Polo or Tiffany would have discovered
23  the error if NUS hadn't identified it right away
24  first.  Right?
25    A.    Our participation in a savings is

UNITED STATE DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
NATIONAL UTILITY SERVICE, INC.,

      Plaintiff,

   -against-  Case No:07CV3345 (RJS)(GWG)

TIFFANY & CO. and TIFFANY and COMPANY,

      Defendants.
----------------------------------------X

     488 Madison Avenue
     New York, New York

     June 19, 2008
     2:00 p.m.


      DEPOSITION of DAVID M. BROWN,

an Expert Witness herein, taken by the Defendants,

pursuant to Article 31 of the Civil Practice Law &

Rules of Testimony, and Notice, held at the

above-mentioned time and place, before SARA FREUND,

a shorthand reporter and a Notary Public of the

State of New York.

Page 26

D.M. Brown

1
2    Q.    Would you describe to me how that amount
3    is calculated?  What did you do to come up with
4    that number that that amount is due NUS for that
5    period?
6        A.    It's 50 percent of the gross savings for
7    that particular month, which would have been
8    $23,536.33.
9        Q.    How did you calculated the gross savings
10   of $23,536.33?
11       A.    What was first done was taking the Polo
12   meter readings, and then taking those meter
13   readings and recalculating it off a meter
14   multiplier of 180 to come up with what Tiffany
15   would have been billed both in a consumption and
16   demand as a result of those meter multipliers.
17       Q.    Are you saying for Polo's usage?
18       A.    It's not Polo's usage, it's Tiffany's
19   usage. It's Polo's meter readings. And these
20   meter readings are placed against the Tiffany meter
21   multiplier of 180 which was in effect during the
22   affected period, if you will, in late 2006. And in
23   that, we come up with the KWH, which is the
24   consumption, and we also come up with the KW both
25   on, off and mid-peak.  Taking that information

Page 27

D.M. Brown

1
2    then, and applying it to the Tiffany rate of 285
3    with LIPA and calculating against that rate, and
4    also taking it against the Con Ed Solution charges
5    to come up with the commodity portion of that, you
6    come up with the former billing, if you will, as to
7    what they would have paid had the NUS
8    recommendations not have been implemented.  The
9    second page of the bill demonstrates how they are
10   presently being billed by both LIPA and Con Ed
11   Solutions.  And then taking that total, you put it
12   to the first page, which is the present, and the
13   difference between the total former charges and the
14   present charges would give you the net savings of
15   $23,536.33 for which one-half of that would be due
16   NUS.
17       Q.    Circle for me, if you would, everything
18   on that page that's a Polo amount.  I gave you my
19   pen.  On the page Bates stamped 887, what I would
20   like you to do is, circle for me all of the
21   readings on here that relate to the usage of Polo
22   Ralph Lauren.  Write next to that "RL," if you
23   would.
24       A.    This is Ralph Lauren Polo.
25       Q.    Is there any place else on that bill

Page 28

D.M. Brown

1
2    that reflects readings that have to do with Polo
3    Ralph Lauren, anything else on that page or the
4    page Bates stamped 888?
5        A.    I believe your first question and your
6    question now are a little bit different.  Are you
7    saying having something to do with --
8        Q.    Let me rephrase it.
9            Are there any other places on this bill
10   where usage of Polo Ralph Lauren is reflected?
11       A.    No.
12       Q.    Is there any other place on these two
13   pages, Bates stamped 887 and 888, that reflect
14   numbers that are attributable to Ralph Lauren as
15   opposed to Tiffany?
16       A.    All of these numbers here would have
17   been the Tiffany charges that were borne out of the
18   Ralph Lauren readings.
19       Q.    So the portion of the page beneath
20   "former billing rate 285" is the amount that NUS
21   --withdrawn.
22            If I understand you correctly, the first
23   page purports to create a bill for Tiffany based
24   upon the Ralph Lauren usage that you circled; is
25   that correct?

Page 29

D.M. Brown

1
2        A.    Yes.  It's based upon what would have
3    been charged to Tiffany had the NUS recommendations
4    not been implemented.
5        Q.    You keep saying "had the NUS."  You're
6    an expert now.  You're not testifying as a fact
7    witness.  You don't know -- as an expert witness
8    you're here testifying in a different capacity, you
9    understand that?
10       A.    Yes.
11       Q.    Had the NUS recommendations not been
12   implemented is NUS's claim in the case.  You
13   understand that?
14       A.    Yes.
15       Q.    You're not testifying here as an
16   advocate today.  I'm here to get your testimony as
17   an expert.  You understand the distinction?
18       A.    Yes.
19           MR. GOODMAN:  Objection.
20       Q.    Mr. Brown, the entire first page Bates
21   stamped NUS 887, purports to create a bill in such
22   a way that had Tiffany continued to receive charges
23   for Polo Ralph Lauren's usage, it's NUS's position
24   that this is the amount that that bill would have
25   been; is that right?

