UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - -x
NATIONAL UTILITY SERVICE, INC.,          :

       Plaintiff,                        :

                                  :

       -against-                         :

                                  :
TIFFANY & CO. and
TIFFANY AND COMPANY,                      :

       Defendants..                       :
- - - - - - - - - - - - - - - - - - - -x

              DEPOSITION of Plaintiff National Utility

Service, by ARNOLD FRANKEL, taken by Defendants at

the offices of Dreier LLP, 499 Park Avenue, New York,

New York on Friday, April 11, 2008, commencing at

10:10 a.m., before Elizabeth Santamaria, a Certified

Shorthand (Stenotype) Reporter and Notary Public

within and for the State of New York.

## Page 2

1
2  APPEARANCES:
3
       HARTMAN & CRAVEN LLP
4        Attorneys for Plaintiff
         488 Madison Avenue
5        New York, New York 10022
6      BY: PETER G. GOODMAN, Esq., of Counsel
7
8
       DREIER LLP
9        Attorneys for Defendants
         499 Park Avenue
10       New York, New York 10022
11     BY: JEFFREY MITCHELL, Esq., of Counsel
12       E. TIMOTHY McAULIFFE, JR., Esq., of Counsel
13
14  ALSO PRESENT:
15
16     Nancy Waite, Esq.
17       Tiffany & Co.
18
19
20
21
22
23
24
25

## Page 3

1
2
3          --oOo--
4
5      IT IS HEREBY STIPULATED AND AGREED
6  by and between the attorneys for the
7  respective parties herein that filing and
8  sealing be and the same are hereby waived.
9      IT IS FURTHER STIPULATED AND AGREED
10 that all objections, except as to the form
11 of the question, shall be reserved to the
12 time of the trial.
13     IT IS FURTHER STIPULATED AND AGREED
14 that the within deposition may be sworn to
15 and signed before any officer authorized to
16 administer an oath, with the same force and
17 effect as if signed and sworn to before the
18 Court.
19
20
21
22
23
24
25

## Page 4

1
2          --oOo--
3  A R N O L D   F R A N K E L, called as a
4    witness, having been first duly sworn by
5    Elizabeth Santamaria, a Notary Public
6    within and for the State of New York, was
7    examined and testified as follows:
8  EXAMINATION BY:
9  MR. MITCHELL:
10     A.  Please state your name for the
11 record.
12     A.  Arnold Frankel.
13     Q.  Where do you presently reside?
14     A.  1507 Cornwall Road, Mahwah, New
15 Jersey 07430.
16     Q.  Mr. Frankel, by whom are you
17 employed?
18     A.  National Utility Service, Inc.,
19 doing business as NUS Consulting Group.
20     Q.  How long have you been employed by
21 NUS?
22     A.  Thirty-five years.
23     Q.  What is your current position?
24     A.  Executive vice president and general
25 manager.

## Page 5

1          Frankel
2      Q.  And what are your responsibilities
3  in that position?
4      A.  I'm responsible for the production
5  and sales of the U.S. operations of NUS.
6      Q.  To whom do you report?
7      A.  Richard and Gary Soultanian.
8      Q.  Do you know David Brown?
9      A.  Yes, I do.
10     Q.  Does he report to you?
11     A.  Yes.
12     Q.  Could you describe for me the titles
13 of the people who are direct reports to you at
14 NUS?
15     A.  It would be David Brown, who is the
16 vice president, also sometimes called vice
17 president of operations; Paul Hofmann, who is the
18 manager of the rate and tariff department; Sean
19 Graham, who manages both the consultants to some
20 degree and what we call the OSS staff operations
21 support services; and Bob Heinrich, who is our
22 vice president and national sales manager.
23     Q.  Is Christine Amundsen in a
24 department that is headed by one of those
25 individuals you just named?

Page 6

```
1                    Frankel
2        A.   Yes, she is.
3        Q.   What department is she in?
4        A.   She is in the consulting department.
5        Q.   And to whom does she report?
6        A.   Probably Dave and Sean Graham,
7    combination.
8        Q.   You are not a direct report for
9    Ms. Amundsen, correct?
10           Let me rephrase the question.
11           In the ordinary course of your
12   business, Ms. Amundsen does not report directly to
13   you; is that correct?
14       A.   I guess the answer would be yes,
15   except I do interface with her literally on a
16   daily basis.
17       Q.   How long have you been executive
18   vice president and general manager of NUS?
19       A.   Since 1997.
20       Q.   What other titles have you held at
21   NUS?
22       A.   When I started with the company, I
23   came in, I believe the title was account manager.
24   I held the title of group manager, I held the
25   title of assistant vice president, I held the
```

Page 7

```
1                    Frankel
2    title of production manager, I held the title of
3    vice president.
4        Q.   When you were vice president, what
5    were your responsibilities?
6        A.   Monitoring or overseeing the
7    production side of the business and dealing in
8    certain degrees with the corporate side of the
9    business.
10       Q.   What is the production side of the
11   business?
12       A.   The analytical side, actually doing
13   the work and auditing and analyzing the accounts
14   as opposed to sales.
15       Q.   Did you have similar
16   responsibilities as a production manager?
17       A.   Yes.
18       Q.   Approximately how many --
19           Approximately what period of time
20   were you production manager and then after that
21   vice president?
22       A.   I'm guessing. I think I became
23   production manager in 1980. I don't remember when
24   I became vice president.
25       Q.   So between 1980 and 1997 when you
```

Page 8

```
1                    Frankel
2    became general manager you had responsibility to
3    analyze accounts on behalf of customers of NUS; is
4    that right?
5        A.   No. Pretty much by that time I had
6    given up most of the direct account handling
7    responsibilities and I was just responsible for
8    interacting with the consultants, analysts and
9    anybody that was involved in the production side
10   of our business.
11       Q.   When you were on the analytical
12   side, what types of things did you analyze?
13       A.   Companies' costs for energy.
14       Q.   Electric?
15       A.   Electric, gas, water, steam, sewer.
16       Q.   You joined NUS approximately 1973?
17       A.   1972.
18       Q.   You attended college while you were
19   working for NUS?
20       A.   That's correct.
21       Q.   Did you go at night?
22       A.   Yes.
23       Q.   Your Web site indicates that you
24   have a BBA from Baruch College you achieved in
25   1980.
```

Page 9

```
1                    Frankel
2        A.   Correct.
3        Q.   You have an MBA from Baruch College
4    in 1982; is that correct?
5        A.   That's correct.
6        Q.   Did you start at NUS right out of
7    high school?
8        A.   No.
9        Q.   It says you were employed by an
10   investment banking and securities firm,
11   J.C. Bradford.
12       A.   Correct.
13       Q.   What did you do for them?
14       A.   I worked in back-office operations.
15       Q.   Is that what you did right out of
16   high school?
17       A.   No. I went into the service right
18   out of high school.
19       Q.   When did you leave high school?
20       A.   '64. I graduated, I went to college
21   for a little while. It didn't agree with me back
22   then and I joined the service and went into the
23   service in January of 1965.
24       Q.   When were you discharged?
25       A.   November of 1967.
```

Page 18

Frankel

2 contract.
3    Q.    Is the contract completely
4 rewritten?
5    A.    It's -- there are numerous changes.
6 Are there any words left that were in this? I
7 believe it has pretty much the same coverage as
8 what you would see here but it's rewritten, yes.
9    Q.    Did you discuss with him his purpose
10 in wanting to provide a definition for the term
11 "savings"?
12    A.    I'm sure we talked about it, yes.
13    Q.    Do you recall what those discussions
14 were?
15    A.    Again, most of the changes were
16 because Richard believed that he felt that that
17 was the way the contract should be written.
18    Q.    The 1992 contract that's at issue in
19 this case does not have a definition of the term
20 "savings" right?
21    A.    The contract I'm looking at?
22    Q.    Yes.
23    A.    No.
24    Q.    No?
25    A.    No.

Page 19

Frankel

2    Q.    Exhibit 1 for identification
3 provides in part for a fee structure for NUS,
4 right?
5    A.    That's correct, yes.
6    Q.    And the contract says in Paragraph 5
7 that as a fee NUS receives 50 percent of any
8 refund, right?
9    A.    Correct.
10    Q.    And then 50 percent of any savings
11 realized for a period of 60 months, correct?
12    A.    Correct.
13    Q.    In every case where there is a
14 refund is there always a savings?
15    A.    No.
16    Q.    Can you give me an instance of where
17 there would be, in your business, a refund but no
18 savings?
19    A.    Yes. Client signs up with us, they
20 send us in their bills. We find an overcharge on
21 a prior bill but subsequent to that there were no
22 errors on the bill. Based upon that, it would be
23 a refund only.
24    Q.    Any other things you can think of?
25    A.    Nothing that jumps out at me, no.

