UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                            :

NATIONAL UTILITY SERVICE, INC.,     :    Case No.: 07 CV 3345
                            :    (RJS)(GWG)
          Plaintiff,         :

          -against-         :

TIFFANY & CO. and TIFFANY AND      :
COMPANY,                    :

          Defendants.       :
                            :
------------------------------------------------------------X

**DEPOSITION EXCERPTS IN OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT
OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

*HARTMAN & CRAVEN LLP*
488 Madison Avenue
New York, New York 10022
(212) 753-7500

*Attorneys for Plaintiff
National Utility Service, Inc.*

Of Counsel:

Peter G. Goodman
Dana V. Syracuse

# AFFRUNTI
# DEPOSITION

NATIONAL UTILITY SERVICE VS. TIFFANY & CO.

LAURENCE AFFRUNTI - 5/1 4/08

CONCORDANCE AND CONDENSED TRANSCRIPT
PREPARED BY:



*Ellen Grauer*
**COURT REPORTING** Co. LLC
worldwide!

TOWER 56, 126 EAST 56TH STREET, FIFTH FLOOR, NEW YORK, NEW YORK 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
WWW.ELLENGRAUER.COM

NATIONAL UTILITY SERVICE                                           VS. TIFFANY & CO.
LAURENCE AFFRUNTI - 5/14/08

## Page 33

(1)
(2) close a date as you can to when you received
(3) the phone call to take a look at the meter
(4) numbers.
(5)     **A.   I really couldn't do that with any**
(6) **accuracy.**
(7)     Q.   Okay.  So when you say several
(8) weeks, could that have been in the middle of
(9) January, which would be about six, seven weeks
(10) later?
(11)    **A.   It could be.**
(12)    Q.   Do you know how the landlord became
(13) aware of the need to take a look at the meter
(14) numbers?
(15)        MR. MCAULIFFE:  Objection.
(16)    **A.   No.**
(17)    Q.   Again, later in your statement now,
(18) second paragraph, you say, "Upon investigation,
(19) it was determined that a clerical error had
(20) occurred switching account names on the meters
(21) when the new meters were installed."  Can you
(22) explain what you mean by clerical error?
(23)    **A.   An error where they write down, say,**
(24) **meter number 123 and assign that to Tiffany**
(25) **when it's really Polo's and vice versa.**

## Page 34

(1)
(2)     Q.   So what happens then when the meter
(3) reader comes to record the usage?  Well, let me
(4) correct --
(5)     **A.   I know as much about what the meter**
(6) **reader does.  He looks at the number on the**
(7) **meter and he writes down its recorded**
(8) **consumption.**
(9)     Q.   Okay, so is it your understanding
(10) that if the meter is identified as being
(11) associated with Tiffany, but it's actually
(12) Polo's meter, that the meter reader will record
(13) the consumption on that meter as being
(14) Tiffany's consumption?
(15)    **A.   Yes, if that number is assigned to**
(16) **Tiffany and it's really attached to Polo's,**
(17) **then yes, it will be switched.**
(18)    Q.   And vice versa?
(19)    **A.   Correct.**
(20)    Q.   After you spoke with Denise Brendel,
(21) did you have any further conversations with
(22) anyone concerning the meter problem?
(23)    **A.   I don't remember.  Once I give it to**
(24) **them, it's their problem.**
(25)    Q.   Do you know whether the problem was

## Page 35

(1)
(2) corrected?
(3)     **A.   No, I don't follow those things**
(4) **because that's a -- it's an accounting thing**
(5) **for the power company.**
(6)     Q.   Have you ever spoken with an
(7) individual by the name of Christine Amundsen?
(8)     **A.   Here you go bringing up names again.**
(9) **I don't recollect.  When I leave this room, I'm**
(10) **not even going to remember your name.**
(11)    Q.   I've got one more for you.
(12)    **A.   Okay.**
(13)    Q.   Do you recall ever speaking with
(14) someone named Paul Hoffman?
(15)    **A.   No.**
(16)    Q.   I want to show you a document that
(17) was previously marked as Exhibit 56.  It's a
(18) January 15, 2007 memorandum to the file of NUS
(19) Consulting Group by D. Brown, who I will
(20) represent to you is David Brown, and ask you to
(21) read that, please.  (Proffered.)
(22)    **A.   (Perusing.)**
(23)    Q.   Have you read Exhibit 56?
(24)    **A.   Yes.**
(25)    Q.   Does Exhibit 56 refresh your

## Page 36

(1)
(2) recollection as to any conversation you had
(3) with David Brown --
(4)     **A.   No.**
(5)     Q.   -- during the middle of 2007?
(6)     **A.   No.**
(7)     Q.   Excuse me, during the middle of
(8) January 2007?
(9)     **A.   No.**
(10)    Q.   Okay.  I show you another memorandum
(11) from D. Brown to NUS Consulting Group's file
(12) also dated January 15, 2007 and this was
(13) previously marked as Exhibit 64 in this case.
(14) **(Proffered.)**
(15)    **A.   (Perusing.)**
(16)    Q.   Have you read Exhibit 64?
(17)    **A.   Yes, I have.**
(18)    Q.   Does Exhibit 64 refresh your
(19) recollection with respect to any conversations
(20) you had with David Brown regarding the electric
(21) meters at the Americana Mall location in
(22) Manhasset during the middle of January 2007?
(23)    **A.   Not at all.**
(24)    Q.   And if you look at the second
(25) paragraph up from the bottom, the memo says

# AMUNDSEN DEPOSITION

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - -x
NATIONAL UTILITY SERVICE, INC.,                :

        Plaintiff,                        :

                             :

        -against-                        :

                             :
TIFFANY & CO. and
TIFFANY AND COMPANY,                           :

        Defendants.                       :
- - - - - - - - - - - - - - - - - - - -x


        DEPOSITION of National Utility Service, Inc.,

by CHRISTINE AMUNDSEN, taken by Defendants at the

offices of Dreier LLP, 499 Park Avenue, New York,

New York on Tuesday, March 4, 2008, commencing at

10:13 a.m., before Elizabeth Santamaria, a Certified

Shorthand (Stenotype) Reporter and Notary Public

within and for the State of New York.

Page 6

Amundsen

1
2        A.    Account manager, energy consultant,
3  senior consultant.
4        Q.    Could you --
5        A.    I thought of one other title.  Group
6  manager.
7        Q.    Where does that fit in?
8        A.    It fits in before the senior
9  consultant.
10       Q.    Could you generally give me the
11 years that you had the various positions, starting
12 with account manager?
13       A.    Account manager, '86 to '95.
14       Q.    Energy consultant?
15       A.    '95 to '97.
16       Q.    Group manager?
17       A.    '97 until -- well, no.  '97 to '99.
18       Q.    And then senior consultant?
19       A.    Yes.
20       Q.    '99 to today?
21       A.    Yes.
22       Q.    Now, using -- those are the only
23 four titles that you recall having while you were
24 at NUS in the last 22 years; is that right?
25       A.    There was a title I recall, client

Page 7

Amundsen

1
2  service supervisor.  That ran concurrent with
3  being the account manager.
4        Q.    Start with account manager.  What
5  was the job description?  How would you describe
6  your role?
7        A.    It was to be the primary contact for
8  various NUS clients and to liaise between the NUS
9  rate department and the client.
10       Q.    How did that change when you became
11 an energy consultant?
12       A.    Basically I was still doing pretty
13 much the same.  I had more experience and training
14 and understanding as far as energy.  So the job
15 didn't change per se.  It more so just was a title
16 that gave me indication than I had more knowledge
17 of energy than I did when I started.
18       Q.    How about when you became group
19 manager?  Did the job change?
20       A.    Yes.
21       Q.    How did the job change?
22       A.    Well, then I had at times seven or
23 eight consultants that I was managing.
24       Q.    What did those consultants do?
25       A.    They were account managers.

Page 8

Amundsen

1
2        Q.    And their primary -- withdrawn.
3              When you became an account manager,
4  you said you were the primary contact person and
5  the person at NUS who was the liaison between the
6  clients and the rate department; is that right?
7        A.    Right.
8        Q.    Is that what those consultants did
9  when you were their group manager?
10       A.    Yes.
11       Q.    And what was your responsibility in
12 relation to those consultants that were in your
13 group?
14       A.    To assist them, enable them, mentor
15 them.
16       Q.    When you became senior consultant in
17 1999, did your job responsibility change in any
18 way?
19       A.    Yes.
20       Q.    How did it change?
21       A.    I was no longer managing other
22 individuals.  I was working with my own
23 accountants again.
24       Q.    So did your job responsibilities go
25 back to being more like they were earlier when you

Page 9

Amundsen

1
2  were an account manager?
3        A.    Yes.
4        Q.    And you no longer had responsibility
5  for other consultants; is that correct?
6        A.    Right.
7        Q.    And what did the title senior
8  consultant mean within the hierarchy of NUS?
9              Let me rephrase that.
10             Was there a difference between an
11 account manager and a senior consultant in terms
12 of job responsibility?
13       A.    Yes.
14       Q.    What is the difference?
15       A.    The senior consultant would more
16 likely handle the larger accounts.
17       Q.    And was Tiffany at NUS considered a
18 larger account?
19       A.    Yes.
20       Q.    So the Tiffany account would be
21 handled by you as a senior consultant; is that
22 right?
23       A.    Yes.
24       Q.    When were you first an assigned to
25 the Tiffany account?

Page 18

Amundsen

1
2    A.   Towards the beginning.
3    Q.   Are you the most senior consultant
4  of the six consultants?
5    A.   Yes.
6    Q.   Do you train other consultants in
7  how to perform their services?
8    A.   Yes.
9    Q.   What types of things do you train
10  these consultants in?
11    A.   Well, throughout my career I have
12  done that. If you mean -- I mean lately I have
13  been visiting clients and I will have a junior
14  person with me.
15    Q.   In the production of documents by
16  NUS there was some memoranda to the file that I
17  saw you wrote. Is that something that you do as
18  part of your job?
19    A.   Yes.
20    Q.   Did someone tell you that it was a
21  good idea to create these memoranda to the files
22  to memorialize certain things?
23    A.   It's policy.
24    Q.   And you say it's policy. Where does
25  that policy come from?

Page 19

Amundsen

1
2    A.   I use the word "policy." I couldn't
3  pull out a policy that I can think of.
4    Q.   Is there a policy manual?
5    A.   I'm not sure.
6    Q.   Have you ever seen one?
7    A.   Not exactly.
8    Q.   Have you ever seen a book that
9  contains form documents that you should use in
10  your consulting services?
11    A.   In the past, the long past.
12    Q.   What do you recall seeing as forms
13  that you should use in providing the services?
14    A.   I wouldn't call it a form. A sample
15  letter. That's the type of thing.
16    Q.   Where did you see that?
17    A.   Early in my career someone had a
18  book of sample letters.
19    Q.   How about a sample report and
20  recommendation? Is there such a thing?
21    A.   There is templates.
22    Q.   Does that still exist, these
23  templates?
24    A.   Yes.
25    Q.   Where are those templates?

Page 20

Amundsen

1
2    A.   In the computer system.
3    Q.   And what templates are you aware of
4  that exist in the computer system?
5    A.   Various ones, numerous ones
6  pertaining, you know, to begin a report on many of
7  the types of recommendations we make.
8    Q.   So on your system you are aware of
9  the existence of various templates that are used
10  at NUS to communicate with clients; is that right?
11    A.   To begin drafting a specific
12  recommendation.
13    Q.   Did anyone ever tell you why there
14  existed templates on the NUS system to guide the
15  drafting of materials to clients?
16    A.   No one told me why.
17    Q.   Do you have an understanding about
18  why they are used at NUS?
19    A.   My understanding, yes.
20    Q.   What is your understanding?
21    A.   Is because they chose wording that
22  was the most appropriate, the best wording to
23  explain what we were recommending. So once they
24  had finalized that this was a very good wording,
25  that was, you know, chosen as the template or

Page 21

Amundsen

1
2  designated the template.
3    Q.   Are there also templates for
4  reporting progress to clients?
5    A.   No.
6    Q.   When you said the best wording, was
7  that because that wording corresponded with
8  language with contracts that NUS had with clients?
9    A.   No, it wasn't -- to my knowledge, it
10  wasn't based on that.
11    Q.   Did the templates contain words like
12  "savings"?
13    A.   No doubt.
14    Q.   Did they contain words like
15  "refund"?
16    A.   Sometimes.
17    Q.   Did they contain words that would
18  assist you in communicating to the client what NUS
19  believes projected savings in the future might be
20  in connection with something you might be doing?
21    A.   Sometimes.
22    Q.   And those would be categories of
23  types of things that NUS might seek to recover a
24  fee for, correct? Savings and refunds?
25    A.   Could you say that one more time?

Page 34

Amundsen

1
2     Q.   So that's not at issue in this case
3  currently?
4     A.   Right.
5     Q.   So in this case currently there is
6  no issue of NUS having negotiated a better rate
7  for Tiffany from its suppliers, correct?
8     A.   Not in this case.
9     Q.   Did you make any report to Tiffany
10 about rate savings through Con Ed Solutions before
11 this dispute arose?
12    A.   Yes.
13    Q.   And when was that?  Do you recall?
14    A.   No.
15    Q.   What does "wheeling" mean in your
16 industry?
17    A.   That's synonymous with third-party
18 supply.
19    Q.   When you say it's synonymous, what
20 is it?  Can you give me a definition?
21    A.   It means seeking an alternate
22 supplier for the commodity portion of your
23 utilities.
24    Q.   Did you make a recommendation to
25 Tiffany in connection with the Manhasset store in

Page 35

Amundsen

1
2  approximately October 2004?
3     A.   I couldn't verify the date without
4  looking, because there were many different
5  recommendations for many different facilities.
6     Q.   And other than with respect to the
7  Manhasset store, whenever a recommendation was
8  made to Tiffany that was implemented, Tiffany paid
9  NUS the fee that NUS claimed was due.  Isn't that
10 right?
11    A.   Right.
12    Q.   So there was never an issue until
13 this case arose of Tiffany paying its bills to
14 NUS, right?
15    A.   Right.
16         MR. MITCHELL:  Let me have the
17         court reporter mark as Exhibit 43 for
18         identification this document, a chart
19         Bates stamped NUS 793 to 794.
20         (Exhibit 43, two-page document
21         bearing Bates numbers NUS 793 - 794,
22         marked for identification, as of this
23         date.)
24    Q.   Ms. Amundsen, I am handing you what
25 has been marked as Exhibit 43 for identification.

Page 36

Amundsen

1
2     A.   Yes.
3     Q.   It is a document produced by NUS.
4  Have you ever seen this before?
5     A.   It's been reduced, but I've seen it.
6     Q.   What is it?
7     A.   It's a list of location address,
8  utility, numerous columns of information
9  pertaining to recommendations that were presented
10 to Tiffany.
11    Q.   So if we go across the top, at the
12 top left on the first page of the exhibit it says
13 "Tiffany and Company."  Do you see that?
14    A.   Yes.
15    Q.   That would be a ledger sheet
16 maintained by NUS for Tiffany and Company?
17    A.   It's information that was on our
18 computer system.
19    Q.   This information is maintained
20 electronically?
21    A.   Yes.
22    Q.   The first column says "Location
23 Address."  Do you see that?
24    A.   Yes.
25    Q.   That would be the various Tiffany

Page 37

Amundsen

1
2  locations to which a proposal might apply?
3     A.   Yes.
4     Q.   The next column says "Utility."  Do
5  you see that?
6     A.   Yes.
7     Q.   Would that be the utility company
8  for that location?
9     A.   Yes.
10    Q.   And there is an account ID number
11 next.  Do you see that?
12    A.   Yes.
13    Q.   Next column says "Reco - Status."
14 Do you see that?  What does that stand for?
15    A.   It's recommendation.  "Reco" is an
16 abbreviated word.
17    Q.   And "reco" stands for
18 recommendation?
19    A.   Yes.
20    Q.   And then beneath that are various
21 entries.  Some say "cancelled."  Do you see that?
22    A.   Yes.
23    Q.   What does "cancelled" mean?
24    A.   It means for one reason or another
25 the recommendation is not pending.

