# SCHWARTING
# DEPOSITION

NATIONAL UTILITY SERVICE, INC. VS. TIFFANY & CO.

KATHLEEN SCHWARTING - 5/6/08

CONCORDANCE AND CONDENSED TRANSCRIPT
PREPARED BY:



Co. LLC
TOWER 56, 126 EAST 56TH STREET, FIFTH FLOOR, NEW YORK, NEW YORK 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
WWW.ELLENGRAUER.COM

NATIONAL UTILITY SERVICE, INC.

KATHLEEN SCHWARTING - 5/6/08

VS. TIFFANY & CO.

Page 17

(1)
(2) you can recall is just hearing their name at
(3) some point in the past?
(4)     A.    That's correct.
(5)     Q.    Was Lisa Quinn one of the
(6) individuals what you supervised during 2006 and
(7) 2007 in the billing department?
(8)     A.    Yes.
(9)     Q.    What was Lisa Quinn's title?
(10)    A.    Customer representative, a grade
(11) six.
(12)          MR. McAULIFFE:  Was it Lisa or
(13) Christine?
(14)          THE WITNESS:  Lisa.
(15)          MR. McAULIFFE:  A grade six.
(16)          THE WITNESS:  Yes.
(17)    Q.    Can you describe how the customer
(18) representatives were graded or classified?
(19)    A.    Once an individual becomes a
(20) customer representative they start at a grade
(21) four.  And based on evaluations and work
(22) performance, they can gradually over the course
(23) of the earliest three years become a grade six
(24) which is the highest grade in pay.
(25)    Q.    So the grades denote level of

Page 18

(1)
(2) experience and seniority?
(3)     A.    Yes, it does.
(4)     Q.    And the practical effect of that
(5) is they're paid more as they advance; is that
(6) correct?
(7)     A.    That's correct.
(8)     Q.    Do they move from grade four to
(9) grade five before they get to six?
(10)    A.    Yes, hopefully.
(11)    Q.    But it starts at four and it ends
(12) at six?
(13)    A.    Yes.
(14)    Q.    So is it fair to say that Lisa
(15) Quinn had been with LIPA -- withdrawn.
(16)          Do you know when Lisa Quinn
(17) attained the level of grade six?
(18)    A.    I don't know exactly.  I'm sorry,
(19) no.
(20)    Q.    Was she a grade six customer
(21) representative in the end of 2006 early 2007?
(22)    A.    Yes, she was.
(23)    Q.    Do you know how long she had been
(24) grade six at that time?
(25)    A.    It would be a guess.  I'm sorry.

Page 19

(1)
(2) I don't know exactly.
(3)     Q.    Before the events in this case
(4) occurred in late 2006 early 2007 had you had
(5) any direct dealings with anyone from the
(6) Tiffany account with respect to the Manhasset
(7) store?
(8)     A.    Not that I'm aware of.
(9)     Q.    When a call comes in with respect
(10) to a billing problem, how is that call routed
(11) to a customer representative or to you?
(12)    A.    Unless there is a problem with the
(13) type of account, it does not come into this
(14) area.  The majority of the calls are answered
(15) in our call center, customer calls, and they
(16) speak to a representative over there.
(17) Hopefully they will answer any questions that
(18) are posed to them.  If they are not answered or
(19) if the customer is not satisfied, what we call
(20) a work request will be sent over here to this
(21) area for us to look a little deeper into the
(22) problem and try to rectify it.  We contact the
(23) customer then and let them know and make sure
(24) they're satisfied with the results.
(25)    Q.    When you refer to -- when you call

Page 20

(1)
(2) here, you're referring to --
(3)     A.    The billing department.  Sorry.
(4)     Q.    Let me try to finish that --
(5)     A.    Sorry.
(6)     Q.    I appreciate you trying to be
(7) helpful, but we'll have a much cleaner record.
(8) You're referring to the billing department,
(9) which is the approximately 15-person department
(10) which you supervise?
(11)    A.    No.
(12)    Q.    Can you clarify that then?
(13)    A.    I'm referring to -- this
(14) department has approximately 50 people in it.
(15) There's different sections depending upon the
(16) type of billing that they are looking at and
(17) the type of work they are doing.  The 15
(18) represents who have direct report to me.
(19)    Q.    Are there other supervisors in the
(20) department?
(21)    A.    Yes, there are.
(22)    Q.    And the department that you're
(23) talking about is still called the billing
(24) department.  Is that the name of the department
(25) you're referring to?

Page 21

(1)
(2)    A.    At the time it was, yes.
(3)    Q.    Okay.  Currently, now, the
(4)    accounts processing department?
(5)    A.    Correct.
(6)    Q.    Let's use the terminology as it
(7)    existed at the time.
(8)    A.    Very good.
(9)    Q.    Which is the billing department.
(10)   So is it your testimony that in late '06 early
(11)   '07 the billing department consisted of about
(12)   50 individuals?
(13)   A.    Correct.
(14)   Q.    And you were one of how many
(15)   supervisors?
(16)   A.    At that time one of three
(17)   supervisors.
(18)   Q.    And the billing department was
(19)   physically located where, in this building
(20)   where we are right now?
(21)   A.    Correct, 15 Park Drive.
(22)   Q.    I got distracted for a second and
(23)   I didn't hear your answer to how many
(24)   supervisors there were?
(25)   A.    At that time there were three

Page 22

(1)
(2)    including myself.
(3)    Q.    Where was the call center where
(4)    the initial inquiry first came in?
(5)    A.    The call center is also located in
(6)    the same building, but on the opposite side of
(7)    the -- on the north side of the building.
(8)    Q.    Are you aware of instances where a
(9)    customer or a customers representative would
(10)   contact the billing department directly with
(11)   respect to a problem that that customer is
(12)   having?
(13)   A.    Yes, there are several occasions
(14)   that that will happen.
(15)   Q.    And was one of those occasions
(16)   what happened here -- withdrawn.  We'll get to
(17)   that.
(18)        Let's talk about the events in
(19)   this case.  What is your recollection as to the
(20)   first contact you had with National Utility
(21)   Service regarding the problem that existed with
(22)   the electric meters at the Manhasset store of
(23)   Tiffany?
(24)   A.    I do recollect speaking with them
(25)   in December of '06.  I do not remember the

Page 23

(1)
(2)    exact date they had.  I spoke to a Christine
(3)    Amundsen, I believe her name was,
(4)    A-M-U-N-D-S-E-N.  She had contacted us
(5)    regarding a high bill at the location after we
(6)    had previously been out there.  At the time I
(7)    told Ms. Amundsen that we would not talk to
(8)    them directly unless we had a letter from
(9)    Tiffany and Company giving them permission to
(10)   receive information on their behalf.
(11)   Q.    You said that the call from
(12)   Christine Amundsen came in after you had
(13)   previously been out there, what are you
(14)   referring to?
(15)   A.    Our meter reader had been out at
(16)   the location and it was reported that the meter
(17)   reader reported back to us that he did not feel
(18)   that the meters were in the correct position.
(19)   So we had initiated, as part of the procedure,
(20)   an opportunity for one of our investigators to
(21)   go out and to look at the meters to verify the
(22)   situation.
(23)   Q.    Who is the meter reader who
(24)   submitted that report?
(25)   A.    I do not know the name.

Page 24

(1)
(2)    Q.    Would it be in the records of
(3)    LIPA?
(4)    A.    I don't know if those records
(5)    would still be available.  They possibly are
(6)    archived.  It was a meter reader doing their
(7)    regular job.  I don't know.
(8)    Q.    How did you learn about the fact
(9)    that this meter reader came in with this report
(10)   and that an investigation had been initiated?
(11)   A.    His remarks were forwarded
(12)   directly to the special investigation area for
(13)   them to go out and verify it.  That's part of
(14)   the procedure.
(15)   Q.    Who were they forwarded to?
(16)   A.    Special investigation department.
(17)   Q.    Where is that department located?
(18)   A.    Also in this building.
(19)   Q.    How many -- how many people make
(20)   up that department?
(21)        MR. LANDAU:  Just so we're clear,
(22)   you're talking back in 2006/2007 not
(23)   presently?
(24)        MR. GOODMAN:  Exactly.  My
(25)   questions all relate to that period, late

Page 29

(1)
(2)    A.    Yes.
(3)    Q.    And let me give you what has been
(4)  marked Exhibit 74, which is a one page letter
(5)  from Chris Amundsen to Kathy Schwarting.  Does
(6)  it indicate there are four pages?
(7)    A.    Okay.
(8)    Q.    Do you recall receiving Exhibit 74
(9)  or on or about December 26, 2006?
(10)   A.    I do not remember receiving two
(11)  pieces of information.
(12)   Q.    Did you -- to the best of your
(13)  recollection, you recall receiving Exhibit 73,
(14)  but not 74?
(15)   A.    To the best of my recollection I
(16)  do remember receiving a fax from her.  I do
(17)  remember seeing the letters of authorization,
(18)  which I do have a copy of myself.  I do not
(19)  remember the exact date in which I received it.
(20)  So I do not know if it was 73 or 74.
(21)   Q.    When you received either 73 or
(22)  74 -- withdrawn.
(23)        When you received the letter of
(24)  authorization from Chris Amundsen, had you
(25)  already spoken with her on the phone?

Page 30

(1)
(2)    A.    I do remember having a
(3)  conversation with her.  I believe it was prior
(4)  to that date advising her that I would need
(5)  authorization before we discussed any of
(6)  Tiffany account information with them.
(7)    Q.    Let me show you what has
(8)  previously been marked as Exhibit 50 for
(9)  identification in this case (handing).
(10)   A.    (Witness perusing.)
(11)   Q.    Can you identify what has been
(12)  marked Exhibit 50?
(13)   A.    This is a copy of the diary
(14)  history listing for Tiffany and Company account
(15)  for the period of 4/27/'06 through 12/05/'07.
(16)   Q.    Is this a document that was
(17)  created and maintained by personnel of LIPA?
(18)  Well, I'm using LIPA synonymously with the
(19)  other entities which you described earlier.
(20)   A.    This is a document that is
(21)  maintained by our computer system prepared by
(22)  individuals on the specific dates of doing
(23)  transactions maintained in accordance with our
(24)  MSA with LIPA.
(25)   Q.    What is MSA?

