**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X
                                               **:**

**NATIONAL UTILITY SERVICE, INC.,**    **:**    **Case No.: 07 CV 3345**
                                               **:**    **(RJS)(GWG)**

            **Plaintiff,**    **:**

                                               **:**

             **-against-**    **:**

                                               **:**

**TIFFANY & CO. and TIFFANY AND**    **:**
**COMPANY,**    **:**

                                               **:**

           **Defendants.**    **:**
                                               **:**
-----------------------------------------------------------------X

**PLAINTIFF'S RESPONSE TO LOCAL RULE 56.1 STATEMENT**
**OF MATERIAL FACTS OF DEFENDANTS, TIFFANY & CO. AND TIFFANY**
**AND COMPANY, AND PLAINTIFF'S STATEMENT OF MATERIAL FACTS**
**IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56.1 of the Local Rules of the United States District Court for the

Southern District of New York, plaintiff, National Utility Service, Inc. ("**NUS**"), through its

attorneys, Hartman & Craven LLP, respectfully submits its response to the Rule 56.1 Statement

of Material Facts of defendants, Tiffany & Co. and Tiffany and Company ("collectively referred

to as "**Tiffany**"), and, in support of its cross-motion for summary judgment, submits its Rule

56.1 statement of material facts as to which there is no genuine issue to be tried.[1]

**I.**    **RESPONSE TO DEFENDANT'S LOCAL**
        **RULE 56.1 STATEMENT OF MATERIAL FACTS**

    1.    Admits.

    2.    Admits.

---

[1]    Unless otherwise indicated, all exhibits referenced herein are to the exhibits annexed to the Declaration of Peter G. Goodman, sworn to on September 4, 2008.

3.      Admits, but states that the Contract provided further that if a savings is in effect at the expiration of the Contract, Tiffany agreed, among other things, to send NUS information and invoices covering the location where savings are in effect until the sixty (60) month shared savings period is completed.  (Ex. A, para. 6).

4.      Admits.

5.      Admits, but denies that this statement is material to the issue whether Tiffany is liable under the Contract to pay NUS a fee for refunds and savings achieved in this case.

6.      Admits, but states further that the Data Management Services Contract was not intended to compensate NUS for any recommendations it made for utility cost savings and refunds and NUS was not compensated for any part of its claim in this case by any payment received pursuant to the Data Management Contract.  Affidavit of Arnold Frankel, sworn to on September 4, 2008 ("**Frankel Aff**."), para. 19.  (Ex. E; Palfini Tr., 35:7-25).

7.      Admits.

8.      Admits, but states further that the quoted testimony is inadmissible parol evidence because it contradicts the unambiguous terms of the Contract.  Further, because the Tiffany officer also testified that he "cannot recall any conversations at all with anybody from NUS[,]" there is no evidence that the officer's subjective intent was communicated to NUS and is therefore immaterial.  (Strohl Tr., 25:7-13).  Finally, the Tiffany officer also testified that there is no limitation of the type of recommendation NUS was authorized to make under the Contract. (Strohl, 27:4-28:16).

9.      Admits.

10.     Admits, but denies the emphasis appears in the original.

11.     Admits.

12.     Admits.

13.     Admits, but states further that (a) the testimony cited by Tiffany does not support this statement and (b) the Tiffany officer who signed the Contract admitted that he understood that the term costs referred to costs **which appeared on Tiffany's bills** and it was his intent that the Contract operate in that manner.  (Strohl Tr., 43:8-17).

14.     Admits but states that the NUS officer who signed the Contract also testified that although he was unaware, the circumstance of a switched meter could have come up under NUS's contracts because "at any time [NUS] can have thousands of contracts with tens of thousands of locations."  (Frankel Tr., 30:24-31:7).  The NUS officer also testified about recommendations NUS has made which are similar to that made in this case, involving the application of the wrong meter multiplier and "people paying for erroneous usage which did not belong to them."  (Frankel Tr., 23:24-24:11; 28:7-11).  Denies that the statements contained in paragraph 14 are material to the issue whether Tiffany is obligated to pay NUS under the Contract for the savings and refunds realized in this case; the types of refunds and savings discovered by NUS in the past are immaterial to whether NUS is entitled to recover for newly discovered refunds and savings.

15.     Admits only that for purposes of computing its bills for its performance fee, "[t]he savings is reviewed on the period in which billing would be issued, in most cases on a monthly basis[,]" all subject to the frequency of bill issuance by the utility and receipt of the bills by NUS.  Affidavit of David Brown, sworn to on September 4, 2008 ("Brown Aff.") para. 9. (Brown Tr., 168:15-22[2]).  Denies the characterization of "real savings," and denies that the

---

[2]         Unless stated otherwise, references to the deposition testimony of David M. Brown are to his deposition held on March 5, 2008.

statements contained in paragraph 15 are material as a result of Tiffany's anticipatory breach of the Contract.

16.    Admits, but states further that the savings in this case did not end when the billing error was corrected, but *began* when the error was corrected.  (Brown Aff., para. 9).

17.    Admits that according to LIPA's representative, the applicable tariff book provides that an entity should be billed only for the electricity it uses.  (Schwarting Tr., 127:8-11).  Denies that Tiffany received bills for another party's usage but states further that LIPA and Con Ed Solutions did render bills to Tiffany which were based upon meter readings of another party (Polo/Ralph Lauren ("**Polo**")).

18.    Admits.

19.    Denies that this statement is material, but admits that the entire square footage of the Manhasset Store is approximately 10,000.

20.    Denies.  Admits that the billing error for Tiffany's Manhasset Store occurred in part as a result of the mislabeling of the meter pans which caused Polo's meter readings to be associated with Tiffany, and *vice versa*.  As a result, the meters for Tiffany and Polo were switched in LIPA's computer system and they began to receive bills which reflected meter readings for the other.  (Schwarting Tr., 83:21-84:23).

21.    Admits that on November 15, 2006, after Tiffany received, paid and sent to NUS its bills for the applicable periods, NUS identified the "unusual usage pattern[,]" which it noted the first time it appeared on Tiffany's electric bills.  Denies that the Data Management Services Contract is material to NUS's claim because it was not intended to compensate NUS for any recommendations it made for utility cost savings and refunds and NUS was not compensated for

any part of its claim in this case by any payment received pursuant to the Data Management

Contract.  (Ex. E; Palfini Tr., 35:13-21; Frankel Aff., para.19).

22.    Denies that it is material whether Tiffany's personnel observed a spike in electric

usage.  Denies that Tiffany's personnel observed a spike in electric usage in late November

2006.  Tiffany's Vice President of the Northeast Region, Brian Ensor ("**Ensor**"), is responsible

for 14 stores and during 2006 did not physically review any electric bills for the Manhasset

Store.  Ensor testified that in the latter part of 2006 he made a "generic" observation of an

increase in the costs of "supplies" and did not isolate the increase to electricity, that he could not

remember which Tiffany financial document he reviewed when he made his observation, and

that other than one conversation with a subordinate and emails generated after NUS became

involved, he made no follow-up on his observation.  Ensor also was unaware who placed the

"check marks" on Exhibit 80.  (Exs. H, J, JJ; Ensor Tr., 5:22-6:14; 12:20-13:7; 17:21-18:20;

18:1-20; 28:13-16; 45:22-46-15; 74:13-24; 88:14-89:11).