NATIONAL UTILITY SERVICE VS TIFFANY & CO

BRUCE EDSON - 2/27/08

CONCORDANCE AND CONDENSED TRANSCRIPT
PREPARED BY:



Ellen Grauer
COURT REPORTING Co. LLC

TOWER 56, 126 EAST 56TH STREET, FIFTH FLOOR, NEW YORK, NEW YORK 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
WWW.ELLENGRAUER.COM

## Page 33

(1)

(2)    Q.   Did you send e-mails relating to

(3)  that line item expense?

(4)    A.   To the line item expense, no.

(5)    Q.   My questions now refer specifically

(6)  to the line item expense that was brought to

(7)  your attention by Brian in October of 2006.

(8)    A.   I understand.

(9)    Q.   So, you did not send e-mails

(10)  relating to that line item expense, is that

(11)  right?

(12)    A.   Yes.

(13)    Q.   Yes, that's correct?

(14)    A.   Yes, I did not send or have any

(15)  conversation relative to that line item with

(16)  anybody at Tiffany & Company.

(17)    Q.   Okay. Did you receive any e-mails

(18)  from Brian with respect to that line item

(19)  expense?

(20)    A.   No.

(21)    Q.   Did Brian tell you whether or not

(22)  he had spoken with anyone at Tiffany about that

(23)  line item expense?

(24)    A.   No.

(25)    Q.   Are you aware of Brian having taken

## Page 34

(1)

(2)  any action with respect to that line item

(3)  expense?

(4)    A.   I am not aware.

(5)    Q.   And when was the next conversation

(6)  you had with Brian where he told you that, in

(7)  fact, that line item expense related to the

(8)  electric service?

(9)    A.   I don't know.

(10)    Q.   When did you learn that the meters

(11)  for electric service had been replaced?

(12)    A.   Through this e-mail that you just

(13)  asked me to look at, the one that states that

(14)  the meter had been replaced. So I guess that

(15)  would be the one that – dated January 11, 2007

(16)  at 4:08.

(17)    Q.   That's from Christine Amundsen to

(18)  Bruce Mogel and Anthony Zelanti?

(19)    A.   Yes.

(20)    Q.   And in that e-mail she asks also,

(21)  "Do you know the reason why LIPA was changing

(22)  the meter last September."

(23)    A.   Yes.

(24)    Q.   That's when you first learned that

(25)  the meters had been changed?

## Page 35

(1)

(2)    A.   Yes.

(3)    Q.   Was the second conversation you had

(4)  with Brian relating to the reason for the line

(5)  item expense around the same time as this

(6)  e-mail?

(7)      MR. MITCHELL:  Can I have that

(8)  question again, please?

(9)      (Record read.)

(10)      MR. GOODMAN:  Let me clean that up

(11)  and I'll restate it.

(12)    Q.   Do you recall the second

(13)  conversation that you described that you had

(14)  with Brian?

(15)    A.   Yes.

(16)    Q.   Okay. And in that conversation you

(17)  talked about or he told you about the reason

(18)  for the line item expense?

(19)    A.   Yes.

(20)    Q.   Okay. Did that conversation take

(21)  place around the time of Christine's e-mail on

(22)  January 11, 2007?

(23)    A.   No.

(24)    Q.   Was it before or after?

(25)    A.   Before.

## Page 36

(1)

(2)    Q.   How soon before?

(3)    A.   I believe it was around Christmas

(4)  week.

(5)    Q.   Did you exchange any e-mails with

(6)  Brian about that subject around Christmas week?

(7)    A.   I don't recall.

(8)    Q.   You testified that you first

(9)  learned about the meter change on January 11th;

(10)  correct?

(11)    A.   Yes.

(12)    Q.   But you're testifying also that

(13)  Brian told you that the reason for the line

(14)  item expense resulted from the meter change;

(15)  correct?

(16)      MR. MITCHELL:  Objection.

(17)    A.   No.