Page 20

Frankel

2    Q.    Can you explain to me from the
3 perspective of NUS the theory behind the shared
4 savings component of the fee?
5    A.    I'm not sure I follow you when you
6 say theory.
7    MR. GOODMAN: Objection.
8    Q.    Well, you have two components of a
9 fee. One would be 50 percent of any refund,
10 right?
11    A.    Correct.
12    Q.    Why does NUS look to also recover
13 50 percent of any amount realized as a savings by
14 the customer for a 60-month period?
15    A.    Because we are a primarily
16 contingency fee oriented firm and that's how we
17 earn our income.
18    Q.    Is there any magic to 60 months?
19    A.    It was a period of time that was
20 determined by senior management at the time that
21 it was put into place.
22    Q.    And what is the shared savings
23 component intended to compensate NUS for?
24    A.    For the expertise that it brings to
25 the table in uncovering opportunities to benefit

Page 21

Frankel

2 the client.
3    Q.    Now, in a shared savings situation
4 where the customer is paying 50 percent of the
5 savings for a 60-month period, isn't it true that
6 the customer is still paying less for its utility
7 usage than it was paying before the savings was
8 recommended by NUS and implemented?
9    MR. GOODMAN: Objection.
10    A.    Could you read that back?
11    MR. MITCHELL: Let me see if I
12    can take it in pieces.
13    Q.    I want to get to the -- I want to
14 understand where it works, so my questions are
15 focused on the mechanics of the 50 percent shared
16 savings component of your fee both from NUS's
17 perspective and then how it works for the
18 customer.
19    A.    Okay.
20    Q.    First of all, with respect to the
21 shared savings component, is it true that it is
22 paid to NUS on whatever periodic basis the utility
23 is billing the customer?
24    A.    That is correct.
25    Q.    So the customer only pays a portion

7 (Pages 22 to 25)

Page 22

Frankel

1
2   of the fee every utility billing period, correct?
3      A.   That is correct.
4      Q.   Now, the customer has an amount
5   prior to implementation of some savings
6   recommendation that it is paying as a general rate
7   or amount for its utility service, right?
8                MR. GOODMAN: Objection.
9                MR. MITCHELL: I will try to
10  rephrase that.
11     Q.   There is a general monthly amount
12  that the customer is paying for a utility based
13  upon a particular usage, right?
14     A.   At the time that we made our
15  recommendation?
16     Q.   Yes.
17     A.   Correct, yes.
18     Q.   And then NUS would make a
19  recommendation on how a savings could be achieved,
20  right?
21     A.   Correct.
22     Q.   So after implementation of that
23  recommendation the amount being paid for the same
24  utility usage by the customer is less, right?
25     A.   Correct.

Page 23

Frankel

1
2      Q.   And that would be a savings?
3      A.   Correct.
4      Q.   And NUS would receive as a fee for
5   60 months the amount by which the charges to the
6   customer for that usage were reduced, correct?
7      A.   Correct.
8      Q.   And the customer would be paying
9   less for its utility usage, right?
10     A.   Than?
11     Q.   Than it was paying before.
12     A.   Yes.
13     Q.   And even though it was paying half
14  of the savings for a 60-month period to NUS, the
15  customer was still paying, at least for that
16  60-month period, less for its overall utility
17  usage because it's getting the benefit of the
18  other 50 percent, right?
19                MR. GOODMAN: Objection.
20     A.   Correct.
21     Q.   And then after 60 months the
22  customer realizes 100 percent of the savings?
23     A.   Correct.
24     Q.   Would you give me examples of
25  typical types of things that NUS recommends to

Page 24

Frankel

1
2   customers to achieve a savings in utility charges.
3      A.   Okay.  Starting from a rate change,
4   power factor improvement, tax exemptions or
5   reductions, application of wrong meter
6   multipliers, high demands, primary service,
7   changing to a time of use rate, changing to an
8   interruptible rate, moving to what we call a
9   third-party supplier, shortening the term of a
10  contract, reduction of contract capacity.
11          I mean that's --
12     Q.   I want to focus on what you said,
13  application of the wrong meter multiplier.  What
14  are you talking about there?
15     A.   Well, I remember one specific case
16  where instead of using the actual demands for the
17  client there was a meter multiplier which I
18  believe was 600, 900, whatever it was.  Instead of
19  using the actual billing demands they were using
20  the 600 or 900 meter multiplier as the customer's
21  demand.  We discovered that, we investigated it,
22  we had the utility corrected to what it should be
23  and it resulted in a refund and a savings for that
24  client.
25     Q.   If I understand the concept, and

Page 25

Frankel

1
2   correct me if I'm wrong, if I understand the meter
3   multiplier concept that's a mechanical application
4   of a formula for how a meter reads out usage.  Is
5   that right?
6      A.   That's correct.
7      Q.   Many of us know utility meters with
8   the dials that are only readable by utility people
9   but as I understand it, each meter is different.
10  So you take whatever usage is reflected by the
11  dials on a particular meter in a given month and
12  then that meter has a multiplier that applies to
13  those dials on that meter to get a kilowatt hour
14  usage for that period; is that correct?
15     A.   That is correct.
16     Q.   So with respect to the meter
17  multiplier itself, that is a number that is used
18  to calculate actual usage by a customer at a given
19  location, right?
20     A.   That is one part of it, yeah.
21     Q.   Now, what about just a pure mistake
22  by the power company?  The bill is wrong and needs
23  to be corrected.  Is that a savings under the
24  contract, by your interpretation?
25                MR. GOODMAN: Objection.

9 (Pages 30 to 33)

## Page 30

Frankel

1    for its neighboring store, Polo Ralph Lauren,
2    right?
3       A.    Correct.
4       Q.    And we also note after the fact that
5    the power authority or power company having --
6    withdrawn.
7           We now know after the fact that the
8    utility, having confirmed that Tiffany was paying
9    for Polo's usage and Polo was paying for Tiffany's
10   usage, they have now gone back in and corrected
11   the billing. Right?
12      A.    Right, as long as we say as a result
13   of what NUS brought to the table on this.
14      Q.    We will get to that. You realize
15   that -- withdrawn.
16          Your contract, Exhibit 1 for
17   identification, contains no definition of the word
18   "refund," right?
19      A.    That is correct.
20      Q.    It also contains no definition of
21   the word "savings," right?
22      A.    That is correct.
23      Q.    And as of April 7, 1992, the
24   circumstance of a switched meter had never come up

## Page 31

Frankel

1    at NUS under any of its contracts, right?
2       A.    I said not that I'm aware of. We at
3    any point in time can have thousands of contracts
4    with tens of thousands of locations. Could it
5    have happened? Absolutely. I don't know every
6    single one of them.
7       Q.    But you signed this contract in
8    1992, right?
9       A.    That's correct.
10      Q.    As you are sitting here today, you
11   don't recall in 1992 that you were aware of NUS
12   having ever been confronted with the correction of
13   a switched meter situation, right?
14      A.    I have no specific recollection of
15   that, no.
16      Q.    So whether in fact the idea that a
17   switched meter correction fell within the
18   definition of "savings" under Exhibit 1 for
19   identification was not in your mind at the time,
20   right?
21      A.    Obviously having said that I'm not
22   aware of recollecting that specific thing, my
23   answer would be "yes."
24      Q.    It was not in your mind?

## Page 32

Frankel

1       A.    Correct.
2       Q.    And obviously you did not discuss
3    that idea of a switched meter situation falling
4    within the definition of "savings" with Tiffany in
5    1992, right?
6       A.    I'm not aware of discussing anything
7    with Tiffany in 1992.
8       Q.    And subsequent to 1992 through the
9    period of time that this dispute arose, at no time
10   in any of the services that NUS provided for
11   Tiffany did it ever correct a switched meter at
12   some other location, correct?
13      A.    Not that I'm aware of, no.
14      Q.    So during the life of the contract
15   with Tiffany there was also never another
16   circumstance in which the situation that is
17   present in this case, correction of the switched
18   meter, had happened during the life of the
19   Tiffany/NUS contractual relationship?
20      A.    Not that I'm aware of.
21      Q.    This 1992 contract, Exhibit 1 for
22   identification, was in effect from 1992 until
23   February 2007, right?
24      A.    I have no idea.

## Page 33

Frankel

1       Q.    Well, you are aware that the
2    contract was terminated -- I'm sorry.
3           Tiffany terminated the contract with
4    NUS, Exhibit 1, after NUS made its demand for a
5    fee of approximately $1 million in connection with
6    correcting the switched meter, right?
7       A.    Correct.
8       Q.    And that was -- the termination was
9    in approximately February 2007, right?
10      A.    I believe so, yes.
11      Q.    And until that time, from the time
12   Exhibit 1 for identification was signed, until
13   then there was in place this contract which is
14   Exhibit 1 for identification, right?
15      A.    That's correct.
16      Q.    And during the life of the contract
17   NUS made recommendations to Tiffany on occasion
18   about the potential savings that could be realized
19   in certain utility charges, right?
20      A.    Correct.
21      Q.    And when implemented by Tiffany in
22   every circumstance-- withdrawn.
23          And every time Tiffany implemented a
24   recommendation NUS was paid a fee, right?