Page 38

Amundsen

1
2     Q.   What does "pending" mean?
3     A.   "Pending" means it's still a viable
4   option, it's still -- it means it hasn't been
5   cancelled for one reason or another.  It means it
6   hasn't been implemented.
7     Q.   Okay.  Then there is "implemented."
8   What does that mean?
9     A.   That means the recommendation was
10  pursued and put into effect.
11    Q.   The next column says "recommendation
12  type."  What does that mean?
13    A.   That means the type of
14  recommendation.  It means what we proposed.
15    Q.   And some here say "direct purchase."
16  What does "direct purchase" mean?
17    A.   Direct purchase means seeking a
18  third-party supplier.
19    Q.   What is the effect of -- withdrawn.
20    How would seeking a third-party
21  supplier result in a savings to Tiffany?
22    A.   In a majority of-- in some cases,
23  the third-party supplier was selling the commodity
24  at a rate cheaper than the utility company.
25    Q.   So a direct purchase would result in

Page 39

Amundsen

1
2   a reduction in rate?  Is that right?
3     A.   I wouldn't call it -- well, rate is
4   a reduction in price.
5     Q.   And price reflected how?
6     A.   Reflected in the cost, the total
7   cost of the commodity.
8     Q.   So the commodity, let's take the
9   first implemented direct purchase on Exhibit 43
10  for identification, which shows for Parsippany,
11  New Jersey, a direct purchase of gas.  Do you see
12  that?
13    A.   Wait a minute.
14    Q.   It's the tenth line down.  Do you
15  see that?
16    A.   Is the utility Jersey Central Power
17  & Light?
18    Q.   New Jersey Natural Gas.
19    A.   Yes, direct purchase implemented.
20    Q.   So the implementation of that direct
21  purchase would result in a lower charge for gas,
22  correct?
23    A.   Could result.  I mean when this
24  recommendation was made with direct purchase you
25  have to keep monitoring the market and the pricing

Page 40

Amundsen

1
2   and things of that sort.  Most cases it's a
3   savings.  Sometimes there are losses.
4     Q.   In going direct, the recommendation
5   would enable Tiffany to purchase gas for less by
6   going directly to the supplier, correct?  That's
7   the idea.
8     A.   The idea is to see if they could
9   lower their cost by doing that.
10    Q.   And here this, we didn't go across,
11  but the next column is "Comments."  Do you see
12  that?
13    A.   Yes.
14    Q.   "Comments" would be what?  What does
15  that mean?
16    A.   If the person who created the
17  recommendation wanted to provide a little more
18  detail about what was being recommended.  But in
19  this case it just says "R/CDP."
20    Q.   Meaning what?
21    A.   Meaning rate change direct purchase.
22    Q.   So in this particular circumstance
23  the comment indicates that direct purchase
24  resulted in a lower rate, correct?
25    A.   Not necessarily.

Page 41

Amundsen

1
2     Q.   What does the "R/C" then mean?
3     A.   It means rate change to direct
4   purchase, but you're saying --
5     I think you said in this case it
6   means a lower rate.
7     Q.   This was an implemented
8   recommendation, correct?
9     A.   Yes.
10    Q.   And then you have another column
11  after that.  It says "EST savings."  Do you see
12  that?
13    A.   Yes.
14    Q.   That would be estimated savings?
15    A.   Yes.
16    Q.   So NUS estimated that the savings by
17  implementing this recommendation would be $9,000,
18  right?
19    A.   It says $9,000 estimated savings.
20    Q.   So the anticipation from NUS was
21  that there would be a reduction in rate to Tiffany
22  that would result in a savings of $9,000.  Is that
23  accurate?
24    A.   I would say reduction in cost.
25    Q.   You're saying cost, but it does say

Page 42

Amundsen

1
2  "R/C," right?
3       A.   Right.  But by that type of R/C, I
4  believe that's more of a designation.
5       Q.   In looking at Exhibit 43 for
6  identification --
7            First of all, have you ever seen
8  this before?
9       A.   Yes.
10      Q.   Does this document provide a history
11 of the recommendations made by NUS to Tiffany
12 during the life of the parties' relationship with
13 each other?
14      A.   I believe so.
15      Q.   And it would show both
16 recommendations that were made and then of those
17 recommendations which ones were implemented,
18 right?
19      A.   Yes.
20      Q.   And isn't it fair to say that if you
21 put aside the dispute in this lawsuit, all of the
22 recommendations contained on this document are
23 recommendations that were made by NUS for Tiffany
24 to lower its cost of a utility?
25      A.   I have to go down the list and just

Page 43

Amundsen

1
2  verify if I think that's the case.
3            Yes.  The recommendations were to
4  lower the cost.
5       Q.   Am I correct in understanding the
6  column "Estimated Savings," that would be the
7  annual estimated savings, is that right, that was
8  projected by NUS?
9       A.   It would be the estimated annual
10 savings or if it were a one-time savings.
11      Q.   And if you look at the column
12 "Estimated Savings" there is not in any of the
13 implemented recommendations other than Manhasset,
14 any implemented recommendation that is even a
15 six-figure estimated savings.  Isn't that right?
16      A.   I'll just verify that.
17           On an annual basis.
18      Q.   That's correct, right?
19      A.   Right.
20      Q.   Many of the estimated savings
21 figures are four figures on an annual basis.  Is
22 that right?
23      A.   Some are four, some are three, some
24 are five.
25      Q.   So until this dispute arose with NUS

Page 44

Amundsen

1
2  concerning the Manhasset store, there had not been
3  an instance where NUS had made a claim that there
4  was an estimated savings as a result of a
5  recommendation that was even in a six-figure
6  amount.  Isn't that right?
7       A.   Right.
8       Q.   So from 1992 to 2006 an estimated
9  annual savings of the magnitude that is at issue
10 in this case had never arisen between the parties.
11 Is that right?
12      A.   Right.
13           MR. MITCHELL:  Please mark
14      this as Exhibit 44.
15           (Exhibit 44, two-page document
16      bearing Bates numbers T-1 - T-2,
17      marked for identification, as of this
18      date.)
19           THE WITNESS:  May I take a
20      restroom break?
21           MR. MITCHELL:  Sure.
22           (Recess taken.)
23      Q.   Ms. Amundsen, you said in order to
24 get commission you have to hit a target number?
25      A.   Yes.

Page 45

Amundsen

1
2       Q.   What was your target number for
3  2006, 2007?
4       A.   Target for collections for myself?
5       Q.   Yes.
6       A.   Fifty -- $52,000 a month.
7       Q.   What does that mean?  Collected
8  revenues for NUS?
9       A.   Yes.
10      Q.   Did you hit your target for 2006?
11      A.   Yes.
12      Q.   How many accounts are you assigned
13 to, approximately?
14      A.   Approximately 135.
15      Q.   And the precise situation that arose
16 here, which was mistagging of meters at the
17 Manhasset store, you had never seen that before in
18 all of your years working at NUS, right?
19      A.   Right.
20      Q.   Now, I would like to hand you what
21 we have marked as Exhibit 44 for identification.
22           Ms. Amundsen, I have handed you what
23 has been marked as Exhibit 44 for identification.
24 Is this an e-mail you wrote to Bruce Mogel on or
25 about December 29, 2003?

Page 62

Amundsen

1
2  spike in usage that was observed at the Manhasset
3  store?
4      A.  Yes.
5      Q.  Now, and the information contained
6  in Exhibit 45 is the information that is reflected
7  on the first line of the page Bates stamped T1128
8  that's part of Exhibit 4 for identification,
9  right?
10      A.  The first line? I'm sorry.
11      Q.  In other words, the bill which is
12  Exhibit 45 for identification is for the period
13  September 19, 2006 to September 27, 2006, correct?
14      A.  Yes.
15      Q.  That's the same time period that the
16  first line of the chart that is part of Exhibit 4
17  for identification is from, correct?
18      A.  Yes.
19      Q.  Turning you to the first page of the
20  bill, Exhibit 45 for identification, there is a
21  line that says, in all caps, "IMPORTANT MESSAGES."
22  Do you see that?
23      A.  Yes.
24      Q.  It says, "The new electric meter at
25  your premises has a multiplier of 180. Your use

Page 63

Amundsen

1
2  of electricity on this new meter is determined by
3  subtracting the previous reading from the present
4  reading and multiplying the difference by this
5  multiplier.
6      "We recently changed your meter.
7  Energy usage shown combines usage from both the
8  removed and new meters."
9      Did you note on the bill that the
10  meter had been changed for the premises?
11      A.  At that time, no.
12      Q.  So you didn't see that?
13      A.  No.
14      Q.  So you on November 15, 2006, reached
15  out to Mr. Mogel to tell him that NUS had
16  identified an unusual spike in usage, correct?
17      A.  Yes.
18      Q.  And you presumed unless there was
19  some explanation for using more power, that this
20  was probably some mistake, right?
21      MR. GOODMAN: Objection.
22      Q.  You thought it probably was a
23  mistake with billing, right?
24      A.  It was unusual, so something had to
25  be questioned.

Page 64

Amundsen

1
2      Q.  And if you had seen that the meter
3  had been recently changed, in your experience,
4  wouldn't that have said to you maybe there is a
5  problem with the new meter?
6      A.  I would still be leaning towards
7  usage more so than a meter problem.
8      Q.  Well, at this time you are a senior
9  consultant, right?
10      A.  Yes.
11      Q.  You have been doing this for
12  20 years, right?
13      A.  Right.
14      Q.  Didn't you think it was important to
15  take a close look at the bill to see all the
16  information contained in it as part of providing
17  your services?
18      A.  Yes, it's important to look at the
19  bill.
20      Q.  And you didn't notice on the bill
21  that the meter had just been changed, right?
22      A.  Right.
23      Q.  And that certainly could have been
24  an important factor, right, the reason for the
25  spike?

Page 65

Amundsen

1
2      A.  Could have been.
3      Q.  Whose responsibility at NUS would it
4  have been to observe from the bill that there had
5  been a changed meter?
6      MR. GOODMAN: Objection.
7      A.  The first person would have been the
8  poster, because we post that information.
9      Q.  So what would you post on your
10  system to reflect that a bill -- a meter had been
11  changed?
12      A.  The new meter number.
13      Q.  And is there some other identifying
14  information that goes into the system?
15      A.  No.
16      Q.  Do you do any work to make sure that
17  the new meter is working properly?
18      A.  Do any work to make sure?
19      Q.  Do you do any calculation? Is there
20  any -- let me rephrase it.
21      Is there any procedure in place at
22  NUS when a meter is changed for a customer to
23  ascertain or make sure that the meter is
24  functioning properly?
25      A.  Verifying the bill, the charges on

Page 70

```
 1                  Amundsen
 2        A.   I just want to read the string.
 3        Q.   Sure.
 4        A.   Yes.
 5        Q.   So by November 16, 2006 you were
 6   aware that Tiffany was not aware of anything it
 7   was doing at the store that would cause its power
 8   consumption to rise so dramatically, correct?
 9        A.   Yes.
10        Q.   So to the extent you surmised on
11   November 15, 2006 that this might be a mistake, by
12   November 16, 2006 I presume you had a stronger
13   feeling that this was probably a billing error.
14   Right?
15        A.   Yes.
16        Q.   So as of November 16, 2006, your
17   assumption that you were operating under is that
18   there is some billing error at Tiffany's Manhasset
19   store, right?
20        A.   Yes.
21        Q.   And on November 16, 2006 in
22   Mr. Mogel's e-mail to you at 1:01 p.m. he writes:
23   "Chris, please investigate the LIPA involvement.
24   Let me know if anything needs to happen at the
25   site." Did you receive that e-mail?
```

Page 71

```
 1                  Amundsen
 2        A.   Yes.
 3        Q.   So Mr. Mogel asked you to look into
 4   this on November 16, 2006, right?
 5        A.   Yes.
 6        Q.   What did you do then on November 16,
 7   2006, after receiving that e-mail?
 8        A.   I don't think I was in the office on
 9   November 16th. It's my husband's birthday. I'm
10   thinking we made a long weekend and then I think
11   we got into Thanksgiving holidays. And so part of
12   me might have said, "Let's wait and see what the
13   next bill might show." Maybe there would be an
14   adjustment, maybe there would be something more
15   conclusive. I'm not sure at that time we had bill
16   or a complete history of the LIPA and the Con Ed
17   Solutions because they came from two different
18   sources.
19        Q.   Tell me what you specifically
20   remember you did next.
21        A.   I remember going to the rate
22   department.
23        Q.   When did you go to the rate
24   department?
25        A.   Early to mid December.
```

Page 72

```
 1                  Amundsen
 2        Q.   Early to mid December?
 3        A.   Right.
 4        Q.   So you do not remember doing
 5   anything specific in connection with this
 6   situation until sometime in December; is that
 7   correct?
 8        A.   Right.
 9        Q.   So to the extent Mr. Mogel asked you
10   on November 16, 2006 to investigate, you did not
11   begin investigating immediately, right?
12        A.   Right.
13        Q.   With respect to Exhibit 4 for
14   identification, the chart, who prepared that
15   chart, which is Page 2 of Exhibit 4 for
16   identification?
17        A.   I believe I did.
18        Q.   Was that prepared on a -- on Excel
19   as a spreadsheet?
20             Let me rephrase the question.
21             Is this a report that comes off some
22   computer system?
23        A.   No.
24        Q.   So this is something you just typed
25   up yourself?
```

Page 73

```
 1                  Amundsen
 2        A.   Right.
 3        Q.   Where did you get the information
 4   that's contained in the report itself?
 5        A.   From the bill.
 6        Q.   So you physically were looking at
 7   the bills?
 8        A.   Yes.
 9        Q.   Is that right?
10        A.   I believe so.
11        Q.   Did somebody then approve this
12   before you sent it out?
13        A.   No.
14        Q.   No, right?
15        A.   No one approved it.
16        Q.   Now, the first communication that I
17   see with LIPA by NUS is a letter dated
18   December 22, 2006. Are you aware of any
19   communication with any of the power companies
20   involved by NUS prior to December 22, 2006?
21        A.   By myself personally?
22        Q.   Are you aware of any communication
23   that anyone made in connection with this observed
24   situation prior to December 22, 2006, by NUS?
25        A.   I'm not specifically aware.
```

Page 74

Amundsen
1
2    Q.   And this is your account, correct?
3    A.   Yes.
4    Q.   And was Bruce Mogel your primary
5  contact at Tiffany for this account?
6    A.   If it related to retail facilities.
7    Q.   Because he was the -- he was in
8  charge of retail facilities, right?
9    A.   Right.
10   Q.   And there is no written
11 communication with Mr. Mogel prior to December 22,
12 2006, in which you tell him that someone on behalf
13 of NUS has reached out to the power authority.
14 That's correct, right?
15   A.   I think we presented a cost analysis
16 report to Bruce.
17   Q.   That's the next thing you remember
18 doing?
19        MR. GOODMAN:  Objection.
20   Q.   Is that correct?
21   A.   After?
22   Q.   After he asked you to investigate in
23 November.
24        MR. GOODMAN:  Objection.
25   A.   Well, no.  I mean the next thing I

Page 75

Amundsen
1
2  did with Bruce.  Because I went -- as I said, I
3  went to the rate department.  There were many
4  conversations ongoing.  I asked the rate
5  department manager to assign it to someone so that
6  if it was a recommendation and report we need to
7  get to the client, it would prepared by the
8  specific analysts.
9    Q.   Did you go to your templates at all
10 during this period?
11   A.   I don't go to templates.  The rate
12 department would use the templates.
13   Q.   How does the rate department use the
14 template?
15   A.   They decide whether or not they want
16 to use one of the templates to start preparing a
17 report.
18   Q.   Who prepared the report and
19 recommendation to Tiffany that was dated
20 December 20, 2006?
21   A.   Steve Schnaer.
22   Q.   Who is Steve Schnaer?
23   A.   One of the rate analysts in the rate
24 department.
25   Q.   When did he begin preparing that

Page 76

Amundsen
1
2  report?
3    A.   First I went to Paul Hoffman, who is
4  the manager of the rate department, and I asked
5  him to assign it and he assigned it to Steve.  I
6  don't know what date he assigned it, offhand.
7    Q.   Was it around the time of your
8  November conversation or is this in December?
9    A.   December.
10   Q.   So your conversation with Paul
11 Hoffman was sometime in December?  Is that the
12 best of your recollection?
13   A.   Yes.
14   Q.   Why did you wait so long to talk to
15 Mr. Hoffman?
16   A.   I didn't wait.  There may have been
17 a case where I was still looking to see if
18 additional bills came in.  There were other
19 account issues.  There were vacation days.
20        I didn't wait to see Paul Hoffman.
21 I took it to Paul Hoffman when I was able to
22 address that issue.
23   Q.   And tell me everything you remember
24 about your conversation with Paul Hoffman.
25   A.   I probably said, "Paul, Christine

Page 77

Amundsen
1
2  Biancho gave me these bills because there is an
3  unusual spike in consumption and would you please
4  have someone in your department look at it,
5  investigate further and see if we need to make a
6  report."
7    Q.   What is the responsibility of the
8  rate departments?  What do they do?
9    A.   They audit, analyze, create
10 recommendations and proposals, prepare reports,
11 deal with third-party suppliers, negotiate
12 pricing.  Things of that nature.
13   Q.   Ultimately this was not a rate
14 problem, right?
15        MR. GOODMAN:  Objection to
16   form.
17   A.   To the best of my knowledge.
18   Q.   You understand what the ultimate
19 resolution was here, correct?
20   A.   Yes.
21   Q.   And there was not a rate issue in
22 the end?
23   A.   Right.
24   Q.   So at the very beginning when you
25 began the process of moving Mr. Mogel's request to

Page 78

Amundsen

1
2   investigate forward, your initial thought was to
3   treat it as a rate issue, right?
4       A.   No.
5       Q.   You took it to the rate department,
6   right?
7       A.   They handle everything that has to
8   do with recommendations, reports, analysis.
9   They're the people that don't leave the office.
10      Q.   But if I understood you correctly,
11  you had never had a situation of a mistagged meter
12  before.  Right?
13      A.   Right.
14      Q.   And as far as you're aware, NUS had
15  never had this situation before, right?
16          MR. GOODMAN:  Objection.
17      Q.   To your knowledge, you are not aware
18  of it ever having happened at NUS?
19      A.   A mistagged meter?
20      Q.   Yes.
21      A.   To my knowledge, that's right.
22      Q.   So you were operating at the outset
23  as if this was something that was more within what
24  you would normally and usually see in your
25  day-to-day activities working for NUS, right?