Page 31

(1)
(2)    A.    Management service contract.
(3)        MR. LANDAU:  Actually management
(4)    service agreement.
(5)        THE WITNESS:  Agreement, um-hum.
(6)    Q.    This is a document that was
(7)  generated by your employer; is that right?
(8)    A.    It's generated by our computer
(9)  system, yes.
(10)   Q.    It came from your office, correct?
(11)   A.    It came from a -- I would say, yes
(12)  it came from a customer relations office.
(13)   Q.    And what are you calling it?
(14)   A.    It's called a diary historical
(15)  listing.
(16)   Q.    What is the purpose of this
(17)  document?
(18)   A.    The purpose of the document is to
(19)  keep track of transactions or conversations
(20)  that have occurred on an account.
(21)   Q.    Conversations between which
(22)  parties?
(23)   A.    Could be between the customer of
(24)  record and a representative, could be between
(25)  the customer of record and an investigator,

Page 32

(1)
(2)  would also be a display of a billing
(3)  transaction that was done on the account.
(4)    Q.    And who from LIPA -- let's just
(5)  get one thing clear.  I want to get full and
(6)  complete answers from you, but I don't want to
(7)  get caught up in asking you about LIPA when
(8)  it's actually National Grid or KeySpan.  So
(9)  when I say LIPA, I'm referring to any of the
(10)  entities that you referred to earlier.
(11)       So if I ask you, which I will ask
(12)  you now, who from LIPA has access to the system
(13)  to enable that person to input data into the
(14)  system, I'm referring to anyone from any of the
(15)  entities you talked about before?
(16)   A.    Any customer representative or
(17)  member of the customer relations group, which
(18)  entails collection, billing, our customer
(19)  office, our call center, have access to this
(20)  diary.
(21)   Q.    Is there a policy of LIPA or
(22)  KeySpan with respect to how this diary can be
(23)  used?
(24)   A.    Yes, there is.
(25)   Q.    Is it a written policy?

Page 65

(1)
(2) the bills during that period had to be
(3) corrected, yes.
(4)　Q. And they had to be corrected
(5) because it was wrong; isn't it true?
(6)　A. Yes.
(7)　Q. And Chris Amundsen, through the
(8) phone call you had with her and through her
(9) written communications, asked you to do
(10) something in terms of investigating this
(11) problem on behalf of LIPA's or KeySpan's
(12) customer Tiffany, correct?
(13)　A. Correct.
(14)　Q. Now, going back to your diary
(15) December 26, '06, you would agree that based on
(16) our discussion for the last minute or two that
(17) the statement you wrote that the billing does
(18) not appear correct since meter change, that was
(19) based on information that was brought to you by
(20) Chris Amundsen; is that right?
(21)　A. Could have been partially. I
(22) don't know. I don't -- it could be also myself
(23) looking at the account. I don't know.
(24)　Q. But to the extent that it might
(25) have been you looking at the account you looked

Page 66

(1)
(2) at the account because Chris asked you to look
(3) it?
(4)　A. Yes.
(5)　Q. Now, there's a reference here to
(6) and I quote, also checking for possible
(7) switched meters on 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-2, what does
(8) that reference to?
(9)　A. That is another account number at
(10) the location near the location of the mall.
(11)　Q. And do you know whose account
(12) number that was?
(13)　A. Off the top of my head, no, I
(14) don't.
(15)　Q. Was that also a note to yourself
(16) that you were checking for a possible switched
(17) meter?
(18)　A. It's a note to the account, yes.
(19)　Q. A note to the account?
(20)　A. Um-hum.
(21)　Q. And you don't recall actually
(22) saying to Chris Amundsen in that phone
(23) conversation that there was a possible switched
(24) meter with another account do you?
(25)　A. I'm gonna have to say, no, I don't

Page 67

(1)
(2) recall.
(3)　Q. And next you state "asking tech
(4) services to expedite investigation. Contact
(5) Christine (201)391-4300, extension 109." And
(6) then there's a reference, SPND billing until
(7) resolved. What does that mean?
(8)　A. Suspend billing until revolved.
(9)　Q. Why was the billing suspended?
(10)　A. We didn't want to continue billing
(11) an account if there was a question or a
(12) possibility that there was a wrong meter there
(13) or wrong index.
(14)　Q. And the billing was suspended as a
(15) result of Christine's request for it to be
(16) suspended, correct?
(17)　MR. McAULIFFE: Objection.
(18)　A. It was part of the regular
(19) procedure.
(20)　Q. Had Christine not called and
(21) brought this to your attention, the billing
(22) would not have been suspended; is that right?
(23)　A. Not necessarily.
(24)　Q. Why would it have been suspended
(25) if you were not aware of the billing problem?

Page 68

(1)
(2)　A. If we became aware of it through
(3) our own meter reading as part of a normal
(4) procedure until we would send it out to have it
(5) verified.
(6)　Q. Okay. But you weren't aware of
(7) it, right?
(8)　MR. McAULIFFE: Objection.
(9)　MR. GOODMAN: Withdrawn.
(10)　Q. You were not aware of it as part
(11) of your own procedure?
(12)　MR. McAULIFFE: Objection. She's
(13) already testified to the error codes that
(14) showed up as early at September 27 and
(15) indicated there's a problem with the
(16) billing.
(17)　MR. GOODMAN: If you have an
(18) objection state the objection.
(19)　MR. McAULIFFE: I stated the
(20) objection.
(21)　MR. LANDAU: Do you remember what
(22) the question was now?
(23)　MR. GOODMAN: I'll restate it.
(24)　Q. As of December 26, as far as
(25) LIPA's and KeySpan's records were concerned,

NATIONAL UTILITY SERVICE, INC.

VS. TIFFANY & CO.

KATHLEEN SCHWARTING - 5/6/08

Page 69

(1)
(2) the indexes were synchronized, correct?
(3)    A.    Correct.
(4)    Q.    That problem has been revolved,
(5) correct?
(6)    A.    Correct.
(7)    Q.    And the battery problem had been
(8) resolved, correct?
(9)    A.    Correct.
(10)    Q.    So between the rectifying of the
(11) battery problem and the indexes problem in
(12) December 26, 2006 nothing internally at KeySpan
(13) or LIPA brought to your attention that there
(14) was a problem with this account, correct?
(15)    A.    Again, it's hard to tell from
(16) what's written here. I'd have to look
(17) elsewhere.
(18)    Q.    Well, we had asked for all the
(19) records with respect to this account.
(20)    A.    You did, but I would have to look
(21) further in records to this. I would be looking
(22) at different screens, looking into history and
(23) trying to find the whole answer. I can't look
(24) at -- you know, this is a note on an account
(25) which we have here.

Page 70

(1)
(2)    Q.    This is a note. This Exhibit 50
(3) is a series of notes pursuant to what anyone
(4) who has any responsibility for this account can
(5) input information regarding the account,
(6) correct?
(7)    A.    Right, but this would prompt me to
(8) look at other screens on an account.
(9)    Q.    What other screens would you look
(10) at?
(11)    A.    ELBH, which is electric bill
(12) history, which we probably have here, it would
(13) be some type of analysis. Just -- this here
(14) doesn't say brought to my attention. I would
(15) have to look at other things while I was
(16) conversing with her.
(17)    Q.    Isn't it true, Ms. Schwarting,
(18) that as of December 26, 2006 you personally had
(19) no knowledge of the billing problem that was
(20) brought to your attention by Chris Amundsen?
(21)    A.    I personally did not.
(22)    Q.    Isn't it true that based upon the
(23) diary that you are looking at, this record
(24) of your company based upon this record of your
(25) company, isn't it true that no one else was

Page 71

(1)
(2) aware of this problem?
(3)        MR. McAULIFFE:  Objection.
(4)    A.    That I can't say for sure. I
(5) don't know.
(6)    Q.    But there's no record that you're
(7) aware of as you sit here now which reflects
(8) that there was any billing problem of the type
(9) and nature that was brought to your attention
(10) by Chris Amundsen on December 26, 2006; is that
(11) right?
(12)        MR. McAULIFFE:  Objection. It's
(13)     the same question.
(14)    A.    Again, I can't answer that. There
(15) could have been something else issued. It
(16) wouldn't have been necessarily reflected here,
(17) but --
(18)    Q.    But you're not aware of --
(19)    A.    I am not personally aware of it.
(20)    Q.    It's actually a different question
(21) that I asked you before. You are not aware of
(22) any record of your company which shows that
(23) anyone at your company was aware of this
(24) problem is before December 26, 2006, correct?
(25)        MR. McAULIFFE:  Same objection.

Page 72

(1)
(2)    A.    I personally am not aware.
(3)    Q.    Let's quickly take a look at these
(4) exhibits that we had marked today. I'm gonna
(5) jump around a little bit because we didn't mark
(6) them in chronological order, but Exhibit 69,
(7) what is this document (handing)?
(8)    A.    This is what we call a work
(9) request that's being sent from our department.
(10) It can be sent from any department in customer
(11) relations to our technical service or special
(12) service investigation group asking them to go
(13) out on a high bill investigation stating the
(14) customer is questioning large jump in usage
(15) after meter and test out location on 9/17.
(16)    Q.    Whose handwriting is this?
(17)    A.    This is Lisa Quinn's handwriting.
(18)    Q.    At some point on December 26, 2006
(19) did you delegate to Lisa Quinn responsibility
(20) for handling the complaints that came in by
(21) Chris Amundsen?
(22)    A.    I can't say positive if I did or
(23) did not.
(24)    Q.    Can you explain how Lisa Quinn
(25) would have issued this T-3 work request form,

Page 77

(1)
(2)    Q.    Now, if you refer to Exhibit 72,
(3) what is this document?
(4)    A.    This is a cover sheet for a
(5) special investigation stating the date the
(6) investigation was initiated, the account number
(7) associated the accounts that we would like the
(8) investigator to look at. It states where the
(9) request is coming from, what department, the
(10) type of service, whether it's gas or electric,
(11) in this indicates it's electric rate 285. It's
(12) providing a contact and an appointment time
(13) request and just quick synopsis of why the
(14) appointment was made.
(15)    Q.    Is any of this handwriting yours?
(16)    A.    No, it is not.
(17)    Q.    This is Lisa Quinn's handwriting;
(18) is that right?
(19)    A.    Yes, it is.
(20)    Q.    On the top left it says ASAP
(21) please rush per KAS, do you see that?
(22)    A.    Yes.
(23)    Q.    KAS is you?
(24)    A.    That's correct.
(25)    Q.    Lisa Quinn is indicating here she