23.    Admits but states further that the retail facilities director also asked NUS to advise

him "if anything needs to happen at the site." (Ex. H).

24.    Admits that as of mid-November 2006, the cause of the ongoing billing error was

unknown and that NUS had noted an "unusual usage pattern" on Tiffany's LIPA and ConEd

bills.  (Ex. F).  Denies that the "spike" was reflected on only one bill, and states further that the

unusual usage pattern was reflected on two bills, *i.e.,* the bills for both LIPA and Con Ed for the

applicable periods.  (Ex. F).

25.    Admits.

26.    Denies that the time interval between NUS's November 15, 2006 communication advising of the "unusual usage pattern" and the December 20, 2006 Cost Analysis Report is material.  Admits that NUS sent its Cost Analysis Report to Tiffany on December 20, 2006.

27.    Denies that Tiffany continued to pay its electric bills because it was under the belief that NUS was investigating the billing issue.  Tiffany continued to pay its bills because its Accounts Payable Manager requested and expected that electric invoices be paid within a week of their receipt at the Accounts Payable Department, and his directive was usually followed. (Ziegler Tr., 21:24-23:18).  Deny that the reason Tiffany continued to pay its electric bills is material because the billing error was ongoing.

28.    Admits that NUS's claim for a fee under the Contract is conditioned on Tiffany's implementation of a NUS recommendation.

29.    Admits that on December 20, 2006, NUS sent a Cost Analysis Report ("**Report**") to Tiffany which contained NUS's recommendation regarding the ongoing electric service billing error at the Manhasset Store.  (Ex. B).

30.    Admits that in the Report NUS set forth the results of its analysis of the ongoing billing error together with its recommendation of action to take with respect to the error. (Ex. B).

31.    Denies that it is material whether NUS conducted an investigation or performed services to learn of the cause of the billing error prior to writing the Report, because the type of billing error would have (and did) result in ongoing overcharges.  Denies that NUS performed no services to learn of the cause of the billing error prior to writing the Report, inasmuch as the NUS senior consultant (Christine Amundsen) wrote to Tiffany on November 15, 2006 to inquire into potential causes of the unusual usage pattern.  (Ex. F).

32.     Denies that NUS uses templates to protect its claim to a fee.  The reports are typically based upon a template developed by NUS which contains "the good basic steps of formatting recommendations" to be used to "start the ball rolling."  (Frankel Tr., 69:7-25).  The template is used "[t]o begin drafting a specific recommendation" for which NUS "chose … the best wording to explain what [NUS] was recommending."   (Amundsen, 20:8-21:2).  Denies that much of the Report is from a generic template.  (Frankel Tr., 70:5-73:2; Frankel Aff., para. 37).

33.     Admits that the Report includes some information about the Manhasset Store already known to the parties as a result of NUS's prior advice to Tiffany and that it advised Tiffany that it appeared it was being billed in error creating ongoing overcharges; however, the Report also detailed potential reasons for the billing error, the financial ramifications of the error and a specific recommended course of action.

34.     Admits that the Report makes a "recommendation" to investigate the overcharge, obtain a refund and correct the ongoing overcharge (Amundsen Tr., 121:7-14), as contained in the following two sections of the Report:

> RECOMMENDATION
> NUS Consulting Group recommends investigating this potential ongoing overcharge.  As detailed above, we estimate that in addition to a refund of approximately $93,000 for past overcharges, a correction of this ongoing overcharge will result in annual savings of approximately $372,000.
>
> SUGGESTED ACTION
> NUS will initiate action to investigate potential overcharge as detailed above.  We will initially approach the Provider [LIPA] to review this matter and correct your billings.  We will then also contact your Marketer [Con Ed] to adjust their invoices and rebill you based on the corrected usage as well.

Ex. B (emphasis omitted).

35.     Denies that it is material whether NUS included part of the parties' previous communications in the Report.  Denies that the Report, which included the NUS

recommendation only reiterated Tiffany's previous request to "investigate the LIPA involvement." (Ex. H). The recommendation was to investigate the overcharge, obtain a refund and correct the ongoing overcharge, and there was much more substance to the Report in detailing the potential refund and ongoing savings as well as other considerations/risks, *e.g.* potential under-recording of usage. Admits that Tiffany's prior authorization was based on NUS's advice to Tiffany that it had uncovered an unusual usage pattern.

36.     Denies. The recommendation suggested the specific course of action to investigate the overcharge, obtain a refund and correct the ongoing overcharge, all of which was likely to, and did, achieve a resolution. (Ex. B (emphasis omitted); Amundsen Tr., 121:7-14).

37.     Admits that after reading the Report and upon receiving a call from NUS to discuss the Report, Tiffany's retail facilities director for the Manhasset Store questioned the large amount of the savings and said that he would want to negotiate with NUS but did not want NUS to delay contacting the utilities to get the problem corrected. He also commented to NUS's Senior Consultant Christine Amundsen ("**Amundsen**") that the recommendation was a "great catch." Amundsen advised Tiffany's representative that pursuant to NUS's standard business model (the contract terms), when a billing discrepancy occurred and was corrected, NUS shared in any refund to which the client was entitled and subsequently billed for shared savings that result from correcting the billing discrepancy. Tiffany's representative advised NUS to investigate the billing error by contacting the utility suppliers as recommended by NUS. Denies that the Tiffany official asserted that NUS's claim was "theoretical." (Ex. I; Amundsen Tr., 174:22-175:11:181:3-17:186:7-16).

38.     Admits.

39.    Admits that Amundsen testified that Tiffany's representative questioned the amount of the potential fee and did not agree to the fee.  The Tiffany representative also stated that he would want to negotiate with NUS but did not want NUS to delay contacting the utilities to get the problem corrected.  (Ex. I).

40.    Admits.

41.    Admits.

42.    Denies that it is material whether NUS was told on December 26, 2006 that it appeared that the Tiffany and Polo meter numbers had been switched.  Admits that NUS called LIPA on December 26, 2006 but denies it was told the meter numbers had been switched on the LIPA computer system when the new meters were installed in September 2006.  (Schwarting Tr., 66:21-67:2).

43.    Admits.

44.    Admits.

45.    Admits that Amundsen sent an email to various individuals at NUS including Brown, Frankel and members of the Rate Department, in which she set forth the contents of her conversation with the LIPA representative, Kathy Schwarting.  (Ex. T).  Denies that it is material to whom she sent the email at NUS.