(18)      MR. MITCHELL:  That's not what he

(19)  said.

(20)    Q.   What did Brian say to you about the

(21)  line item expense and what he had learned about

(22)  the reason for it?

(23)    A.   Brian told me that the line item

(24)  expense had something to do with electrical

(25)  usage in the Manhasset branch.

NATIONAL UTILITY SERVICE VS. TIFFANY & CO.

BRIAN ENSOR - 5/14/08

CONCORDANCE AND CONDENSED TRANSCRIPT
PREPARED BY:



*Ellen Grauer*
COURT REPORTING Co. LLC

TOWER 56, 126 EAST 56TH STREET, FIFTH FLOOR, NEW YORK, NEW YORK 10022
PHONE: (212) 750-6434    FAX: (212) 750-1097
WWW.ELLENGRAUER.COM

NATIONAL UTILITY SERVICE

BSA XMAX(5/5)
BRIAN ENSOR - 5/14/08

VS. TIFFANY & CO.

---

Page 17

(1)
(2) of the meter for the electric service at the
(3) Manhasset location?
(4)     A.  Yes.
(5)     Q.  And when did you first become aware
(6) of the replacement of the meter?
(7)     A.  Through information shared sometime
(8) in the latter part of the fiscal year 2006.
(9)     Q.  When does the fiscal year begin and
(10) end?
(11)     A.  Begins February 1 through January
(12) 31.
(13)     Q.  How did you first become aware that
(14) the meter had been changed at the Manhasset
(15) store?
(16)     A.  Through Bruce Mogel corresponding by
(17) Email.
(18)     Q.  Have you ever learned why the meter
(19) was changed?
(20)     A.  No.
(21)     Q.  Did there come a time when you
(22) became aware of an unusual electric usage
(23) pattern at the Manhasset store?
(24)     MR. MITCHELL:  Object to the form of
(25)     the question.

---

Page 18

(1)
(2)     A.  At the latter part of 2006, we,
(3) through the monthly reportings that we have
(4) available to us, we saw an increase in our
(5) supplies costs, which I remember.
(6)     Q.  I'm sorry, what is the last thing
(7) you said?
(8)     A.  I remember an increase in our
(9) supplies cost.
(10)     Q.  You're referring to we and is there
(11) someone else with whom you made that
(12) observation?
(13)     A.  With the operations manager, Bruce
(14) Edson.
(15)     Q.  Did you make the observation that
(16) there was an increase in electric costs or was
(17) it more generically costs of supplies for the
(18) store?
(19)     A.  My observation was more generic,
(20) supplies.
(21)     Q.  Did you have a conversation with
(22) Bruce Edson about this?
(23)     A.  Yes.
(24)     Q.  Did you have more than one
(25) conversation with Bruce about this observation?

---

Page 19

(1)
(2)     A.  Yes.
(3)     Q.  How many conversations in total did
(4) you have with Bruce about the increase in
(5) supplies costs?
(6)     A.  I don't have an exact remember -- I
(7) can't remember exactly how many.  It was more
(8) than one.
(9)     Q.  Okay.  Do you recall when the first
(10) conversation you had with Bruce?
(11)     A.  Late in the fiscal year.
(12)     Q.  Are you able to fix a month?
(13)     A.  Not a specific month, no.
(14)     Q.  As you sit here today, are you
(15) unable to say whether that conversation
(16) occurred in November, December 2006 or
(17) January 2007?
(18)     A.  I don't remember exactly.  It's late
(19) in that year.
(20)     Q.  What did you say to Bruce and what
(21) did he say to you?
(22)     A.  My conversation would simply be to
(23) alert Bruce to the unusual dollars spent on
(24) supplies against our planned forecasts and
(25) asking him to look into it.

---

Page 20

(1)
(2)     Q.  Do you actually remember saying that
(3) to him or is that something that you think you
(4) would have said under the circumstances?
(5)     A.  In the circumstances, from what I
(6) remember two years ago, that would have been
(7) really the gist of what I would have said,
(8) yeah.  The exact words, I can't remember, but
(9) the gist of these expenses are beyond our
(10) planned expenses, can you look into that?
(11)     Q.  And what was Bruce's response, if
(12) anything?
(13)     A.  To go away and take a look at what
(14) the expense -- expenditure was.  I mean, give
(15) me an explanation for it.
(16)     Q.  Did he ever report back to you with
(17) an explanation?
(18)     A.  In the time that we were
(19) investigating and Bruce was investigating, the
(20) facilities team had also been looking into that
(21) expense, and through Bruce Edson and Bruce
(22) Mogel collaboratively and collectively,
(23) information was sent back to me.
(24)     Q.  Do you know how the facilities team
(25) became aware of the reason for the increased

---

NATIONAL UTILITY SERVICE

BSA XMAX(16/16)

BRIAN ENSOR - 5/14/08

VS. TIFFANY & CO.