Page 34

Frankel

1
2    A.   To the best of my knowledge, yes.
3    Q.   And there was never any dispute
4  until this case arose between the companies over
5  the payment of any fee by Tiffany for NUSs
6  services, right?
7    A.   Not that I'm aware of, no.
8    Q.   Never been in a lawsuit by NUS
9  against Tiffany?
10   A.   No.
11   Q.   No collection problems, right?
12   A.   Not that I'm aware of, no.
13   Q.   Now, you said you are primarily a
14 contingency company. That means that you get paid
15 for success; is that right?
16   A.   Correct.
17   Q.   So part of the services you provide
18 in order to earn a contingency fee is that you
19 receive and analyze utility bills, correct?
20   A.   Correct.
21   Q.   So during the life of the contract
22 between Tiffany and NUS, would Tiffany send to NUS
23 its utility bills?
24   A.   Yes.
25   Q.   Was that at the direction of NUS?

Page 35

Frankel

1
2    A.   Well, I believe it actually states
3  something in the contract to that effect.
4       In Paragraph 2 it says, "Your
5  continuing analysis will cover our current bills
6  which we will send to you each month." I mean I'm
7  sure Christine or whoever was the consultant on
8  the account would speak to them and say we are
9  either getting or not getting your bills.
10   Q.   So by the fall of 2006 this contract
11 had been in place for 14 years, right?
12   A.   Correct.
13   Q.   And there was 14 years of history of
14 Tiffany sending NUS its utility bills, right?
15   A.   There was a number of years, whether
16 they always sent them in or didn't, but it was in
17 effect for 14 years, yes.
18   Q.   NUS analyzed Tiffany's bills over
19 that period of time, correct?
20   A.   Correct.
21   Q.   And throughout that period of time
22 it looked for errors, right?
23   A.   Correct.
24   Q.   Also looked for potential savings,
25 right?

Page 36

Frankel

1
2    A.   Correct.
3    Q.   Because that's part of the services
4  that you offer and provide?
5    A.   Correct.
6    Q.   Now, in the spring of 2006 Tiffany
7  also signed a document called a data management
8  services agreement, right?
9    A.   They signed another agreement, I
10 don't remember exactly when, but the answer is
11 "yes."
12   Q.   And that added to the services that
13 NUS was providing for Tiffany, right?
14   A.   Correct.
15   Q.   And for the services under this new
16 agreement Tiffany paid for that service, right?
17   A.   Yes. There was, I believe, a
18 monthly fee associated with that.
19   Q.   For that service NUS did more than
20 simply analyze Tiffany's bills, right?
21   A.   Correct.
22   Q.   It also input the data from the
23 bills into a computer system, correct?
24   A.   Correct.
25   Q.   And then the data that was put into

Page 37

Frankel

1
2  the system would reflect usage, right?
3    A.   Usage, yes.
4    Q.   How much the charges were for power,
5  right?
6    A.   Correct.
7    Q.   What other types of information?
8    A.   It would give you any one of a
9  number of key performance indicators. Whatever
10 the client would tell us was important to them, we
11 could build into the system. So it would show
12 units of energy per revenue, per -- anything they
13 want, up to about six different points. It would
14 show comparisons of different facilities, and it
15 was all available to them to view online.
16   Q.   And I assume the data was also
17 available to people at NUS to review online,
18 right?
19   A.   Correct.
20   Q.   So as part of providing the services
21 that NUS provided under Exhibit 1 for
22 identification, the analysis of bills could also
23 now be accomplished online because the information
24 from those bills is also online, right?
25        MR. GOODMAN: Objection.

Page 42

```
 1                  Frankel
 2  2006, in a position to owe NUS the same amount of
 3  money essentially that NUS claimed as a fee in
 4  January of 2007, right?
 5          MR. GOODMAN: Objection.
 6      A.  You asked me if NUS contacted the
 7  utility -- and I'm paraphrasing -- and as a result
 8  of that they corrected an error, would be entitled
 9  to a savings and I'm saying "yes." Is it the
10  exact same amount here than it would have been in
11  January? I don't know, but it's something along
12  those lines, yes.
13      Q.  The bulk of the fee being sought
14  here is for the shared savings component, right?
15      A.  Correct.
16      Q.  And the shared savings component
17  portion that NUS is seeking a fee for is
18  approximately $1 million, right?
19      A.  Correct.
20      Q.  So by virtue of this e-mail on
21  November 15, 2006, simply because NUS found it
22  first, Tiffany would owe NUS the shared savings
23  component of the contract if NUS corrected the
24  problem?
25          MR. GOODMAN: Objection to the
```

Page 43

```
 1                  Frankel
 2  form.
 3      Q.  That's your testimony, right?
 4      A.  If NUS uncovers a problem and the
 5  problem is corrected subsequent to our uncovering
 6  of it, the answer is "yes."
 7      Q.  Refund and savings?
 8      A.  If there is a refund involved, yes
 9  and a savings, yes.
10      Q.  Did Ms. Amundsen come speak with you
11  about this on November 15, 2006?
12      A.  I have no idea.
13      Q.  When is the first time you became
14  aware of the issue at the Manhasset store?
15      A.  I have no date involved, but I could
16  tell you I was aware of it early on.
17      Q.  What does that mean, "early on"?
18  Give me a time frame.
19      A.  Probably -- well, it could --
20          I don't know a date. It could have
21  been here, it could have been when I knew there
22  was a document which was written I think in
23  December. I was aware of it back at its infancy
24  stages.
25      Q.  Did you participate in the
```

Page 44

```
 1                  Frankel
 2  preparation of the document called "Report and
 3  Recommendation"?
 4      A.  Could you show it to me?
 5      Q.  I show you has been previously
 6  marked as Exhibit 2 for identification. It's
 7  called "Cost Analysis Report." Do you see that?
 8      A.  Yeah. I've seen this. I don't
 9  remember whether I was actually involved in
10  developing it.
11      Q.  Were you involved in the issues
12  surrounding the Manhasset store before the
13  creation of the cost analysis report?
14      A.  I have no recollection one way or
15  the other.
16      Q.  How did you first become aware about
17  the situation at the Manhasset store?
18      A.  It was brought to my attention by --
19  could be Christine, could be Dave. It could be
20  anybody.
21      Q.  What did you remember being told?
22      A.  I was aware that there was a
23  recommendation pending, that it was large. I
24  remember specifically a situation which came about
25  when the utility came back with their initial
```

Page 45

```
 1                  Frankel
 2  response on the error and what we did as a result
 3  of that.
 4      Q.  I want to go to the beginning. I
 5  want to go further on.
 6          There is no recommendation pending
 7  obviously as of November 15, 2006, the date of
 8  Exhibit 4 for identification, right?
 9          MR. GOODMAN: Objection.
10      Q.  I'm trying to refresh your
11  recollection on dates here, Mr. Frankel. I had
12  asked you if you had been involved in the creation
13  of the document that's part of Exhibit 2 for
14  identification and you don't think you recall,
15  right?
16      A.  If I was involved in developing
17  this? I don't recall.
18      Q.  And we have Ms. Amundsen's e-mail
19  dated November 15, 2006, where Bruce Mogel is
20  alerted to the -- what she calls "an unusual usage
21  pattern" at the Manhasset store, right?
22      A.  That's correct.
23      Q.  If we take November 15, 2006 as the
24  first day that NUS notifies Tiffany about its
25  observations of usage at the Manhasset store --
```

Page 46

Frankel

1
2    A.    Correct.
3    Q.    -- and December 20, 2006, the date
4 of the cost analysis report, which is Plaintiff's
5 Exhibit 2, in that time period did you become
6 aware of the situation at the Manhasset store
7 during that time period?
8    A.    I have no recollection one way or
9 the other.
10   Q.    Do you have any recollection of
11 having done anything during the period
12 November 15, 2006 to December 20, 2006 in
13 connection with Tiffany's Manhasset store?
14   A.    Not that I can sit here today and
15 tell you, no.
16   Q.    And do you recall any conversations
17 you had with anyone during that time period about
18 Tiffany's Manhasset store?
19   A.    Other than I remember being aware of
20 it, no.
21   Q.    How would you know it would be a
22 potentially big fee?  Why would you know that
23 right from the beginning?
24   A.    Because I was made aware of the
25 numbers that were included in this report.

Page 47

Frankel

1
2    Q.    At the beginning you don't know what
3 the problem is, right?
4    A.    I knew there was, as it's termed
5 there, an unusual usage pattern.  That's a
6 starting point when we start the investigation.
7    Q.    If you look at the attachment --
8    You were obviously in this field so
9 you can read these things.
10   A.    Uh-huh.
11   Q.    Look at the attachment to
12 Ms. Amundsen's e-mail, which is the second page of
13 Exhibit 4, Bates stamped T1128.
14   A.    Uh-huh.
15   Q.    You see that it shows for July 26,
16 2006 through August 28, 2006 thirty-three days of
17 usage, right?
18   A.    Uh-huh.
19   Q.    Yes?
20   A.    Yes.
21   Q.    54,720 hours or -- 54,720
22 kilowatt-hours of usage during that period, right?
23   A.    Correct.
24   Q.    In your experience, there are summer
25 rates and winter rates for electric usage?