Page 79

Amundsen

1
2       A.   We're talking about a spike in
3   usage?  That's a scene in my day-to-day
4   activities.
5       Q.   And your assumption as you are
6   proceeding at the beginning is that at least the
7   meter is recording usage for the premises that's
8   getting the bill, right?  That's your assumption?
9       A.   Yes.
10      Q.   So you did not operate from the
11  assumption at the outset that Tiffany was actually
12  receiving a bill for usage of another premises,
13  correct?
14      A.   Correct.
15      Q.   So your mind set was this could be a
16  problem with the rate that's being applied to
17  Tiffany's usage, correct?
18      A.   No.  That wasn't my mind set.
19      Q.   Did you have any mind set at all
20  about what you thought it might be when you go and
21  speak with Mr. --
22      A.   Mr. Hoffman.
23      Q.   -- Mr. Hoffman?
24      A.   No.  I didn't have -- I thought this
25  is something for the rate department to look into.

Page 80

Amundsen

1
2       Q.   Now, if we jump forward to the
3   resolution, the resolution of the problem was
4   handled by an investigation that was conducted by
5   LIPA, right?
6           MR. GOODMAN:  Objection.
7       A.   Numerous people were involved in the
8   investigation.
9       Q.   Well, you never went to the
10  premises, correct?
11      A.   Correct.
12      Q.   Did anyone for NUS ever look at the
13  meters?
14      A.   Not to best of my knowledge.  We
15  offered, I believe.
16      Q.   But you didn't go, correct?
17      A.   Yes.
18      Q.   There were representatives of LIPA
19  that looked at the meter, correct?
20      A.   Yes, based on our asking them to do
21  so.
22      Q.   Just people that went.  Okay?
23      A.   Yes.
24      Q.   The people that went was somebody
25  from LIPA, right?

Page 81

Amundsen

1
2       A.   Yes.
3       Q.   And there was someone from the
4   electrical contractor who was hired by the
5   landlord, correct?
6       A.   Yes.
7       Q.   Albertson Electric?
8       A.   Yes.
9       Q.   Those are the people that physically
10  inspected the boxes, correct?
11      A.   Based on our asking them to look at
12  it.
13      Q.   Right.  You communicated to the
14  power company that we have observed something
15  unusual and the power company sent someone out to
16  look at it, right?
17      A.   Yes.
18      Q.   That's what happened?
19      A.   Yes.
20      Q.   And in addition the landlord's
21  contractor took a look at it?
22      A.   Yes.
23      Q.   And ultimately it was the
24  observations of the people who took a look at this
25  that concluded that there was a problem in the

Page 82

```
 1              Amundsen
 2  tagging of the meters, correct?
 3         MR. GOODMAN: Objection.
 4      A.    There is an element in there of our
 5  rate department discerning that it wasn't just the
 6  multiplier being responsible for the spike, so
 7  that caused the ultimate investigation and result.
 8      Q.    Ms. Amundsen, what prevented you
 9  from contacting the power company on November 16,
10  2006 and saying to the power company, "We have a
11  client that has a very unusual bill for last
12  month. Could you take a look at that, please"?
13  What stopped you from doing that?
14      A.    That would have been premature on my
15  part.
16      Q.    Well, Mr. Mogel simply said
17  investigate it on November 16th, right?
18      A.    Right.
19      Q.    And then he left it to your judgment
20  to determine the manner in which you would
21  investigate it, right?
22      A.    Yes.
23      Q.    And I'm asking you now, what
24  prevented you from just picking up the phone,
25  contacting someone at the power company and
```

Page 83

```
 1              Amundsen
 2  saying, "This bill looks strange. The client
 3  tells me they haven't done anything unusual. Why
 4  is there so much usage reflected"? Why couldn't
 5  you do that?
 6      A.    I wouldn't normally do that. I
 7  would consult with the NUS rate department first.
 8      Q.    Ms. Amundsen, by this period of time
 9  you have been in this business for 20 years,
10  right?
11      A.    Right.
12      Q.    And you have already concluded,
13  based upon your communication with your client,
14  that it is likely that there is some mistake here,
15  right?
16      A.    Right.
17      Q.    The place where the mistake probably
18  happened is at the power company, right?
19      A.    Right.
20      Q.    So wouldn't it have been simple to
21  simply call someone, use your contacts at the
22  power company, pick up the phone and say, "Would
23  you please take a look at this bill"? That seems
24  to be very simple.
25         MR. GOODMAN: Objection.
```

Page 84

```
 1              Amundsen
 2      Q.    Isn't it?
 3      A.    It seems simple, but it's not the
 4  way we handle cases procedurally. We rely on our
 5  rate department for analysis.
 6      Q.    To build up the file?
 7      A.    Build up?
 8         MR. GOODMAN: Objection.
 9      Q.    I'm just asking. To build up the
10  file?
11      A.    No, not to the build up. For advice
12  and review and insight.
13      Q.    Isn't it what you ultimately did?
14  Didn't you ultimately call LIPA? That's what you
15  did.
16         MR. GOODMAN: Objection.
17      A.    Not before we did our own group
18  review and study of what possibilities could be,
19  sought to make sure we had complete historical
20  data. It's a process, it isn't a quick pick up
21  the phone, talk to the utility.
22      Q.    Well, that's what you did, right?
23      A.    Eventually.
24      Q.    And when you picked up the phone and
25  talked to the utility, in that first conversation
```

Page 85

```
 1              Amundsen
 2  the utility told you it looks like the meters were
 3  switched. Right?
 4         MR. GOODMAN: Objection.
 5      Q.    They didn't tell you that?
 6      A.    Oh, switched. When you said
 7  switched, I had the wrong interpretation. They
 8  said a new meter was installed, I believe.
 9      Q.    Didn't they also tell you that they
10  looked at the Polo meter at the same time?
11      A.    Not that I recall.
12      Q.    You don't recall that?
13      A.    No.
14      Q.    Isn't it true that when you talked
15  to the power company on December 26, 2006, that
16  the representative for LIPA pulled up on her
17  screen both the usage for Tiffany and Polo? You
18  don't remember that?
19      A.    Not perfectly clearly, no.
20      Q.    And you don't remember the person
21  telling you that when she looked at the screen,
22  she saw not only a spike in the Tiffany usage but
23  a similar decrease in the Polo usage at the same
24  time?
25      A.    I remember hearing that, but I don't
```

Page 118

1           Amundsen
2  proposal?
3       A.   The purpose was to assist --
4            MR. GOODMAN: I object to the
5       form of the question.
6       Q.   Let me rephrase the question.
7            Does NUS have a business purpose for
8  this kind of proposal?
9            MR. GOODMAN: Object to the
10      form.
11      A.   Yes.
12      Q.   Is this a document that's contained
13 in one of the templates about which you are aware?
14      A.   This document is not in a template.
15 Part of this could be in a template.
16      Q.   Is there a cost analysis report
17 template?
18      A.   There is specific templates that
19 have "Cost Analysis Report" on the heading of all
20 of them.
21      Q.   Is this document consistent with
22 other business records you've seen at NUS that
23 have been captioned "Cost Analysis Report"?
24           MR. GOODMAN: Objection.
25      A.   The top portion is and the format

Page 119

1           Amundsen
2  is.
3       Q.   The format is. So Mr. Schnaer would
4  have been in part using a template to prepare this
5  document; is that right?
6            MR. GOODMAN: Objection.
7       Q.   Is that your understanding?
8            MR. GOODMAN: Lack of
9       foundation. Objection.
10           THE WITNESS: Am I supposed to
11      answer questions when you say
12      "objection"?
13           MR. GOODMAN: Yes.
14      A.   Yes.
15      Q.   That is your understanding?
16      A.   Yes.
17      Q.   Isn't it true that the purpose of
18 this report was to tell Tiffany what it is you
19 propose to do?
20           MR. GOODMAN: Objection.
21      A.   The purpose of the report was to
22 identify the issues and make recommendations of
23 what had to be done.
24      Q.   And if what is contained in this
25 report were later implemented, NUS would then

Page 120

1           Amundsen
2  claim that Tiffany implemented its recommendation,
3  right?
4       A.   Yes.
5       Q.   And it would form the basis of a
6  claim for a fee, right?
7       A.   Yes.
8       Q.   Is it your understanding that once a
9  recommendation is committed to writing if the
10 customer implements that recommendation, it would
11 owe NUS a fee?
12      A.   Yes.
13      Q.   If Tiffany implemented a
14 recommendation contained in a cost analysis report
15 it would not have an option to not pay a fee.
16 That's your understanding, right?
17           MR. GOODMAN: Objection.
18      A.   That's my understanding.
19      Q.   And is it your testimony that
20 Tiffany could have rejected this cost analysis
21 report and not owed NUS a fee?
22           MR. GOODMAN: Could you read
23      it back, please.
24      (Record read.)
25           MR. GOODMAN: Objection.

Page 121

1           Amundsen
2       A.   No.
3       Q.   So Tiffany really did not have an
4  option to reject this proposal, right? That's
5  your understanding?
6       A.   Yes.
7       Q.   What is the recommendation?
8            Let me focus the question. It's a
9  very important question.
10           Tell me what it is that NUS was
11 recommending to Tiffany.
12      A.   It was twofold. It was to
13 investigate the overcharge, obtain a refund and
14 correct the ongoing overcharge.
15      Q.   Isn't it actually true that the
16 recommendation was simply to investigate? That's
17 really all the recommendation.
18           MR. GOODMAN: Objection.
19      A.   If that was it, then that's what we
20 would have said. "Investigate the overcharge."
21      Q.   Well --
22           MR. GOODMAN: She wasn't
23      finished.
24      Q.   I'm sorry.
25      A.   But we detailed exactly what action

Page 122

Amundsen

1   Amundsen
2   needed to be taken.  I don't see how our business
3   could survive if we were just recommending
4   investigating.
5       Q.   Well, let's look at the heading.  I
6   assume that the heading "Recommendation" is on the
7   template that you have at NUS; is that right?
8       A.   Right.
9       Q.   So that's a section of your reports
10  that is the section that contains what it is you
11  are advising the client to do, right?
12      A.   Yes.
13      Q.   And because your contract is written
14  that way, if the customer implements your
15  recommendation, whether NUS does it or not, the
16  customer owes a fee, right?
17          MR. GOODMAN:  Objection.
18      Q.   That's your understanding, isn't it?
19          MR. GOODMAN:  Objection.
20      A.   Yes.
21      Q.   Okay.  The first sentence under
22  recommendation says, "NUS Consulting Group
23  recommends investigating this potential ongoing
24  overcharge."  That's the recommendation, isn't it?
25      A.   No.  The recommendation is

Page 123

1   Amundsen
2   everything that's bolded and underlined in that
3   section.
4       Q.   If you read on, Ms. Amundsen, and
5   the rest of it doesn't recommend anything, it just
6   says, "As detailed above, we estimate that in
7   addition to a refund of approximately $93,000 for
8   past overcharges, a correction of this ongoing
9   overcharge will result in annual savings of
10  approximately $372,000."
11          That sentence does not recommend any
12  action, does it?
13      A.   Yes.  It recommends a correction.
14      Q.   Well, if there was an investigation
15  that found an error the correction would come
16  automatically, right?
17      A.   No, not always.
18      Q.   Let's take it step by step.
19          Your testimony is that the
20  recommendation here was not simply to investigate.
21  That's what you say?
22      A.   Yes.
23      Q.   Okay.  The cost analysis report does
24  not identify the cause of the spike in usage at
25  the Manhasset store, correct?

Page 124

1   Amundsen
2       A.   Correct.
3       Q.   And, in fact, the day or the week --
4   withdrawn.
5          In fact, the week before
6   December 20, 2006 you were still asking the rate
7   department to look at this, right?
8       A.   Yes.
9       Q.   So at this stage you really didn't
10  know what an investigation would show, right?
11      A.   Right.
12      Q.   You hadn't investigated yet, right?
13      A.   Right.
14      Q.   So if Tiffany had opted to
15  investigate itself to look into the overcharge it
16  would be implementing NUS's recommendation, right?
17      A.   You mean subsequent to their receipt
18  of our report?
19      Q.   Correct.
20      A.   Yes.
21      Q.   So once Mr. Mogel was in possession
22  of Exhibit 2 for identification, Tiffany was no
23  longer free to investigate itself, correct?
24          MR. GOODMAN:  Objection.
25          MR. MITCHELL:  Let me rephrase

Page 125

1   Amundsen
2   it.
3       Q.   After the receipt of Exhibit 2 for
4   identification, your report, if Tiffany
5   investigated itself and received a refund, NUS to
6   your understanding would claim entitlement to a
7   fee because its recommendation had been
8   implemented, correct?
9       A.   Yes.
10      Q.   Now, in fact, isn't it true that on
11  November 16, 2006, when Mr. Mogel asked NUS to
12  investigate, that had you simply investigated then
13  and found out what the problem was, you still
14  would have been entitled to a fee?  Right?  Didn't
15  change anything, the report, did it?
16          MR. GOODMAN:  Objection to the
17      form.
18      A.   We hadn't formally made our
19  recommendation.
20      Q.   Well, Mr. Mogel is the one who asked
21  you to investigate on November 16th, right?
22      A.   Right.  After we asked him if he
23  could give us a reason for the unusual spike in
24  consumption.
25      Q.   Right.  He said, "Please

Page 174

Amundsen

1
2    A.   I don't understand.
3    Q.   Did you ever hear of something
4  called -- for lack of a better phrase -- a
5  cover-your-ass memo?
6    A.   Yes.
7    Q.   Did you ever write one of those?
8    A.   I suppose.
9    Q.   And sometimes you just want to make
10  it clear, if it ever comes up later that you
11  know, "Everybody's on the same page here and I put
12  it in writing so nobody forgets what was said,"
13  right?
14    A.   Well, you're saying I want to make
15  it clear that everybody's on the same page?
16    Q.   Well, if you have a conversation and
17  people appear to be in agreement with something
18  during that conversation, at least you want to put
19  it in writing at the time so there is some record
20  of that, right?
21    A.   Yes.
22        MR. MITCHELL:  Let me have the
23    court reporter mark as Exhibit 49 for
24    identification a document captioned
25    "Report on Client Contact" dated

Page 175

Amundsen

1
2  December 22, 2006 to file from
3    C. Amundsen, Bates stamped NUS15.
4        (Exhibit 49, document
5    captioned "Report On Client Contact"
6    bearing Bates number NUS15, marked for
7    identification, as of this date.)
8    Q.   Let me hand you what has been marked
9  as Exhibit 49 for identification.  Did you write
10  the Report On Client Contact that is Exhibit 49?
11    A.   Yes.
12    Q.   When is the last time you read it?
13    A.   In preparation for the deposition.
14    Q.   And before that, when was the last
15  time you read it before that?
16    A.   A very -- well, probably sometime in
17  early '07.
18    Q.   Early '07?
19    A.   Well, when this became a dispute.
20    Q.   When did you write that?
21    A.   I wrote it the date it's dated.
22    Q.   So you wrote it after you got off
23  the phone?
24    A.   Right.
25    Q.   And then you may have looked at it

Page 176

Amundsen

1
2  in early January 2007?
3    A.   January or February.
4    Q.   So about a year between the time you
5  last looked at it and the time you read it to
6  prepare for your deposition?
7    A.   Yes.
8    Q.   And when did you read it in
9  preparation for your deposition?
10    A.   Oh --
11        MR. GOODMAN:  I'm going to
12    caution the witness not to disclose
13    anything that was discussed with
14    counsel in connection with the
15    preparation of the deposition.
16        MR. MITCHELL:  The question
17    was just when.
18        MR. GOODMAN:  That includes
19    the presentation of any documents by
20    counsel.
21    Q.   I just said "When?"
22    A.   Last Friday.
23    Q.   Did you read it again after last
24  Friday?
25    A.   I might have read it yesterday.