Page 78

(1)
(2) wants a rush put on this pursuant to your
(3) request, correct?
(4)    A.    Correct.
(5)    Q.    Does this refresh your
(6) recollection to whether or not you told Lisa
(7) Quinn to follow up on the customer complaint or
(8) the customer request of a large jump in usage
(9) on or about December 26, 2006?
(10)    A.    This reflects my asking her to
(11) expedite an investigation.
(12)    Q.    There are two account numbers on
(13) the top right. Do you know what account
(14) numbers -- excuse me, withdrawn.
(15)        Do you know which customers those
(16) account numbers are associated with?
(17)    A.    Yes.
(18)    Q.    Who are they associated with?
(19)    A.    Tiffany and Co. and Ralph Lauren.
(20)    Q.    And you're indicating the Ralph
(21) Lauren for what reason?
(22)    A.    It is the store adjacent to
(23) Tiffany and the meters are adjacent in the
(24) meter room.
(25)    Q.    Which is the Tiffany account

Page 79

(1)
(2) number, which is Ralph Lauren account number?
(3)    A.    I believe the Tiffany account
(4) number is the 1 that ends in 22205, the Ralph
(5) Lauren is 21808.
(6)    Q.    Now, if you look at Exhibit 70,
(7) what is this document.
(8)    A.    This is a result of field
(9) investigation completed by Mr. Esby.
(10)    Q.    What's Mr. Esby's first name?
(11)    A.    James.
(12)    Q.    And what's the purpose of this
(13) document?
(14)    A.    It's showing the results of the
(15) field investigation.
(16)    Q.    Do you recognize all this
(17) handwriting?
(18)    A.    Yes.
(19)    Q.    Is it all Mr. Esby's?
(20)    A.    Yes.
(21)    Q.    Does that include the numbers
(22) written on the top right under the line account
(23) number?
(24)    A.    Yes, those are his number.
(25)    Q.    Including the 2180-8, is that his

Page 80

(1)
(2) handwriting as well?
(3)    A.    I believe so.
(4)    Q.    To your knowledge, this was
(5) prepared by Mr. Esby sometime in early January,
(6) 2007?
(7)    A.    Correct.
(8)    Q.    In fact it refers to an
(9) appointment date of January 3, 2007, correct?
(10)    A.    Correct.
(11)    Q.    Did you receive a copy of
(12) Mr. Esby's results of field investigation at or
(13) about the time that he prepared it?
(14)    A.    No, I did not.
(15)    Q.    When was the first time you saw
(16) this document?
(17)    A.    I believe the first time I saw
(18) this document is when Miss Quinn brought it to
(19) my attention after she had the results given
(20) back to her.
(21)    Q.    What were the results of
(22) Mr. Esby's investigation?
(23)    A.    States here found incorrect
(24) multiplier listed on bill history at 180,
(25) correct multiplier is 80. There's a notation

NATIONAL UTILITY SERVICE, INC.                                              VS. TIFFANY & CO.
KATHLEEN SCHWARTING - 5/6/08

---

Page 81

(1)

(2)  there where he's timing the rotation on the
(3)  meter dial and it equals 80. It's asking us to
(4)  please correct multiplier and rebill folio
(5)  2220-5 other folio 2180-8 is correct.
(6)      Q.   What does the term folio refer to?
(7)      A.   That's the last portion of the
(8)  customers account number that identifies the
(9)  actual location of the store or the house.
(10)     Q.   So essentially he's saying correct
(11) the multiplier to indicate 80 and rebill
(12) Tiffany's account number?
(13)     A.   Correct.
(14)     Q.   And then he says that the other
(15) account number is for Ralph Lauren; is that
(16) correct?
(17)     A.   Correct.
(18)     Q.   Meaning the multiplier -- well, he
(19) doesn't say that --
(20)     A.   That's what he was out to take a
(21) look at.
(22)     Q.   The multiplier?
(23)     A.   Right.
(24)     Q.   He's saying that the multiplier
(25) for Ralph Lauren is correct?

---

Page 82

(1)

(2)      A.   Um-hum.
(3)      Q.   Have you determined since the date
(4)  of this document of the correct multiplier for
(5)  Tiffany's account?
(6)      A.   Have I learned of it, yes.
(7)      Q.   What is it?
(8)      A.   The correct multiplier is 80.
(9)      Q.   Are you aware and I'll be happy to
(10) show you some bills that LIPA generated. Are
(11) you aware of the multiplier being applied to
(12) the account is 120?
(13)     A.   It could very well be now. I
(14) don't know. As a result of this investigation,
(15) it's saying that it's 80.
(16)     Q.   So you don't know whether
(17) Mr. Esby's conclusion was correct or incorrect
(18) as it related to the multiplier being 80?
(19)     A.   Again, I'm reviewing and
(20) testifying to this piece of evidence as a
(21) result of field investigation. I'm stating
(22) what Mr. Esby stated.
(23)     Q.   You've done no independent
(24) confirmation of whether the correct multiplier
(25) for Tiffany is 80; is that right?

---

Page 83

(1)

(2)      A.   I would have to look at the
(3)  account. Are there statements other statements
(4)  on the account.
(5)      Q.   So you haven't done any further
(6)  confirmation?
(7)          MR. LANDAU:  Yourself.
(8)      A.   Myself?
(9)      Q.   Yes.
(10)     A.   I didn't do it myself, no. So
(11) when Mr. Espy went out to the location in
(12) Manhasset on or about January 3rd, 2007 he did
(13) not -- he did not discover that the Polo Ralph
(14) Lauren and Tiffany meter had been
(15) miss-tagged; is that right?
(16)         MR. McAULIFFE:  Would you read
(17)     that question back, please?
(18)         MR. GOODMAN:  You know, let me
(19)     withdraw the question. I'm gonna ask you
(20)     another one.
(21)     Q.   First have you learned since
(22) January 3rd, 2007 that the problem at this
(23) location was that the meters for Ralph Lauren
(24) and Tiffany were switched in that they were
(25) tagged one for the other?

---

Page 84

(1)

(2)      A.   Meters were not switched.
(3)      Q.   What did you understand the
(4)  problem ultimately to be with the Tiffany
(5)  bills?
(6)      A.   The meters were actually at --
(7)  were not switched in the field. The meters
(8)  were switched in our computer system.
(9)      Q.   So where did the miss-tag take
(10) place?
(11)     A.   When the meters were installed,
(12) they are installed in a meter pan or prior to
(13) them being installed, excuse me, they are put
(14) into the meter pan and on the meter pan there
(15) is a -- it is written actually what that meter
(16) pan services what store.
(17)     Q.   Was there a mislabeling somewhere.
(18)     A.   There was a mislabeling, yes.
(19)     Q.   Where did the mislabeling take
(20) place?
(21)     A.   On the meter pan itself.
(22)     Q.   How did that translate to a
(23) mislabeling at your home location?
(24)     A.   The meter reader reported it as
(25) part of his normal procedure, that the meter

---

Page 85

(1)
(2)   number associated with Tiffany that was coming
(3)   up in his ITron meter reading back was, indeed,
(4)   now showing because he was reading the
(5)   handwritten notation on the meter pan to be
(6)   Ralph Lauren and vice versa.
(7)        Q.    Now, Mr. Esby did not discover
(8)   that problem when he went out on January 3,
(9)   2007, correct?
(10)       A.    No, he did not that was prior to
(11)  that.
(12)       Q.    What do you mean it was prior to
(13)  that?
(14)       A.    That problem was reported by a
(15)  meter reader prior to Mr. Esby going out.
(16)       Q.    Is there any document evidencing
(17)  that report?
(18)       A.    I don't have it, but I do now know
(19)  it was prior to Mr. Esby going out that a meter
(20)  reader reported it. It's on -- I don't know if
(21)  the screens are in here. I have to take a
(22)  look. May I?
(23)       Q.    Please.
(24)       A.    (Witness perusing.) On this -- I
(25)  don't know what number you have. It -- the

Page 86

(1)
(2)   information that was provided by legal to you
(3)   as part of the subpoena.
(4)        Q.    I don't have that in front of me
(5)   what are you referring to?
(6)        A.    This is a copy of the meter
(7)   reading for the time period of 9/27/07. That's
(8)   the meter reading file. If you notice on the
(9)   top line where the date is, all the way over to
(10)  the right, there's indications of CHG, means
(11)  change, in parenthesis there's a meter number
(12)  there.
(13)       Q.    Can you point out where you're
(14)  looking at?
(15)       A.    Right up here you follow this line
(16)  (indicating).
(17)            MR. McAULIFFE:  CHG you said?
(18)            THE WITNESS:  Yes.
(19)       A.    I'm sorry, the bottom 1. I'm very
(20)  sorry. For 9/27.
(21)       Q.    Before you continue, we'll mark
(22)  this in a second, but let's just refer to this
(23)  right now as Exhibit 75?
(24)            MR. McAULIFFE:  I have a bates
(25)            stamped copy from the production if you

Page 87

(1)
(2)   want to mark that one instead.
(3)            MR. GOODMAN:  Okay. I don't care.
(4)            MR. McAULIFFE:  Either way.
(5)            MR. GOODMAN:  Let's just continue
(6)   then we'll copy it.
(7)        A.    This is a stamp of the meter
(8)   reading on 9/27/06. It's showing another meter
(9)   number in here and a multiplier showing that
(10)  that's what he's picking up. Plus, internally
(11)  this would send it over to meter and test which
(12)  is another department for them to go out and
(13)  take a look at it. Our representative would
(14)  get an exception message on this to say it
(15)  doesn't match.
(16)       Q.    So the first indication that there
(17)  was something switched here --
(18)       A.    Was here.
(19)       Q.    But no -- there was no message
(20)  that you're pointing to. Where is the
(21)  message -- where is the error message?
(22)       A.    Where is the error message?
(23)       Q.    Yes.
(24)       A.    This would go directly to our
(25)  meter and test department. It wouldn't come

Page 88

(1)
(2)   here.
(3)        Q.    Do you have any records of the
(4)   meter and test department showing that an error
(5)   was picked up?
(6)        A.    They went out there and did a
(7)   changed meter, if that's what you mean. They
(8)   were out there and looked into it.
(9)        Q.    Let's back up for a second. The
(10)  meter is changed?
(11)       A.    The meter was not changed at this
(12)  point.
(13)       Q.    Well, the meter was changed on
(14)  September 18th, 2006 according to Exhibit 50
(15)  and according to your testimony earlier?
(16)       A.    If you looked at the date, that is
(17)  not when the transactions were -- you'll see
(18)  that it was after this date. Do you see the
(19)  date where the transaction was worked, I think
(20)  it's 10/4, there where it says meter change.
(21)       Q.    That's right.
(22)       A.    So that's the actual date when
(23)  that transaction or that changed meter was
(24)  worked in the computer, this meter reading date
(25)  is prior to that.