46.    Denies that it is material whether Brown or Frankel had any involvement with the Tiffany account until December 26, 2006.  Denies that neither Brown nor Frankel had any involvement with the Tiffany account until December 26, 2006.  (Brown Tr., 125:25-126:13; Frankel Tr., 45:23-46:25) (testimony limited to the Report and to the period between November 15, 2006 and December 20, 2006).  Further, Frankel signed the Contract on behalf of NUS, attended meetings at Tiffany's offices during the 15 years of the Contract and negotiated and

signed the Data Services Management Agreement.  Also, in his capacity as general manager, Frankel was generally aware of ongoing activities with the Tiffany account.  (Frankel Aff., para. 21).

47.     Admits.

48.     Denies that this statement is material.  Denies that NUS knew after one phone call the crux of the billing error and that it would be fixed by LIPA within weeks.  LIPA's representative, Schwarting, does not recall telling Amundsen in the first phone call that there was a possible switched meter. (Schwarting Tr., 66:21-67:2).  Also, at the time of the first phone call the investigation was in its early stages and neither NUS nor LIPA knew the true cause of the billing error.  (Frankel Aff. para. 44).  In fact, LIPA's initial investigation was flawed because its investigator ascribed an incorrect meter multiplier to Tiffany (Frankel Aff., para. 46) and concluded that Polo's meter multiplier was correct, but he failed to detect anything about a meter mis-tagging.  (Ex. Q; Schwarting Tr., 81:14-82:15; 99:11-100:17).  Based upon this faulty work LIPA incorrectly believed the billing problem had been rectified.  (Schwarting Tr., 104:3-17).

49.     Denies that Amundsen reported "far less information to Tiffany" than she relayed to NUS's officials.  Amundsen's email to Tiffany conveyed all of the pertinent data from her conversation with LIPA including the fact that LIPA definitely saw a possible billing error which would require a field investigation, put a hold on the account with no late fees or collections and would put a rush on the investigation which could still take one or two weeks for results.  The only thing the email to Tiffany omitted was the potential cause of the billing error which was immaterial considering it was still under investigation and, based upon LIPA's first response ascribing the error to the wrong meter multiplier, would have been wrong.

50.     Admits that on January 15, 2007 NUS learned of the "mis-tagging" of the new electric meters and that the next day, January 16, 2007, NUS provided Tiffany with a comprehensive status report in which it disclosed this new discovery. (Ex. V).

51.     Denies that Tiffany and Polo had not been receiving "their own bills." Admits that in order to correct the mistake LIPA had to change the meter multiplier and switch the meter numbers in its computer system so that Tiffany and Polo would receive bills that reflected the recorded usage and demand for the meter assigned to each of their premises. (Ex. V).

52.     Denies that Tiffany and Polo had been receiving "bills for each other." Admits that when the meters were changed LIPA failed to change Tiffany's meter multiplier, which was lower for the new meter, resulting in Tiffany receiving a bill that reflected usage that was higher than what was accurate for the Tiffany account. Denies that Polo's meter multiplier was incorrect; after a field visit LIPA's investigator concluded that Polo's multiplier was correct. (Ex. Q; Schwarting Tr., 81:14-82:2; 99:11-22).

53.     Admits.

54.     Denies. Admits that after LIPA initially concluded that the billing error was caused by the application of an incorrect meter multiplier, NUS determined through further analysis that the incorrect multiplier accounted for only about half of the error in billings and then NUS continued its investigation which ultimately resulted in the discovery of the mis-tagged meters. (Exs. NN, V).

55.     Denies and denies that this statement is material. Admits that if only the meter multiplier was corrected but the mis-tagging of Tiffany's and Polo's meters was not corrected, Tiffany's electric bill would continue to reflect Polo's meter readings.

56.     Denies.  There is no evidence to support this statement.  The exhibits cited by Tiffany do not suggest in any way that over the period of weeks NUS concocted work on the issues.  The exhibits are contemporaneous records which show that through its perseverance, NUS uncovered the solution to the ongoing billing error, which even had eluded LIPA when it concluded the problem was limited to the incorrect meter multiplier.  (Ex. Q; Schwarting Tr., 81:14-82:2; 99:11-100:17; 104:3-17).  This statement is also immaterial to the fundamental issue whether NUS made a recommendation subsequently implemented by Tiffany that resulted in the realization of savings and refunds.

57.     Denies that the quoted phrase is an "example" of any misconduct by NUS as alleged by Tiffany.  Admits that NUS wrote to Tiffany on January 2, 2007, and advised it of LIPA's impending field inspection.  (Ex. OO).

58.     Admits that the LIPA investigator initially reported that the multiplier for Tiffany's new meter was 80 and not 180.  Denies that LIPA concluded Polo's multiplier was incorrect; the investigator concluded that the multiplier for Polo's account was correct.  (Ex. Q; Schwarting Tr., 80:21-82:2; 99:11-22).  Further, the multiplier for Tiffany's account was actually 120, and not 80 as reported by the investigator.  (Frankel Aff., para. 46; Ex. Q; Schwarting Tr., 79:6-81:13:81:24-82:15).

59.     Admits that Tiffany's usage was being overstated.  Denies that Polo's usage was being overstated because the LIPA investigator concluded that its multiplier was correct.

60.     Denies.  Denies that the statement is material.  Denies that the cited testimony supports the statement.  Admits only that after LIPA concluded that the billing error was caused by the application of an incorrect meter multiplier, NUS determined that the incorrect multiplier

accounted for only about half of the error in billings and then NUS continued its investigation which ultimately resulted in the discovery of the mis-tagged meters. (Exs. NN, V).

61.    Admits.

62.    Admits.

63.    Admits.

64.    Denies that Amundsen's boss, David Brown, "took over the account[,]" but admits that on January 15, 2007, Brown was "filling in" for Amundsen because she had "taken ill."  (Exs. NN, V).

65.    Admits that Brown's January 16, 2007 email to Tiffany references a conversation between NUS and Albertson Electric which occurred on January 12, 2007.

66.    Admits.

67.    Admits that NUS seeks damages of approximately $965,000.  (Ex. C).

68.    Admits, but states further that the Contract does not limit the types of recommendations which NUS can make or share in nor does it identify *any* specific type of recommendation which is non-compensable.  (Ex. A).

69.    Denies that the statements contained in paragraph 69 are material to the issue whether Tiffany is obligated to pay NUS under the Contract for the savings and refunds realized in this case.  Admits, but states further that to the extent the statements are considered, the NUS officer who signed the Contract also testified that although he was unaware, the circumstance of a switched meter could have come up under NUS's contracts because "at any time [NUS] can have thousands of contracts with tens of thousands of locations."  (Frankel Tr., 30:24-31:7). The NUS officer also testified about recommendations NUS has made which are similar to that made in this case, involving the application of the wrong meter multiplier and "people paying for

erroneous usage which did not belong to them." (Frankel Tr., 23:24-24:6; 28:7-11). Also, because the Tiffany officer who signed the Contract testified that he "cannot recall any conversations at all with anybody from NUS[,]" there is no evidence that the officer's subjective intent was communicated to NUS and is therefore immaterial. (Strohl Tr., 25:7-13). Finally, the Tiffany officer also testified that there is no limitation in the type of recommendation NUS was authorized to make under the Contract. (Strohl, 27:4-28:16).