## Page 61

(1)

(2)  first.

(3)      Q.   Okay.  And did you read these

(4)  reports at or around the time they were issued?

(5)      A.   Most times.

(6)      Q.   Okay.  Did you read them on a

(7)  monthly basis?

(8)      A.   Yes.

(9)      Q.   Okay.  So always within the month

(10)  that the report was issued, you would review

(11)  these reports; is that fair?

(12)      A.   Yes.

(13)      Q.   Okay.  And you would get the reports

(14)  that are contained in Exhibit 80 before you

(15)  would get the blue book report, right?

(16)      A.   Yes.

(17)      Q.   Okay.  Now, looking at this

(18)  October 11, 2006 report for the period ending

(19)  September 30, 2006, I'd like to focus your

(20)  attention on the Utility line, okay?

(21)      A.   Yes.

(22)      Q.   Do you see that?  Okay.  Now, it

(23)  shows that for the prior year, September 30,

(24)  2005, the Manhasset store spent $8,569 for

(25)  utilities.  Do you see that?

## Page 62

(1)

(2)      A.   Yes.

(3)      Q.   The planned amount for the month of

(4)  September 2006 in the budget was $8,000,

(5)  correct?

(6)      A.   Yes.

(7)      Q.   Okay.  So with respect to the plan

(8)  versus the prior year actual, whoever prepared

(9)  that project that had utility costs would be

(10)  lower for September than they had been the

(11)  prior year, correct?

(12)      A.   Yes.

(13)      Q.   And that projection is based not

(14)  just on prior year, but on the review of a

(15)  number of years of actual usage; is that

(16)  correct?

(17)      A.   Yes.

(18)      Q.   Okay.  Now, the middle column on the

(19)  left side for monthly shows that the actual

(20)  amount spent on utilities for the Manhasset

(21)  store in September 2005 was $14,243.  Do you

(22)  see that?

(23)      A.   Yes.

(24)      Q.   Which the next two columns show is

(25)  $5,674 over what you'd spent the year before,

## Page 63

(1)

(2)  correct?

(3)      A.   Yes.

(4)      Q.   And $6,243 over budget, correct?

(5)      A.   Yes.

(6)      Q.   In fact, if you look at the charge,

(7)  it's almost twice as much being spent on

(8)  utilities in September 2006 than were spent on

(9)  utilities in September 2005, correct?

(10)      MR. GOODMAN:  Objection to the form.

(11)      MR. MITCHELL:  Withdrawn.

(12)      Q.   The document reflects a variance

(13)  over budget of 1.78 percent, correct?

(14)      A.   Yes.

(15)      Q.   I'm sorry, that's wrong.

(16)      A.   178 percent.

(17)      Q.   Yeah, so you are just under two

(18)  times for the month alone over budget, right?

(19)      A.   Yes.

(20)      Q.   So it was visible on a report

(21)  generated by Tiffany delivered to you on

(22)  October 11, 2006 that for the month of

(23)  September 2006, utility costs at the Manhasset

(24)  store were 178 percent of budget for that month

(25)  alone, correct?

## Page 64

(1)

(2)      MR. GOODMAN:  Objection to the form.

(3)      A.   Yes.

(4)      Q.   Okay.  And then going to the right

(5)  side, we show that on a cumulative basis, you

(6)  are on the right side 104 percent of your

(7)  budget for utilities as of the end of

(8)  September 30, 2006, correct?

(9)      A.   Yes.

(10)      Q.   And that would be on a cumulative

(11)  basis, right?

(12)      A.   Yes.

(13)      Q.   So the prior month, you were under

(14)  budget by 6 percent, right?

(15)      A.   Yes.

(16)      Q.   And the following month, you're now

(17)  over budget by 4 percent?

(18)      A.   Yes.

(19)      Q.   Right?  That's an 8 percent variance

(20)  in one month on an annualized basis, right?

(21)      A.   Yes.

(22)      Q.   Okay.  Is that the types of things

(23)  that you would observe in reviewing these

(24)  reports?

(25)      A.   Yes.