Page 48

Frankel

1
2    A.    Some utilities have them, others
3 don't.
4    Q.    In addition, summer is a high demand
5 period because air conditioning runs, especially
6 in the Northeast?
7    A.    It can be if the air conditioning is
8 on that specific meter.
9    Q.    Your assumption would be, wouldn't
10 it, that in Manhasset, Long Island between
11 July 26th and August 28th that air conditioning
12 would be running fairly regularly during those
13 days, right?
14   A.    I would assume it was.  But, again,
15 I just want to clarify that whether the air
16 conditioning is part of that meter or is part of a
17 general charge that is issued by a landlord can
18 differ.
19   Q.    Okay.  But that would give you, in
20 your expertise, some baseline for looking at that?
21   A.    Correct.
22   Q.    Then you have another period,
23 August 28, 2006 to September 19, 2006, twenty-two
24 days of usage and 27,180 kilowatt-hours, right?
25   A.    Correct.

Page 49

Frankel

1
2    Q.    So that would be in line with the
3 usage shown during the month July 26th to
4 August 28th, 2006, right?
5    A.    Somewhat, yeah.
6    Q.    A little lower even, right?
7    A.    Uh-huh.
8    Q.    Yes?
9    A.    Yes.
10   Q.    So now you would see -- so that
11 would probably show you that the usage was a
12 little higher in the July-August period, right?
13   A.    Correct.
14   Q.    September a little cooler maybe?
15 Not as much.  That would kind of show you that the
16 usage was a little lower but not out of line,
17 right?
18   A.    Correct.
19   Q.    Then you have a period September 19,
20 2006 to September 27, 2006, just eight days,
21 showing you 61,920 kilowatt-hours of usage, right?
22   A.    Correct.
23   Q.    Now, NUS holds itself out as an
24 expert in utility analysis, right?
25   A.    Correct.

18 (Pages 66 to 69)

Page 66

Frankel

1
2    Q.   Let's assume that comes back
3    negative as well.
4        A.   I would then launch the query with
5    the utility company.
6        Q.   And would you start with any basic
7    assumptions what the source of the problem might
8    be?
9        A.   Having no other information
10   available to me?
11       Q.   Correct.
12       A.   I might think it was a metering
13   error. I might think somebody tapped into the
14   service. Those are the two things that jump out
15   at me. A broken meter, computer error.
16       Q.   Now, depending on what it was —
17       Assume it later turns out to have
18   been an error, just a mistake. Depending on what
19   the error was would impact upon what the fee would
20   be to NUS, right?
21       A.   I'm not sure I'm following this.
22       Q.   There are circumstances where NUS
23   only shares in the refund, right?
24       A.   Correct. And I explained to you
25   what I could think of earlier.

Page 67

Frankel

1
2    Q.   Right. I understand.
3        So since you don't know what the
4    error is yet because the investigation is not
5    concluded, as you begin searching for the source
6    of the error you don't yet know what the fee will
7    be, right?
8        A.   Again, since at this point I'm not
9    aware whether the error has already corrected
10   itself, I guess the answer would be "Yes."
11       Q.   You could only tell what the fee is
12   going to be once you know what the problem is and
13   it's solved, right?
14       A.   Correct.
15       Q.   So as of November 16, 2006, when
16   Tiffany asks NUS to investigate, at that point
17   what the fee will be for the service is unknown,
18   right?
19       A.   Correct.
20       Q.   Could be zero, right?
21       A.   I don't think it would be zero.
22       Q.   Well, if it was right — if the bill
23   was right —
24       A.   Okay. I stand corrected. If the
25   bill was right, it could be zero.

Page 68

Frankel

1
2    Q.   So NUS could provide services in
3    investigating this usage pattern and find that the
4    authority was absolutely correct and then whatever
5    work it performed to investigate would not result
6    in any fee, right?
7        A.   Correct.
8        Q.   And that's part of working on the
9    "contingency"?
10       A.   That is correct.
11       Q.   So you understand that going in?
12       A.   Yes.
13       Q.   Now, turning you to Exhibit 2 for
14   identification, I would like to start on the
15   second page, which is the cost analysis report
16   that was prepared by NUS and forwarded by
17   Ms. Amundsen to Mr. Mogel on December 20, 2006.
18   You said you don't recall if you were involved in
19   the preparation of this document, right?
20       A.   Well, I want to clarify that. There
21   was a point in time where I was involved in
22   creating portions of this type of document, which
23   are then used as a starting point for people in
24   the company. So the answer is I was involved in
25   some of this stuff that's on here.

Page 69

Frankel

1
2    Q.   So the cost analysis report is a
3    form that is used at NUS to make recommendations
4    to customers; is that right?
5        A.   It's a form which is used to
6    initiate the process of creating a recommendation.
7        Q.   When you say you were involved in
8    the process of creating the underlying documents,
9    what portions of this are you speaking of?
10       A.   I couldn't -- I mean I couldn't tell
11   you.
12       At a point in time, whether it was
13   several years back, we decided that it would be a
14   useful thing to take what we consider to be the
15   good basic steps of formatting recommendations and
16   putting that into a template that the analysts and
17   consultants could then use to sort of start the
18   ball rolling and not have to put everything
19   generically into or generally into a document. So
20   "Our review of your invoices for the
21   above-referenced location," why do I need to have
22   somebody put that type of stuff into it? So that
23   type of stuff we created and then the specifics as
24   to the situation are added by the analyst or the
25   consultant.

Page 78

Frankel

1    it

2    Q.   The meter assigned to Tiffany ends

3    in a 45.  Did you know that?

4        A.   Not as I sit here, no.

5        Q.   The meter assigned to Polo Ralph

6    Lauren ends in 44.  Did you know that?

7        A.   I might have seen that at some point

8    in time, but I didn't know that probably back at

9    the point this was created.

10       Q.   So since no work had yet been done

11   to investigate as of the date of the report,

12   December 20, 2006, NUS did not know that it would

13   necessarily recover under the shared savings

14   component of its contract, right?

15       A.   With the understanding that I don't

16   know what work did or didn't occur as of

17   December 20th, based upon an earlier discussion,

18   we would not know the fee until the investigation

19   was completed.

20       Q.   Now, looking to the recommendation

21   portion, the recommendation says, "NUS Consulting

22   Group recommends investigating this potential

23   ongoing overcharge."

24       Do you see that?

Page 79

Frankel

1        A.   Yes.

2        Q.   Now, the recommendation that NUS was

3    making to Tiffany is that NUS interface with the

4    utility to investigate the source of what appears

5    to be a billing error, right?

6        A.   The cost analysis report in its

7    entirety is our recommendation and it was to

8    investigate the potential overcharges and recovery

9    of any refunds.

10       Q.   And it uses the word "potential"

11   ongoing.  Do you see that?

12       A.   Yes, I do.

13       Q.   It doesn't say "ongoing," right?

14       A.   Correct.

15       Q.   So at the time you didn't know

16   whether it was ongoing or not ongoing, right?

17       A.   We didn't know if it was an error or

18   not an error.  The answer is "yes."

19       Q.   So this is the sequence of events as

20   of December 20, 2006.

21       On November 15, 2006 Ms. Amundsen by

22   her e-mail which is Exhibit 4 for identification

23   notifies Tiffany that NUS had observed "an unusual

24   usage pattern" which was shown on an attached

Page 80

Frankel

1    schedule, right?

2        A.   Correct.

3        Q.   The following day, November 16,

4    2006, as shown by the first page of Exhibit 5 for

5    identification, Mr. Mogel asks NUS to investigate,

6    right?

7        A.   Correct.

8        Q.   And then five weeks later NUS issues

9    its cost analysis report in which it recommends

10   back to Tiffany that NUS investigate, right?

11       A.   Right, with the understanding that

12   it expanded upon what the unusual -- what did we

13   call it? -- usages pattern, what the financial

14   ramifications of it were.

15       Q.   What they might be.

16       Q.   What they might be.

17       Q.   The day of the report and

18   recommendation was December 20, 2006.  Do you see

19   that?

20       A.   Yes, I do.

21       Q.   That's a Wednesday?

22       A.   I have no idea.

23       Q.   Well, we can make that easy.

24       If you look at the first page of

Page 81

Frankel

1    Exhibit 2 for identification, you will see on

2    Ms. Amundsen's e-mail -- look at the first page,

3    the cover page on the agreement.  You will see

4    Ms. Amundsen's mail?  Wednesday, December 20,

5    2006.  Do you see that?

6        A.   Yes, I do.

7        Q.   So that's a Wednesday?

8        A.   That is correct.

9        Q.   I show you what was previously

10   marked as Exhibit 49 for identification.  It is a

11   memorandum prepared by Ms. Amundsen called "Report

12   on Client Contact."  That's also a form that NUS

13   uses, this type of document; is that right?

14       A.   That's correct.

15       Q.   Is there a template for that, as

16   well?

17       A.   Other than the NUS consulting name,

18   the lines and the "To," "From," "Date" and "Re,"

19   that's it.

20       Q.   And in this document Ms. Amundsen

21   says that she communicated with Mr. Mogel on

22   December 22, 2006 and he, according to

23   Ms. Amundsen, asked NUS to proceed with an

24   investigation.  Do you see that?