Page 177

Amundsen

1
2    Q.   When you say you might have read it
3  yesterday, did you read it yesterday?
4    A.   Well, because we went over
5  documents, so --
6    Q.   So you read it yesterday?
7        MR. GOODMAN:  Well, objection.
8    And, again, I'm asking you and
9    directing you not to disclose anything
10    that you reviewed with me.
11    A.   Okay.  Then I can't disclose it.
12        MR. MITCHELL:  I'm allowed to
13    ask when she reviewed the document.
14    I'm not asking her --
15    The fact that --
16        MR. GOODMAN:  She gave you an
17    answer.
18        MR. MITCHELL:  Yes, except for
19    you to say "that you reviewed with me"
20    I didn't ask who she reviewed it with.
21    If you are volunteering that
22    information, then you are opening the
23    door.  I didn't ask that question.  I
24    just asked when.
25        MR. GOODMAN:  I am not

Page 178

1              Amundsen
2      volunteering it. She made a statement
3      and I was cautioning her and I was
4      instructing her not to make statements
5      regarding what she reviewed with me.
6           And I think she answered your
7      question, but go ahead. Go ahead. If
8      you have more questions about when she
9      read it, then be my guest.
10          MR. MITCHELL: Thank you.
11     Q.   This document contains headings
12  "Objective" and "Results." Are those part of the
13  template?
14     A.   It's the standard format of all
15  these Report On Client Contact memos.
16     Q.   When someone joins NUS, how do they
17  know to use this standard form of memorializing
18  client contacts or creating reports and
19  recommendations to clients?
20     A.   They are instructed.
21     Q.   By whom?
22     A.   Well, whoever trains them how to be
23  a consultant or how to be an account manager.
24     Q.   Did anybody ever tell you why you do
25  this, why you follow these standard forms for

Page 179

1              Amundsen
2   these kinds of things?
3      A.   It's company policy.
4      Q.   Did anybody ever tell you where the
5   policy came from or where there is such a policy?
6      A.   No.
7      Q.   Nobody ever told you. Did you ever
8   ask?
9      A.   No.
10     Q.   Was it done to assist in lawsuits?
11     A.   I never asked.
12     Q.   Is it your understanding that it's
13  done to help lawsuits?
14     A.   It's not my understanding that
15  that's the purpose of this.
16     Q.   It's not.
17     A.   The purpose of this is to keep an
18  exact record of what happens with the client.
19     Q.   In your Report On Client Contact,
20  this document does not say that Mr. Mogel agreed
21  to the payment of the estimated savings amount
22  that was contained in Exhibit 2 for
23  identification, correct?
24     A.   Correct.
25     Q.   And I assume if he had agreed and he

Page 180

1              Amundsen
2   had said, "I agree to pay that amount," you would
3   have reported that in your client contact, right?
4      A.   We don't -- It would have been very
5   unusual to -- for the conversation to be like
6   that.
7      Q.   Your Report On Client Contact, in
8   fact, says that he questioned the amount. Right?
9      A.   Right.
10     Q.   So, in fact, he did not agree to it.
11  Right?
12     A.   Right.
13     Q.   And you indicated in your report
14  that Mr. Mogel did not agree to the shared savings
15  on a going-forward basis, right?
16     A.   He asked us, "How is this going to
17  be handled going forward?" He was concerned.
18     Q.   Right. And he actually did not
19  indicate agreement to you, right?
20          MR. GOODMAN: Objection.
21     Q.   You would have said so if he had,
22  right?
23          MR. GOODMAN: Objection.
24     Asked and answered.
25     A.   I said what he said from what I

Page 181

1              Amundsen
2   recollected.
3      Q.   In fact, he says, quote --
4           Now, you have a sentence in here.
5   "I advised Bruce" -- referring to the onward
6   savings -- "that this was our standard business
7   model. That is, when a billing discrepancy
8   occurred and was corrected, we shared in any
9   refund to which the client was entitled and
10  subsequently billed for shared savings that
11  resulted with correcting the billing discrepancy."
12          You testified earlier that you had
13  never seen at NUS a circumstance where meters had
14  been mistagged, so what was the standard business
15  model that you are referring to here?
16     A.   When I referred to standard business
17  model I meant our contract.
18     Q.   So you did not know actually as you
19  wrote this memo whether in fact correction of a
20  mistagged meter for another customer constituted a
21  shared savings as a business model, right? You
22  didn't know that?
23          MR. GOODMAN: Objection.
24     A.   The business model I was talking
25  about was our contract terms.

Page 186

1                    Amundsen
2    confused when you said "close quote."
3         Q.   And you do not say anywhere that he
4    agreed with you on the shared savings concept,
5    right?
6         A.   Right.
7         Q.   Now, you note in your memo --
8              Skimming down a sentence where the
9    sentence begins "However" you say -- your memo
10   says, "However, for the time being, he did not
11   want us to delay contacting the utility suppliers
12   and getting the problem corrected."
13             Was it your understanding that he
14   wanted you at least to get the problem corrected
15   and "We'll deal with the bill later"?
16        A.   Yes.
17        Q.   "Let's see what the problem is and
18   then we'll talk about it afterwards."  Right?
19        A.   That's -- I wouldn't necessarily
20   agree to your exact words.
21        Q.   Generally is that it?
22        A.   Let's work on getting the problem
23   corrected, that was my priority.
24        Q.   And "We'll talk about the bill after
25   it's corrected," right?

Page 187

1                    Amundsen
2         A.   Yes.
3         Q.   Yes?
4         A.   Yes.
5         Q.   Now, December 22, 2006 was a Friday.
6    Do you recall that?
7         A.   I believe it was, yes.
8         Q.   And, in fact, you tried to call LIPA
9    that day, right?
10        A.   Do you have a record that I did?
11        Q.   Do you recall?
12        A.   I just -- I probably did.  I just --
13   I rely heavily on my own files and records.
14        Q.   Let me show you what has been marked
15   as Exhibit 10 for identification.  This is an
16   e-mail at 3:29 p.m. on Friday, December 22, 2006
17   that you sent to Bruce Mogel.
18        A.   Okay.  Yes, I confirmed that I
19   called LIPA on that day.
20        Q.   And they were closed for the
21   holiday, right?
22        A.   Yes.
23        Q.   So December 22, 2006 was the Friday
24   before Christmas weekend, right?
25        A.   Yes.

Page 188

1                    Amundsen
2         Q.   Let me show you what has been
3    previously marked as Exhibit 7 for identification.
4    It is a letter dated December 22, 2006.  Did you
5    send that letter on December 22, 2006?
6         A.   Yes.
7         Q.   Did you send it before or after you
8    made the phone call?
9         A.   I sent it before.
10        Q.   Why --
11        A.   No, excuse me.  I'm sorry.  I sent
12   it -- when I couldn't get anyone at LIPA I decided
13   to fax the letter over.
14        Q.   You didn't even have the name of
15   someone who was -- who you should talk to on this
16   account?
17        A.   No, not at that time.
18        Q.   So you just sent a letter to a
19   P.O. Box at Long Island Power Authority?  That's
20   all you did?
21        A.   I believe I faxed it over to a fax
22   number I had for LIPA, because it takes too long
23   through the mail and I wanted to get something
24   over there.
25        Q.   You are saying it was a fax.  I

Page 189

1                    Amundsen
2    don't see any indication of a fax there.  Do you?
3         MR. MITCHELL:  I don't recall.
4    Is there any document that was
5    produced with a fax cover sheet?
6         MR. GOODMAN:  I have no fax
7    cover sheet.
8         Q.   Is that just --
9         A.   I know how I handle the utility
10   companies and I don't ordinarily send things
11   through the mail to them, because at least with a
12   fax there is some record that it was received.
13        Q.   Well, no record of any sending by
14   fax or receipt by the power company of this letter
15   has been produced.
16        A.   Well, maybe the fact that
17   subsequently there is a response from the utility
18   shows that they received it.
19        Q.   Well, would you agree with me at
20   least that sending a letter to LIPA at a P.O. Box
21   does not indicate any specific, you know,
22   increased knowledge that NUS was bringing about
23   how to get this to the attention of the Power
24   Authority?  Would you agree with me?
25        A.   No.

Page 190

Amundsen

1
2    Q.    You don't have a person you are
3    sending it to, you are just sending it to a
4    P.O. Box.  Anybody can do that, can't they?
5          MR. GOODMAN: Objection.
6    A.    We are making a specific reference
7    to one of the accounts, giving them the account
8    number, the meter number, the address.  If I
9    had -- I'm telling you, maybe we can check fax
10   records to see that this was faxed.  I don't know
11   how far back the records go.
12   Q.    All right.  I presume that you took
13   off for Christmas weekend like everyone else.
14   A.    Yes.
15   Q.    And you didn't work Christmas Day,
16   which was Monday.
17   A.    Right.
18   Q.    So Tuesday, December 26th is the
19   next business day after your conversation with
20   Bruce Mogel that was reflected in your notes,
21   correct?
22   A.    Yes.
23   Q.    And on that day you called LIPA and
24   spoke with a woman by the name of Cathy
25   Schwarting, right?

Page 191

Amundsen

1
2    A.    Yes.
3    Q.    When you were on the phone with
4    Ms. Schwarting, isn't it true that she pulled up
5    the records -- withdrawn.
6          After you contacted Ms. Schwarting,
7    isn't it true that she told you she pulled up the
8    billing records for both Tiffany and Ralph Lauren
9    and noted that Tiffany's usage seemed high and
10   Polo's seemed low?
11   A.    I think initially we were looking at
12   just Tiffany and then she might have also looked
13   at the Polo.
14   Q.    Didn't she also tell you in that
15   phone call that it looked like you might be
16   looking at a switched meter situation?
17         MR. GOODMAN: Objection.
18   A.    I don't recall the exact
19   conversation.  I would have to read my own record
20   of it.
21   Q.    Do you remember discussing with
22   Ms. Schwarting the possibility that the meter for
23   Tiffany was switched with Polo in that
24   conversation on December 26, 2006?
25   A.    No.

Page 192

Amundsen

1
2          MR. MITCHELL:  Let me have the
3    court reporter mark as Exhibit 50 a
4    printout that we received from LIPA of
5    contacts for information, I guess, on
6    the Tiffany and Company account in
7    Manhasset.  These were produced
8    pursuant to subpoena that was
9    delivered to LIPA.
10         (Exhibit 50, document bearing
11   Bates numbers KS11 - KS14, marked for
12   identification, as of this date.)
13   Q.    Ms. Amundsen, I am handing you what
14   has been marked as Exhibit 50 for identification.
15   I presume you haven't seen this before.
16   A.    Right.
17   Q.    Is that correct?
18   A.    Right.
19   Q.    I would like to direct your
20   attention to the page Bates stamped KS14, which is
21   the last page of the document, and there are some
22   entries on December 26, 2006.
23   A.    Yes.
24   Q.    The first entry reading from the
25   bottom up says, "Issued field investigation

Page 193

Amundsen

1
2    billing does not appear correct since meter
3    change.  Also checking for possible switched
4    meters on 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-2.  Asking tech services to
5    expedite investigation.  Contact Christine
6    (201)391-4300, extension 109.  SPNB"-- which I
7    assume is suspend -- "billing until resolved."
8          First of all, is that phone number
9    listed there your phone number?
10   A.    Yes.
11   Q.    So did you give Ms. Schwarting your
12   phone number when you spoke with her on the phone?
13   A.    Yes.
14   Q.    And that's your extension?
15   A.    Yes.
16   Q.    Does that refresh your recollection
17   that the subject of the switched meters came up in
18   your conversation at that time?
19   A.    It refreshes my recollection that I
20   spoke with Cathy Schwarting and I remember her
21   telling me she was going to assign Lisa Quinn to
22   handle it.
23   Q.    You see the next entry above it
24   which mentions an L. Quinn?
25   A.    Yes.

Page 194

1            Amundsen
2      Q.   It says, "Suspend billing:
3  Elec:" -- which is standing for electric --
4  "Switched MTR" -- which stands for meter --
5  "Investigate C/S - Christine:  Phone:  KAS/RBS and
6  L. Quinn."  Do you see that?
7      A.   Yes.
8      Q.   So does that refresh your
9  recollection that the reason Lisa Quinn was being
10 assigned was to look into a switched meter
11 situation?
12     A.   I thought the first thing they were
13 looking at was the meter multiplier situation, so
14 this seems earlier than my recollection of talking
15 about a switched meter.
16     Q.   Obviously we can get Schwarting in
17 to talk about this.  Do you have any reason to
18 dispute that this is accurate?
19     A.   No.
20     Q.   The next entry says, "Correct
21 possible switched meter with R. Lauren Polo
22 account 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-8.  Asking tech services to
23 expedite" -- "tech serv to expedite."
24        So there are three entries in LIPA's
25 records which reflect the subject of switched

Page 195

1            Amundsen
2  meters.  In looking at that now, does that refresh
3  your recollection that Ms. Schwarting had pulled
4  up the Polo and Tiffany accounts and told you in
5  that conversation it looked like the meters were
6  switched?
7      A.   No.  I remember having conversations
8  and I seem to recall the gist of the conversation
9  was the meter multiplier issue, that the wrong
10 multiplier had been applied to the meter.
11        MR. MITCHELL:  Let me have the
12        court reporter mark as Exhibit 51 for
13        identification an e-mail from
14        Christine Amundsen to Arnold Frankel,
15        CC'ing David Brown, Paul Hoffman, Sean
16        Graham and Stephen Schnaer, Bates
17        stamped NUS88.
18        (Exhibit 51, document bearing
19        Bates number NUS00088, marked for
20        identification, as of this date.)
21     Q.   Ms. Amundsen, I have handed you what
22 has been marked as Exhibit 51 for identification.
23 Is that an e-mail that you wrote on December 26,
24 2006 at 1:34 p.m.?
25     A.   Yes.

Page 196

1            Amundsen
2      Q.   That was an e-mail that you sent
3  internally at NUS, correct?
4      A.   Yes.
5      Q.   And that was an e-mail you sent at
6  or around the time of your telephone call with
7  Cathy Schwarting of LIPA, correct?
8      A.   Yes.
9      Q.   And this memorandum was written on
10 the same day as the notes that we looked at that
11 are reflected in the LIPA records that are part of
12 Exhibit 50 for identification, correct?
13     A.   Yes.
14     Q.   Now, why were you writing to Arnold
15 Frankel about this?
16     A.   Because I think Arnold became aware
17 of the fact that we were investigating this for
18 Tiffany.
19     Q.   Between Friday the 22nd and Tuesday
20 the 26th you became aware?
21     A.   Yes.
22     Q.   Who made him aware?  Did you tell
23 him?
24     A.   I went to talk to him after I had my
25 conversation with Bruce.

Page 197

1            Amundsen
2      Q.   Isn't it unusual for Mr. Frankel to
3  be involved in a resolution of a problem for a
4  customer?
5      A.   No.
6      Q.   Not unusual at all?
7      A.   No.
8      Q.   What was the purpose of your writing
9  this e-mail?
10     A.   To update everyone on what I had
11 discussed with LIPA and what LIPA was going to do.
12     Q.   And you say in your e-mail that
13 "When I gave her the details of the Tiffany
14 account she looked at her screen and then advised
15 she would call right back.  Subsequently, she
16 called and relayed the following:"
17        Does that refresh your recollection
18 that she pulled up the account for Tiffany on her
19 screen?
20     A.   Yes.
21     Q.   Does it also refresh your
22 recollection, looking at this e-mail, that she
23 pulled up the Ralph Lauren account?
24     A.   Yes.
25     Q.   So you say under your first bullet,

Page 202

```
 1              Amundsen
 2  collections, no late charges."
 3      A.   Right.
 4      Q.   Doesn't that indicate to you --
 5      A.   That there is a problem.
 6      Q.   With both accounts, right?
 7      A.   Yes.
 8      Q.   Both neighboring accounts?
 9      A.   Yes.
10      Q.   Right?
11      A.   Yes.
12      Q.   And we know there were new meters
13  put in now in September, right?
14      A.   Yes.
15      Q.   Certainly for Tiffany.
16      A.   Yes.
17      Q.   So as of December 26, 2006, your
18  investigation had proceeded far enough now to
19  report internally at NUS that based upon one
20  telephone call, they were putting a hold on both
21  the Polo and Tiffany accounts and were going to
22  send someone out to investigate, right?
23      A.   Yes.
24      Q.   Then you go on to say why the
25  investigation can't happen right away, right?
```

Page 203

```
 1              Amundsen
 2      A.   Yes.
 3      Q.   It's the holidays, right?
 4      A.   Yes.
 5      Q.   People are on vacation, right?
 6      A.   Yes.
 7      Q.   So it may take one or two weeks to
 8  get someone out there, right?
 9      A.   Yes.
10      Q.   And knowing how power companies
11  work, it may take three weeks but they are going
12  to get to it, right?
13      A.   Yes.
14      Q.   So the ball is now in motion for
15  LIPA to go take a look at the situation and figure
16  out what's wrong, correct?
17      A.   Yes.
18      Q.   And the determination of what was
19  wrong is going to be made by people who are going
20  to go out to the Manhasset location and take a
21  look at the meters, right?
22      A.   Yes.
23           MR. GOODMAN:  Objection.
24      Q.   And that's not something that anyone
25  from NUS is going to do, right?
```

Page 204

```
 1              Amundsen
 2           MR. GOODMAN:  Objection.
 3      A.   (No response.)
 4      Q.   You are not going out there.  They
 5  are sending other people.
 6      A.   At this point we haven't offered to
 7  go out.
 8      Q.   So your one phone call is spurring
 9  action at the power company?
10      A.   Yes.
11      Q.   Let me show you what has been
12  previously marked as Exhibit 12 for identification
13  which is Bates stamped T46 to T47.  These are
14  e-mails.  One of them from you to Bruce Mogel,
15  which is at the bottom of the first page, carries
16  over to the second, and the other is internally at
17  Tiffany.
18           I would like to focus your attention
19  to your e-mail to Bruce Mogel on December 26, 2006
20  at 4:39 p.m.  What was the purpose of you sending
21  this e-mail?
22           First of all, did you send this
23  e-mail to Mr. Mogel at 4:39 p.m. on December 26,
24  2006?
25      A.   Yes.
```

Page 205

```
 1              Amundsen
 2      Q.   What was the purpose for you to send
 3  this e-mail?
 4      A.   To give Bruce an update.
 5      Q.   Did you give Bruce a complete update
 6  about what you knew as of that date?
 7      A.   I unintentionally didn't mention the
 8  Ralph Lauren store.
 9      Q.   Unintentionally?
10      A.   Right.
11      Q.   You saw it as important to tell
12  Mr. Mogel that the name of the person you spoke
13  with was Cathy Schwarting.  That was important,
14  right?
15      A.   She's a supervisor, yeah.
16      Q.   But nowhere in this memo do you say
17  that she pulled up on her screen the details of
18  the Tiffany account and the Polo Ralph Lauren
19  account, right?  You don't say that?
20      A.   Right.
21      Q.   You kept that information from
22  Tiffany, right?
23      A.   Unintentionally.
24      Q.   Unintentionally.
25           You sent an e-mail at 1:34 p.m.
```

Page 210

Amundsen

1
2    A.   Like the fact that LIPA came back
3  and said, "You know what?  We found the error.  It
4  was the meter multiplier was wrong.  We are going
5  to correct that and there we are.  We have
6  resolved the problem."
7    Q.   But that's easy to find figure out
8  that that's not the resolution --
9          MR. GOODMAN:  Objection.
10         Objection.  Is that a question?
11   Q.   That's easy to --
12         MR. GOODMAN:  Where is your
13       question other than an argumentative
14       statement?  What is your question?
15   Q.   I said that's easy to figure out.
16  Isn't that right?
17   A.   If someone knew to look for that,
18  then it's easy to figure out.
19   Q.   That's what you do.  You look at
20  bills to look for that.  Right?  That's part of
21  what you do, isn't it?
22         MR. GOODMAN:  Objection.
23   Q.   That's part of the services you
24  provide anyway.
25   A.   We analyze the bills.