## Page 97

(1)
(2)     **MR. GOODMAN:** I'm going to
(3) withdraw that question.
(4)     Q.   Isn't it correct that after
(5) December 26, 2006 until approximately
(6) January 17, 2007 no field investigation was
(7) initiated to investigate the mislabeling of the
(8) Tiffany and the Ralph Lauren meters?
(9)     **MR. McAULIFFE:** Objection. That's
(10) the same question.
(11)     **MR. GOODMAN:** No, it's different.
(12)     **MR. LANDAU:** You can answer it.
(13)     **MR. GOODMAN:** That question is
(14) standing.
(15)     A.   Our initial request, I think you
(16) have, I don't know what number you have it as.
(17) I'm sorry.
(18)     **MR. McAULIFFE:** It's Exhibit 72.
(19)     A.   On 72, the special investigation
(20) cover sheet -- do you have it?
(21)     Q.   Yes.
(22)     A.   On here, she makes a request for
(23) customer questioning large jump in usage after
(24) meter test out at location. There is no
(25) specific notification for a switched meter.

## Page 98

(1)
(2) However, this is part of their regular
(3) procedure.
(4)     Q.   Let's break that down?
(5)     A.   Um-hum.
(6)     Q.   Miss Quinn makes no specific
(7) reference to a possible switched meter,
(8) correct?
(9)     A.   Correct.
(10)     Q.   And that's on December 26, 2006?
(11)     A.   Correct.
(12)     Q.   And on January 17, 2007 your
(13) response to -- your response to that
(14) investigation and request, Mr. Esby does an
(15) investigation at the site, correct?
(16)     A.   Yes.
(17)     Q.   And as a result of that
(18) investigation he doesn't pick up that there is
(19) a mislabeling of the meters, correct?
(20)     A.   Correct.
(21)     Q.   And when he's at the location, he
(22) looks at both meter pans, correct?
(23)     **MR. McAULIFFE:** Objection.
(24)     A.   I don't know. I wasn't there.
(25)     Q.   He refers to both meters pans in

## Page 99

(1)
(2) his report?
(3)     A.   He refers to both meters --
(4) different from meter pans.
(5)     Q.   Would it be reasonable to expect
(6) that if he refers to both meters on his report
(7) and if the request referred to both account
(8) numbers that he took a look at both accounts
(9) and both meters?
(10)     A.   I can't answer that. I'm sorry.
(11)     Q.   But you agree that he does
(12) conclude that something with respect to the
(13) Ralph Lauren account is correct, and I'm
(14) looking now at Exhibit 70 he says folio 2180-8
(15) is correct?
(16)     A.   Yes, he says that.
(17)     Q.   So based on that reference you
(18) would agree that he took a look at something
(19) with the Ralph Lauren account?
(20)     A.   Again, based on this reference, I
(21) would say he took a look at the multiplier to
(22) make sure that that was correct.
(23)     Q.   And based on that reference you
(24) would also agree that he probably did not take
(25) a look at the meter pan?

## Page 100

(1)
(2)     A.   I don't know.
(3)     Q.   Okay. So he goes to the location
(4) in January 3rd and does not observe the
(5) switched meters, correct?
(6)     A.   I don't know. It's not indicated
(7) on this report.
(8)     Q.   He doesn't report about switched
(9) meter to headquarters, correct?
(10)     A.   Correct.
(11)     Q.   As of January 3rd, you're not
(12) aware of the switched meters, correct?
(13)     A.   Based on this report, no, I'm not.
(14)     Q.   Based on anything in the file
(15) you're not aware of it?
(16)     **MR. LANDAU:** You personally?
(17)     A.   No, I'm not.
(18)     Q.   And Miss Quinn never reports to
(19) you as of January 3rd, 2007 that there were
(20) switched meters, correct?
(21)     **MR. McAULIFFE:** Objection.
(22)     A.   Again, this --
(23)     Q.   The question is very simple. As
(24) of January 3rd, 2007 did Miss Quinn report to
(25) you that there --

---

Page 101

(1)
(2)  **A.    No.**
(3)  Q.    – were switched meters?
(4)  **A.    No.**
(5)  Q.    And it's not until January 17,
(6)  2007 that Mr. Esby goes back out to the
(7)  location to investigate the possible switched
(8)  labeling on the changed meters, correct?
(9)  **A.    Correct.**
(10)  Q.    If you look to page KS12 on
(11)  Exhibit 50, there's a reference on the
(12)  January 19, 2007 entry, it says per
(13)  investigations with Albertson Electric and John
(14)  Gutkes, G-U-T-K-E-S, meters are wired
(15)  correctly. Who is John Gutkes?
(16)  **A.    John Gutkes is a an employee of**
(17)  **National Grid. He works in electric design and**
(18)  **construction.**
(19)  Q.    And was he investigating the
(20)  problem with the Tiffany's meter, is that why
(21)  he was out there?
(22)  **A.    He was the designer on the**
(23)  **original jack. So she was asked to go out and**
(24)  **join Mr. Esby.**
(25)  Q.    So it's your understanding that

---

Page 102

(1)
(2)  both Mr. Gutkes and Mr. Esby were at the
(3)  location sometime around January 19, 2007?
(4)  **A.    They were there on the 19th.**
(5)  Q.    And they were there with someone
(6)  from Albertson Electric?
(7)  **A.    Yes, I believe Larry from**
(8)  **Albertson.**
(9)  Q.    Do you know Larry Afronti
(10)  (phonetic)?
(11)  **A.    No.**
(12)  Q.    You never met him?
(13)  **A.    I've never met him personally.**
(14)  Q.    Did you ever talk to him on the
(15)  phone?
(16)  **A.    I may have spoke to him once in**
(17)  **regards to this, just setting up the**
(18)  **appointment. I don't recollect who I actually**
(19)  **set the appointment up with though.**
(20)  Q.    What is on the second line on this
(21)  entry, the reference ITMT?
(22)  **A.    ITMT is the transaction that we**
(23)  **put into our computer system that shows us any**
(24)  **changed meters, all the information regarding**
(25)  **that changed meter from meter and test.**

---

Page 103

(1)
(2)  Q.    So what does this statement mean
(3)  where it says per investigation meters are
(4)  wired correctly ITMT did not have any new meter
(5)  info and info in ITMR was switched causing a
(6)  switched meter condition will correct both
(7)  meters and rebill?
(8)  **A.    Again, the meters in the field**
(9)  **were not switched. The meters were switched on**
(10)  **the computer based on the information somebody**
(11)  **manually inputting the information.**
(12)  Q.    Please refer to KS13. If you look
(13)  at the third entry from January 10, 2007, would
(14)  you just explain what that says? You don't
(15)  have to read it verbatim, just explain.
(16)      MR. LANDAU:  Are you speaking
(17)  about the one that starts with S/W.
(18)      MR. GOODMAN:  That's right?
(19)  **A.    Okay. This entry is done by Lisa**
(20)  **Quinn. She spoke with Chris. She advised them**
(21)  **that the she was gonna do a cancel and rebill**
(22)  **to correct the constant or the multiplier on**
(23)  **the changed meter and that Lisa promised to fax**
(24)  **a copy of the corrected bills to Lisa. And she**
(25)  **stated that after it's all done, she's gonna**

---

Page 104

(1)
(2)  **calculate the interest on what we owe them.**
(3)  Q.    Is it correct that then as of
(4)  January 10, 2007, LIPA's understanding was that
(5)  the billing problem, which had been reported by
(6)  Chris Amundsen or about December 26, '06 was
(7)  rectified?
(8)  **A.    It was our understanding, yes,**
(9)  **that it was rectified.**
(10)  Q.    But, in fact, that understanding
(11)  was incorrect; is that right?
(12)  **A.    That it was rectified, we sent**
(13)  **Mr. Esby back out.**
(14)  Q.    And you sent him out because it
(15)  turned out that there was an additional problem
(16)  with the billing correct?
(17)  **A.    Yes.**
(18)      MR. GOODMAN:  Off the record.
(19)      (Discussion off the record.)
(20)      (Plaintiff's Exhibit 75, Meter
(21)  reding history, marked for
(22)  identification.)
(23)      (Plaintiff's Exhibit 76,
(24)  LIPA/Tiffany Bills, marked for
(25)  identification.)

---

---

Page 121

(1)

(2)     her answer the question.

(3)     A.    Again they were not all generated

(4) when all the information was acquired.

(5)     Q.    Was each of the bills generated at

(6) or about the time of the date of the bill date?

(7)     A.    Say that again. I'm sorry.

(8)     Q.    Was each of the bills contained in

(9) 76 and 77 generated at or about the time of the

(10) bill date?

(11)     A.    Yes, the bills were generated at

(12) the time of the bill date.

(13)     Q.    And each of the bills was based

(14) upon and included data that was inserted from,

(15) among other sources, the meter reader, correct?

(16)     A.    Correct.

(17)     Q.    And the meter reader transmits his

(18) or her reads of the meter immediately upon

(19) reading the meter correct?

(20)     A.    Correct.

(21)     Q.    If meter -- okay.

(22)           Was each bill prepared within the

(23) course of a regular course of business

(24) activity?

(25)     A.    Yes.

---

Page 122

(1)

(2)     Q.    And was it the regular practice of

(3) KeySpan and its employees to prepare the bills

(4) that you see in Exhibit 76 and 77?

(5)     A.    Yes.

(6)     Q.    Was it the regular practice of kay

(7) span and its employees to maintain each such

(8) bill in its records?

(9)     A.    Yes.

(10)     Q.    Just take a quick look please at

(11) what has been marked Exhibit 78.

(12)           For the record, Exhibit 78 we

(13) called it a LIPA/Polo bill summery 3-page

(14) document. Would you describe what this

(15) document is?

(16)     A.    It shows that it's a statement of

(17) the electric history for Ralph Lauren Polo from

(18) a period of time -- a specific period of time.