70.     Denies. Prior to the commencement of this action NUS provided Tiffany with its calculation of its fee for its share of the refund realized by Tiffany. Further, in early May 2008, after NUS was finally in possession of the necessary utility documents, which were obtained during discovery, it prepared its damage calculations in the form of an "Invoice" for each month of the savings for which NUS had received actual billing data, together with a summary of all of its damages in the format of a "Statement of Account." NUS utilized the same format it uses when it bills its customers in the ordinary course of its business. (Ex. FF; Brown Aff., 10).

71.     Admits.

72.     Denies. Admits that in order to calculate the "savings" under the Contract, NUS subtracted the actual costs paid for electric service at the Manhasset Store for the periods after the savings began ("**Present Costs**") from the costs that Tiffany would have paid had the electric service bills of LIPA and Con Ed not been corrected as recommended by NUS ("**Former Costs**"). (Brown Aff., para. 14). When it computed the Former Costs, NUS applied a meter multiplier of 180 which was the multiplier used by LIPA on each of the erroneous bills; the multiplier was applied to the meter readings shown on Polo's bills, in the same way that the erroneous bills were rendered by LIPA prior to the correction of the ongoing error resulting from NUS's recommendation and subsequent investigation. The consumption (KWH) and demand

(KW) are then applied to LIPA's Rate 285 which was in effect during each respective billing period, to arrive at the Former Costs.  (Brown, 6/19/08 Tr. 26:22-27:8; Brown Aff., para. 21).  In this way, NUS has re-created what the utilities' bills would have been, but for the change after implementation of NUS's recommendation.  (Brown, 6/19/08 Tr. 26:19-22).

73.    Denies that NUS created a "fictional bill" for Polo.  As explained in paragraph 72, *supra*, NUS computed the costs that Tiffany would have paid had the electric service bills of LIPA and Con Ed not been corrected as recommended by NUS, in the same manner NUS has calculated savings (and its fee) for its clients for the past 75 years.  (Brown Aff., para. 12).

74.    Admits that the second page of the Invoice for the first month of the 60 month participation period ("**Month #1**") (stamped NUS 888) contains information relating to Tiffany's actual electric service bills incurred for that period, including usage and charges (comprising the Present Costs), which charges represent the Present Costs or the costs after implementing the NUS recommendation and correcting the ongoing billing error.

75.    Admits that NUS has calculated the "savings" for Month #1 as $23,536.33, and that this sum was computed by deducting the Present Costs from the Former Costs.  Admits that NUS claims half of that sum as its performance fee for Month #1.  Denies that the Polo charges are fictional rather than the standard billing method used by NUS for 75 years to re-create the Former Costs for the purpose of calculating savings.  Denies that NUS did anything to make its calculations "look like an invoice;" rather, it was an invoice as used by NUS to bill its clients for savings and refunds.

76.    Admits.

77.    Denies that there are "fictional savings" or that NUS has calculated a "fictional bill" or that the savings are amplified rather than simply reflecting the actual ongoing savings to

Tiffany.  The savings shown are actual savings on the electric costs that Tiffany would have paid had it not implemented NUS's recommendation, and such costs were based upon Polo's meter readings for the applicable monthly periods and the meter multiplier (180) which was applied by LIPA during the periods of incorrect billing prior to the implementation of NUS's recommendation for correcting the ongoing overcharges.  Admits that during a month when usage is greater (such as a hot summer month), the savings will be greater, and admits that Polo's usage is shown as 135,955.40 when applying a meter multiplier of 80 and 304,560 when applying a multiplier of 180.

78.    Admits.  Denies that this statement is material.

79.    Denies that this statement is material because it ignores the correct methodology for computing "savings" under the Contract, which is the difference between the actual billing by the utilities and what the billing by the utilities would have been, but for Tiffany's implementation of NUS's recommendation.  Admits that when these figures are computed, the "savings" under the Contract is $51,604.81 for this period.  (Ex. PP).

80.    Denies that this statement is material because it ignores the correct methodology for computing "savings" under the Contract, but admits the content of the statement.

81.    Denies that this statement is material because it ignores the correct methodology for computing "savings" under the Contract.  This computation requires a determination of the amount Tiffany would have been billed had the error not been corrected, and such erroneous bills were based upon both Polo's meter readings resulting from the mis-tagged meters for the applicable monthly periods as well as the use of the wrong meter multiplier (180) which was applied by LIPA during the periods of incorrect billing.  Admits that for one year Polo used 2.7 times more power than Tiffany for the Manhasset Store.

82.    Denies that NUS's claim for savings is based on "fictional usage" of Polo and denies that NUS has "falsely reported" Polo's usage.  The savings computed by NUS are actual savings on the electric costs that Tiffany would have paid had it not implemented NUS's recommendation, and such costs were based upon Polo's meter readings for the applicable monthly periods and the meter multiplier (180) which was applied by LIPA during the periods of incorrect billing.


II.    **PLAINTIFF'S LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT**

A.    **Parties**

1.    ***National Utility Service, Inc.***

1.    National Utility Service, Inc. ("**NUS**") is a corporation organized and existing under the laws of the State of New Jersey, with its principal place of business at One Maynard Drive, Park Ridge, New Jersey.  (Ex. C).

2.    NUS has been providing energy cost consulting services for 75 years.  NUS maintains offices in 11 countries, employs 450 professionals and is under contract with approximately 20,000 commercial and industrial users of utility services.  (Frankel Aff., para. 3).

3.    At all times relevant hereto, NUS was, and continues to be, in the business of providing audit, analysis, procurement, data management and consulting services with regard to electricity, gas, oil and petroleum products, water, sewerage, steam and telecommunications expenditures for industrial and commercial organizations.  (Frankel Aff., para. 4).

4.    As part of its business, NUS identifies opportunities for savings and refunds on Energy and Telecom expenditures for such industrial and commercial organizations.  (Frankel Aff., para. 5).

       **2.**      ***The Defendants.***

5.      Tiffany & Co. is a corporation organized and existing under the laws of the State of Delaware.  (Frankel Aff. para. 6; Exs. C para 5, D para. 5).

6.      Tiffany and Company is a corporation organized and existing under the laws of the State of New York.  (Frankel Aff. para. 5; Exs. C para. 6, D para 6).

7.      Tiffany & Co. and Tiffany and Company both maintain their principal place of business at 727 Fifth Avenue, New York, New York 10022.  (Frankel Aff. para. 5; Exs. C para 7, D, para. 7).