Page 82

Frankel

1
2    A.   Yes, I do.
3    Q.   He also says -- she also says that
4  he told her in that conversation on December 22nd
5  that he questioned the amount of the prospective
6  fee that NUS said was possible.
7    A.   I didn't read the whole document.
8  Just a minute.
9    Q.   Why don't you take a look at it.
10   (Witness reviewed document.)
11   A.   Yes, I see where he questioned it.
12   Q.   So even at the outset Mr. Mogel said
13 to NUS, according to Ms. Amundsen, that he
14 questioned the entirety of the fee that was laid
15 out as a possibility in Exhibit 2 for
16 identification. You see that, right?
17   A.   He questioned the fee, yes.
18   Q.   So since the 20th was a Wednesday we
19 know that the 22nd was a Friday. Do you see that?
20   A.   Yes.
21   Q.   So that's Friday, December 22nd,
22 2006, the Friday before Christmas weekend.
23   A.   Okay.
24   Q.   So that was the day, I presume,
25 based upon Mr. Mogel asking NUS to proceed again

Page 83

Frankel

1
2  after delivery of Exhibit 2 for identification,
3  that NUS would then begin work. Is that right?
4    MR. GOODMAN: Objection.
5    MR. MITCHELL: Let me rephrase
6  the question.
7    Q.   After you send the report and
8  recommendation to the client, you wait for the
9  client to approve you moving forward before NUS
10 begins work, right? That's typically how you do
11 it?
12   A.   Correct.
13   Q.   So Ms. Amundsen is writing to the
14 file here about her conversation with Mr. Mogel on
15 December 22, 2006, right?
16   A.   Correct.
17   Q.   So that would be the day that NUS
18 would then begin work moving forward with the
19 recommendation contained as part of Exhibit 2 for
20 identification, right?
21   A.   With the following clarification, if
22 I might.
23   I mean I believe there was work done
24 to get us to that point but with the understanding
25 that if you're saying further investigation, the

Page 84

Frankel

1
2  answer is "yes."
3    Q.   Some work you do anyway. You do
4  work as part of services you provide. You review
5  bills?
6    A.   We do an analysis and audit, yes.
7    Q.   That's part of what you do every
8  month?
9    A.   Every month, every day.
10   Q.   And at that time you are also
11 inputting that into your system, right? Because
12 Tiffany had a separate contract with NUS?
13   A.   Correct.
14   Q.   So other than those activities,
15 you're not aware of NUS having done any other
16 analytical work prior to December 22, 2006, right?
17   A.   I'm not personally aware as it
18 relates to this matter, no.
19     MR. MITCHELL: Let's take a
20   break.
21     MR. GOODMAN: I was going to
22   suggest that.
23     MR. MITCHELL: Thanks.
24   (Recess taken.)
25   Q.   Mr. Frankel, in 1992 when the

Page 85

Frankel

1
2  contract with Tiffany was signed you were
3  identified under your signature as vice president.
4  You see that?
5    A.   That's correct, yes.
6    Q.   Was that your title back then?
7    A.   If I signed it as vice president, I
8  say "yes."
9    Q.   What were your responsibilities in
10 1992?
11   A.   I was responsible for the production
12 department of NUS, as I explained before. I was
13 responsible for signing contracts. I was probably
14 responsible for other things on a corporate level
15 just in general having to do with the day-to-day
16 operations of the office.
17   Q.   Did you meet with any Tiffany
18 representatives prior to the execution of the
19 contract in 1992?
20   A.   I don't remember one way or the
21 other.
22   Q.   So if I asked you whether you recall
23 what you said to Tiffany prior to the execution
24 of the contract, you would not remember -- you don't
25 even remember meeting with anyone; is that right?

Page 98

Frankel
1
2  bullets as a start, with your expertise in your
3  industry, that would say to you that it looks like
4  the source of this "unusual usage pattern" that
5  was identified by Ms. Amundsen in her November 15,
6  2006 e-mail is likely that Tiffany is receiving
7  Polo's bill and Polo is receiving Tiffany's bill,
8  right?
9      A.   Or that the meters were crossed,
10 something along those lines, yes.
11     Q.   So by the first business day --
12          Let's even go beyond that.  By
13 1:34 p.m. on the first business day after Tiffany
14 asked NUS to proceed with an investigation, you as
15 well as your three managers knew that the likely
16 source of the "unusual usage pattern" was that for
17 some reason Tiffany was being billed for Polo
18 Ralph Lauren's usage and Polo Ralph Lauren was
19 being billed for Tiffany's usage, right?
20     A.   We knew that was a possibility, yes.
21     Q.   It was more than a possibility.  It
22 was probable, right?
23     A.   I don't know the difference between
24 probable and possible.  To me they mean the same
25 thing.

Page 99

Frankel
1
2      Q.   Mr. Frankel, you are -- the one
3  thing that you hold yourselves out to be is having
4  vast experience in analyzing utility bills and
5  usage patterns, right?
6      A.   That's correct.
7      Q.   So certainly in the vast experience
8  that you have in the 35 years you've been in this
9  industry, you would read those first three
10 bulleted points and in your mind, unless something
11 else strange happened, it's probable that for some
12 reason Tiffany's getting Ralph Lauren's bill and
13 Ralph Lauren's getting Tiffany's bill, right?
14     A.   It's probable with the understanding
15 that I don't know the nature of the error.  Is it
16 a wiring error?  Is it as we learned in the end,
17 is it mistagged meters?  Is it administrative
18 error done through some computer mixup?  We know
19 something along those lines, but I don't know
20 exactly what the error is.
21     Q.   We don't know exactly.  I understand
22 you don't know exactly.  That is to be solved, but
23 the power company will solve it, right?  The power
24 authority is not --
25          Let's rephrase the question.

Page 100

Frankel
1
2      Based upon a communication from
3  Ms. Schwarting, who now has put a hold on two
4  accounts, LIPA will investigate the problem and
5  try to figure it out, right?  That's what she's
6  saying.
7      A.   That's what she's saying.  And as
8  you will find later on, they did and they came up
9  with the wrong conclusion.
10     Q.   Would you agree with me,
11 Mr. Frankel, that if you in your home receive an
12 electric bill on a monthly basis that averages
13 between $400 and $500, depending upon the season,
14 and then one month you get a bill for $2,500, that
15 you as a customer have the ability to call the
16 utility and say, "Can you explain to me this
17 bill?"  Right?
18     A.   Yes.
19     Q.   And you as a customer, a homeowner,
20 would expect that the utility will then go out and
21 investigate the problem, right?
22     A.   I would expect they would, yes.
23     Q.   So assuming that they investigate
24 the problem and come back to you with a
25 conclusion, the result of which is instead of

Page 101

Frankel
1
2  getting a $400 to $500 a month bill, you then get
3  a $1,900 a month bill, would you agree with me
4  that you would then call the power company again
5  and say, "Hey, guys, that didn't fully solve the
6  problem"?  Right?
7          MR. GOODMAN:  Objection.
8      Q.   You'd notice it, right?
9      A.   I would notice it and I would do as
10 you indicated.
11     Q.   Right.  And unless your bill
12 returned to its previous levels you would believe
13 that the problem wasn't solved, right?
14     A.   Correct.
15     Q.   Now, NUS's expertise was to make
16 sure the problem got solved for Tiffany, right?
17     A.   Our expertise and that's what we
18 were contracted to do, yes.
19     Q.   Right.  So as of December 26, 2006,
20 your expert view would have been that it is likely
21 that the problem here is that for some reason
22 Tiffany is being billed for Ralph Lauren's usage
23 and Ralph Lauren is being billed for Tiffany's
24 usage, right?  Probably?
25     A.   I would suspect that's a potential,

Page 122

1           Frankel
2       Q.   So the likelihood is that even a
3   layman would have noticed that my utility usage
4   went up a lot and would have inquired at some
5   point.
6       A.   You asked me that and I'm trying to
7   be responsive, but the fact is Tiffany paid those
8   higher charges and the person who paid it was not
9   only a, quote-unquote, as you call it, layman, he
10  was like the manager of their accounting
11  department.
12      Q.   Do you know anything about the
13  Tiffany procedure for paying utility bills?
14      A.   Not in detail, no.
15      Q.   In fact, you probably don't know
16  anything about it, right?
17      A.   Okay. I don't.
18      Q.   Were you aware that the Tiffany
19  procedure is to pay the bills and then rely on NUS
20  for a post-payment audit?
21      A.   No.
22      Q.   And did you know that the reason
23  that was in place was because there was concern
24  that if utility bills weren't paid, that power
25  might be turned off to particular store locations

Page 123

1           Frankel
2   and that would be a problem?
3       A.   I think that goes as a general
4   statement for anybody who is paying utility bills.
5       Q.   So you were assuming when you said
6   that that Tiffany analyzed the bills before they
7   paid them, right?
8       A.   I'm assuming that, as you said,
9   anybody would notice such a large increase which
10  was like five or six times the normal bill.
11      Q.   I am just trying to establish the
12  level of expertise it really took to observe that
13  your bill went up six times. It doesn't take that
14  much expertise, does it?
15          MR. GOODMAN: Objection.
16      Q.   Right?
17      A.   (No response.)
18      Q.   Correct?
19      A.   Fine. It doesn't take that much
20  expertise.
21      Q.   Do you have any explanation why no
22  one at NUS told Tiffany about a switched meter or
23  a mistagged meter until January 15, 2007?
24          MR. GOODMAN: Objection.
25      A.   No.