Page 211

Amundsen

1
2    Q.   Right, okay.
3         So they changed the multiplier which
4  means, if I understand it correctly, they take the
5  reading from the meter, they multiply it by the
6  multiplier to come up with the kilowatt hour
7  usage, right?
8    A.   Yes.
9    Q.   So after they change the multiplier,
10  one simply multiplies the meter reading times the
11  multiplier to see what the new kilowatt hour usage
12  would be with the new multiplier; isn't that true?
13   A.   Yes.
14   Q.   And it would still be, when you
15  looked at it, higher than what Tiffany's ordinary
16  and customary usage was in Manhasset, right?
17   A.   Yes.
18   Q.   So it was clear when they changed
19  the multiplier that that was not the only problem,
20  right?
21   A.   Wrong.  It was clear that the
22  utility was making a mistake and that's why we're
23  in our business, because laymen are not as
24  familiar with utilities making errors.
25   Q.   Okay.  So you -- that's the big --

Page 212

Amundsen

1
2         So the big find here was that that
3  wasn't enough.  Let me rephrase.
4         So other than when they changed the
5  multiplier that wasn't enough, what else did NUS
6  do?
7    A.   We went back to Tiffany and asked
8  for the connected load to -- we verify everything,
9  so we wanted to see what that store was capable of
10  using before we automatically said, "Oh, you know,
11  that's wrong."
12   Q.   Okay.  Anything else?
13   A.   Then we found that we had to contact
14  the landlord to have him go back and look at the
15  meter.
16   Q.   Would you agree with me that by
17  January 16, 2006, every problem had been
18  identified?
19   A.   I'd have to ask a question.  I'd
20  have to ask, is that the date that we heard back
21  from the electrical contractor who identified that
22  the meters were mistagged?
23   Q.   There is an e-mail from Mr. Brown to
24  Tiffany on January 16, 2007 reporting on all of
25  the issues that have been identified and were

Page 213

Amundsen

1
2  being resolved.  Does that help you?
3    A.   Yes.
4    Q.   So by January 16th you knew what the
5  resolution was, correct?
6    A.   Yes.
7    Q.   So between January 26, 2006 --
8          MR. GOODMAN:  December.
9    Q.   I'm sorry.  Between December 26,
10  2006, the day after Christmas, and January 16,
11  2007, the entire problem was resolved other than
12  getting the refunds issued, correct?
13   A.   As long as we are assured that the
14  billing would be corrected going forward.
15   Q.   And Tiffany offered to pay
16  50 percent of the refund to NUS for its services,
17  right?
18   A.   Not that I recall.
19   Q.   You don't recall that?
20   A.   Right.
21   Q.   You weren't at a meeting where
22  Tiffany offered to pay 50 percent of the refund
23  for its -- for NUS's services?
24   A.   I don't believe we came to any --
25         I think the meeting resulted in

Page 214

Amundsen

1  we're going to speak to our legal.
2  
3      Q.    How much is NUS looking for in this
4  case?
5      A.    They are looking for half of the
6  refund and half of the monthly ongoing savings.
7      Q.    What is that total?
8      A.    We could only estimate. We don't
9  know.
10     Q.    What is your estimate?
11     A.    I don't have that figure on the top
12 of my head.
13     Q.    It's approximately $1 million; is
14 that correct?
15     A.    I know it's up there.
16     Q.    Approximately $1 million?
17     A.    Yes.
18     Q.    And after your phone call on
19 December 26, 2007, what was primarily required was
20 for NUS to follow up with LIPA and confirm that as
21 a result of a problem with the meter that whatever
22 was discovered was properly resolved and credited,
23 correct?
24          MR. GOODMAN: Could you read
25       that back, please?

Page 215

Amundsen

1  
2          MR. MITCHELL: Let me rephrase
3       that question. I got distracted in
4       the middle of that.
5      Q.    Did you already have the load data,
6  by the way?
7          MR. GOODMAN: By when?
8          MR. MITCHELL: When you asked
9       for it after December 26, 2006.
10     A.    It was the connected load. It's
11 different than the load data.
12     Q.    But you had historic bills, right?
13     A.    Yes.
14     Q.    And so you knew what the load had
15 been, at least what the used load had been in the
16 building, right, at the premises?
17     A.    Yes.
18     Q.    The load data was what is simply how
19 much power they could possibly use if everything
20 was turned on full blast at all times?
21     A.    Yes.
22     Q.    Let me show you what has been marked
23 as Exhibit 17 for identification. Is that the
24 document that you asked for from Tiffany to show
25 its load data?

Page 216

Amundsen

1  
2      A.    Yes.
3      Q.    So it was just a page from an
4  electrical schematic, correct?
5      A.    Yes.
6      Q.    And you didn't have that already?
7      A.    No.
8      Q.    And I presume you total up the
9  numbers here to see if it's possible that they
10 could be using as much as would still be
11 reflected, right?
12     A.    It's not just the total of the
13 numbers. It depends on the time of day. I
14 believe -- the rate department is more the people
15 who would work with this information than me.
16     Q.    You would, though, have known from
17 your own records what the historic usage was at
18 the Manhasset store by Tiffany, correct?
19     A.    By looking at the records, yes.
20     Q.    And you already knew from Mr. Mogel
21 that nothing unusual had gone on at the store
22 during the period of time of the spike, correct?
23     A.    Yes.
24     Q.    And after the multiplier was changed
25 the usage reflected with the new multiplier was

Page 217

Amundsen

1  
2  still considerably higher than it had been before
3  the meter was changed. Right?
4      A.    Yes.
5      Q.    So this load data would only have
6  been relevant if something unusual was going on in
7  the store to cause the company to be using more
8  load than it ordinarily used, right?
9      A.    Yes.
10     Q.    The real information you needed was
11 whether you were doing anything unusual and the
12 answer to that you already knew was no, correct?
13          MR. GOODMAN: Objection to the
14       form.
15     A.    We wanted to get as much information
16 as possible to base our estimation of how off
17 those numbers LIPA provided were.
18     Q.    Let me show you what has been
19 previously marked as Exhibit 16 for
20 identification. It's a series of e-mails Bates
21 stamped T994 through T997. Specifically I would
22 like to refer you to the e-mail that begins at the
23 bottom of Page 1 of the exhibit, dated January 11,
24 2007, 2:06 p.m.
25          Did you send that e-mail to Bruce

Page 218

Amundsen

1
2  Mogel that's reflected there?
3      A.   Yes.
4      Q.   By the way, changing the meter
5  constant didn't answer the question about why
6  Polo's bill was abnormally low and Tiffany's bill
7  was abnormally high, right?
8      A.   Except if the multipliers were
9  switched, like someone who was creating the
10  billing.
11      Q.   So did you think to ask LIPA, "So
12  were the multipliers switched between Tiffany and
13  Polo? Is that what happened?" Did you ask that
14  question of anyone?
15      A.   I didn't.
16      Q.   So you never followed up after they
17  told you the multiplier was -- that was being used
18  was wrong to find out how that impacted upon the
19  Polo bill being too low and the Tiffany bill being
20  too high. Isn't that right?
21      A.   We never followed up with LIPA you
22  mean?
23      Q.   Right.
24      A.   We concerned ourselves with why are
25  the bills still too high.

Page 219

Amundsen

1
2      Q.   I understand it is late in the day.
3  I would like to try to get answers to the
4  questions I'm asking, if it's possible.
5          You conceded, because you have it in
6  your e-mail to Mr. Frankel on December 26, 2006,
7  that you told the group at NUS that you learned
8  from LIPA that Polo's bill was unusually low and
9  Tiffany's bill was unusually high during the
10  relevant time period. Right?
11      A.   Yes.
12      Q.   The information that you received
13  from LIPA, that the meter constant was wrong, in
14  and of itself does not answer the question why
15  Polo's bill would be low during the time period
16  and Tiffany's high, correct?
17      A.   Right.
18      Q.   So in order to have --
19          Just with the information you had,
20  before you asked for any more load data, before
21  you asked Tiffany for any more information, you
22  were possessed of information from LIPA that
23  enabled you to go back to LIPA and say, "Did that
24  also resolve the Polo bill," right? That would
25  have been easy?

Page 220

Amundsen

1
2      A.   Yes, it would have been easy to ask
3  that question.
4      Q.   And you did not ask that, correct?
5      A.   Right.
6      Q.   And we know that it did not resolve
7  the Polo bill either, right? We now know that.
8      A.   Right.
9      Q.   Because it turned out that it was
10  both a meter multiplier for both and switched
11  meters, right?
12      A.   It was switched meters.
13      Q.   So without doing a load study and
14  without getting load information from Tiffany,
15  using your general common sense and knowledge as a
16  power and utility consultant, all you had to do
17  was make another phone call to someone who you now
18  knew at LIPA and say, "Did changing the constant
19  resolve everything?" and they would have said,
20  "No," right?
21      A.   Well --
22          MR. GOODMAN: Objection to the
23      form.
24      A.   They came to us and said, "We did
25  resolve the problem." They thought they had

Page 221

Amundsen

1
2  resolved the problem when they figured out that
3  the meter constant was wrong. We went back to
4  them and said, "No, that wasn't the problem."
5      Q.   Where is there communication from
6  the power company that they thought that resolved
7  the entire power problem?
8      A.   I don't have anything handy.
9          MR. MITCHELL: I have never
10      seen a communication from LIPA that
11      they thought that resolved the entire
12      problem. Was there such a document
13      that exists?
14          MR. GOODMAN: Ask the witness.
15      Q.   Are you aware of any document by
16  which LIPA advised NUS that changing the meter
17  constant resolved the entire problem for both
18  Tiffany and Polo?
19      A.   I thought there was a memo or an
20  e-mail, because I remember myself thinking that
21  it -- "Here is the answer" and then in bringing it
22  to the rate department they are saying "No, that's
23  not the answer."
24      Q.   Well, looking at Exhibit 16 for
25  identification, your e-mail to Mr. Mogel --

Page 222

1               Amundsen
2       A.   Which date?
3       Q.   The one from January 11, 2007, at
4   the bottom of Page 1.
5       A.   Okay.
6       Q.   You say you would like to provide an
7   update on the overall investigation of this
8   matter. To this point I do not believe you have
9   yet advised Mr. Mogel that Polo was having similar
10  problems as Tiffany, except the reverse. Correct?
11          MR. GOODMAN:  Objection.
12      Q.   There is no mention of Polo in here.
13  Would you agree with me?
14          MR. GOODMAN:  Did you read the
15          whole thing? You'd better read the
16          whole thing.
17          THE WITNESS:  I'd better read
18          the whole thing.
19      A.   Yes, there is no mention of Polo.
20      Q.   You conclude in the last paragraph
21  of your e-mail to Mr. Mogel that you are not
22  convinced that changing the multiplier completely
23  resolves the matter, right?
24      A.   Right.
25      Q.   And that is simply because if you

Page 223

1               Amundsen
2   multiply the new multiplier by the readings on the
3   meter, it still appears that the usage is higher
4   than usual. Right?
5       A.   Right.
6       Q.   So it didn't take a tremendous
7   amount of insight and knowledge to know that that
8   didn't resolve the whole problem. You just did
9   the math.
10      A.   I didn't do the math. The rate
11  department did the math.
12      Q.   So somebody did the math and said,
13  "No, usage is still high, based upon the
14  multiplier." Right?
15      A.   Right.
16          MR. MITCHELL:  Let me have the
17          court reporter mark as Exhibit 52 for
18          identification a string of e-mails
19          Bates stamped T48 to 50. The first
20          one is an e-mail from Christine
21          Amundsen to Bruce Mogel dated
22          January 12, 2007 at 10:15 a.m.
23          (Exhibit 52, string of e-mails
24          bearing Bates numbers T48 - T50 marked
25          for identification, as of this date.)

Page 224

1               Amundsen
2       Q.   Ms. Amundsen, I have handed you what
3   has been marked as Exhibit 52 for identification.
4          Is the e-mail at the top of page
5   Bates stamped T48 an e-mail you sent to Bruce
6   Mogel on Friday January 12, 2007?
7       A.   Yes.
8       Q.   The e-mail that you sent on the 11th
9   that we looked at as part of Exhibit 16 for
10  identification, one at 2:06 p.m. on January 11,
11  2007, do you see that?
12      A.   Yes.
13      Q.   You are sending now another e-mail
14  on the Friday, the 12th at 10:15 a.m. Do you see
15  that?
16      A.   Yes.
17      Q.   What happened between January 11,
18  2007, 2:06 p.m. and January 12, 2007 at 10:15 a.m.
19  to give you more information about the situation
20  in Manhasset?
21      A.   There were conversations between the
22  rate department and there might have been another
23  conversation with LIPA.
24      Q.   The LIPA records, which are
25  Exhibit 50 for identification, indicate a call on

Page 225

1               Amundsen
2   January 12, 2007, but only reflecting --
3          Reflecting an entry on January 12,
4   2007, but only about a manual rebill for electric.
5   "Manual bill electric." Do you see that?
6       A.   Yes.
7       Q.   There is no indication of a call
8   with you. Do you see that?
9       A.   Yes.
10      Q.   The next indication of any entry
11  after that is on the 17th when Mr. Espey goes out
12  to look at possible switched -- I guess C/M's
13  would be customer meters. Do you see that?
14      A.   Yes.
15      Q.   Is it fair to say that you don't
16  recall having engaged in any further investigation
17  between January 11, 2007 at 2:06 p.m. and
18  January 12, 2007 at 10:15 a.m. that would have
19  disclosed to you for the first time a wiring issue
20  in connection with the Ralph Lauren meter?
21  Correct?
22      A.   It's correct to say I don't recall.
23      Q.   And you don't -- as you are sitting
24  here today, there is no "aha!" moment that you can
25  think about that you recall on or between those

# BROWN-3/5/08
# DEPOSITION

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - -x
NATIONAL UTILITY SERVICE, INC.,                :

        Plaintiff,                             :

                          :

        -against-                              :

TIFFANY & CO. and                              :
TIFFANY AND COMPANY,                           :

        Defendants.                            :

- - - - - - - - - - - - - - - - - - - -x


        DEPOSITION of National Utility Service, Inc.,

by DAVID M. BROWN, taken by Defendants at the offices

of Dreier LLP, 499 Park Avenue, New York, New York on

Wednesday, March 5, 2008, commencing at 10:11 a.m.,

before Elizabeth Santamaria, a Certified Shorthand

(Stenotype) Reporter and Notary Public within and for

the State of New York.