(19)     Q.    The last page is a -- is a list of

(20) codes that are reflected in this summery; is

(21) that right?

(22)     A.    It's a list of reading codes.

(23)     Q.    With respect to the first two

(24) pages which is the summery itself --

(25)     A.    Um-hum.

---

Page 123

(1)

(2)     Q.    -- is the data that is reflected

(3) in the summery for the period from January '07

(4) to April 2008 derived from the bills that make

(5) up Exhibit 77?

(6)     A.    Yes, it is.

(7)     Q.    Do you have any familiarity with

(8) how KeySpan generates this type of summery from

(9) its computer system?

(10)     A.    Of how it compiles the data that

(11) is up in the mainframe and it's programmed to

(12) report this type of a billing statement or a

(13) bill history for the electric meter.

(14)     Q.    Did you print this out?

(15)     A.    Did I personally print it out, no.

(16)     Q.    You're aware that someone from Key

(17) span printed it out in response to the company

(18) service?

(19)     A.    Someone from our legal department

(20) printed it, yes.

(21)     Q.    It's your understanding this was

(22) printed out from KeySpan's mainframe system?

(23)     A.    It is.

(24)     Q.    As you testified minute ago, the

(25) data contained in the summery, the back-up for

---

Page 124

(1)

(2) that data is contained in Exhibit 77?

(3)     A.    Part of it, yes.

(4)     Q.    Now, if a customer of LIPA doesn't

(5) pay a bill, eventually the service will be shut

(6) off, correct?

(7)     A.    Yes.

(8)     Q.    Now, in this case the bills that

(9) were rendered -- withdrawn.

(10)           In this case you're aware that

(11) there were certain bills during the latter part

(12) of 2006 which were rendered to Tiffany based

(13) upon Ralph Lauren's usage, correct?

(14)     A.    Yes as a result yes.

(15)     Q.    And that was as a result of the

(16) mislabeling in the meter correct?

(17)     A.    Um-hum.

(18)     Q.    The bills that were rendered to

(19) Tiffany were still considered to be Tiffany's

(20) electrical according to KeySpan and LIPA,

(21) correct?

(22)     MR. McAULIFFE:  Objection.

(23)     A.    Correct.

(24)     Q.    If Tiffany had not paid the bills

(25) which were rendered to it and which contained

---

## Page 125

(2) incorrect usage data, it would have been
(3) Tiffany's service that would have been
(4) terminated, correct?
(5)      MR. McAULIFFE:  Objection.
(6)    A.    Yes.
(7)    Q.    Have you talked to anybody other
(8) than counsel for KeySpan in this case and other
(9) KeySpan employees about any of the
(10) circumstances that we discussed today?
(11)    A.    I've spoken to other people in the
(12) legal department.
(13)    Q.    I'm not interested in hearing
(14) about any of that.
(15)    A.    No.
(16)    Q.    Other than speaking with legal,
(17) did you talk to anyone outside of KeySpan about
(18) this case?
(19)    A.    Today or --
(20)    Q.    At any time?
(21)    A.    Miss Quinn and Mr. Esby.
(22)    Q.    When was the last time you spoke
(23) with either of them?
(24)    A.    Miss Quinn today.  Mr. Esby
(25) regarding this case, I would say, maybe last

## Page 126

(2) week.
(3)    Q.    And what did they say to you and
(4) what did you say to them?
(5)    A.    I was just asking them if we had
(6) all the records I jus wanted the make sure.
(7)      MR. GOODMAN:  I have nothing
(8) further thank you.
(9) EXAMINATION BY
(10) MR. McAULIFFE:
(11)    Q.    Ms. Schwarting I have a few
(12) questions.  I aPologize.  I know it's late I
(13) just have some points that I have to address.
(14) First thing is, you mentioned earlier that LIPA
(15) governs -- its rates are governed by a tariff
(16) book, correct?
(17)    A.    Correct.
(18)    Q.    That tariff book also governs
(19) other policies and procedures that LIPA must
(20) follow, correct?
(21)    A.    Yes.
(22)    Q.    Such as how electricity is billed.
(23) What happens in the event -- withdrawn.
(24)      The tariff book also includes
(25) other policies and procedures including such as

## Page 127

(2) how electricity should be billed, correct?
(3)    A.    Correct.
(4)    Q.    Another policy contained in the
(5) tariff book is what happens when an overcharge
(6) happened, correct?
(7)    A.    Correct.
(8)    Q.    And the tariff book says that only
(9) the electricity that an entity uses is what
(10) that entity is billed for, correct?
(11)    A.    Correct.
(12)    Q.    If somebody is billed for an
(13) overage of usage, somebody else's usage there
(14) is to be a refund pursuant to the tariff book?
(15)      MR. GOODMAN:  Objection.
(16)    A.    Yes, there is.
(17)    Q.    Directing your attention to
(18) Exhibit 50 and we looked at it previously.
(19) Directing your attention to the 3 entries that
(20) we looked at previously from October 6th, '06
(21) through November 30, '06, you see those?
(22)    A.    Um-hum.
(23)    Q.    On all three of those entries
(24) there are, what you indicate, an error message
(25) or error memoranda; is that correct?

## Page 128

(2)    A.    Correct.
(3)    Q.    The first 1 from 10/6/06 is error
(4) memorandum number 507, correct?
(5)    A.    Correct.
(6)    Q.    November 30, 2006 error message is
(7) 527, correct?
(8)    A.    Correct.
(9)    Q.    What are the policy and procedures
(10) in place for what happens when an error message
(11) number 507 shows up?
(12)    A.    It is produced and the
(13) representative reviews the account and sees if
(14) the 507 has to do with 1 of the indexes would
(15) not be the indexes -- would not be in line.
(16) Basically they review the account and they
(17) would manually, in this case, if the history
(18) was good they would produce a bill based on
(19) previous history.
(20)    Q.    This entry for October '06, the
(21) first 1 that we looked at, when that error
(22) message came up, that number 507, Miss Quinn
(23) was required to create a manual bill because
(24) the information that she was receiving did not
(25) appear to be in line with what the indexes

Page 141

(1)
(2) published to the public, state that meter
(3) readings are considered correct unless it is
(4) determined that the meter is not registering
(5) accurately?
(6)    A.    Okay.
(7)    Q.    Would that surprise you?
(8)    A.    No.
(9)    Q.    In fact, if an incorrect bill is
(10) not brought to LIPA's attention by either the
(11) customer or by an error memo that we talked
(12) about earlier it would not be corrected by
(13) LIPA, correct?
(14)    A.    Possibly, yes.
(15)    Q.    Well, isn't it correct --
(16)    A.    At a specific point in time, yes.
(17)    Q.    So you need -- withdrawn.
(18)        LIPA needs a billing error to come
(19) to its attention either through an error memo
(20) or through a complaint from a customer in order
(21) to correct the bill?
(22)    A.    Correct.
(23)    Q.    With respect to Exhibit 50 KS13 --
(24)    A.    Yes.
(25)    Q.    -- you testified that as of -- I'm

Page 142

(1)
(2) sorry not page KS13. KS14, you testified that
(3) as of October 6, 2006, LIPA was on notice of a
(4) potential billing error?
(5)    A.    An exception message was produced.
(6)    Q.    Right, but I don't want to go
(7) through all this again because we spent a lot
(8) of time on it earlier, but isn't it true that
(9) earlier you testified that the exception
(10) message 507 had been corrected, right?
(11)    A.    507, it will stop the account from
(12) billing. So the representative billed it
(13) manually using the information that she had
(14) available.
(15)    Q.    So that was addressed?
(16)    A.    Um-hum.
(17)    Q.    And then the 527 error messages
(18) were also -- they were corrected; isn't that
(19) right?
(20)    A.    Yes.
(21)    Q.    And as of November 30th 2006 as far
(22) as LIPA was concerned there was no further
(23) potential billing error?
(24)    A.    At that point, correct.
(25)    Q.    I just want to clarify something

Page 143

(1)
(2) that you testified about on cross which was
(3) that higher usage -- withdrawn.
(4)        Do I understand correctly that if
(5) an account is showing an abnormal usage that
(6) that is not the type of phenomenon that would
(7) generate an error message?
(8)        MR. McAULIFFE:  Objection.
(9)    A.    No.  I did not say that.  I said,
(10) it did not generate one of these error
(11) messages.
(12)    Q.    I think your testimony was that
(13) higher usage for a location is not an exception
(14) error message?
(15)    A.    No, it's not one of these error
(16) messages.
(17)        MR. LANDAU:  Indicating 507 of
(18) 527?
(19)        THE WITNESS:  Right.  Right.
(20)    Q.    I understand that.  Are you
(21) familiar with the current contract status
(22) between Tiffany and KeySpan or LIPA with
(23) respect to it's electric service?
(24)    A.    I'm familiar with Tiffany's
(25) account, yes.

Page 144

(1)
(2)    Q.    Is the contract Mr. McAuliffe
(3) showed you an agreement, I'll pull it out if
(4) you want me to, but you recall he showed you an
(5) agreement between KeySpan?
(6)        MR. McAULIFFE:  Objection.  It
(7) wasn't KeySpan it was Con Ed Solutions.
(8)        MR. GOODMAN:  Strike that.
(9)    Q.    Mr. McAuliffe showed you Exhibit
(10) 51, do you have that in front of you?  I
(11) believe it was the memorandum by Christine
(12) Amundsen to certain people at NUS.
(13)    A.    I have it now.
(14)    Q.    You've never seen that before
(15) today?
(16)    A.    I don't remember seeing it no.
(17)    Q.    Well, you wouldn't have seen it
(18) would you because it's an internal NUS
(19) memoranda; isn't that right?
(20)    A.    Not necessarily.  I don't remember
(21) seeing it.
(22)        MR. McAULIFFE:  Just so the record
(23) is clear it's an e-mail, not memoranda.
(24)    Q.    I stand corrected.  This is an
(25) e-mail from Christine Amundsen to Arnold

# STROHL DEPOSITION

NATIONAL UTILITY SERVICE, INC. VS. TIFFANY & CO.

DALE STROHL - 5/7/08

CONCORDANCE AND CONDENSED TRANSCRIPT
PREPARED BY:



Co. LLC

TOWER 56, 126 EAST 56TH STREET, FIFTH FLOOR, NEW YORK, NEW YORK 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
WWW.ELLENGRAUER.COM



**Page 17**

(1)

(2)    Do you recall how that agreement

(3) came to your attention?