8.      At all times relevant hereto, Tiffany and Company was, and continues to be, a subsidiary of Tiffany & Co.  (Frankel Aff. para. 6; Exs. C, para 9, D, para 9).

**B.**      **The Utility Cost Consulting Contract**

9.      On or about April 7, 1992, Dale Strohl ("**Strohl**") signed a Contract which was dated April 7, 1992 (the "**Contract**").  (Ex. A).

10.      At the time he signed the Contract, Strohl was Tiffany's Senior Vice President for Operations and Human Resources and reported directly to the "chairman of the board."  (Strohl Tr., 14; 17-18).[3]

11.      Strohl testified that before he signed the Contract, he did not ask for any changes to be made to the Contract.  (Strohl Tr., 25:14-17).

12.      Strohl does not know whether he signed the Contract on behalf of Tiffany & Co. or Tiffany and Company.  (Strohl Tr., 19:11-20:21;21:2-6).

13.      Strohl does not know whether, at the time he signed the Contract, he was employed by Tiffany & Co. or Tiffany and Company.  (Strohl Tr., 20:23-25;21:2-6).

---

[3]      Transcript of Deposition of Dale Strohl, conducted on May 7, 2008 ("Strohl Tr."), is annexed to the Goodman Dec.

14.    Strohl has no recollection of any discussion about the Contract with any NUS employee before he signed it on April 7, 1992.  (Strohl Tr., 24:21-25).

15.    On or about April 13, 1992, NUS signed the "Accepted By:" portion of the Contract by its Vice President, Arnold Frankel.  (Ex. A).

16.    Tiffany's retail store located at 1980 Northern Blvd., Manhasset, New York (the "**Manhasset Store**") was a location covered under the Contract.  (Ex. A, para. 8; Palfini Tr., 42:5-8).[4]

17.    Pursuant to the Contract, Tiffany authorized NUS to analyze Tiffany's costs for electricity, gas, oil and petroleum products, water, sewerage, steam and telecommunications. (Ex. A, paras. 1-3; Palfini Tr., 43:11-44:9).

18.    Pursuant to the Contract, Tiffany authorized NUS to submit recommendations for possible savings and refunds on its utility costs, including electric costs.  (Ex. A, paras. 1-3).

19.    The Contract contained no limitation as to the type of recommendation NUS was authorized to make with respect any of the covered utilities, including Tiffany's electric costs. (Ex. A; Strohl Tr., 27:4-28:16).

20.    Tiffany understood that the term "costs" as set forth in paragraph 1 of the Contract referred to costs that appeared on Tiffany's utility bills.  (Ex. A, para. 1; Strohl Tr., 43:8-12).

21.    Pursuant to the Contract, Tiffany paid NUS a service fee in the amount of $12,000 ("**Service Fee**"), which was to be recaptured by Tiffany, in full, from the first gross savings and refunds realized. (Ex. A, para. 5, C, para. 20, D, para. 9).

---

[4]    Transcript of Deposition of Lawrence Palfini, conducted on February 27, 2008 ("Palfini Tr."), is annexed to the Goodman Dec.

22.     Prior to its receipt of the recommendation which is the subject of this action, Tiffany recaptured the Service Fee in full.  (Frankel Aff., para.11).

23.     Pursuant to the Contract, Tiffany agreed to pay NUS "(i) fifty (50%) percent of each refund realized; [and] (ii) fifty (50%) percent of each savings realized for a period of sixty (60) months" as a result of the implementation of any course of action recommended by NUS. (Ex. A, paras. 3, 5; Frankel Tr., 19[5]; Frankel Aff., para. 13).

24.     The contingent component of NUS's fee was intended to compensate NUS for its expertise in uncovering opportunities to benefit Tiffany.  (Frankel Tr., 20:22-21:2).

25.     The term of the Contract was "five (5) years from the date of [NUS's] acceptance, and shall continue thereafter … for consecutive five (5) year terms unless cancelled by written notice at least thirty (30) days prior to the beginning of any new term."  (Ex. A, para. 7).

26.     Tiffany had not provided any written notice of cancellation of the Contract until February 23, 2007.   (Exs. C, para. 29, D, para 11).

27.     Pursuant to the Contract, if a savings is in effect at the expiration of the Contract, Tiffany agreed to share the savings with NUS until the sixty (60) month shared savings period is completed, pay NUS as outlined in the Contract and send NUS information and invoices covering the location where savings are in effect.  (Ex. A, para. 6).

**C.     The Data Management Service Contract.**

28.     On March 7, 2006, Tiffany's Group Director of Corporate Real Estate Services, Lawrence Palfini ("**Palfini**"), signed a document entitled Data Management Service Contract (the "**Data Management Contract**").  (Ex. E; Mogel Tr., 158:16-159:4; Palfini Tr., 24:25-29:23).

---

[5]     Transcript of Deposition of Arnold Frankel, conducted on April 11, 2008 ("Frankel Tr."), is annexed to the Goodman Dec.

29.     Pursuant to the Data Management Contract, NUS provided Tiffany with a license to use "NUSdirect" which is a web-based utility data management system providing on-line access to certain Tiffany utility billing data.  (Ex. E, Mogel Tr., 158:16-159:4).

30.     Tiffany admitted in discovery that the Data Management Contract was not intended to compensate NUS for any recommendations it made for utility cost savings and refunds.  (Palfini Tr., 35:13-21).

31.     NUS was not compensated for any part of its claim in this case relating to the Manhasset Store by any payment received pursuant to the Data Management Contract.  (Frankel Aff., para. 19).

**D.      NUS and Tiffany Performed Under the Contract for Almost 15 Years.**

32.     During the period from 1992 through early 2007, the parties performed under the Contract by Tiffany's submission of utility bills and NUS's providing analysis, advice and recommendations with respect to Tiffany's utility costs.  (Frankel Aff., para. 20).

33.     During the term of the Contract NUS made approximately 96 recommendations for utility cost savings for Tiffany's various facilities.  (Frankel Aff., para.22; Ex. Z (spreadsheet setting forth a history of recommendations made by NUS to Tiffany during the parties' relationship by location, utility and other information pertaining to each recommendation); Amundsen Tr., 35:16-44:12).[6]

34.     The recommendations made by NUS during the term of the Contract were for gas and electric utilities, and suggested a variety of actions including "wheeling," meter combination, adoption of a special rider, rate changes, "direct purchase," correcting erroneous demand, participation in an energy efficiency program, tax elimination and refund, negotiation of

---

[6]      Transcript of Deposition of Christine Amundsen, conducted on March 4, 2008 ("Amundsen Tr."), is annexed to the Goodman Dec.

electric contracts with NUS acting as a broker, and the investigation and correction of an ongoing electric billing overcharge (together with obtaining a refund of erroneous payments). (Ex. Z; Frankel Aff., para. 23).