Page 124

1           Frankel
2       Q.   You do not?
3       A.   No.
4           MR. MITCHELL: Off the record.
5           (Recess taken.)
6       Q.   Mr. Frankel, I would like to turn my
7   attention to the Wis-Pak case. Did you ever read
8   the decision by the appellate course in the
9   Wis-Pak case?
10      A.   I'm sure I did.
11      Q.   Did you ever listen to Mr. Goodman's
12  oral argument before the Seventh Circuit panel in
13  that case?
14      A.   No.
15      Q.   Did you attend any part of the
16  proceedings in that case?
17      A.   No.
18      Q.   Did anyone in your office attend any
19  part of the proceedings in that case?
20      A.   I wouldn't know.
21      Q.   The decision was issued by the court
22  of appeals for the Seventh Circuit in 2003, right?
23  Do you remember that?
24      A.   No, I don't.
25          MR. MITCHELL: Let me have the

Page 125

1           Frankel
2   court reporter mark as Exhibit 68 for
3   identification a copy of the Seventh
4   Circuit decision in the Wis-Pak case.
5           (Exhibit 68, copy of the
6   Seventh Circuit decision in the
7   Wis-Pak case, marked for
8   identification, as of this date.)
9       Q.   Mr. Frankel, I have handed you what
10  we have marked as Exhibit 68 for identification
11  which is a copy of a decision we pulled offline in
12  the case Wis-Pak, Inc. versus National Utility
13  Service, Inc. for the United States Court of
14  Appeals for the Seventh Circuit argued March 31,
15  2003, decided May 12, 2003.
16          My first question to you is,
17  Mr. Frankel, were you aware of the Wis-Pak
18  decision when it was issued?
19      A.   I'm sure I was, yes.
20      Q.   And at the time it was issued did
21  you read the opinion?
22      A.   I'm sure I did, yes.
23      Q.   And the National Utility Service,
24  Inc. party in that case is your company, right?
25      A.   Correct.

NATIONAL UTILITY SERVICE VS TIFFANY & CO

BRUCE MOGEL - 2/26/08

CONCORDANCE AND CONDENSED TRANSCRIPT
PREPARED BY:



TOWER 56, 126 EAST 56TH STREET, FIFTH FLOOR, NEW YORK, NEW YORK 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
WWW.ELLENGRAUER.COM

NATIONAL UTILITY SERVICE

BSA XMAX(16/18)
BRUCE MOGEL - 2/26/08

VS TIFFANY & CO

---

Page 69

(1)
(2)    A.  Yes.
(3)    Q.  Is that an e-mail that -- that you
(4) prepared?
(5)    A.  Yes.
(6)    Q.  And you prepared that on or about
(7) November 15, 2006?
(8)    A.  Yes.
(9)    Q.  And you sent it to Sandy Lutz;
(10) correct?
(11)   A.  Yes.
(12)   Q.  Who was Sandy Lutz?
(13)   A.  Sandy Lutz is regional facilities
(14) manager.
(15)   Q.  I ask you to take a look at the
(16) first page of Exhibit 3 and the top two e-mails
(17) where you are identified as a recipient.
(18)   A.  Yes.
(19)   Q.  Do you see them?
(20)   A.  Yes.
(21)   Q.  One is from Brian Ensor and one is
(22) from Bruce Edsor; correct?
(23)   A.  Yes.
(24)   Q.  And you received those on or about
(25) November 16, 2006?

---

Page 70

(1)
(2)    A.  Yes.
(3)    Q.  Were Mr. Ensor's or Mr. Edson's
(4) comments ever forwarded on to anyone else?
(5)    A.  I don't remember.  E-mail
(6) forwarded?
(7)    Q.  Yes, were those e-mails forwarded
(8) to anyone else?
(9)    A.  I -- I don't remember.
(10)   Q.  Did you ever tell NUS the substance
(11) of what Mr. Ensor or Mr. Edson told you?
(12)   A.  I told NUS -- I believe I told
(13) Chris that there wasn't anything unusual going
(14) on in the store that would account for these
(15) fluctuations.
(16)   Q.  Okay.
(17)       MR. GOODMAN:  Now I ask that
(18)   another string of e-mails be marked as
(19)   Exhibit 5 and these bear Bates numbers T
(20)   1139 through T 1141.
(21)       (Plaintiff's Exhibit 5, document
(22)   Bates stamped T 1139 through T 1141,
(23)   marked for identification.)
(24)   Q.  Have you had a chance to look at
(25) Exhibit 5, sir?

---

Page 71

(1)
(2)    A.  Yes.
(3)    Q.  In fact, I see that the answer to
(4) an earlier question is contained here where on
(5) your November 16th e-mail on the first page of
(6) the exhibit it's the second e-mail down,
(7) November 16th at 1:01 p.m..
(8)    A.  Yes.
(9)    Q.  Is this an e-mail that you prepared
(10) and sent to all of the individuals listed on
(11) the addresses line including Christine
(12) Amundsen?
(13)   A.  Yes.
(14)   Q.  And by sending that e-mail to
(15) Christine, you were asking NUS to investigate
(16) the problem at the Manhasset store with respect
(17) to its electric service?
(18)   A.  Yes.
(19)       MR. MITCHELL:  You made a statement
(20)   that answers one of our questions.
(21)   That's hanging out there as a statement,
(22)   but I figured you were going to ask a
(23)   question.
(24)       MR. GOODMAN:  I'll clarify that.
(25)   Q.  What I was referring to there was

---

Page 72

(1)
(2) in your e-mail on November 16 at 1:01 p.m., did
(3) you forward all of the preceding e-mails in
(4) this chain to Christine, among others?
(5)    A.  I --
(6)    Q.  As best you can tell.
(7)    A.  I have no way of telling that.  I
(8) don't e-mail -- e-mail technical things that
(9) are unknown to me.  I'm not sure if -- if
(10) everything preceding this went or not.  I can't
(11) tell by looking at this.  I sent this, but I
(12) don't know what else.
(13)       MR. GOODMAN:  I have another series
(14)   of e-mails that I ask be marked as
(15)   Exhibit 6.  These e-mails do not bear any
(16)   production numbers.  It's a three-page
(17)   string of e-mails.  The first one is on
(18)   the header of Christine Amundsen.  It's
(19)   from Bruce Mogel to Christine Amundsen
(20)   dated December 21, 2006.
(21)       (Plaintiff's Exhibit 6, series of
(22)   e-mails dated 12/20/06 and 12/21/06,
(23)   marked for identification.)
(24)   Q.  Okay, referring to the last e-mail
(25) on this string which is on the first page, this

---

NATIONAL UTILITY SERVICE
BSA XMAX(38/38)
BRUCE MOGEL - 2/26/08
VS TIFFANY & CO

## Page 149

(1)
(2)  problem was resolved?
(3)      A.   Yes. I said let's figure out what
(4)  went wrong and we'd talk about things.
(5)      Q.   And that was agreeable to
(6)  Ms. Amundsen; correct?
(7)      A.   I guess. I don't recall exactly
(8)  what she said.
(9)      Q.   Okay. Now, at the time of Exhibit
(10)  2 for identification, were you aware that the
(11)  meter at the Manhasset store had been changed?
(12)      A.   I have to go back in those trail of
(13)  e-mails. The first I heard about that there
(14)  was an issue with the meter was the one e-mail
(15)  from, I think, the store referencing that there
(16)  was some work, but I didn't relate that back to
(17)  any kind of meter change.
(18)      Q.   When you were first notified by
(19)  Ms. Amundsen in November 2006 about a spike in
(20)  usage --
(21)      A.   Oh, okay.
(22)      Q.   -- at the Tiffany store, were you
(23)  aware at that time that the meter had been
(24)  changed?
(25)      A.   No, I wasn't aware of that.

## Page 150

(1)
(2)      Q.   That's not something that you had
(3)  authorized the landlord to do at the premises
(4)  before it happened; correct?
(5)      A.   That's correct.
(6)      Q.   As far as you know Tiffany was
(7)  uninvolved in that work; right?
(8)      A.   As far as I knew, yeah.
(9)      Q.   Now, did you ever admit to NUS that
(10)  Tiffany owed a fee for projected savings in
(11)  connection with the correction of the Manhasset
(12)  bill? Did you ever use words like that?
(13)      MR. GOODMAN: Objection.
(14)      Q.   Let me rephrase the question. Did
(15)  you ever tell Christine Amundsen or anyone else
(16)  on behalf of NUS that Tiffany admits that it
(17)  owes a fee based on projected savings as a
(18)  result of the correction of the meter error at
(19)  the Manhasset store?
(20)      A.   No, I didn't say that.
(21)      Q.   What was your interest in asking --
(22)  what was your intent in asking Ms. Amundsen to
(23)  correct the problem after the report on
(24)  December 20, 2006?
(25)      A.   My intent was they were the -- they