Page 126

Brown

1    recollection of being involved in creating the
2    cost analysis report, but then by the following
3    Tuesday you're in the loop on something that you
4    have no recollection of having been in the loop on
5    before. Can you explain that at all?
6        A.   I don't think there is a need to
7    explain. I mean she was a direct report of mine.
8    I believe I testified that I was aware of this. I
9    don't know when I specifically was aware and I
10   also testified that I may have been involved in
11   the creation of the report. I just don't have a
12   recollection of it, but --
13       Q.   But you are doing the best you can
14   to give me your complete knowledge today of
15   everything you remember.
16       A.   I'm doing the best I can to tell you
17   the truth.
18       Q.   And to give me the benefit of
19   everything you can honestly remember as you are
20   sitting here today, correct?
21       A.   That's correct.
22       Q.   And as you are sitting here today,
23   you have no recollection of why Ms. Amundsen was
24   reporting to Mr. Frankel about her first

Page 127

Brown

1    communication with LIPA concerning the Manhasset
2    store, right?
3        A.   I don't know why she sent it to
4    Arnold. I don't see anything usual in her sending
5    it to Arnold either.
6        Q.   Did you ever discuss with Arnold
7    Frankel that he told her, "I want you to keep me
8    fully informed of everything you do for Tiffany in
9    Manhasset"?
10       A.   I don't recall that discussion.
11       Q.   Did you ever have any discussion
12   with Mr. Frankel about him wanting to be
13   personally involved in the resolution of the
14   Tiffany billing issue at Manhasset?
15       A.   I recall that Arnold wanted to
16   attend the meeting in late January, early
17   February. I think it was late January of '07,
18   that he wanted to attend that meeting. I think
19   there was some suggestion that it was just going
20   to be Chris and I to go and Arnold said, "No, I
21   would like to go as well." He wanted to come
22   along.
23            But I don't recall Arnold saying,
24   you know, "I want to know every moment of this

Page 128

Brown

1    account as it occurs."
2        Q.   Let me show you what has been
3    previously marked as Exhibit 51 for
4    identification. It's an e-mail also from
5    December 26, 2006, but at 1:34 in the afternoon.
6    Do you see that?
7        A.   Yes.
8        Q.   That's an e-mail that you also
9    received a CC of, right?
10       A.   Yes.
11       Q.   And that's an e-mail from
12   Ms. Amundsen to Mr. Frankel providing more
13   information about what she learned in her
14   conversation with Ms. Schwarting, right?
15       A.   Yes.
16       Q.   Now, and you were --
17            Do you have any explanation of why
18   so many people are in the loop on this situation?
19            MR. GOODMAN: Objection.
20            MR. MITCHELL: I will rephrase
21   it.
22       Q.   Do you have any reason why so many
23   people are being provided with detailed
24   information from Ms. Amundsen about what she was

Page 129

Brown

1    doing with LIPA in connection with the Tiffany
2    store in Manhasset?
3        A.   I wouldn't classify this as being so
4    many people. I mean there are five people. There
5    is Arnold, there is myself, Paul Hofmann and Steve
6    Schnaer. I wouldn't characterize this as being so
7    many people or unusual in any way.
8        Q.   Well, we have Mr. Frankel as the
9    person to whom this information is being sent. He
10   is the executive vice president, it says on your
11   website, "with primary responsibility for the
12   general management of the United States
13   operations."
14       A.   Correct.
15       Q.   Right?
16       A.   Correct.
17       Q.   Other than the Soultanians
18   themselves, he is the highest officer in the
19   company, right?
20       A.   No.
21       Q.   The Soultanians are both
22   co-presidents, right?
23       A.   Right.
24       Q.   And he is the only executive vice

Page 166

Brown

1       Q.  So you walked out of the meeting and
2  dismissed what Mr. Palfini was saying out of hand.
3  Is that it?
4       A.  I remember walking out of the
5  meeting feeling that, you know, we were at a
6  difference of opinion as to the application of our
7  agreement.
8       Q.  And it was your opinion that the
9  "correction of the ongoing billing error" should
10  result in NUS being paid a fee equal to 50 percent
11  of the amount of that billing error brought out
12  for a period of 60 months by a formula using
13  60 months, correct?
14           MR. GOODMAN:  Objection.
15       Q.  Let me rephrase that.  That was
16  inartful.
17           Your contract requires in
18  circumstances where there is a refund a payment of
19  a fee to NUS of 50 percent of the refund, correct?
20       A.  Correct.
21       Q.  And if there is a savings, a payment
22  of 50 percent of the savings calculated over a
23  60-month period, correct?
24       A.  Yeah.  Those two components can

Page 167

Brown

1  exist within the agreement, yes.
2       Q.  The savings component would
3  contemplate a fee to NUS based upon an assumption
4  that the client will realize the benefit of the
5  savings for a 60-month period and, therefore,
6  shares half of that amount with NUS as a fee.
7  Correct?
8       A.  As I testified before, I don't
9  consider it to be based upon an assumption.  I
10  base it upon the fact that a correction is made
11  and on a forward basis, if you will, they are not
12  paying the ongoing billing error and as a result
13  that would constitute a savings under the
14  agreement.
15       Q.  What happens in a circumstance where
16  you negotiate a reduced rate for a customer and
17  the rate only remains reduced for a period of
18  12 months and then goes back up after 12 months?
19  How much is NUS paid as a fee in that
20  circumstance?
21           MR. GOODMAN:  Objection.
22       A.  Are we speaking entirely under a
23  contingency arrangement?
24       Q.  Under the contract that Tiffany has.

Page 168

Brown

1           There is testimony in the record
2  that there were circumstances where rates went
3  back up after they had been reduced and NUS did
4  not recover a full 60 months of reduced fees.  Is
5  it your practice at NUS to collect 60 months of
6  fees on a going-forward basis even if the rate
7  does not remain reduced for the full 60 months?
8       A.  No.
9       Q.  What is your practice in that
10  circumstance?
11       A.  If the result of the recommendation
12  that is implemented goes away, we would not
13  continue to participate in the savings.
14       Q.  So if I understand your answer
15  correctly, you look at what actually happens
16  during that 60-month period in determining whether
17  the entirety of the 60-month period is paid as a
18  fee, 50 percent of that savings as a fee, right?
19       A.  The savings is reviewed on the
20  period in which billing would be issued, in most
21  cases on a monthly basis.
22       Q.  Isn't it fair to say that in the
23  circumstance of NUS's claim in this case to
24  50 percent of the item identified as "savings" in

Page 169

Brown

1  Paragraph 61 of the complaint, that the assumption
2  is that this billing error would not have been
3  discovered for 60 months?
4       A.  No.  It assumes that the conditions
5  that measure a savings is still in existence
6  during that month period and whether or not during
7  the specific 60 months --
8           To give you an example is to give
9  you if all of a sudden a year down the line LIPA
10  mistags these meters again and result in Tiffany's
11  increase in their bill as a result, let's say that
12  happens during month 36, we wouldn't participate
13  any more because they are paying based upon Polo's
14  usages or the usage as recorded by that particular
15  meter.
16       Q.  But in making a claim for a fee
17  based on 60 months of projected savings as a
18  result of correcting the mistagged meters here
19  there is no opportunity, because of the fact that
20  now the meter was corrected, to ever know when in
21  fact either Polo or Tiffany would have discovered
22  the error if NUS hadn't identified it right away
23  first.  Right?
24       A.  Our participation in a savings is

# BROWN-6/19/08 DEPOSITION

UNITED STATE DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
NATIONAL UTILITY SERVICE, INC.,

                          Plaintiff,

        -against-      Case No:07CV3345 (RJS)(GWG)

TIFFANY & CO. and TIFFANY and COMPANY,

                          Defendants.
----------------------------------------X

              488 Madison Avenue
              New York, New York

              June 19, 2008
              2:00 p.m.


                    DEPOSITION of DAVID M. BROWN,

an Expert Witness herein, taken by the Defendants,

pursuant to Article 31 of the Civil Practice Law &

Rules of Testimony, and Notice, held at the

above-mentioned time and place, before SARA FREUND,

a shorthand reporter and a Notary Public of the

State of New York.

Page 22

D.M. Brown

1
2      A.   No. I'm saying that what I had written
3  down was how it should structurally look and where
4  the information should all go, and this is pretty
5  much what it looks like.
6      Q.   Mr. Brown, when you testified previously
7  as an expert, did you produce your work papers?
8      A.   No, I did not.
9      Q.   Nobody asked for your work papers?
10      A.   Not that I can recall.
11      Q.   You understand that if you testify as an
12  expert, the other side is entitled to see your work
13  papers to challenge how you calculated certain
14  things. You understand that, right?
15      A.   I don't know.
16      Q.   You didn't think about that?
17      A.   No.
18      Q.   And all we have as --withdrawn.
19          There is no backup in the form of either
20  prior drafts, notes or modifications that exist in
21  writing in connection with the preparation of
22  Exhibit 80 for identification; is that correct?
23      A.   That's correct.
24      Q.   And it is your testimony that all of the
25  instructions that you gave to Mei were verbal,

Page 23

D.M. Brown

1
2  right?
3      A.   Correct.
4      Q.   And that Mei took no notes, correct?
5      A.   Not that I can recall, she didn't take
6  any notes.
7      Q.   And that when you reviewed the work
8  product for the first time, it was perfect.
9      A.   Yes.
10      Q.   So, let's take a look at Exhibit 80 in
11  greater detail. The bill on the first page
12  calculates what NUS claims is the amount it is
13  entitled to be paid as a fee from Tiffany, right?
14      A.   Correct.
15      Q.   The first entry on the first page says
16  "Savings as per attached invoices from 12/27/2006
17  to 2/26/2008, 14 months," correct?
18      A.   Correct.
19      Q.   $216,293.24. That's the number?
20      A.   Correct.
21      Q.   Is that amount one-half of the savings
22  that you say Tiffany realized as a result of the
23  services performed by NUS?
24      A.   Correct.
25      Q.   So through February 26, 2008, you claim

Page 24

D.M. Brown

1
2  that there is an actual savings realized of over
3  $400,000 by Tiffany, correct?
4      A.   Correct.
5      Q.   Let's go to the second. The third line
6  says "Savings for the remaining participation, 46
7  months." You see that?
8      A.   Yes.
9      Q.   $710,677.92. Do you see that?
10      A.   Yes.
11      Q.   That's a projection, right?
12      A.   Yes.
13      Q.   So the only actual entry for what NUS
14  claims are actual savings realized would be the
15  entry $216,293.24 in that component of the bill,
16  right?
17      A.   Correct.
18      Q.   Looking back, it also says "In
19  calculating the remaining 46 months on a
20  going-forward basis, an average of $15,449.52 a
21  month." Do you see that?
22      A.   Yes.
23      Q.   What did you do? You took the billing
24  periods reflected from December 27, 2006 to
25  February 26, 2008 and divided that by the number of

Page 25

D.M. Brown

1
2  months to come up with a monthly amount; is that
3  correct?
4      A.   I took 14 months, and I divided it into
5  the $216,293.24 to come up with the average.
6      Q.   And then you just made an assumption
7  that would be on a going-forward basis for the
8  next 46 months, the savings that Tiffany would
9  realize for the remainder of the 16-month term
10  under the NUS contract, correct?
11      A.   My opinion is a reasonable calculation
12  that this is what Tiffany will -- one-half of what
13  Tiffany will save for the next 46 months. So to
14  answer your question, yes.
15      Q.   It's an estimate, right?
16      A.   It's an estimate of future savings.
17      Q.   Now, let's take a look at the bill for
18  the period December 27, 2006 to January 25, 2007,
19  which is on page Bates stamped NUS 887. You see
20  that?
21      A.   Yes.
22      Q.   In that particular month, it shows that
23  the amount NUS claims as its 50-percent share of
24  the savings is $11,768.17, right?
25      A.   Correct.

Page 26

D.M. Brown

1
2    Q.  Would you describe to me how that amount
3  is calculated?  What did you do to come up with
4  that number that that amount is due NUS for that
5  period?
6    A.  It's 50 percent of the gross savings for
7  that particular month, which would have been
8  $23,536.33.
9    Q.  How did you calculated the gross savings
10  of $23,536.33?
11    A.  What was first done was taking the Polo
12  meter readings, and then taking those meter
13  readings and recalculating it off a meter
14  multiplier of 180 to come up with what Tiffany
15  would have been billed both in a consumption and
16  demand as a result of those meter multipliers.
17    Q.  Are you saying for Polo's usage?
18    A.  It's not Polo's usage, it's Tiffany's
19  usage. It's Polo's meter readings.  And those
20  meter readings are placed against the Tiffany meter
21  multiplier of 180 which was in effect during the
22  affected period, if you will, in late 2006.  And in
23  that, we come up with the KWH, which is the
24  consumption, and we also come up with the KW both
25  on, off and mid-peak.  Taking that information

Page 27

D.M. Brown

1
2  then, and applying it to the Tiffany rate of 285
3  with LIPA and calculating against that rate, and
4  also taking it against the Con Ed Solution charges
5  to come up with the commodity portion of that, you
6  come up with the former billing, if you will, as to
7  what they would have paid had the NUS
8  recommendations not have been implemented.  The
9  second page of the bill demonstrates how they are
10  presently being billed by both LIPA and Con Ed
11  Solutions.  And then taking that total, you put it
12  to the first page, which is the present, and the
13  difference between the total former charges and the
14  present charges would give you the net savings of
15  $23,536.33 for which one-half of that would be due
16  NUS.
17    Q.  Circle for me, if you would, everything
18  on that page that's a Polo amount.  I gave you my
19  pen.  On the page Bates stamped 887, what I would
20  like you to do is, circle for me all of the
21  readings on here that relate to the usage of Polo
22  Ralph Lauren.  Write next to that "RL," if you
23  would.
24    A.  This is Ralph Lauren Polo.
25    Q.  Is there any place else on that bill

Page 28

D.M. Brown

1
2  that reflects readings that have to do with Polo
3  Ralph Lauren, anything else on that page or the
4  page Bates stamped 888?
5    A.  I believe your first question and your
6  question now are a little bit different.  Are you
7  saying having something to do with --
8    Q.  Let me rephrase it.
9      Are there any other places on this bill
10  where usage of Polo Ralph Lauren is reflected?
11    A.  No.
12    Q.  Is there any other place on these two
13  pages, Bates stamped 887 and 888, that reflect
14  numbers that are attributable to Ralph Lauren as
15  opposed to Tiffany?
16    A.  All of these numbers here would have
17  been the Tiffany charges that were borne out of the
18  Ralph Lauren readings.
19    Q.  So the portion of the page beneath
20  "former billing rate 285" is the amount that NUS
21  --withdrawn.
22      If I understand you correctly, the first
23  page purports to create a bill for Tiffany based
24  upon the Ralph Lauren usage that you circled; is
25  that correct?

Page 29

D.M. Brown

1
2    A.  Yes. It's based upon what would have
3  been charged to Tiffany had the NUS recommendations
4  not been implemented.
5    Q.  You keep saying "had the NUS." You're
6  an expert now.  You're not testifying as a fact
7  witness.  You don't know -- as an expert witness
8  you're here testifying in a different capacity, you
9  understand that?
10    A.  Yes.
11    Q.  Had the NUS recommendations not been
12  implemented is NUS's claim in the case.  You
13  understand that?
14    A.  Yes.
15    Q.  You're not testifying here as an
16  advocate today.  I'm here to get your testimony as
17  an expert.  You understand the distinction?
18    A.  Yes.
19      MR. GOODMAN: Objection.
20    Q.  Mr. Brown, the entire first page Bates
21  stamped NUS 887, purports to create a bill in such
22  a way that had Tiffany continued to receive charges
23  for Polo Ralph Lauren's usage, it's NUS's position
24  that this is the amount that that bill would have
25  been; is that right?

# ENSOR
# DEPOSITION

NATIONAL UTILITY SERVICE VS. TIFFANY & CO.

BRIAN ENSOR - 5/14/08

CONCORDANCE AND CONDENSED TRANSCRIPT
PREPARED BY:




TOWER 56, 126 EAST 56TH STREET, FIFTH FLOOR, NEW YORK, NEW YORK 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
WWW.ELLENGRAUER.COM

Page 5

(1) B R I A N   E N S O R,    called as a witness,
(2)    having been duly sworn by a Notary
(3)    Public, was examined and testified as
(4)    follows:
(5)
(6) EXAMINATION BY
(7) MR. GOODMAN:
(8)    Q.   Please state your name for the
(9) record.
(10)    A.   Brian Ensor.
(11)       MR. GOODMAN:  That is taken pursuant
(12)    to notice and the Federal Rules of Civil
(13)    Procedure.
(14)    A.   Brian Ensor. E-N-S-O-R.
(15)    Q.   What is your home address,
(16) Mr. Ensor?
(17)    A.   30 Bogart Avenue, Port Washington,
(18) New York 11050.
(19)    Q.   What is your business address?
(20)    A.   It's 1980 Northern Boulevard,
(21) Manhasset, New York 11030.
(22)    Q.   Do you work at the Tiffany retail
(23) store at 1980 Northern Boulevard?
(24)    A.   I do.  I have regional
(25) responsibilities that takes me into 14 other

Page 6

(1)
(2) stores also.
(3)    Q.   What is your title?
(4)    A.   I'm vice president of the northeast
(5) region.  Tiffany Company.
(6)    Q.   Is there a store that you call your
(7) home base?
(8)    A.   It would be Manhasset, yeah.
(9)    Q.   For how long have you been the vice
(10) president of the northeast region?
(11)    A.   Just about three years now.
(12)    Q.   Sometime in spring of 2005 you took
(13) on that position?
(14)    A.   About that time, yes.
(15)    Q.   What are your responsibilities as
(16) vice president of the northeast region?
(17)    A.   To ensure that my region, 14 stores
(18) within my region, meet sales plans and
(19) profitability objectives.  And to lead that
(20) team to that course.
(21)    Q.   Approximately how many people report
(22) to you?
(23)    A.   You know, in terms of direct
(24) reports, I have eight, but within the teams,
(25) they lead considerably more than that.