(4)    A.    No.

(5)    Q.    And how you came to signing it?

(6)    A.    No, I don't.

(7)    Q.    Let me show you what's been

(8) previously marked as Exhibit 1 in this case --

(9) in this case for identification (handing).

(10)    A.    (Witness perusing.)

(11)    Q.    Have you had a chance to take a

(12) look at Exhibit 1?

(13)    A.    Yes.

(14)    Q.    Do you recognize this document?

(15)    A.    Well, I recognize it only because

(16) my attorney showed it to me this morning.

(17)    Q.    For the record, let me identify

(18) Exhibit 1 as a letter agreement between

(19) National Utility Service Incorporated and

(20) Tiffany ampersand and the word companies

(21) spelled out. It's dated April 7, 1992. The

(22) second page is -- there's one paragraph typed

(23) on the second page and then there's a third

(24) page to it as well.

(25)    Directing your attention to the

**Page 18**

(1)

(2) bottom right of the first page, do you

(3) recognize that signature?

(4)    A.    Yes.

(5)    Q.    Is that your signature?

(6)    A.    Yes.

(7)    Q.    And you signed this agreement on

(8) or about April 7, 1992?

(9)    A.    Yes.

(10)    Q.    Do you have any independent

(11) recollection of signing it as you sit here

(12) today?

(13)    A.    The actual act?

(14)    Q.    Well, the act of signing it and

(15) where you were, who you were with?

(16)    A.    No.

(17)    Q.    If --

(18)    A.    No.

(19)    Q.    If you turn the page and look at

(20) the second page of the exhibit, do you

(21) recognize any of the little scribbles which

(22) appear to be initial marks?

(23)    A.    No.

(24)    Q.    Neither of those are yours?

(25)    A.    No.

**Page 19**

(1)

(2)    Q.    And if you turn to the third page,

(3) do you recognize the signature on the

(4) right-hand side, middle of the page?

(5)    A.    Yes.

(6)    Q.    Whose signature is that?

(7)    A.    Phil Bottega.

(8)    Q.    Do you know when Mr. Bottega

(9) signed this document?

(10)    A.    No.

(11)    Q.    At the time that you signed this

(12) document in 1992, is it true that there were at

(13) least two entities with a Tiffany name and the

(14) first one is Tiffany ampersand Co. and that was

(15) the parent company?

(16)    A.    Um-hum.

(17)    Q.    Is that your understanding?

(18)    A.    It was something with a Delaware

(19) corporation and that was Tiffany ampersand and

(20) then there was Tiffany Company for the

(21) operation for the stores or for the stores.

(22) That's my recollection.

(23)    Q.    Do you recall whether one of those

(24) companies was the parent corporate entity of

(25) the other company?

**Page 20**

(1)

(2)    A.    To the best of my recollection

(3) that the Tiffany ampersand Co. is the parent

(4) company.

(5)    Q.    And the Tiffany and Company where

(6) both the words and company are spelled out,

(7) would be the subsidiary as best you can recall?

(8)    A.    As best as I can recall.

(9)    Q.    If you take a look at the

(10) agreement Exhibit 1, 3 lines up from your

(11) signature, the words Tiffany ampersand Company

(12) spelled out is typed in, do you see that?

(13)    A.    Um-hum.

(14)    Q.    Now, that derivation of the

(15) Tiffany name is something different from the

(16) two varieties we just discussed, do you agree

(17) with that?

(18)    A.    Yes.

(19)    Q.    What was your understanding as to

(20) which Tiffany entity you were signing for when

(21) you signed this?

(22)    A.    I don't recall.

(23)    Q.    Who were you employed by in 1992,

(24) the parent or the subsidiary?

(25)    A.    I don't know.

Page 21

(1)
(2)     Q.    At any time after you signed the
(3)  agreement, did you ever reach an understanding
(4)  as to which Tiffany entity had entered into the
(5)  agreement with National Utility Service?
(6)     A.    No.
(7)     Q.    What do you recall, if anything,
(8)  regarding how Exhibit 1 came to your attention
(9)  with respect to you signing on behalf of
(10)  Tiffany?
(11)     A.    Someone, and I don't know who,
(12)  must have said to me that here is a company
(13)  that can monitor our utility bills or savings
(14)  either through better rates or better usage.
(15)  And the agreement was that or that -- the
(16)  understanding, I guess, was -- is that if they
(17)  found a way through better rates or savings
(18)  that they would be compensated for that. I
(19)  think that was the gist of it.
(20)     Q.    Do you have a specific
(21)  recollection of someone from Tiffany saying
(22)  that to you?
(23)     A.    I don't remember who that was. I
(24)  can't recall that.
(25)     Q.    Because you -- in your answer, you

Page 22

(1)
(2)  said that someone must have said that here's a
(3)  company that can do these things for you, do
(4)  you recall that, the way you phrased that?
(5)     A.    Yeah, sure.
(6)     Q.    So you don't actually remember if
(7)  anyone said that to you?
(8)     A.    The specific person?
(9)     Q.    What any -- whether anyone said
(10)  it?
(11)     A.    No.
(12)     MR. MITCHELL:  Can I hear the
(13)     question back?
(14)     MR. GOODMAN:  Let me just withdraw
(15)     it.  I'll restate it.
(16)     Q.    Isn't it true that you don't
(17)  recall whether anyone told you the things you
(18)  just testified about with respect to the
(19)  services that NUS could provide?
(20)     MR. MITCHELL:  Object to the form
(21)     of the question.
(22)     A.    I don't recall who said that to
(23)  me.
(24)     Q.    Do you recall that anyone said
(25)  that to you or are you just speculating that

Page 23

(1)
(2)  someone must have --
(3)     A.    No, someone had to say that to me.
(4)  I -- someone would have had to come to me and
(5)  said, here's a company that can do this kind of
(6)  thing.  It just didn't drop out of the sky.
(7)  Someone would have had to come to me and said,
(8)  Dale, here's an opportunity for something
(9)  like -- for something like that.  I can't
(10)  recall who said it though.
(11)     Q.    You don't recall whether someone
(12)  told you that NUS's services would be limited
(13)  to finding better rates do you?
(14)     A.    Oh, yes.
(15)     Q.    You have a specific recollection
(16)  of that?
(17)     A.    No.
(18)     Q.    Is that your testimony today?
(19)     A.    I can recall and I said -- I can
(20)  remember this.  I said, that's good because we
(21)  do not have the internal expertise to look at
(22)  utility bills to determine whether these are
(23)  the best rates we can get or whether we can
(24)  find ways to get better usage.  And because of
(25)  the -- we didn't have that internal expertise.

Page 24

(1)
(2)  I said, this sounds good.
(3)     Q.    Did you understand -- withdrawn.
(4)     Was it your understanding that NUS
(5)  would have any other responsibilities under the
(6)  agreement?
(7)     A.    I can only recall electricity
(8)  being it because we did not have internal
(9)  expertise for electricity.
(10)     Q.    Did you read the agreement before
(11)  you signed it?
(12)     A.    Yes.
(13)     Q.    Did you discuss it with anyone at
(14)  Tiffany?
(15)     A.    I don't recall a discussion.
(16)     Q.    Do you recall any specific
(17)  discussion with anyone at Tiffany that occurred
(18)  before you signed the agreement on April 7th,
(19)  1992?
(20)     A.    No, I don't recall that.
(21)     Q.    Do you recall any specific
(22)  discussion you had with anyone from National
(23)  Utility Service before you signed the agreement
(24)  on April 7th, 1992?
(25)     A.    No.

NATIONAL UTILITY SERVICE, INC.

DALE STROHL - 5/7/08

VS. TIFFANY & CO.



Page 25

(1)
(2)    Q.    Do you have any recollection of
(3) speaking with anyone from National Utility
(4) Service even if it's just a general
(5) recollection?
(6)    A.    I cannot recall that at all.
(7)    Q.    Did anyone from NUS ever say
(8) anything to you similar to what you testified
(9) about a minute ago with respect to that NUS
(10) would monitor utility expenses through better
(11) rates or better usage?
(12)    A.    I cannot recall any conversations
(13) at all with anybody from NUS.
(14)    Q.    Did you ask for any changes to be
(15) made to the pre-printed agreement that you see
(16) as the first page of Exhibit 1?
(17)    A.    I don't recall that I did.
(18)    Q.    I'm referring now to before you
(19) signed it, that's what my question referred to?
(20)    A.    No.
(21)    Q.    Were you particularly concerned
(22) with electric costs?
(23)    A.    As senior vice president for
(24) operations I was concerned with all costs, but
(25) not particularly electric, but all costs.

Page 26

(1)
(2)    Q.    You mentioned a couple minutes ago
(3) that you had focused, you didn't use that word,
(4) but you said the gist of it was you focused on
(5) electrical costs?
(6)    A.    I did not say that.
(7)    Q.    Were costs of electricity one of
(8) the larger components of Tiffany's utilities
(9) over all expenditures in the early 1990s?
(10)    A.    I can't recall to what degree that
(11) was.
(12)    Q.    Have you ever seen any marketing
(13) or promotional literature distributed by NUS?
(14)    A.    I don't recall that.
(15)    Q.    Do you ever recall seeing any
(16) promotional marketing literature relating to
(17) NUS whether or not it came from NUS?
(18)    A.    No.
(19)    Q.    Was the Tiffany retail store,
(20) which is currently in operation in Manhasset,
(21) New York, in operation at the same place in
(22) 1992?
(23)    A.    I don't know if it was in
(24) operation in 1992.  In 1992, no, it was not in
(25) operation in '92.

Page 27

(1)
(2)    Q.    That store was not open in 1992?
(3)    A.    No.
(4)    Q.    If you look at paragraph one of
(5) the agreement it states "we hereby authorize
(6) you to submit recommendations for savings and
(7) refunds on our costs of electricity, gas, oil
(8) and petroleum products, water, sewerage, steam
(9) and telecommunications. You will analyze our
(10) costs and advise where refunds and reductions
(11) can be obtained.
(12)        Wouldn't you agree that there's no
(13) limitation contained within that paragraph with
(14) respect to the type of recommendation that NUS
(15) was authorized to make --
(16)    MR. MITCHELL:  Object to the form
(17) of the question.
(18)    Q.    -- under the agreement?
(19)    MR. MITCHELL:  Same Objection.
(20)    A.    Would you repeat the question,
(21) please.
(22)    MR. GOODMAN:  Would you read it
(23) back please?
(24)    (Record read.)
(25)    A.    Yes.