      **E.**     **NUS's Recommendation for the Manhasset Store.**

35.     At all relevant times, Tiffany purchased the commodity portion of its electricity supply for the Manhasset Store from Con Edison Solutions ("**Con Ed**").  (Frankel Aff., para. 26; Exs. C, para. 35, D, para. 14).

36.     At all relevant times, Tiffany also incurred charges from Long Island Power Authority ("**LIPA**") for the transmission and distribution portion of its electricity supply to the Manhasset Store.  (Frankel Aff., para 26; Exs. C, para, 36, D, para. 14).

37.     Pursuant to the Contract, Tiffany furnished NUS with certain data relating to the costs of electric supply, transmission and distribution purchased from Con Ed and LIPA for the Manhasset Store (the "**Manhasset Electric Data**").  (Frankel Aff., para. 27; Exs. C, para. 37, D, para. 15).

38.     Tiffany furnished the Manhasset Electric Data to NUS to enable NUS to audit and analyze the data and submit recommendations authorized by the Contract regarding refunds and savings at its Manhasset Store.  (Frankel Aff., para. 28; Exs. C, para. 38, D, para. 15).

39.     NUS thereafter analyzed the data set forth in the Manhasset Electric Data.

40.     On November 15, 2006, Christine Amundsen ("**Amundsen**") was a Senior Consultant for NUS who was assigned to the Tiffany account.  (Ex. F; Amundsen Tr., 9:20-23;63:14-17).

41.     On November 15, 2006, Bruce Mogel ("**Mogel**") was a Director Retail Facilities for Tiffany, and had been Tiffany's contact person with NUS since 1996.  (Mogel Tr., 22:23-24:11).[7]

42.     On November 15, 2006, Amundsen sent Mogel an email advising that NUS had reviewed the electric bills for the Manhasset Store and noted "an unusual usage pattern for last August and September."  Amundsen's email, in an attempt to eliminate one of the possible explanations for this anomaly, inquired as to whether Mogel was aware of anything which might account for the unusual increase in consumption.  (Ex. F).

43.     Prior to Amundsen's email to Mogel, he had been unaware of the error and had not taken any steps to correct it.  (Exs. H, F; Mogel Tr., 54:14-55:16).

44.     Mogel forwarded Amundsen's email to Sandra Lutz, one of the managers who reported to him, and directed her to ask the operations manager at the Manhasset Store for a response.  (Ex. H; Mogel Tr., 68:14-69:14).

45.     Mogel received responses to his email and concluded that "nothing different was being done" at the Manhasset Store which would explain the reason for the unusual usage pattern.  (Mogel Tr., 54:14-55:9).

46.     On November 16, 2006, Mogel sent an email to Amundsen instructing her to proceed with an investigation of the electric problem at the Manhasset Store and to advise him if anything needed "to happen at the site."  (Ex. H; Mogel Tr., 71:3-18; Frankel Aff., para. 31).

47.     Amundsen forwarded the file to a NUS Analyst for for further review and preparation of a detailed analysis report.  (Frankel Aff., para. 32)

---

[7]     Transcript of Deposition of Bruce Mogel, conducted on February 26, 2008 ("Mogel Tr."), is annexed to the Goodman Dec.

48.    As part of its analysis, NUS extracted vital billing data (i.e., kW demand, kWh consumption) from Tiffany's monthly electric bills included with the Manhasset Electric Data. (Ex. B; Frankel Aff., para. 33).

49.    NUS also examined Tiffany's current electric consumption and load profile and undertook a comparison of the current information to Tiffany's historical usage for a period of at least 12 months.  (Ex. B; Frankel Aff., para. 34).

50.    As a result of NUS' analysis, it identified overcharges as well as an ongoing billing error that were being billed to Tiffany for the period after September 19, 2006, when the Manhasset Electric Data reflected consumption and demand usage far in excess of previous levels.  NUS's review of the Manhasset Electric Data also identified that the usage surge occurred when the electric meter for the Manhasset Store was replaced.  (Ex. B; Frankel Aff., para. 35).

51.    On or about December 20, 2006, NUS sent to Tiffany a Cost Analysis Report (the "**Report**") by electronic mail.  (Ex. B).

52.    The Report was received by Mogel, an official of Tiffany duly authorized by Tiffany to receive recommendations and related communications from NUS.  (Exs. C, para. 47, D, para. 18; Mogel Tr., 41:23-43:5).

53.    The Report advised Tiffany of NUS's analysis and conclusions, including that the electric invoices reflected consumption and demand usage far in excess of previous levels and that an ongoing billing error in Tiffany's electric service bills at the Manhasset store had resulted in monthly overcharges of approximately $31,000.  The Report also provided possible explanations such as a "meter reading error, meter malfunction, computer error, administrative error, etc."  (Ex. B).

54.     The recommendation in the Report was to investigate the overcharge, obtain a refund and correct the ongoing overcharge.  (Ex. B; Amundsen Tr., 121:7-14).

55.     Tiffany admitted during discovery that the recommendation included obtaining a refund and correcting the billing error.  (Mogel Tr., 109:4-11).

56.     Mogel read the Report and it "made sense" to him.  (Mogel Tr., 40:15-41:3;49:23-50:7).

57.     Mogel believed the Report could benefit Tiffany because Tiffany would not "be paying the same meter charge."  (Mogel Tr., 50:8-12).

58.     Mogel understood that the recommendation contained in the Report would result in Tiffany obtaining a refund for overcharges it had previously paid on its electric costs.  (Mogel Tr., 50:13-18).

59.     Mogel believed there would be a financial benefit to Tiffany when the meter was fixed and it received a corrected bill from the utility company.  (Mogel Tr., 50:19-21:19).

60.     Mogel understood that if the electric bill had not been corrected, Tiffany would have been paying higher bills.  (Mogel Tr., 51:20-23).

61.     Mogel understood that fixing the bill would benefit Tiffany going forward.  (Mogel Tr., 51:24-52-5).

62.     NUS was authorized under the Contract to make recommendations which could save Tiffany money on the cost of electricity.  (Ex. A; Mogel Tr., 52:6-10).

63.     At no time did Mogel or any other Tiffany official object to the length of time between Amundsen's initial e-mail of November 16, 2006 and the date NUS sent the Report or raise any issues as to form, detail or substance of NUS' recommendation.  (Mogel Tr. 115:14-116:15).

F.    **Tiffany's Approval and Implementation of NUS's Recommendation.**

64.    During a telephone conversation on December 22, 2006, Mogel commented to Amundsen that the recommendation contained in the Report was a "great catch," and instructed Amundsen to investigate the billing error by contacting the utility suppliers.  (Ex. I; Amundsen Tr., 174:22-175:11;186:7-16).

65.    During the December 22nd phone conversation, Amundsen also advised Mogel that pursuant to NUS's standard business model, when a billing discrepancy occurred and was corrected, NUS shared in any refund to which the client was entitled and subsequently billed for shared savings that result from correcting the billing discrepancy.  Although Mogel stated he would want to negotiate the fee with NUS, he did not want to delay having NUS contact the utilities and fix the problem.  (Ex. I; Amundsen Tr., 174:22-175:11;181:3-17;186:7-16).