## Page 151

(1)
(2)  had the contacts with the utilities that we
(3)  didn't. They knew who to call in the various
(4)  departments in that world and I knew that they
(5)  would be better at it than we would and I felt
(6)  that that's something that they should do.
(7)      Q.   And in your mind, was it your
(8)  belief that they would likely be entitled to
(9)  some fee for their services?
(10)      A.   Yes, certainly.
(11)      Q.   And was it your belief that it
(12)  would be a reasonable fee for those services?
(13)      MR. GOODMAN: Objection to the
(14)  form.
(15)      A.   Yes.
(16)      Q.   And did you believe that the fee
(17)  that was projected in Exhibit 2 for
(18)  identification was a reasonable fee based upon
(19)  what you knew about the contract between the
(20)  parties?
(21)      MR. GOODMAN: Objection.
(22)      A.   No, I didn't think that was
(23)  reasonable.
(24)      Q.   Okay. Now, you were shown --
(25)      MR. GOODMAN: Objection for the

## Page 152

(1)
(2)  additional reason that it
(3)  mischaracterizes. There's no fee recited
(4)  in Exhibit 2.
(5)      MR. MITCHELL: You can say
(6)  "Objection." I didn't make any speaking
(7)  objections.
(8)      MR. GOODMAN: Objection. It
(9)  misstates the contents of the document.
(10)      MR. MITCHELL: Thank you.
(11)      Q.   Exhibit 4 for identification is the
(12)  e-mail from Christine Amundsen dated November
(13)  15, 2006. Do you see that?
(14)      A.   Yes.
(15)      Q.   Do you recall, was that the first
(16)  time that NUS notified you or anyone else on
(17)  behalf of Tiffany about having observed an
(18)  issue with the bill from Manhasset?
(19)      A.   That's the first time they notified
(20)  me.
(21)      Q.   And you're not aware of anyone else
(22)  being notified about this before you; correct?
(23)      A.   I'm not aware of it.
(24)      Q.   Okay. So, we can date the first
(25)  communication as best we can to November 15,

NATIONAL UTILITY SERVICE VS TIFFANY & CO

LAWRENCE PALFINI - 2/27/08

CONCORDANCE AND CONDENSED TRANSCRIPT
PREPARED BY:



Ellen Grauer
COURT REPORTING Co. LLC

TOWER 56, 125 EAST 56TH STREET, FIFTH FLOOR, NEW YORK, NEW YORK 10022
PHONE: (212) 750-6434    FAX: (212) 750-1097
WWW.ELLENGRAUER.COM

NATIONAL UTILITY SERVICE   BSA XMAX(16/16)   VS TIFFANY & CO
LAWRENCE PALFINI - 2/27/08

## Page 61

(1)
(2)    A.   I would like a break.
(3)    Q.   Out of courtesy of counsel, I will
(4) offer you a break.
(5)        MR. MITCHELL:  Mr. Goodman, I've
(6) been sitting in your conference room,
(7) this is now the second afternoon —
(8)        MR. GOODMAN:  We don't need to do
(9) this on the record.
(10)       MR. MITCHELL:  Well, you just did
(11) it on the record and it was
(12) inappropriate.  I asked for a break.
(13) It's an hour and a half.  I need to use
(14) the men's room.  I didn't know that if I
(15) say, can we take a break after an hour
(16) and 20 minutes, I have to get a speech
(17) from you and I need your permission to
(18) walk out.
(19)       I was courteous enough to say that
(20) I need a break and I asked if we could
(21) take a break now.  You asked a few more
(22) questions.  I said fine and you continued
(23) to ask questions.  That's not
(24) appropriate.  We can be civil in here.
(25)       MR. GOODMAN:  I'm not being

## Page 62

(1)
(2) uncivil.  Let's take a break.
(3)        MR. MITCHELL:  Thank you.
(4)        MR. GOODMAN:  I'm not finished
(5) responding to you.  You can walk out if
(6) you want.
(7)        MR. MITCHELL:  Finish your
(8) response.
(9)        MR. GOODMAN:  My response is I was
(10) middle of a line of inquiry and I did not
(11) want to interrupt it.  You didn't say
(12) initially that you needed to use the
(13) men's room.  The witness didn't ask for a
(14) break.  I wanted to finish, but if you'd
(15) like a break now, please take one.
(16)       MR. MITCHELL:  Thank you.
(17)       (Recess taken.)
(18)    Q.   Sir, was it your understanding in
(19) 2006 and 2007 that Bruce Mogel was the person
(20) designated by Tiffany to interact with NUS?
(21)    A.   For the retail accounts only, yes.
(22)    Q.   The Manhasset store was included
(23) under that umbrella of retail accounts?
(24)    A.   Yes.
(25)    Q.   And as part of his

## Page 63

(1)
(2) responsibilities, was he authorized to approve
(3) recommendations made by NUS?
(4)    A.   Yes.
(5)    Q.   Was he authorized to reject
(6) recommendations made by NUS?
(7)    A.   Yes.
(8)    Q.   And he was otherwise authorized to
(9) communicate with NUS with respect to utility
(10) bills and NUS's recommendations; is that right?
(11)    A.   Correct.
(12)    Q.   If you turn to Exhibit 41 that we
(13) talked about earlier, and specifically the
(14) addendum to the 1992 agreement which begins on
(15) T 152, what is your understanding as to what
(16) this addendum relates to?
(17)    A.   It relates to additional services
(18) requested of NUS to provide data management
(19) services, to provide historical data though an
(20) internet portal for members of Tiffany and
(21) Company that have been designated and approved.
(22)    Q.   Okay.  I think — you may be
(23) slightly confused and let me just help you.
(24) Does the data management function, is that
(25) covered in the Data Management Service

## Page 64

(1)
(2) Agreement which is what we covered earlier,
(3) it's the second agreement in that packet
(4) starting on page T 155?
(5)    A.   You are correct.
(6)    Q.   Okay.  So we already discussed that
(7) one, correct?
(8)    A.   Yes.
(9)    Q.   Now I'm referring to this addendum
(10) beginning at T 152.  On the first page it
(11) refers to the scope of additional service.  Do
(12) you see that?
(13)    A.   Yes.
(14)    Q.   And do you agree that the
(15) additional service that was covered by this
(16) addendum related to the opening and closing of
(17) Tiffany facilities?
(18)    A.   Yes, that's correct.
(19)    Q.   Now, did the Manhasset store — do
(20) you know when the Manhasset store opened?
(21)    A.   No.
(22)    Q.   The Manhasset store was opened
(23) during 2006; correct?
(24)    A.   I believe so.
(25)    Q.   And it's been open continuously

NATIONAL UTILITY SERVICE, INC. VS. TIFFANY & CO.

KATHLEEN SCHWARTING · 5/6/08

CONCORDANCE AND CONDENSED TRANSCRIPT
PREPARED BY:



*Ellen Grauer*
COURT REPORTING
Co. LLC

TOWER 56, 126 EAST 56TH STREET, FIFTH FLOOR, NEW YORK, NEW YORK 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
WWW.ELLENGRAUER.COM

NATIONAL UTILITY SERVICE, INC.
BSA XMAX(32/32)
KATHLEEN SCHWARTING - 5/6/08
VS. TIFFANY & CO.

---

**Page 125**

(1)
(2) incorrect usage data, it would have been
(3) Tiffany's service that would have been
(4) terminated, correct?
(5)      MR. McAULIFFE: Objection.
(6)   A.  Yes.
(7)   Q.  Have you talked to anybody other
(8) than counsel for KeySpan in this case and other
(9) KeySpan employees about any of the
(10) circumstances that we discussed today?
(11)   A.  I've spoken to other people in the
(12) legal department.
(13)   Q.  I'm not interested in hearing
(14) about any of that.
(15)   A.  No.
(16)   Q.  Other than speaking with legal,
(17) did you talk to anyone outside of KeySpan about
(18) this case?
(19)   A.  Today or --
(20)   Q.  At any time?
(21)   A.  Miss Quinn and Mr. Esby.
(22)   Q.  When was the last time you spoke
(23) with either of them?
(24)   A.  Miss Quinn today. Mr. Esby
(25) regarding this case, I would say, maybe last

---

**Page 126**

(1)
(2) week.
(3)   Q.  And what did they say to you and
(4) what did you say to them?
(5)   A.  I was just asking them if we had
(6) all the records I jus wanted the make sure.
(7)      MR. GOODMAN: I have nothing
(8)   further thank you.
(9)   EXAMINATION BY
(10) MR. McAULIFFE:
(11)   Q.  Ms. Schwarting I have a few
(12) questions. I aPologize. I know it's late I
(13) just have some points that I have to address.
(14) First thing is, you mentioned earlier that LIPA
(15) governs -- its rates are governed by a tariff
(16) book, correct?
(17)   A.  Correct.
(18)   Q.  That tariff book also governs
(19) other policies and procedures that LIPA must
(20) follow, correct?
(21)   A.  Yes.
(22)   Q.  Such as how electricity is billed.
(23) What happens in the event -- withdrawn.
(24)      The tariff book also includes
(25) other policies and procedures including such as

---

**Page 127**

(1)
(2) how electricity should be billed, correct?
(3)   A.  Correct.
(4)   Q.  Another policy contained in the
(5) tariff book is what happens when an overcharge
(6) happened, correct?
(7)   A.  Correct.
(8)   Q.  And the tariff book says that only
(9) the electricity that an entity uses is what
(10) that entity is billed for, correct?
(11)   A.  Correct.
(12)   Q.  If somebody is billed for an
(13) overage of usage, somebody else's usage there
(14) is to be a refund pursuant to the tariff book?
(15)      MR. GOODMAN: Objection.
(16)   A.  Yes, there is.
(17)   Q.  Directing your attention to
(18) Exhibit 50 and we looked at it previously.
(19) Directing your attention to the 3 entries that
(20) we looked at previously from October 6th, '06
(21) through November 30, '06, you see those?
(22)   A.  Um-hum.
(23)   Q.  On all three of those entries
(24) there are, what you indicate, an error message
(25) or error memoranda; is that correct?