Page 7

(1)
(2)    Q.   So the direct reports are heads of
(3) other teams?
(4)    A.   Other heads of other teams or vice
(5) presidents or group directors of a number of
(6) stores.
(7)    Q.   What are the teams who report to
(8) you?
(9)    A.   It would be vice presidents of
(10) stores and group directors of stores, directors
(11) of stores and some store managers.
(12)    Q.   What types of things do they report
(13) to you on?
(14)    A.   Sales activities, expense
(15) activities.  When I mention sales, I would
(16) include client development activities.  Client
(17) outreach.  Human resource activities.  And
(18) their activities within the communities in
(19) which we -- we have a business presence.
(20)    Q.   Who do you report to?
(21)    A.   Elizabeth Ames, who's group vice
(22) president.
(23)    Q.   For how long have you reported to
(24) Elizabeth aims?
(25)    A.   Probably between four and five

Page 8

(1)
(2) years.
(3)    Q.   So you reported to her before you
(4) became vice president of the northeast region?
(5)    A.   Yes, I did.
(6)    Q.   Okay.  What was your prior position?
(7)    A.   It was vice president for the Long
(8) Island market.
(9)    Q.   Did your responsibilities differ
(10) from what they are today?
(11)    A.   The responsibilities were expanded
(12) when I took on the regional role, but the
(13) responsibilities insomuch as they relate to the
(14) store activities for Manhasset and East Hampton
(15) were pretty much aligned.
(16)    Q.   Are the responsibilities that you
(17) described with respect to your current position
(18) the same today as they were in late 2006, early
(19) 2007?
(20)    A.   The situation in 2006 was different
(21) in that I was additionally store head for the
(22) Manhasset location, so I acted out of the role
(23) of regional vice president and store head of
(24) the Manhasset location.
(25)    Q.   Was your title store head or was --

### Page 9

(1)
(2)     **A.  No, my title was regional vice**
(3) **president northeast region.  We had not -- we**
(4) **did not have a store leader, a store head for**
(5) **the Manhasset location.  That as my home base**
(6) **store meant that I covered that role for**
(7) **Manhasset in addition to my regional**
(8) **responsibilities.**
(9)     **Q.**  Did you serve the function in 2006
(10) as the general manager of the Manhasset store?
(11)     **A.  That would be fair to say, yup.**
(12)     **Q.**  Was there anyone at the Manhasset
(13) store who was superior to you in the hierarchy?
(14)     **A.  Not located in Manhasset, no.**
(15)     **Q.**  During 2006, in addition to acting
(16) as the general manager of the Manhasset store,
(17) you were also responsible in your role as
(18) regional vice president for 13 other stores; is
(19) that correct?
(20)     **A.  At the time, no.  We had nine stores**
(21) **in total within the northeast region.  We've**
(22) **grown the region to be now 14 stores.**
(23)     **Q.**  During what period did you act as
(24) the general manager of the Manhasset store?
(25)     **A.  What time span is this?**

### Page 10

(1)
(2)     **Q.**  Well, when did it begin and when did
(3) it end, approximately?
(4)     **A.  It began in 1998.  And approximately**
(5) **until early 2007.**
(6)     **Q.**  Why did your function change in
(7) early 2007 with respect to managing the
(8) Manhasset store?
(9)     **A.  I appointed a store director to the**
(10) **Manhasset location at that time.**
(11)     **Q.**  Who did you appoint?
(12)     **A.  Don Rudolph.**
(13)     **Q.**  So was it Don?
(14)     **A.  Don Rudolph, yes.**
(15)     **Q.**  Is Mr. Rudolph still the store
(16) director for Manhasset?
(17)     **A.  Yes.**
(18)     **Q.**  Why did you appoint a store
(19) director?
(20)     **A.  Because of the needs of the**
(21) **business.**
(22)     **Q.**  Did you find that you weren't able
(23) to attend to all of your responsibilities with
(24) respect to Manhasset and therefore needed
(25) somebody to help out?

### Page 11

(1)
(2)     **A.  The growth of the region certainly**
(3) **was the reason.  And Manhasset is a busy store.**
(4)     **Q.**  So is it fair to say that you needed
(5) some assistance in terms of the management of
(6) Manhasset?
(7)     **MR. MITCHELL:**  Object to the form of
(8) the question.
(9)     **A.  I need assistance in every store**
(10) **that I have responsibilities for.  I have a**
(11) **management team in every store that assists me**
(12) **in the running of those stores.**
(13)     **Q.**  Okay, but there came a time with
(14) Manhasset when you felt the need to appoint
(15) somebody to handle the day-to-day operations of
(16) your store; is that right?
(17)     **A.  Yes.**
(18)     **Q.**  Was Don Rudolph working at the
(19) Manhasset store before you appointed him as
(20) store director?
(21)     **A.  He was the director of our store in**
(22) **East Hampton.**
(23)     **Q.**  Who reported to you at the Manhasset
(24) store during the time that you were serving as
(25) general manager?

### Page 12

(1)
(2)     **A.  Sales manager.**
(3)     **Q.**  Who was that?
(4)     **A.  Christine Tricarico.  And Bruce**
(5) **Edson, operations manager.**
(6)     **Q.**  During 2006, how frequently were you
(7) physically present at the Manhasset store?
(8)     **A.  Approximately 90 percent of the**
(9) **time.**
(10)     **Q.**  Am I correct in my understanding
(11) that during 2006, bills for electric service
(12) for the Manhasset store were sent directly by
(13) the service providers to a Tiffany processing
(14) facility located in New Jersey?
(15)     **A.  Yes.**
(16)     **Q.**  Am I also correct in my
(17) understanding that copies of those bills were
(18) never sent to the Manhasset store?
(19)     **A.  They were never sent, no.**
(20)     **Q.**  During the time that you were
(21) serving the function of general manager at the
(22) Manhasset store, did you ever physically review
(23) any electricity service bills with respect to
(24) that location?
(25)     **A.  At any point in time?  I'm not quite**

Page 13

(1)
(2)  sure of the question.
(3)      Q.  Well, I'm focusing on the —
(4)      A.  On the year of 2006.
(5)      Q.  -- the year 2006, which is the year
(6)  that the events in this case --
(7)      A.  No.
(8)      Q.  During the time that you were
(9)  serving the function of general manager of the
(10) Manhasset store, did you have any role in
(11) approving or disapproving the payment of
(12) utility bills including electricity?
(13)     A.  No.
(14)     Q.  What was the total amount of time
(15) that you've been employed by Tiffany?
(16)     A.  Ten-and-a-half years.
(17)     Q.  And obviously, you're employed by
(18) Tiffany today, correct?
(19)     A.  Yes.
(20)     Q.  During those ten-and-a-half years,
(21) were you continuously employed by Tiffany or
(22) were there any interruptions?
(23)     A.  Continuously.
(24)     Q.  For how long were you the vice
(25) president for the Long Island market?

Page 14

(1)
(2)      A.  Approximately two years.
(3)      Q.  And what was your position before
(4)  vice president for Long Island?
(5)      A.  Director store in Manhasset.
(6)      Q.  For how long?
(7)      A.  Six, seven years.
(8)      Q.  Was that the first position you held
(9)  with Tiffany?
(10)     A.  It was.
(11)     Q.  During the time that you were
(12) serving as general manager of the Manhasset
(13) store, did you personally have any interactions
(14) with any representatives from the utility
(15) companies which provided electric service for
(16) the store?
(17)     A.  No.
(18)     Q.  When did you first become aware of
(19) National Utility Service Incorporated?
(20)     A.  The actual name, I can't be sure. I
(21) mean, I have no direct recollection exactly
(22) when, no.
(23)     Q.  Were you aware of National Utility
(24) Service during 2006 when you were serving as
(25) the general manager of Manhasset?

Page 15

(1)
(2)      A.  I would have to say my recollection
(3)  would be through facilities perhaps mentioning
(4)  them.
(5)      Q.  What do you mean when you refer to
(6)  facilities?
(7)      A.  Facilities corporate organization
(8)  mentioning that.
(9)      Q.  Is that a department within Tiffany
(10) that you're referring to?
(11)     A.  It is a department, yeah. It's a
(12) separate department within Tiffany.
(13)     MR. MITCHELL:  Let him finish the
(14) question.
(15)     Q.  Yeah, let me just request that you
(16) let me finish speaking before you provide an
(17) answer because, as you know, the court reporter
(18) is --
(19)     A.  Sorry.
(20)     Q.  -- writing everything down.
(21)     A.  Okay.
(22)     Q.  So that is a department within
(23) Tiffany?
(24)     A.  Yes.
(25)     Q.  Okay.  And during 2006, who do you

Page 16

(1)
(2)  recall being part of that department?
(3)      A.  Bruce Mogel, Sandy Lutz.
(4)      Q.  Where were they located during 2006?
(5)      A.  Bruce Mogel in New York. Sandy Lutz
(6)  covered a region within the country in a
(7)  facilities capacity.
(8)      Q.  Did her or his region include the
(9)  northeast?
(10)     A.  Yes.
(11)     Q.  Okay. So it included Manhasset?
(12)     A.  Yes.
(13)     Q.  And how frequently did you
(14) communicate with either Bruce Mogel or Sandy
(15) Lutz?
(16)     A.  Infrequently.
(17)     Q.  Let me show you what has previously
(18) been marked as Exhibit 1. It's an agreement
(19) between National Utilities Service and Tiffany
(20) & Co. dated April 7, 1992. (Proffered.) I
(21) just wanted to know whether you've ever seen
(22) that before today.
(23)     A.  No.
(24)     Q.  Did there come a time when you
(25) became aware that there had been a replacement

NATIONAL UTILITY SERVICE

BRIAN ENSOR - 5/14/08

VS. TIFFANY & CO.

## Page 17

(1)
(2) of the meter for the electric service at the
(3) Manhasset location?
(4)     **A.   Yes.**
(5)     Q.   And when did you first become aware
(6) of the replacement of the meter?
(7)     **A.   Through information shared sometime**
(8) **in the latter part of the fiscal year 2006.**
(9)     Q.   When does the fiscal year begin and
(10) end?
(11)     **A.   Begins February 1 through January**
(12) **31.**
(13)     Q.   How did you first become aware that
(14) the meter had been changed at the Manhasset
(15) store?
(16)     **A.   Through Bruce Mogel corresponding by**
(17) **Email.**
(18)     Q.   Have you ever learned why the meter
(19) was changed?
(20)     **A.   No.**
(21)     Q.   Did there come a time when you
(22) became aware of an unusual electric usage
(23) pattern at the Manhasset store?
(24)         MR. MITCHELL:  Object to the form of
(25)     the question.

## Page 18

(1)
(2)     **A.   At the latter part of 2006, we,**
(3) **through the monthly reportings that we have**
(4) **available to us, we saw an increase in our**
(5) **supplies costs, which I remember.**
(6)     Q.   I'm sorry, what is the last thing
(7) you said?
(8)     **A.   I remember an increase in our**
(9) **supplies cost.**
(10)     Q.   You're referring to we and is there
(11) someone else with whom you made that
(12) observation?
(13)     **A.   With the operations manager, Bruce**
(14) **Edson.**
(15)     Q.   Did you make the observation that
(16) there was an increase in electric costs or was
(17) it more generically costs of supplies for the
(18) store?
(19)     **A.   My observation was more generic,**
(20) **supplies.**
(21)     Q.   Did you have a conversation with
(22) Bruce Edson about this?
(23)     **A.   Yes.**
(24)     Q.   Did you have more than one
(25) conversation with Bruce about this observation?

## Page 19

(1)
(2)     **A.   Yes.**
(3)     Q.   How many conversations in total did
(4) you have with Bruce about the increase in
(5) supplies costs?
(6)     **A.   I don't have an exact remember -- I**
(7) **can't remember exactly how many.  It was more**
(8) **than one.**
(9)     Q.   Okay.  Do you recall when the first
(10) conversation you had with Bruce?
(11)     **A.   Late in the fiscal year.**
(12)     Q.   Are you able to fix a month?
(13)     **A.   Not a specific month, no.**
(14)     Q.   As you sit here today, are you
(15) unable to say whether that conversation
(16) occurred in November, December 2006 or
(17) January 2007?
(18)     **A.   I don't remember exactly.  It's late**
(19) **in that year.**
(20)     Q.   What did you say to Bruce and what
(21) did he say to you?
(22)     **A.   My conversation would simply be to**
(23) **alert Bruce to the unusual dollars spent on**
(24) **supplies against our planned forecasts and**
(25) **asking him to look into it.**

## Page 20

(1)
(2)     Q.   Do you actually remember saying that
(3) to him or is that something that you think you
(4) would have said under the circumstances?
(5)     **A.   In the circumstances, from what I**
(6) **remember two years ago, that would have been**
(7) **really the gist of what I would have said,**
(8) **yeah.  The exact words, I can't remember, but**
(9) **the gist of these expenses are beyond our**
(10) **planned expenses, can you look into that?**
(11)     Q.   And what was Bruce's response, if
(12) anything?
(13)     **A.   To go away and take a look at what**
(14) **the expense -- expenditure was.  I mean, give**
(15) **me an explanation for it.**
(16)     Q.   Did he ever report back to you with
(17) an explanation?
(18)     **A.   In the time that we were**
(19) **investigating and Bruce was investigating, the**
(20) **facilities team had also been looking into that**
(21) **expense, and through Bruce Edson and Bruce**
(22) **Mogel collaboratively and collectively,**
(23) **information was sent back to me.**
(24)     Q.   Do you know how the facilities team
(25) became aware of the reason for the increased

## Page 25

(1)
(2) Service at the time of these Emails?
(3)    A.   No.
(4)    Q.   Well, is it correct then that you
(5) learned of National Utilities Service after the
(6) date of this string of E-mails?
(7)    A.   Yes.
(8)    Q.   Show you an exhibit that's been
(9) marked Exhibit 5 in a previous deposition
(10) bearing production numbers T 1139 through 1141.
(11) (Proffered.)
(12)    A.   (Perusing.)
(13)    Q.   If I can speed this up a little bit,
(14) some of these Emails are duplicative of what
(15) you just looked at and it's a new string,
(16) however, that begins really on the first page.
(17)    A.   Yeah.
(18)    Q.   Okay.  Do you see the second Email
(19) on the first page of the exhibit from Bruce
(20) Mogel to Brian Ensor, Bruce Edson, Sandy Lutz
(21) and Christine Amundsen dated November 16, 2006
(22) at 1:01 p.m.?
(23)    A.   Yes.
(24)    Q.   Did you receive this Email on or
(25) about the date and time indicated?

## Page 26

(1)
(2)    A.   Yes.
(3)    Q.   Okay.  Do you have any specific
(4) recollection of receiving it?
(5)    A.   No.
(6)    Q.   Do you recall any discussions that
(7) you had with Bruce Mogel around the time of
(8) these Emails in the middle of November 2006
(9) concerning electric usage or costs at the
(10) Manhasset location?
(11)    A.   Not that I recall.
(12)    Q.   Show you a document which has been
(13) previously marked as Exhibit 2.  (Proffered.)
(14) My first question is whether you've ever seen
(15) this document before?
(16)    A.   (Perusing.) No.
(17)    Q.   As of the middle of November 2006,
(18) did you know who Christine Amundsen was?
(19)    A.   No.
(20)    Q.   Did there come a time when you
(21) learned who Christine Amundsen is?
(22)    A.   Only as we speak now.
(23)    Q.   Let me show you a document which has
(24) previously been marked as Exhibit 9.
(25) (Proffered.)  Exhibit 9 is a string of Emails

## Page 27

(1)
(2) bearing productions numbers T 43 through T 45.
(3)    If you begin on the second page of the exhibit,
(4) there's an Email from Bruce Mogel to Eric
(5) Zeigler, which you are copied on, dated
(6) December 22, 2006 at 12:18 p.m.
(7)    A.   (Perusing.)
(8)    Q.   Do you recall receiving this
(9) December 22, 2006 Email from Bruce Mogel?
(10)    A.   I'm seeing it now, but specifically
(11) not.
(12)    Q.   Do you recall learning about the
(13) fact that Tiffany had overpaid for its electric
(14) service charges for the Manhasset location?
(15)    A.   Yes.
(16)    Q.   And when did you first learn about
(17) that?
(18)    A.   Really at the latter end of the
(19) fiscal year.
(20)    Q.   Okay.  Do you recall whether it was
(21) before or after the middle of December 2006?
(22)    A.   I can't recall.
(23)    Q.   When you first learned about the
(24) overpayments for electricity at Manhasset, what
(25) were the circumstances?