Page 28

(1)
(2)    Q.    And, in fact, there's no
(3) limitation anywhere in the agreement as to the
(4) type of recommendation that NUS is authorized
(5) to make with respect to electric costs; isn't
(6) that true?
(7)    MR. MITCHELL:  Object to the form
(8) of the question.
(9)    THE WITNESS:  Do I answer that?
(10)    MR. MITCHELL:  Yes.
(11)    A.    Sorry.  Say it again.
(12)    MR. GOODMAN:  Could you read it
(13) back, please?
(14)    (Record read.)
(15)    Q.    Isn't that true?
(16)    A.    That's true.  That's true.
(17)    Q.    Do you recall whether you had an
(18) understanding when you signed the contract in
(19) 1992 as to how NUS was to be paid under the
(20) contract?
(21)    A.    They were to be paid for savings
(22) that they could identify -- could identify for
(23) electricity.
(24)    Q.    You agree that the contract
(25) covered utilities other than electricity?

Page 41

(1)
(2)    MR. GOODMAN:  And you also don't
(3)    have a right to coach the witness and to
(4)    make speaking objections.  You said your
(5)    objection, I addressed it, I did not ask
(6)    him to change his testimony.
(7)    MR. MITCHELL:  You're asking --
(8)    MR. GOODMAN:  I'm asking him a
(9)    question, which is different from an
(10)   earlier question.
(11)   MR. MITCHELL:  I submit to you,
(12)   Mr. Goodman, your question is, one,
(13)   wholly improper based upon the prior
(14)   answers that this witness has given you.
(15)   I would be happy to explain to you why
(16)   outside, not in the presence of the
(17)   witness, you have declined that
(18)   invitation for me to do that.
(19)   Consequently I'm just advising the
(20)   witness as he's sitting here, so the
(21)   advice the clear on the record and I do
(22)   not believe the court would disagree with
(23)   me, that the witness has no duty to
(24)   change a prior answer other than that I'm
(25)   telling him to answer the question.

Page 42

(1)
(2)    MR. GOODMAN:  Let's go off the
(3)    record.  We're gonna go off the record.
(4)    (Discussion off the record.)
(5)    MR. GOODMAN:  Okay.  The prior
(6)    question if I hadn't withdrawn it, it is
(7)    now withdrawn.
(8)    BY MR. GOODMAN:
(9)    Q.    Mr. Strohl, would you please take
(10)   a look at paragraph 1 of Exhibit 1.  I'm not
(11)   gonna read it in to the record again, but
(12)   specifically I refer you to the word costs in
(13)   both the first sentence and the second
(14)   sentence.  Do you see where that word appears?
(15)   A.    Um-hum.
(16)   Q.    In 1992 what was your intent with
(17)   respect to the meaning of the term costs?
(18)   A.    Rates and usage.
(19)   Q.    And what was that based on what
(20)   you testified earlier -- withdrawn.
(21)         Was that understanding based on
(22)   what you described earlier as having
(23)   some conversation with someone from Tiffany?
(24)   A.    Yes.
(25)   Q.    And did you have -- was it your

Page 43

(1)
(2)    intent in 1992 that the term costs as it
(3)    related to usage referred to the costs as they
(4)    appeared on Tiffany's electric bills?
(5)    MR. MITCHELL:  Object to the form
(6)    of the question.
(7)    A.    I didn't hear what you said.
(8)    Q.    Was it you're understanding that
(9)    as it related to usage the term costs referred
(10)   to costs that appeared on Tiffany's utility
(11)   bills?
(12)   A.    Yes.
(13)   MR. MITCHELL:  Object to the form
(14)   of the question.
(15)   Q.    Was it you're intent that the
(16)   contract operated in that matter?
(17)   A.    Yes.
(18)   Q.    Have you told me everything that
(19)   you remember with respect to conversations you
(20)   had with Tiffany officials and personnel before
(21)   you signed the agreement in April 1992?
(22)   A.    As of this moment, yes.
(23)   Q.    Have you told me everything that
(24)   you remember with respect to any conversations
(25)   with NUS representatives that occurred before

Page 44

(1)
(2)    you signed the agreement in April, 1992?
(3)    A.    As I said earlier, I don't recall
(4)    any conversations with NUS.
(5)    Q.    Earlier I asked you about
(6)    promotional and marketing materials, now I'm
(7)    now asking you whether you recall receiving any
(8)    correspondence, any written correspondence at
(9)    all from NUS relating to the contract that was
(10)   signed and implemented in 1992?
(11)   A.    I don't recall that.
(12)   Q.    What happened after you signed the
(13)   contract with respect to its administration?
(14)   A.    I really don't know.  I really
(15)   don't know.
(16)   Q.    Do you recall whether you
(17)   delegated the responsibility to someone else at
(18)   Tiffany for handling the contract and dealing
(19)   with NUS?
(20)   A.    In my management style, I would
(21)   say just make it happen.
(22)   Q.    And do you have any recollection
(23)   as to who you said or might have said that to?
(24)   A.    No.
(25)   Q.    You have no recollection of

# ZIEGLER DEPOSITION

NATIONAL UTILITY SERVICE, INC. VS. TIFFANY & CO.

ERIC ZIEGLER - 4/8/08

CONCORDANCE AND CONDENSED TRANSCRIPT
PREPARED BY:



TOWER 56, 126 EAST 56TH STREET, FIFTH FLOOR, NEW YORK, NEW YORK 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
WWW.ELLENGRAUER.COM

Page 13

(1)
(2)      A.   Regular mail.
(3)      Q.   Were there any instances of
(4)  electronic transmittal of bills?
(5)      A.   No.
(6)      Q.   Now, this case involves bills that
(7)  were rendered for Tiffany's facility in
(8)  Manhasset, New York, are you aware of that?
(9)      A.   Yes.
(10)     Q.   And specifically it involves bills
(11) rendered by Long Island Power Authority known
(12) as LIPA?
(13)     A.   Yes.
(14)     Q.   And also ConEd Solutions, are you
(15) aware of that?
(16)     A.   Yes.
(17)     Q.   Were the bills rendered by those
(18) two providers treated differently from any of
(19) the other utility bills handled by your office?
(20)     A.   No.
(21)     Q.   Walk me through, please, the
(22) process that occurred when a utility bill, such
(23) as from LIPA or from ConEd, would be received
(24) by your office and then paid by Tiffany through
(25) your office.

Page 14

(1)
(2)      A.   We would prepare a voucher, which
(3)  is a document, a cover sheet we put on almost
(4)  all of our invoices that we process, and on
(5)  that cover sheet, there would be the store
(6)  being charged, the cost center and also to an
(7)  account described as electric in this case.
(8)      The form would be initialed or
(9)  signed by someone who works for me as evidence
(10) that he was a preparer of the document for me
(11) to sign and once I get them, I merely compare
(12) the top voucher sheet to the invoice and
(13) authorize its payment.
(14)     Q.   Was it a voucher sheet or was it a
(15) voucher form, multiple-page form?
(16)     A.   It's a sheet. It's not a
(17) multiple-page form. It's something we Xerox.
(18)     Q.   And do I understand correctly that
(19) you signed off on or approved every voucher
(20) sheet for every bill that was paid by Tiffany?
(21)     MR. MITCHELL:   Object to the form
(22) of the question.
(23) A.   No.
(24)     THE WITNESS:   I'm sorry?
(25)     MR. MITCHELL:   I objected to the

Page 15

(1)
(2)  form of the question, but you can still
(3)  answer.
(4)      A.   No, I don't -- I don't sign other
(5)  vouchers. Vouchers come in preauthorized in
(6)  most cases.
(7)      What we decided to do relative to
(8)  electric was to simply pay them timely so that
(9)  we wouldn't experience any electrical
(10) shut-offs, which we had experienced
(11) occasionally in the past, and so my role was
(12) simply to compare the totals that we're paying
(13) with the total that was required to be paid
(14) timely and that the utility got their money.
(15)     Q.   So you compared the total that was
(16) shown on the voucher with the total shown on
(17) the bill?
(18)     A.   Just to make sure that it would be
(19) keyed properly, yeah.
(20)     Q.   Is that considered one of the
(21) preauthorized vouchers that you described?
(22)     A.   It's a prepayment. It's not --
(23) it's authorized in the sense only that it
(24) needed to be paid to keep electrical current
(25) with the vendor in our system. It wasn't

Page 16

(1)
(2)  analyzed to be correct or not correct.
(3)      Q.   You mentioned the term a minute ago
(4)  of a "preauthorized voucher." Is that
(5)  something different from what you just
(6)  described or is that what you meant by a
(7)  preauthorized voucher?
(8)      A.   A preauthorized voucher is
(9)  something that comes in from the field reviewed
(10) by the purchasing party or parties telling me
(11) that a payment, again, is required.
(12)     Q.   And is a preauthorized voucher
(13) approved by someone in the field?
(14)     A.   Yes.
(15)     Q.   And when you refer to the field,
(16) you mean someone at a retail store?
(17)     A.   Anybody outside -- I'm sorry.
(18)     Q.   When you refer to the field, are
(19) you referring to someone at a store or the
(20) manufacturing or distribution facility?
(21)     A.   Anybody outside our department is
(22) in the field.
(23)     Q.   What is your department's role with
(24) respect to preauthorized vouchers?
(25)     A.   Simply to gather them and process

NATIONAL UTILITY SERVICE, INC.

BSA XMAX(5/5)
ERIC ZIEGLER - 4/8/08

VS. TIFFANY & CO.