66.    When Amundsen referred to NUS's "standard business model," she was referring to the contract terms.  (Amundsen Tr., 181:3-17).

67.    In an email to Mogel on December 22, 2006, Palfini described the NUS Report as "another example of why" Tiffany's accounts payable department should not be processing utility invoices and expressed an interest in having NUS take over the bill paying function.  (Ex. J; Mogel Tr., 76:4-78:7; Palfini Tr., 86:7-87:20).

68.    Mogel sent an email in response to Palfini in which he noted the fact that "the potential annual savings of over $372,000.00 … could not have been caught without NUS."  Mogel also acknowledged that Tiffany could owe NUS half of the savings.  (Ex. J).

69.    On December 22, 2006, Mogel sent Amundsen by facsimile Con Ed and LIPA bills covering various periods from August to November 2006.  (Ex. QQ; Mogel Tr., 79-81).

70.      At no time did Mogel object to the Report or its contents on any ground, including that the recommendation contained in the Report was not permitted by the Contract.  (Mogel Tr., 115:14-116:15).

71.      At no time did Mogel object to the length of time between his November 16, 2006 email with Amundsen and the date NUS sent the Report.  (Mogel Tr., 115:14-116:15).

72.      Mogel signed a letter written on Tiffany's letterhead which was to be submitted to the utility companies for the purpose of giving the utilities permission to work with NUS on Tiffany's behalf.  (Ex. P; Mogel Tr., 75:2-76:3).

73.      NUS was authorized to use the letter in connection with its efforts to correct the electric service billing at the Manhasset Store.  (Ex. P; Mogel Tr., 75:23-76:3).

74.      Mogel approved the recommendation contained in the Report.  (Exs. P, J, QQ, I; Frankel Aff., para. 41).

75.      On December 22, 2006, Amundsen sent a letter to LIPA by facsimile in which she informed LIPA of the elevated consumption and demand readings on Tiffany's account and requested that LIPA investigate whether an error had occurred, correct the meter so that it properly records all future usage and credit the account for all past overcharges.  Amundsen also included a copy of the Letter of Authorization signed by Mogel.  (Exs. L, M; Amundsen Tr., 188:2-190:11; Schwarting Tr., 29:12-30:6).

76.      Amundsen attempted to contact LIPA on December 22, 2006, but it was closed for the Christmas holiday.  (Ex. CC; Amundsen Tr., 187:8-21).

77.      On December 26, 2006, Amundsen spoke with LIPA's Billing Supervisor, Kathleen Schwarting ("**Schwarting**"), about the potential overcharge and cost savings.  As a result, Schwarting put a hold on all billing for Tiffany's account, put in a rush request for a field

investigation and designated Lisa Quinn ("**Quinn**") as an individual at LIPA who would be working on the matter.  (Exs. N, O; Frankel Aff., para. 44; Amundsen Tr., 195:11-196:8; 204:11-205:4).

78.    Shortly thereafter Amundsen contacted Con Ed to advise it of the LIPA billing error and began discussions regarding the correction of Con Ed's billing.  (Frankel Aff., para. 45).

79.    On January 3, 2007, LIPA's investigator, James Espy ("**Espy**"), performed a field investigation and concluded that the high electric bill at Tiffany's Manhasset Store was simply caused by the application of an incorrect meter multiplier.  Specifically, Espy noted on his report entitled "Results of Field Investigation" that the meter multiplier was listed on Tiffany's bill history as 180 and stated that the correct multiplier is 80.  (Ex. Q; Frankel Aff., para. 46; Schwarting Tr., 79:6-81:13).[8]

80.    Espy was wrong because Tiffany's correct multiplier was later determined to be 120.  (Schwarting Tr., 81:24-82:19).   Espy's investigation was also flawed because although he concluded the meter multiplier was correct for the neighboring store operated by Polo/Ralph Lauren ("**Polo**"), he failed to detect anything about a meter mis-tagging.  (Ex. Q; Schwarting Tr., 81:14-82:2; 99:11-100:17).  Based upon Espy's faulty work LIPA believed the billing problem had been rectified.  (Schwarting Tr., 104:3-17).  In fact, its records show "field investigation complete" as of January 5, 2007.  (Ex. R).

81.    The meter multiplier in conjunction with the meter readings is used to calculate the monthly demand kW and energy kWh used for billing purposes.  (Frankel Aff., para. 47; Frankel Tr., 25:7-15).

---

[8]    Transcript of Deposition of Kathleen Schwarting, conducted on May 6, 2008 ("Schwarting Tr."), annexed to the Goodman Dec.

82.    NUS reviewed the results of LIPA's investigation and determined that the application of the incorrect meter multiplier accounted for only about one-half of the total billing error and ongoing increased charges.  As a result, NUS requested Tiffany to provide a connected load study for the Manhasset Store to aid in its further investigation. (Exs. S, T).

83.    The connected load study showed the equipment (*i.e.*, lighting, etc.) in the Manhasset Store so that NUS could calculate the maximum levels of kW (demand) and kWh (consumption) that could be created by such equipment and confirm that the lower billing data prior to the error was not a potential underbilling that could result in additional charges to Tiffany.  (Exs. S, T; Frankel Aff., para. 49; Amundsen Tr., 217:18-223:15).

84.    The study confirmed NUS's findings that there had been a billing error which resulted in monthly overcharges and that the original findings of LIPA did not correct the entire problem.  Specifically, the connected load study showed that the level of kW and resulting kWh billed to the Manhasset Store could not be reached with the equipment being used by Tiffany. (Exs. S, T; Frankel Aff., para. 50).

85.    NUS contacted LIPA to further investigate the recovery of past overcharges and correction of ongoing billing errors on future bills and discuss NUS's findings on LIPA's initial conclusions.  As a result of its discussion with LIPA, NUS determined that the next step would be to contact the landlord's representative for the mall where the Manhasset Store was located. (Ex. OO; Frankel Aff., para. 51; Amundsen Tr., 212:12-15).

86.    On January 12, 2007, Amundsen contacted Tiffany's landlord's representative about the possibility that during recent work at the mall where the Manhasset Store was located (**"Mall"**) there were cross-wired circuits resulting in the overcharges and higher billing to

Tiffany and determined that the next step would be to speak to the Mall's electrical contractor. (Ex. U; Frankel Aff., para. 52; Amundsen Tr., 212:12-15).

87.    On January 15, 2007, David Brown ("**Brown**"), a vice president of NUS who filled in for Amundsen because she was ill, contacted the electrical contractor for the Mall and advised it of the electric service billing error, the facts which NUS had discovered to date and NUS's suggestions as to possible causes of the billing error.  (Ex. U; Frankel Aff., para. 53).