---

**Page 128**

(1)
(2)   A.  Correct.
(3)   Q.  The first 1 from 10/8/06 is error
(4) memorandum number 507, correct?
(5)   A.  Correct.
(6)   Q.  November 30, 2006 error message is
(7) 527, correct?
(8)   A.  Correct.
(9)   Q.  What are the policy and procedures
(10) in place for what happens when an error message
(11) number 507 shows up?
(12)   A.  It is produced and the
(13) representative reviews the account and sees if
(14) the 507 has to do with 1 of the indexes would
(15) not be the indexes -- would not be in line.
(16) Basically they review the account and they
(17) would manually, in this case, if the history
(18) was good they would produce a bill based on
(19) previous history.
(20)   Q.  This entry for October '06, the
(21) first 1 that we looked at, when that error
(22) message came up, that number 507, Miss Quinn
(23) was required to create a manual bill because
(24) the information that she was receiving did not
(25) appear to be in line with what the indexes

---

NATIONAL UTILITY SERVICE, INC.

BSA XMAX(33/33)

KATHLEEN SCHWARTING - 5/6/08

VS. TIFFANY & CO.

## Page 129

(1)

(2) indicated that location should have used,

(3) correct?

(4)     A.    Correct.  It could be one index it

(5) could be multiple indexes, correct.

(6)     Q.    At that point LIPA and KeySpan

(7) were on notice that there was a potential error

(8) in the usage at Tiffany's location in

(9) Manhasset?

(10)         MR. GOODMAN:  Objection.

(11)     Q.    It's an error message correct?

(12)     A.    It's a control message.

(13)     Q.    I think you denominated it as an

(14) error memoranda?

(15)     A.    It's produced as a control.

(16)     Q.    It's a potential error?

(17)     A.    Possibly.

(18)     Q.    And you testified earlier that the

(19) error message number 527 was a possible problem

(20) with the battery in the meter, correct?

(21)     A.    I believe so.

(22)     Q.    As a result of the possible

(23) problem with the battery Miss Quinn was forced

(24) to create a manual bill for that billing period

(25) ending October 26, 2006, correct?

## Page 130

(1)

(2)     A.    Correct.

(3)     Q.    Like wise for the period ending

(4) November 22nd, 2006?

(5)     A.    Correct.

(6)     Q.    So pursuant to the tariff book the

(7) usage, if an error, would have been required to

(8) be corrected, correct -- I'll rephrase.

(9)         If Miss Quinn had to do a manual

(10) bill because something was indicating that the

(11) usage was higher than normal for the location?

(12)         MR. GOODMAN:  Objection.

(13)     A.    That's not the type of exception

(14) error they kicked out.

(15)     Q.    If the usage had, in fact, been

(16) higher than what Tiffany was using at the

(17) Manhasset location pursuant to the tariff book,

(18) LIPA and KeySpan would have had to correct that

(19) coverage correct if they -- withdrawn.

(20)         If Tiffany's Manhasset location

(21) was being charged for more usage than they

(22) actually used, then LIPA and KeySpan would have

(23) had to correct that pursuant to the tariff

(24) book, correct, because they were being billed

(25) for more than they actually used?

## Page 131

(1)

(2)     A.    Correct.

(3)         MR. GOODMAN:  Objection.

(4)     Q.    So looking at the entry from

(5) December 26, 2006 the next 1 in the line it

(6) indicates that this is your entry, correct,

(7) because your initials are shown there?

(8)     A.    Um-hum.

(9)     Q.    It indicates that you were

(10) checking for possible switched meters on

(11) 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 which we cleared up is Tiffany's

(12) account number correct?

(13)     A.    That's not Tiffany's account

(14) number 22205 is their account number.

(15)         MR. GOODMAN:  Could you tell me

(16) where you're pointing to.

(17)     Q.    12/26/06 checking for possible

(18) switched meter 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-2.  That may not be

(19) the exact number for Tiffany, but it appears to

(20) be indicating that that is the Tiffany account

(21) number, it may be a digit off.

(22)         MR. GOODMAN:  Objection.

(23)     A.    I -- again, I can't be sure.  It

(24) could be referring to another account.  It's

(25) not clear.

## Page 132

(1)

(2)     Q.    All right.  I'll show you a

(3) document that's been marked previously as

(4) Exhibit 36, which is the electricity bills

(5) agreement between Con Edison Solutions and

(6) Tiffany and Company, you see that?

(7)     A.    Um-hum.

(8)     Q.    If you look at the third page of

(9) that exhibit for Tiffany's address at 1980

(10) Northern Boulevard, Manhasset, New York, the

(11) LIPA account number is listed as 5307323305 is

(12) that correct, you see that?

(13)     A.    Could be an additional electric

(14) meter at that location that's under Tiffany's

(15) name.  I don't know for sure without looking at

(16) computer.  I'm sorry.

(17)     Q.    All right.  If I direct your

(18) attention to the second entry on Exhibit 50

(19) from the dated 12/26/06, it says correct

(20) possible switched meter with R Lauren Polo

(21) account 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?

(22)     A.    Yes.

(23)     Q.    And we saw on Exhibit 72 that the

(24) 2 account numbers that the special

(25) investigation sheet was issued with respect to

# ORIGINAL

1

1  UNITED STATES DISTRICT COURT

2  SOUTHERN DISTRICT OF NEW YORK

   ------------------------------------------X

3  NATIONAL UTILITY SERVICE, INC.,

4               Plaintiffs,

5       - against -

6  TIFFANY & CO., and TIFFANY AND COMPANY,

7              Defendants.

8  Index No.: 07 CV 3345 (RJS)

   ------------------------------------------X

9

10

11                   499 Park Avenue

12                   New York, New York

13

14                   May 7, 2008

                    10:07 a.m.

15

16

17         Deposition of DALE STROHL, pursuant

18  to Subpoena, before Patricia A. Reed, a Notary

19  Public of the State of New York.

20

21

22

23     ELLEN GRAUER COURT REPORTING CO. LLC

      126 East 56th Street, Fifth Floor

24         New York, New York 10022

           212-750-6434

25            REF: 87485

31

STROHL

1

2    A.    Yes.

3    Q.    What was the mechanism pursuant to

4 which NUS would be paid as you understood it in

5 1992?

6    MR. MITCHELL:  Object to the form

7    of the question.

8    A.    I don't recall that, but I see

9 here that it's -- this was the deal right here,

10 paragraph five, as I re-read this and I

11 recollected that that was what was agreed upon.

12    Q.    Do you remember having an

13 understanding in 1992 as to how paragraph five

14 operated?

15    MR. MITCHELL:  You're being asked

16    about your recollection back in 1992 not

17    based upon what you're reading today.  He

18    wants to know what you knew in 1992 if

19    you remember.

20    A.    That NUS would get our utility

21 bills and they would identify or -- no, they

22 would identify opportunities for us for savings

23 in all of our -- in all our electricity bills,

24 either through rate changes or through better

25 usage.  That's my recollection in 1992 as to

55

STROHL

1
2          MR. GOODMAN:  Nothing further.
3      Thank you.
4  EXAMINATION BY
5  MR. MITCHELL:
6          Q.    Mr. Strohl, couple questions.
7  Referring you to Exhibit 1 for identification,
8  first paragraph first line says, we hereby
9  authorize you to submit recommendations for
10  savings on our cost of electricity, first line,
11  you see that?
12          A.    Yes.
13          Q.    When you saw this contract, was it
14  your intent for National Utility Service to
15  submit recommendations for savings for utility
16  usage by any company other than Tiffany?
17          A.    No.
18          Q.    Did you believe when you read
19  paragraph one and the reference to our costs
20  that it was referring to usage by Tiffany?
21          A.    Yes.
22          Q.    And was it you're intent when you
23  signed this agreement that the phrase our costs
24  would refer to usage by a company other than
25  Tiffany?

56

STROHL

1

2          A.      No.

3          Q.      Was it your intent when you signed

4     Exhibit 1 for identification that this

5     agreement would apply in any way to electric

6     usage by a company other than Tiffany?

7          A.      No.

8          Q.      Now, with respect to your intent

9     in signing this agreement in connection with

10    savings you identified better rates and usage

11    as the source or savings, do you recall that?

12         A.      Yes.

13         Q.      Was it your intent when you signed

14    that agreement that if a recommendation was

15    adopted by Tiffany, that after adoption of that

16    recommendation the amount paid by Tiffany for

17    it's own usage at a particular premises would

18    be less than it was before?

19         A.      Yes.

20         Q.      And did you have -- withdrawn.

21              If a recommendation was adopted by

22    NUS, was it your --

23              MR. GOODMAN:  Do you mean by

24         Tiffany?

25              MR. MITCHELL:  I'm sorry.  Let me