## Page 28

(1)
(2)    MR. MITCHELL:  Object to the form of
(3) the question.
(4)    MR. GOODMAN:  Let me withdraw that.
(5)    Q.   How did you first learn about the
(6) overpayment for electricity?
(7)    A.   Through observing in a monthly
(8) report document a spiking in expenses that were
(9) beyond what we planned.
(10)    Q.   Was that a different observation
(11) from the one that you testified about earlier?
(12)    A.   No, it's the same observation.
(13)    Q.   Okay.  In that first observation,
(14) you didn't isolate the increase in costs to
(15) electricity, correct?
(16)    A.   No, supplies.
(17)    Q.   Okay.  My question is when did you
(18) first learn that there was an overpayment with
(19) respect to electricity specifically?
(20)    A.   Specifically, I would say during the
(21) course of the Email correspondence that I'd
(22) received.
(23)    Q.   Do you recall ever being consulted
(24) with respect to supplying National Utility
(25) Service with load data for the Manhasset store?

Page 45

(1)
(2)    Q.    What is more detailed in this
(3)    document?
(4)    A.    The expense lines.
(5)    Q.    Is it the description of the types
(6)    of expenses which is detailed or something
(7)    else?
(8)    A.    The descriptions are summarized in
(9)    the blue book.
(10)    Q.    Can you give me an example of what
(11)    the heading would be as it related to
(12)    utilities?
(13)    A.    Supplies.
(14)    Q.    What would be under the category of
(15)    supplies in the blue book?
(16)    A.    Utilities would be included, sundry
(17)    stock items would be included.
(18)    Q.    You mean packaging material?
(19)    A.    Yes.
(20)    Q.    Boxes, stationery, things like that?
(21)    A.    Of that type, yes.
(22)    Q.    Earlier you testified that toward
(23)    the end of fiscal year 2006, you observed an
(24)    increase in supplies costs.  Do you recall
(25)    that?

Page 46

(1)
(2)    A.    Yes.
(3)    Q.    Okay.  Based on that observation,
(4)    would you agree that it was likely that what
(5)    you were looking at was the blue book financial
(6)    reporting document as opposed to the type of
(7)    expense report that has been marked as Exhibit
(8)    80?
(9)        MR. MITCHELL:  Objection to the form
(10)    of the question.
(11)    A.    May have been both.
(12)    Q.    Okay, but you don't recall which
(13)    document it was as you sit here today; is that
(14)    right?
(15)    A.    I don't recall.
(16)    Q.    And other than telling Bruce Edson
(17)    about the observation about the increased
(18)    supply costs, did you tell anyone else at
(19)    Tiffany about the observation you made?
(20)    A.    Not that I recall.
(21)    Q.    Did you ever put anything in writing
(22)    regarding your observation of an increase
(23)    supply costs toward the end of fiscal year
(24)    2006?
(25)    A.    Not that I recall.

Page 47

(1)
(2)    Q.    Have you had any discussions with
(3)    anyone from Tiffany, other than counsel,
(4)    regarding National Utilities Services' claim
(5)    for payment of a fee as it relates to the
(6)    correcting of the electrical billing problem
(7)    for the Manhasset store?
(8)    A.    No.
(9)    Q.    Have you had any communications with
(10)    anyone from Albertson Electric regarding the
(11)    events involved in this lawsuit?
(12)    A.    Not that I recall.
(13)    Q.    Have you had any communications with
(14)    anyone from Tiffany's landlord for the
(15)    Manhasset store, Castagnia Realty, with respect
(16)    to the events involved in this lawsuit?
(17)    A.    Not that I recall.
(18)        MR. GOODMAN:  I have nothing
(19)    further.  Thank you.
(20)        MR. MITCHELL:  I have some questions
(21)    for you.
(22)    EXAMINATION BY
(23)    MR. MITCHELL:
(24)    Q.    Mr. Ensor, first I'd like to ask, do
(25)    you carry a Blackberry?

Page 48

(1)
(2)    A.    Yes.
(3)    Q.    Did you carry a Blackberry in 2006?
(4)    A.    I don't recall exactly when I got my
(5)    Blackberry, I'm sorry.
(6)    Q.    Okay.  At times when you received
(7)    Emails that might be relevant to the job
(8)    description of someone who works for you, do
(9)    you sometimes forward those Emails to that
(10)    person so that that person will deal with the
(11)    information contained in those Emails?
(12)    A.    Yes.
(13)    Q.    And in connection with your job
(14)    responsibilities, if something falls within
(15)    someone else's job description beneath you in
(16)    the chain of command, does that sometimes
(17)    impact upon the amount of attention you give to
(18)    the Email you might receive or be copied on?
(19)        MR. GOODMAN:  Objection.
(20)    A.    Yes.
(21)    Q.    How would that affect the attention
(22)    that you might give to such an Email?
(23)    A.    It would involve a delegation of
(24)    responsibility to investigate and be held
(25)    accountable for the -- their actions.

Page 73

(1)
(2)    A.    Bruce Edson, yes.
(3)    Q.    Okay. Did Bruce Edson use any
(4) materials other than the reports that you
(5) discussed earlier today in connection with his
(6) review of utility expenses for Manhasset?
(7)    A.    No.
(8)    Q.    Other than reviewing reports, did
(9) Bruce Edson, to your knowledge, perform any
(10) other action with respect to monitoring the
(11) utility expenses for Manhasset?
(12)    A.    You know, I'm not quite clear about
(13) the question in terms of other activities.
(14)    Q.    Okay, let me start with this: Do
(15) you know if Bruce Edson even reviewed reports
(16) independent of anything that you would discuss
(17) with him concerning a report?
(18)    A.    Yes, he would.
(19)    Q.    Have you ever seen him review
(20) reports?
(21)    A.    Yes, I have.
(22)    Q.    Other than see him review reports,
(23) did you ever see him take any other steps to
(24) monitor utility expenses?
(25)    A.    No.

Page 74

(1)
(2)    Q.    Who is the person who is responsible
(3) for preparing the utility budget that would be
(4) used in connection with the expense reports
(5) shown as Exhibit 80?
(6)    A.    For Manhasset, that would have been
(7) me.
(8)    Q.    So you are the person who would have
(9) transmitted to the finance department at
(10) Tiffany the data that is reflected in Exhibit
(11) 80 showing the budgeted amount for that year?
(12)    A.    Yes.
(13)    Q.    If you take a look at Exhibit 80, on
(14) the pages 1191 through 1194, there are check
(15) marks in the middle section of the exhibit
(16) placed near the columns in the Utilities line.
(17) Do you see those?
(18)    A.    Yes.
(19)    Q.    Did you place those check marks
(20) there?
(21)    A.    Not that I recall.
(22)    Q.    Do you know who placed those check
(23) marks?
(24)    A.    Not that I recall, no.
(25)    Q.    Do you know when those check marks

Page 75

(1)
(2) were placed?
(3)    A.    Not that I recall.
(4)    Q.    You went over this with Mr. Mitchell
(5) and on the top right of each report is a date.
(6) And for page 1191, which is the August '06
(7) expense report, there's a date September 8,
(8) '06. Do you see that?
(9)    A.    Yes.
(10)    Q.    And then the next one is dated
(11) October 11, '06?
(12)    A.    Yes.
(13)    Q.    And the next is November 9, '06?
(14)    A.    Yes.
(15)    Q.    And the next is 12-8-06. Do you see
(16) that?
(17)    A.    Yes.
(18)    Q.    Is it fair to say that the reports
(19) were generated by Tiffany sometime within the
(20) first two weeks of the succeeding months?
(21)    A.    Yes.
(22)    Q.    And when did you receive the reports
(23) after they were generated?
(24)    A.    These reports are received online.
(25) At any point after this, of receiving them

Page 76

(1)
(2) online, I would take the chance to review them
(3) whenever I had the time.
(4)    Q.    Was it the practice of Tiffany to
(5) send you as the general manager of the
(6) Manhasset store the report at the same time
(7) that it was dated or was there some lag between
(8) the date that it was dated and the time that it
(9) was sent to you?
(10)    A.    We are made aware that the reports
(11) are accessible online as a company both the
(12) store leaders, store managers and the
(13) operations managers.
(14)    Q.    So as I understand it, the report is
(15) not actually sent to you as an attachment to an
(16) Email or in some other electronic fashion,
(17) you're just notified that the report is ready
(18) for your review?
(19)    A.    Yes.
(20)    Q.    Is that right?
(21)    A.    Yes.
(22)    Q.    And at some point thereafter, it was
(23) your practice to access the report and view it,
(24) correct?
(25)    A.    Yes.

## Page 85

(1)

(2)    Q.    And with respect to outside
(3)  services, did you take any steps to bring that
(4)  cost down to within budget?
(5)    A.    Not that I recall.  That alarm
(6)  **expense is paid for by our security division.**
(7)  **They pay invoices, they negotiate the contracts**
(8)  **of alarm -- alarm cover for each store.  So no,**
(9)  **not that I recall.**
(10)    Q.    But it was a still a budgeted item
(11)  for the Manhasset location, correct?
(12)    A.    **It is.**
(13)    Q.    Okay.  Were you held accountable
(14)  with respect to that component of the Manhasset
(15)  store's budget?
(16)    A.    **Not specifically, no.**
(17)    Q.    Even though it was contained within
(18)  the Manhasset store's budget?
(19)    A.    **There are controllable expenses that**
(20)  **we do control locally and there are**
(21)  **uncontrollable expenses that we don't control**
(22)  **locally.  The security element is an**
(23)  **uncontrollable expense that's dictated,**
(24)  **governed and budgeted centrally.**
(25)    Q.    So is it fair to say that you didn't

## Page 86

(1)

(2)  pay much attention to the security element?
(3)    A.    **Not as much attention, no.**
(4)    Q.    And that's because you personally
(5)  weren't going to be held accountable?
(6)    A.    **I'm not personally held accountable**
(7)  **for the budgeting of security alarm systems,**
(8)  **no.**
(9)    Q.    But did you think that it might be
(10)  helpful to Tiffany to bring it to the attention
(11)  of the department who was responsible for that
(12)  cost, to tell them that it was over budget?
(13)    A.    **Yes, we do.  Each year at time of**
(14)  **profit planning, we look back and reflect on**
(15)  **what's happened rear prior.  We get feedback**
(16)  **from the security division each year with the**
(17)  **best plan and data entry the budget dollar**
(18)  **amount month by month.  At that time, we would**
(19)  **question whether we'd used a sufficient dollar**
(20)  **amount for each month based on the history of**
(21)  **over spending the previous year, so yes, we**
(22)  **connect, we communicate, we give feedback on**
(23)  **what the actual dollar amounts are when we're**
(24)  **doing profit plan.**
(25)    Q.    With respect to this four-month

## Page 87

(1)

(2)  period that we're discussing here, specifically
(3)  August through November 2006, you gave no
(4)  feedback to anyone at Tiffany concerning the
(5)  over budget with respect to the alarm system
(6)  and security?
(7)    A.    **Not that I recall.**
(8)    Q.    And with respect to the office
(9)  supply over budget during this four-month
(10)  period, you took no steps to fix that item in
(11)  the budget; is that right?
(12)    MR. MITCHELL:  Object to the form of
(13)    the question.  Mischaracterizes prior
(14)    testimony.
(15)    A.    **Locally, we look at what that budget**
(16)  **entailed and what actions we were taking and**
(17)  **felt, you know, I can feel justified in**
(18)  **spending money if it's relevant to growing the**
(19)  **sales component of our business.**
(20)    Q.    Do you recall making that decision?
(21)    A.    **That's a constant decision I make.**
(22)    Q.    My question is do you recall --
(23)    A.    **Specifically --**
(24)    Q.    -- as you sit here today?
(25)    A.    **I'm asking that question all of the**

## Page 88

(1)

(2)  **time.**
(3)    Q.    Let me finish my question to you.
(4)    A.    **Sure.**
(5)    Q.    Do you have a specific recollection
(6)  of during 2006 making the decision with respect
(7)  to the office supply component of the budget
(8)  which was over budget for at least four months?
(9)    A.    **Not that I recall.**
(10)    Q.    Is your compensation directly or
(11)  indirectly influenced by the outcome of this
(12)  lawsuit?
(13)    A.    **No.**
(14)    Q.    Now, you testified earlier that you
(15)  considered the deviation from the budget of the
(16)  utility expenses, and specifically the
(17)  electricity, to be significant.  Do you recall
(18)  that?
(19)    A.    **Yes.**
(20)    Q.    Other than the three Emails that we
(21)  saw earlier between you and Bruce Edson, was
(22)  there any other follow up by you to make sure
(23)  that that deviation was corrected?
(24)    A.    **Not that I recall.**
(25)    Q.    You don't recall any meeting other

---

Page 89

(1)
(2) than what you testified about with respect to
(3) that one meeting with Bruce?
(4)     **A.** **Not that I recall. Not an**
(5) **additional meeting.**
(6)     **Q.** And you don't recall any further
(7) follow up that you made asking Bruce or anyone
(8) else at Tiffany about the progress in
(9) addressing that deviation; is that correct?
(10)     **A.** **Not that I recall. My feedback from**
(11) **the Emails I received was satisfying me.**
(12)     **Q.** Well, but you don't recall actually
(13) reading any of those Emails as you sit here
(14) today, do you?
(15)     **A.** **During the period, the specific date**
(16) **of those Emails, no, I don't recall. Have I**
(17) **acknowledged and understood them to be part of**
(18) **this, this situation in the fourth quarter,**
(19) **yes.**
(20)     **MR. GOODMAN:** I have nothing
(21) further.
(22)     **MR. MITCHELL:** Sorry, but I have a
(23) few questions.
(24) FURTHER EXAMINATION
(25) **BY MR. MITCHELL:**

---

Page 90

(1)
(2)     **Q.** Exhibit 80 for identification, would
(3) it be fair to call this a management tool?
(4)     **A.** **Yes.**
(5)     **Q.** When you call it a management tool,
(6) Exhibit 80, describe for me how you use it as a
(7) tool to manage the Manhasset store?
(8)     **A.** **I use it to manage our expense**
(9) **controls within the Manhasset store.**
(10)     **Q.** Okay. So when you see variances to
(11) budget, following up on that sometimes doesn't
(12) take any more than a phone call, right?
(13)     **A.** **Yes.**
(14)     **Q.** Okay. So what this document does is
(15) it gives you a picture of how the store is
(16) doing in relation to how you projected the
(17) prior year it would be doing, right?
(18)     **A.** **Yes.**
(19)     **Q.** And it gives you details to show if
(20) you are at variance with what you thought where
(21) some of the variances might come from, right?
(22)     **A.** **Yes.**
(23)     **Q.** And isn't it true that as a manager
(24) who receives reports like this, it is a primary
(25) job responsibility of yours to understand if

---

Page 91

(1)
(2) you are at variance with projection, why you
(3) are at variance with projection?
(4)     **A.** **Yes.**
(5)     **MR. GOODMAN:** Objection to form.
(6)     **Q.** That's part of your job
(7) responsibility, isn't it?
(8)     **MR. GOODMAN:** Objection.
(9)     **A.** **Yes.**
(10)     **Q.** So taking expenses in particular, if
(11) you see expenses that are over budget, you
(12) would, as part of your responsibility, look
(13) into why something might be over budget, right?
(14)     **A.** **Yes.**
(15)     **Q.** And there might be a legitimate
(16) reason for it to be over budget, correct?
(17)     **A.** **Yes.**
(18)     **Q.** You testified in response to
(19) Mr. Goodman's questions that you had learned in
(20) looking at an expense for local supplies that
(21) the store had increased sending out cards to
(22) customers, correct?
(23)     **MR. GOODMAN:** I think you meant
(24) office supplies.
(25)     **MR. MITCHELL:** Office supplies,

---

Page 92

(1)
(2) correct.
(3)     **Q.** Isn't that right?
(4)     **A.** **Yes.**
(5)     **Q.** That was something you looked into,
(6) right?
(7)     **MR. GOODMAN:** Objection.
(8)     **Q.** You learned that by looking into the
(9) question; isn't that true?
(10)     **A.** **Yes.**
(11)     **Q.** Okay. And you made a determination
(12) as a manager that it was okay to be over budget
(13) in that area because the reason was
(14) justifiable, right?
(15)     **MR. GOODMAN:** Objection.
(16)     **A.** **Yes.**
(17)     **Q.** Okay. Now, sometimes you might find
(18) a variance with budget that would uncover a
(19) problem, right?
(20)     **A.** **Yes.**
(21)     **Q.** Okay. Let me give you some problems
(22) that you might find when you look in and tell
(23) me if those are the types of things when you
(24) look into it, you might learn: Someone might
(25) be stealing, right?

---