---

Page 17

(2) them as timely as we can and process them as
(3) accurately as we can.
(4)     Q.    Is any additional review function
(5) performed by your department --
(6)     A.    No.
(7)     Q.    -- with respect to a preauthorized
(8) voucher?
(9)     A.    No.
(10)     Q.    And as distinct from a
(11) preauthorized voucher, you also have what you
(12) described with utility bills and I think you
(13) called it a prepayment arrangement?
(14)     A.    It's simply an arrangement to be
(15) paid timely, since it's not a prepayment. It's
(16) already been invoiced. We're just trying to
(17) get it paid timely, that's all.
(18)     Q.    And is there a third category of
(19) invoices that come into your department where
(20) they're not preauthorized?
(21)     A.    Well, we have merchandise --
(22) merchandise, finished goods, even raw materials
(23) for that matter, that come in, and we actually
(24) do reconcile that to purchase orders prior to
(25) payment being made. So we are in the

---

Page 18

(2) authorizing role in that case, yes, or the
(3) reviewing role.
(4)     Q.    So with respect to LIPA and ConEd
(5) invoices in 2006 for the Manhasset store, they
(6) would fall under this category of this
(7) prepayment arrangement; is that right?
(8)     A.    Yes.
(9)     Q.    And with respect to those invoices,
(10) the only review that was done was a comparison
(11) of the voucher request form and the amount
(12) contained on that with the amount shown as
(13) being payable as reflected on the invoice
(14) itself?
(15)     A.    That's correct.
(16)     Q.    Do you have any training in
(17) reviewing utility invoices?
(18)     A.    No.
(19)     Q.    Do you know how to read a utility
(20) invoice with respect to the components of an
(21) electric bill?
(22)     MR. MITCHELL:  Object to the form
(23) of the question.
(24)     MR. GOODMAN:  Withdraw that.
(25)     Q.    Who fills out the voucher request

---

Page 19

(2) forms in your department?
(3)     A.    For electrical invoices?
(4)     Q.    For electric invoices?
(5)     A.    One of my subordinates.
(6)     Q.    Is there one particular person who
(7) is in charge for electric or could it be any
(8) number of people?
(9)     A.    No, his assignment is to process
(10) these electric invoices.
(11)     Q.    What is his name?
(12)     A.    Anthony Zelanti.
(13)     Q.    And Mr. Zelanti is assigned to
(14) electric?
(15)     A.    It's one of his tasks, yes.
(16)     Q.    Is Mr. Zelanti assigned to the
(17) electric invoice task in 2006?
(18)     A.    Yes.
(19)     Q.    And also in 2007?
(20)     A.    Yes.
(21)     Q.    Does he still work for you?
(22)     A.    Yes.
(23)     Q.    Is Mr. Zelanti also the person who
(24) receives the bill from ConEd or LIPA and opens
(25) the envelope?

---

Page 20

(2)     A.    He doesn't open up the envelope.
(3) We have a gal Friday that does that, but they
(4) are presented to him at his desk.
(5)     Q.    So there is a person who is
(6) responsible for the receipt of all of the bills
(7) and invoices that are received by your
(8) department, opening them and compiling them; is
(9) that right?
(10)     A.    Yes.
(11)     Q.    Were there any written policies
(12) governing the operation of your department that
(13) were in place in 2006?
(14)     A.    We had -- we did have an accounts
(15) payable manual.
(16)     Q.    Is that currently in use?
(17)     A.    It's currently unavailable. It was
(18) old and out of -- what would you call it --
(19) many of the processes have changed over the
(20) years and it hasn't been updated.
(21)     Q.    Does it still exist?
(22)     A.    No.
(23)     Q.    Someone threw it out?
(24)     A.    Probably so, in the last move.
(25)     Q.    Where is your office currently?

---

Page 21

(1)

(2)    A.   15 Sylvan Way.

(3)    Q.   What town is that?

(4)    A.   Parsippany.

(5)    Q.   When did you move to that location?

(6)    A.   I think it was 1997.

(7)    Q.   So, the manual that you referred to

(8) was last seen before that move in 1997?

(9)    A.   No, I think it was seen after that,

(10) but I haven't seen it in about four or five

(11) years and I was looking for it one day and I

(12) couldn't find it.

(13)    Q.   Were you looking for it in

(14) connection with this case?

(15)    A.   No.

(16)    Q.   Was there anything in that manual

(17) that related to payment of utility invoices?

(18)    A.   I do not believe so.

(19)    Q.   With respect to electric invoices

(20) for the Manhasset, New York location, was it

(21) necessary to obtain any approvals for the

(22) payment of those invoices?

(23)    A.   No.

(24)    Q.   Was there a protocol at Tiffany

(25) which prescribed the time between receipt of an

Page 22

(1)

(2) invoice and the time that the invoice should be

(3) paid, and I'm referring now to electric

(4) invoices?

(5)    A.   Officially stated is your question

(6) or just a -- conceived.

(7)    Q.   We'll start with any official

(8) protocol that you're aware of, whether written

(9) or otherwise.

(10)    A.   My official -- my managerial

(11) request was that it be done within the week.

(12)    Q.   You mean your manager?

(13)    A.   Yes.

(14)    Q.   Mr. Feld?

(15)    A.   No, I mean myself.

(16)    Q.   Okay. So your policy as the

(17) manager of the department?

(18)    A.   Department.

(19)    Q.   Was that --

(20)    A.   Get them paid.

(21)    Q.   I appreciate you trying to be

(22) helpful, but —

(23)    A.   I'm not used to this.

(24)    Q.   I understand, but we're not going

(25) to be able to figure out what anybody is

Page 23

(1)

(2) saying, so let's go slow.

(3)    A.   Okay.

(4)    Q.   So, do I understand you correctly

(5) that you as the manager expected electric

(6) invoices to be paid within a week of their

(7) receipt at your department?

(8)    A.   Yes.

(9)    Q.   Was that generally followed?

(10)    A.   Yes.

(11)    Q.   Did you ever receive any directive

(12) from someone above you in the corporate

(13) hierarchy with respect to the amount of time

(14) that should elapse before a utility invoice was

(15) paid?

(16)    A.   Not directly. It was just that --

(17) it was expected that we wouldn't be in such a

(18) shape that power could be turned off.

(19)    Q.   Other than Mr. Zelanti and you, was

(20) anyone else involved in the review or payment

(21) of electric invoices for the Manhasset store in

(22) 2006?

(23)    A.   Just my data entry clerk, who would

(24) be the one to actually data enter the

(25) transaction prior to checks being printed.

Page 24

(1)

(2)    Q.   And the data entry occurred after

(3) you signed the voucher; is that right?

(4)    A.   That's right.

(5)    Q.   And did that data entry person

(6) perform any review function or was it simply

(7) entering data?

(8)    A.   Simply entering data.

(9)    Q.   Did you have the authority not to

(10) approve a utility bill in 2006?

(11)    A.   I would say no.

(12)    Q.   Is it fair to say then that

(13) regardless of what the charge might have been

(14) on the invoice, you had no authority to

(15) disapprove a bill so long as the charge on the

(16) invoice matched up with the amount on the

(17) voucher?

(18)    A.   Yes.

(19)    Q.   During 2006, did your department

(20) have any system in place to identify an

(21) incorrect utility bill before it was paid?

(22)    A.   No.

(23)    Q.   You're now aware of National

(24) Utility Service; correct?

(25)    A.   National Utility Service, NUS?

Page 93

(1)
(2) should be put on hold?
(3)     MR. MITCHELL:  Object to the form
(4) of the question.
(5)     A.  It would look like it.
(6)     Q.  Are you aware of whether there are
(7) any bills that came before this January 2, 2007
(8) bill which were held by Tiffany?
(9)     A.  I'm not sure.
(10)     Q.  I just ask that this last exhibit
(11) be marked as 67.  It's an e-mail from Lawrence
(12) Palfini to Christine Amundsen with a copy,
(13) among others, to Eric Ziegler, dated February
(14) 24, 2006.
(15)     (Exhibit 67, document Bates stamped
(16)     T-415, marked for identification.)
(17)     Q.  Does this e-mail refresh your
(18) recollection about the time that you met
(19) Christine Amundsen?
(20)     A.  Yes.
(21)     Q.  What is your recollection?
(22)     A.  That we met to discuss -- well,
(23) they were concerned that -- Larry was concerned
(24) that, since we were going to electronic bill
(25) pay, that we did not want to involve NUS in

Page 94

(1)
(2) paying bills on our behalf.
(3)     Q.  And that's what Larry is referring
(4) to in the first paragraph where he says
(5) "Tiffany's will be undertaking a major
(6) companywide initiative to introduce online bill
(7) payment of all invoices"?
(8)     A.  That's correct.
(9)     Q.  Did that ever happen?
(10)     A.  I'm currently three weeks away from
(11) going live with that project.
(12)     Q.  Now, with respect to the electric
(13) bills at Manhasset, you would have continued to
(14) approve the bills for payment until someone
(15) told you not to do that; correct?
(16)     A.  Correct.
(17)     Q.  Have you had any discussions with
(18) anyone from Tiffany about this lawsuit before
(19) today?
(20)     A.  Only with attorneys.
(21)     Q.  You haven't spoken with Bruce Mogel
(22) about it?
(23)     A.  No.
(24)     Q.  You haven't spoken with Larry
(25) Palfini about it?

Page 95

(1)
(2)     A.  No.
(3)     Q.  Have you spoken with Anthony
(4) Zelanti about NUS's claims?
(5)     A.  No.
(6)     Q.  Did you speak with anyone from
(7) Tiffany about what to expect during your
(8) testimony today?
(9)     A.  What to expect?
(10)     Q.  Let me withdraw that.
(11)     Did you speak with anyone at
(12) Tiffany about their testimony in this lawsuit?
(13)     A.  No.
(14)     Q.  Are you familiar with Albertson
(15) Electric Company?
(16)     A.  I don't believe so.
(17)     Q.  Are you familiar with Castagna
(18) Realty?
(19)     A.  No.
(20)     MR. GOODMAN:  I have nothing
(21) further.  Thank you.
(22)     MR. MITCHELL:  Let me ask a couple
(23) of questions.
(24) EXAMINATION BY
(25) MR. MITCHELL:

Page 96

(1)
(2)     Q.  Mr. Ziegler, in connection with the
(3) questions you were asked regarding Exhibit 65
(4) for identification, Mr. Goodman asked you
(5) whether the approval always came for the
(6) payment of invoices within one to two days
(7) after the date the voucher distribution
(8) document was prepared.  Do you recall that?
(9)     A.  Yes.
(10)     Q.  If I could, if you take a look at
(11) Exhibit 11 for identification, take, for an
(12) example, the first page of the exhibit.  You
(13) show an accounts payable voucher distribution
(14) dated December 12, 2006 for a bill amount or
(15) payment amount of $21,202.14.
(16)     Do you see that?
(17)     A.  Correct, I do.
(18)     Q.  Okay.  On the next page is the bill
(19) from ConEd solutions, page two of the exhibit.
(20)     Do you see that?
(21)     A.  Yes, I do.
(22)     Q.  And the amount circled is
(23) $21,202.14.
(24)     Do you see that?
(25)     A.  I do.