88.    Brown arranged for an inspection of the site by the electrical contractor who determined that LIPA had "mis-tagged or mis-labeled" the newly installed meters for the Manhasset Store and a neighboring store in the Mall so that the recorded usage/demand for Tiffany was actually usage for a neighboring store.  (Ex. U; Frankel Aff., para. 54).

89.    NUS reported to LIPA that the electrical contractor had confirmed the incorrect labeling of the meters and arranged for another site survey to be taken by LIPA.  (Ex. W; Frankel Aff., para. 55).

90.    On or about January 19, 2007, LIPA's Espy performed another site survey together with another utility representative and Albertson's representative.  (Ex. R; Schwarting Tr., 101:10-102:8).  At that point it was confirmed by LIPA that the meter pans, into which the new meters were placed, were mislabeled.  (Schwarting Tr., 84:3-21).  As a result of the mislabeling, Tiffany was receiving incorrect bills based upon Polo's usage.  (Schwarting Tr., 124:10-17; Frankel Aff., para. 56).

91.    NUS next confirmed that LIPA would re-bill Tiffany for the billings issued subsequent to September 19, 2006, with interest, and correct future billings so they reflected the lower, and appropriate, demand and usage readings and associated charges.  (Ex. X).

92.     NUS also contacted Con Ed to advise that LIPA would be rebilling the erroneous invoices and that it should expect information from LIPA, which would allow it to correct its invoices and future billings.  (Ex. X; Frankel Aff., para. 58).

93.     NUS obtained refunds for Tiffany totaling approximately $67,021.58 for overcharges on its electric service at the Manhasset Store.  (Frankel Aff., para. 59).

94.     Effective with the LIPA and Con Ed invoices dated March 27, 2007 and March 29, 2007, respectively, the ongoing billing error was corrected with respect to Tiffany's electric service at the Manhasset Store.   (Frankel Aff., para. 60).

95.     On behalf of Tiffany, NUS implemented the recommendation contained in the Report.  (Frankel Aff., para.61).

96.     In an e-mail exchange between Mogel and Palfini Mogel stated:  "The question is, without NUS, when would we have discovered this?  A month, a year?"  (Ex. K).

97.     In an email dated January 16, 2007, Mogel told Palfini: "**The way I read the contract, we will owe them [NUS] $945,000.**"  (Ex. K (emphasis added)., Mogel Tr., 107:9-15).

**G.     The Billing Error Was Ongoing In Nature.**

98.     For LIPA to correct an electric bill it needs a billing error to come to its attention either through an internal "error memo" or through a complaint from the customer.  (Schwarting Tr., 141:17-22).

99.     When she spoke with Amundsen on December 26, 2006, Schwarting had no knowledge of the billing problem that Amundsen brought to her attention and is unaware of any LIPA record showing that anyone at LIPA was aware of the billing problem before December 26, 2006.  (Schwarting Tr., 70:17-72:2).

100.    According to Tiffany's Accounts Payable Manager, Eric Ziegler ("**Ziegler**"), before Tiffany paid LIPA and Con Ed invoices it did not analyze the invoices for their correctness, and Ziegler would have continued to approve for payment the electric bills for the Manhasset Store until he was told by someone not to make payment.  (Ziegler Tr., 14:18-16:2;18:4-14;94:12-16). [9]

101.    The billing error which appeared on Tiffany's electric bills was an ongoing billing error which would not have corrected on its own.  (Schwarting Tr., 141:3-14; Ziegler Tr., 14:18-16:2;18:4-14;94:12-16).

### H.    The Computation of NUS's Fee Under the Contract.

102.    Pursuant to the Contract, NUS is entitled to be paid fifty (50%) percent of the savings realized by Tiffany for a period of sixty (60) months as a result of the correction of the ongoing billing error on Tiffany's electric service purchases at the Manhasset Store ("**Savings**"). (Ex. A).

103.    The Savings under the Contract are calculated as follows: for each month of the sixty (60) month savings participation period, commencing with the first correctly rendered bill after Tiffany's implementation of NUS's recommendation (the billing period December 27, 2006 to January 25, 2007), the current costs paid for electric service at the Manhasset Store (previously defined as "**Present Costs**") are to be subtracted from the costs that Tiffany would have paid had the electric service bills of LIPA and Con Ed not been corrected as recommended by NUS (previously defined as "**Former Costs**").  (Brown Aff., para. 14).

104.    Pursuant to the Contract, NUS's fee is calculated as fifty (50%) percent of the difference between the Former Costs and Present Costs.

---

[9]    Transcript of Deposition of Eric Ziegler, conducted on April 8, 2008 ("Ziegler Tr."), annexed to the Goodman Dec.

105.    Based upon actual billing and usage data for the first fourteen months (December 27, 2006 to February 26, 2008) of the sixty month savings participation period, the total amount of savings realized by Tiffany is $432,586.48, and NUS's fee based thereon is **$216,293.24**.  The average monthly savings during such fourteen month period is $30,899.04, and NUS's average monthly fee during such period is $15,449.52.  According to a projection based upon this average savings and fee calculation, NUS is entitled to an additional **$710,677.92** as its fee for the remaining forty-six months of the savings participation period (fifty (50%) percent of the gross savings of $1,421,355.80 (46 months X $30,899.04)).  (Brown Aff., paras. 16, 20; Exs. FF, GG).

106.    Tiffany also received refunds from LIPA and Con Ed in the aggregate sum of $67,021.58 with respect to overcharges for electric service at the Manhasset Store.  (Brown Aff., para. 17).

107.    Pursuant to the Contract, NUS is entitled to be paid fifty (50%) percent of the refunds realized by Tiffany for the electric service overcharges ("**Refunds**").  (Ex. A, para. 5b).

108.    NUS's fee for the Refunds is equal to **$33,510.79**.  (Brown Aff., para. 17).

109.    NUS's total fees under the Contract are **$964,906.29**, calculated as the sum of **$216,293.24** (fee for savings based upon actual billings for 14 months) plus **$710,677.92** (projected fee for remaining 46 months using average monthly fee) plus **$33,510.79** (fee for refunds), adjusted upward by **$4,424.34**.  The adjustment was necessary because the billing credits issued by LIPA each month need to correctly match the billing charges reflected on Con Ed invoices.  (Brown Aff., para. 18; Exs. FF, GG).

Dated:  New York, New York
        September 4, 2008

                                        HARTMAN & CRAVEN LLP


                                        By:  s/ Peter G. Goodman
                                            Peter G. Goodman (PG-4210)
                                        488 Madison Avenue
                                        New York, New York 10022
                                        (212) 753-7500

                                        *Attorneys for Plaintiff*
                                        *National Utility Service, Inc.*

TO:     Jeffery A. Mitchell, Esq.
        E. Timothy McAuliffe, Jr., Esq.
        DREIER LLP
        499 Park Avenue
        New York, New York 10022
        (212) 328-6100
        *Attorneys for Defendants*
        *Tiffany & Co. and Tiffany and Company*