UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
                           :

NATIONAL UTILITY SERVICE, INC.,        :

                  Plaintiff,      :

                -against-     :   Case No.: 07 CV 3345

                        :   (RJS)(GWG)

TIFFANY & CO. and TIFFANY AND    :
COMPANY,                     :

              Defendants.    :

------------------------------------------------------------------X

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND
IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR
SUMMARY JUDGMENT**

HARTMAN & CRAVEN LLP
488 Madison Avenue, 16th Floor
New York, New York 10022
(212) 753-7500

*Attorneys for Plaintiff*
*National Utility Service, Inc.*

Of Counsel:

Peter G. Goodman
Dana V. Syracuse

## <u>TABLE OF CONTENTS</u>

Table of Authorities ......................................................................................................... ii

Preliminary Statement ........................................................................................................1

Statement of Facts ..............................................................................................................3

    A.  The Contract ...........................................................................................................3

    B.  NUS identifies an ongoing billing error and submits a recommendation ............4

    C.  Tiffany Accepts and Implements NUS's recommendation......................................6
        1.  Tiffany compliments NUS and authorizes it to proceed.................................6
        2.  Tiffany implements the recommendation and secures
           a refund and ongoing savings .........................................................................7

Argument ..........................................................................................................................11

       POINT I:
       SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF NUS AND
       AGAINST TIFFANY BECAUSE NO GENUINE ISSUE OF FACT EXISTS AS
       TO ANY ELEMENT OF NUS'S CLAIM FOR BREACH OF CONTRACT.................11

         A.  The Legal Principles ........................................................................11
            1.  The disputed issues on summary judgment ................................11
            2.  Principles of contract interpretation.........................................12

         B.  There is no genuine issue of fact whether NUS's recommendation
            qualified for payment under the Contract ........................................13

         C.  There is no genuine issue of fact that Tiffany realized a
            "savings" as contemplated by the Contract ....................................19

         D.  NUS is entitled to recover its share of all the refunds
            received by Tiffany ..........................................................................21

         E.  NUS's damage calculations are not speculative and
            are based on the Contract ................................................................22

## TABLE OF AUTHORITIES

*Allied Supermarkets, Inc. v. National Utility Service, Inc.*,
  Civil Action No. 32336 (E.D. Mich. 1974) ............................................................23

*Ananta Group, Ltd. v. Jones Apparel Group, Inc.*,
  2001 WL 648926 (S.D.N.Y. June 11, 2001) ...................................................12, 13

*Aniero Concrete Co. Inc. v. New York City Construction Authority*,
  1997 WL 3268 (S.D.N.Y. January 3, 1997) ...........................................................22

*Compagnie Financiere de CIC et de L'Union Europeenne v.*
  *Merrill Lynch, Pierce, Fenner & Smith Inc.*,
  232 F.3d 153 (2d Cir.2000)......................................................................................12

*Innophos Inc. v. Rhodia*,
  S.A., 882 N.Y.3d 25, 29 (2008) ...............................................................................18

*JA Apparel Corp. v Abboud*,
  2008 WL 2929533*6 (S.D.N.Y. June 5, 2008) ......................................................18

*Klagsbrun v. Ross*,
  1995 WL 43664 (S.D.N.Y. February 3, 1995) ........................................................12

*National Utility Service, Inc. v. Callahan Mining Corp.*,
  799 F. Supp. 1004 (N.D. Cal. 1990) ......................................................................25

*National Utility Service, Inc. v. Cambridge Lee Industries, Inc.*,
  Civil Action No. 02-3294 (D. N.J.) .........................................................................22

*National Utility Service, Inc. v. Savannah Foods & Industries, Inc.*,
  1994 WL 16182865 (Sept. 9, 1994, D. N.J.), aff'd in part, vacated in part,
  61 F.3d 895 (3d Cir. 1995), cert. denied, 516 U.S. 1047 (1996) ...........15, 16, 23, 24

*Porter v. Property Damage Control Group, Inc.*,
  2007 WL 2907403 (Sept. 28, 2007 E.D.N.Y.) ......................................................13

*Sayers v. Rochester Tel. Corp. Supplemental Management Pension Plan*,
  7 F.3d 1091 (2d Cir.1993).......................................................................................12

*Seiden Assoc. Inc. v. ANC Holdings, Inc.*,
  959 F.2d 425 (2d Cir.1992)......................................................................................12

*Shaw Group Inc. v. Triplefine Int'l Corp.*,
  322 F.3d 115 (2d Cir. 2003).....................................................................................18

*Shepley v. New Coleman Holdings Inc.*,
  174 F.3d 65, 72 n. 5 (2d Cir.1999).........................................................................................13

*Ten Seventy One Home Corp. v. Liberty Mut. Fire Ins. Co.*,
  2008 WL 2464187 (S.D.N.Y., June 18, 2008) ........................................................................18

*Utility Audit, Inc. v. Horace Mann Service Corporation*,
  383 F.3d 683 (7th Cir. 2004) ........................................................................................... 14-16

*Wells Fargo Bank Minnesota v. Brooks America Mortgage Corp.*,
  2004 WL 2072358 (S.D.N.Y. Sept. 14, 2004)........................................................................20

*Wis-Pak, Inc. v. National Utility Service, Inc.*,
  2002 WL 32341818 (W.D. Wis. Sept. 16, 2002),
  *aff'd* 65 Fed. Appx. 84, 2003 WL 21130017 (7th Cir. 2003) ........................................... 20-21

**<u>Preliminary Statement</u>**

This case involves a claim for payment for consulting services which, at the time of being rendered, Tiffany[1] complimented as a "great catch" and accepted without question as to their quality, sufficiency or timeliness.  Tiffany, however, upon reviewing its 15 year old consulting agreement and realizing the extent of its own liability, then decided to employ a strategy of wait and negotiate.  In essence it deliberately allowed National Utility Service, Inc. ("**NUS**") to complete the performance of its services and then attempted to negotiate the amount of the fee.  Only when this strategy failed and litigation ensued did Tiffany fabricate a variety of arguments concerning the actual services provided to avoid payment.

It is therefore not surprising that Tiffany's motion reads like a closing argument to a jury; it is chock-full of immaterial arguments which, even if considered, are unsupported by the record.  The fundamental issue in the case is whether Tiffany achieved compensable electric cost "savings" for its Manhasset Store[2] when it indisputably implemented NUS's recommendation to investigate the ongoing electric service billing error, obtain a refund of the erroneous charges and correct the error.  Thus, Tiffany's references to the alleged delay in generating the written recommendation, its conspiracy theory that NUS hid the solution to the billing error, its claims that the solution to the error was simple and easy to find and its assertion of "chicanery" in the calculation of NUS's damages, are of no consequence.

Tiffany's claim that the recommendation was "generic" is baseless.  NUS's recommendation was both specific and tailored to the particular billing error it had identified with regard to the Manhasset Store.  NUS's report and recommendation not only identified the error but also offered possible explanations and provided a specific suggested course of action.

---

[1]    "Tiffany" or "Defendants" refers collectively to defendants Tiffany & Co. and Tiffany and Company.
[2]    "Manhasset Store" refers to the Tiffany retail store located at 1980 Northern Blvd., Manhasset, New York.

Tiffany attempts to belittle the work performed when NUS implemented the recommendation for Tiffany by claiming it was little more than a telephone call. This charge is also baseless. Considering LIPA's initial misdiagnosis of the problem (as revealed by NUS's further analysis, including the review of a connected load study of the premises) and NUS's multiple contacts with the utilities, Tiffany's landlord and electrical contractor, NUS's work in implementing the recommendation was both substantial and valuable.

There is no issue of fact whether the cost reductions achieved are "savings" under the parties' contract. The cost reductions realized by Tiffany constitute "savings" under the plain, dictionary definition of the word. Further, there is no merit to Tiffany's contention that the reductions are not savings because the mistaken electric costs were not Tiffany's but were its neighbor's. Among other things, this argument unreasonably limits the scope of NUS's services and places NUS in a no-win situation – if it finds and corrects the error it receives no compensation and if it fails to identify and correct the error, it surely would be criticized for failure to perform. Clearly the intention of the parties was that NUS would identify any and all cost savings opportunities, including the identification and correction of all errors.

As for damages, Tiffany's smokescreens about the timing and format of NUS's calculations should be summarily rejected. NUS did not create phony calculations but simply utilized the same methodology for calculating its fee which has been accepted by other courts. There is nothing speculative about NUS's damage calculations and Tiffany fails to provide any reason for rejecting them. The claim of billing irregularities, just like Tiffany's other assertions, is obviously an afterthought manufactured for litigation.

**Statement of Facts**

**A.    The Contract.**

NUS is a New Jersey corporation that has been providing energy cost consulting services for 75 years.  NUS maintains offices in 11 countries, employs 450 professionals and provides services to approximately 20,000 utility intensive businesses around the world.  (Frankel Aff., para. 3).[3]  NUS and Tiffany[4] entered into a utility cost consulting Contract dated April 7, 1992 ("**Contract**").  (Ex. A).[5]  The Contract obligated Tiffany to send energy and telecommunications ("**Energy**") bills to NUS each month during the term of the Contract and authorized NUS to analyze Tiffany's Energy expenditures.  Pursuant to the Contract NUS was authorized to submit recommendations for savings and refunds on Tiffany's Energy costs.  (Ex. A, paras. 1, 2).  The Contract did not explicitly define the terms "savings" or "refunds" nor did it limit the type of recommendation which NUS was authorized to submit.  (Ex. A; Strohl Tr., 27:4-28:16; Palfini Tr., 43:11-50:19).

Under the Contract Tiffany is obligated to pay NUS a "performance fee" of fifty (50%) percent of each refund realized and "fifty (50%) percent of each savings realized for a period of sixty (60) months" if any NUS recommendation is "subsequently implemented."  (Ex. A, paras. 3, 5).

The term of the Contract is five years and continues for consecutive five year terms unless cancelled by written notice at least 30 days prior to the beginning of the new term.  (Ex. A, para. 7).  If NUS's participation in a savings is not complete at the expiration of the Contract,

---

[3]        Affidavit of Arnold Frankel, sworn to on September 4, 2008.
[4]        The Contract was signed by "Tiffany & Company," which is a hybrid of the parent company "Tiffany & Co." and its subsidiary "Tiffany and Company."  Dale Strohl, who signed the Contract for Tiffany, did not know whether he signed the Contract on behalf of the parent or the subsidiary.  (Strohl Tr., 19:11-21:6).
[5]        References to exhibit letters and to deposition transcripts are to the Declaration of Peter G. Goodman, dated September 4, 2008.

then Tiffany will continue to pay NUS as outlined in the Contract and send Energy invoices covering the locations where the savings are in effect. (Ex. A, para. 6).

NUS and Tiffany negotiated and entered into a separate contract entitled Data Management Service Agreement (the "**Data Management Agreement**"), dated March 7, 2006, pursuant to which NUS provided Tiffany with a license to use its web-based utility data management system called "NUSdirect." (Ex. E; Mogel Tr. 158:16-159:9). The fees NUS received in connection with the Data Management Agreement were not intended to compensate NUS for any recommendations it made for utility cost savings and refunds under the Contract. (Palfini Tr., 35:7-21).

### B.    NUS identifies an ongoing billing error and submits a recommendation.

As a result of its ongoing review of Tiffany's electric bills, NUS identified an "unusual usage pattern" for the months of August and September 2006 at Tiffany's store located in Manhasset, New York ("**Manhasset Store**").[6] On November 15, 2006, Christine Amundsen ("**Amundsen**"), a Senior Consultant for NUS assigned to the Tiffany account, informed Bruce Mogel, Tiffany's Director Retail Facilities and NUS's longstanding Tiffany contact ("**Mogel**"), of the situation by email. (Ex. F; Amundsen Tr., 9:20-23; 63:14-17; Mogel Tr., 22:23-24:11). Amundsen's email, in an attempt to eliminate one of the possible explanations for this anomaly, inquired as to whether Mogel was aware of anything which might account for the unusual increase in consumption. (Ex. F). Prior to Amundsen's email to Mogel, he had been unaware of the error and had not taken any steps to correct it. (Ex. G; Mogel Tr., 54:14-55:16; Amundsen Tr., 70:5-9).

---

[6]    During 2006 Tiffany was billed by Long Island Power Authority ("**LIPA**") for the transmission and distribution portion of its electricity supply to the Manhasset Store, and purchased the commodity portion of its electricity supply from Con Edison Solutions ("**Con Ed**"). (Frankel Aff., para. 26).

Mogel forwarded Amundsen's e-mail and observations to other Tiffany personnel in order to determine whether something "different was being done" at the Manhasset Store which would explain the reason for the unusual usage pattern.  (Ex. H; Mogel Tr., 54:14-55:9).  The responses received from Tiffany's personnel indicated that they could not explain the increase in usage and, on November 16, 2006, Mogel sent an e-mail to Amundsen instructing her to proceed with an investigation of the electric problem at the Manhasset Store and to advise him if anything needed "to happen at the site."  (Ex. H; Mogel Tr., 71:3-18).

Amundsen, whose main responsibility was serving as the primary liaison with her clients for the purpose of implementing recommendations, forwarded the file to an Analyst for further review and preparation of a detailed analysis report.   (Frankel Aff., para. 32; Amundsen Tr., 71:19-72:3; 74:22-78:25).

On December 20, 2006, NUS sent to Tiffany a Cost Analysis Report ("**Report**") by email.  (Ex. B).  Mogel received the Report as he was authorized by Tiffany to receive such recommendations and related communications from NUS.  (Exs. C, D; Complaint, para. 46; Answer, para. 18; Mogel Tr., 41:23-43:5).  The Report stated in pertinent part the following:

**SUMMARY**

… **Our analysis, based upon your recent consumption patterns and load profile, reveals that while your present rate is the most cost effective, a billing error which appears to be ongoing in nature, is resulting in monthly overcharges of approximately $31,000.  Therefore, in addition to a refund of approximately $93,000 for past overcharges, we project a correction of this overcharge on your account will result in an annual savings of approximately $372,000.**

**RECOMMENDATION**

**NUS Consulting Group recommends investigating this potential ongoing overcharge.  As detailed above, we estimate that in addition to a refund of approximately $93,000 for past overcharges, a correction of this ongoing overcharge will result in annual savings of approximately $372,000.**

**SUGGESTED ACTION**

NUS will initiate action to investigate [the] potential overcharge as detailed above.
We will initially approach the Provider [LIPA] to review this matter and correct your
billings.  We will then also contact your Marketer [Con Ed] to adjust their invoices
and rebill you based on the corrected usage as well.

(Ex. B, emphasis in original).

As seen above, NUS's Report and recommendation was detailed and tailored to Tiffany's specific situation.  The recommendation was to investigate the overcharge, obtain a refund and correct the ongoing overcharge.  (Amundsen Tr., 121:7-14).  Mogel read the Report and it "made sense" to him.  (Mogel Tr., 40:15-41:3:49:23-50:7).  He understood that the recommendation contained in the Report would result in Tiffany obtaining a refund for overcharges it had previously paid on its electric costs.  (Ex. B; Mogel Tr., 50:13-18).  Mogel also believed there would be a financial benefit to Tiffany when the meter was fixed and it received a corrected bill from the utility company.  (Mogel Tr., p. 50:19-51:19).  Mogel understood that if the electric bill had not been corrected, Tiffany would have been paying higher bills (Mogel Tr., 51:20-23), and also understood that fixing the bill would benefit Tiffany going forward.  (Mogel Tr., 51:24-52:5).

**C.      Tiffany Accepts and Implements NUS's recommendation.**

**1.      Tiffany compliments NUS and authorizes it to proceed.**

During a telephone conversation reviewing NUS's Report on December 22, 2006, Mogel commented to Amundsen that the recommendation contained in the Report was a "**great catch**," and instructed Amundsen to implement the recommendation.  (Ex. I (emphasis added); Amundsen Tr., 174:22-175:11; 186:7-16).  During the same phone conversation, Mogel confirmed that NUS would be entitled to share in any resulting refund but expressed a desire to negotiate with regard to any on-going savings.  (Ex. I).  At no time did Mogel or any other

Tiffany official object to the length of time between Amundsen's initial e-mail of November 16, 2006 and the date NUS sent the Report or raise any issues as to form, detail or substance of NUS' recommendation.  (Mogel Tr. 115:14-116:15).

Mogel reported to Lawrence Palfini, Tiffany's Vice President – Global Construction and Property Management Services ("**Palfini**").  (Mogel Tr., 57:3-11; Palfini Tr., 9:12-10:14). Apparently quite pleased with NUS's work, Palfini wrote to Mogel on December 22, 2006 and described the NUS Report as "another example of why" Tiffany's accounts payable department should not be processing utility invoices and expressed an interest in having NUS take over the bill paying function.  (Ex. J, p. T 43-44; Mogel Tr., 76:4-78:7; Palfini Tr., 86:7-87:20).  In Mogel's response to Palfini he stated: "Because of the potential annual savings of over $372,000.00, and given the fact that this could have not been caught [sic] without NUS, we could owe them ½ of that savings.  The question was, when would we have caught it if it not for them? . . . Shook the hell out of me." (Ex. J).  In an e-mail exchange between Mogel and Palfini approximately three weeks later the issue of compensation (not the substance or timing of the recommendation) was raised again (Ex. K, Mogel Tr., 107:9-15):

> Mogel to Palfini (January 16, 2007, 1:17 p.m.):  We have not discussed a fee for this yet.  I am awaiting resolution of the entire matter. . . .The question is, without NUS, when would we have discovered this?  A month, a year?  This matter of compensation is a very thorny issue.
>
> Palfini to Mogel (January 16, 2007, 1:21 p.m.):  I recommend we wait until they submit an invoice and understand their position and contractual basis for the claim.  I understand the existing contract has a blanket statement which may entitle them to 50% shared savings but believe that there may be some room to negotiate the final amount.
>
> Mogel to Palfini (January 16, 2007, 1:55 p.m.):  The way I read the contract, we will owe them $945,000.00.

### 2.    Tiffany implements the recommendation and secures a refund and on-going savings.

Immediately after receiving Tiffany's approval, on December 22, 2006, Amundsen sent a letter to LIPA by facsimile in which she informed LIPA of the elevated consumption and demand readings on Tiffany's account and requested that LIPA investigate whether an error had occurred, correct the meter so that it properly records all future usage and credit the account for all past overcharges.  Amundsen also included a copy of the Letter of Authorization signed by Mogel.  (Exs. L, M; Amundsen Tr., 188:2-190:11; Schwarting Tr., 29:12-30:6).[7]  On December 26, 2006, Amundsen spoke with LIPA's Billing Supervisor, Kathleen Schwarting ("**Schwarting**"), about the potential overcharge and cost savings.  In response to the call, Schwarting put a hold on all billing for Tiffany's account, put in a rush request for a field investigation and designated Lisa Quinn ("**Quinn**") as an individual at LIPA who would be working on the matter.  (Ex. N, O; Amundsen Tr., 195:11-196:8; 204:11-205:4).  Amundsen then contacted Con Ed to advise it of the LIPA billing error and began discussions regarding the correction of Con Ed's billing. (Schwarting Tr., 66:21-67:2)[8]

On January 3, 2007, LIPA's investigator, James Espy ("**Espy**"), performed a field investigation and concluded that the high electric bill at Tiffany's Manhasset Store was caused

---

[7]    Mogel had previously signed a letter written on Tiffany's letterhead which was to be submitted to the utility companies for the purpose of giving the utilities permission to work with NUS on Tiffany's behalf.  (Ex. P; Mogel Tr., 75:2-76:3).  According to Mogel, NUS was authorized to use the letter in connection with its efforts to correct the electric service billing at the Manhasset Store.  (Ex. P; Mogel Tr., 75:23-76:3).

[8]    Tiffany claims that after Amundsen's first phone call with LIPA, NUS knew that the problem was a simple billing error caused primarily by switched meters, and that NUS tried to hide this fact from Tiffany in order to "drag things out" and make it appear that NUS was performing a meaningful service when in fact LIPA was investigating on its own.  (Tiff. Br., pp. 9-11).  Whether this alleged scheme even existed is fundamentally immaterial.  Because NUS is paid its performance fee based upon Tiffany's realization refunds and savings after implementation of an NUS recommendation, any alleged attempt by NUS to trump up its work has no bearing on its entitlement to a fee.  Once the recommendation is made NUS is entitled to be paid if the recommendation is subsequently implemented and refunds or savings are realized.  Just as important, Tiffany points to no direct evidence of the scheme.  Its argument is based primarily on the alleged contrast between Amundsen's email to her superiors and her email to Mogel providing the status.  Any material difference in the communications (which is denied), proves nothing.  Moreover, Tiffany's accusation that NUS's executives "saw an opportunity to try and position this simple error into a sizeable fee" is based on a disturbingly inaccurate citation of the record (the testimony cited relates to the period *after* the error was corrected, not the beginning of the process).  Tiff. Br., p. 11.

by the application of an incorrect meter multiplier.  Specifically, Espy noted on his report entitled "Results of Field Investigation" that the meter multiplier listed on Tiffany's bill history is 180 and stated that the correct multiplier is 80.[9]  (Ex. Q; Schwarting Tr., 79:6-81:13).  In fact, Espy's initial conclusions were wrong because Tiffany's correct multiplier was later determined to be 120.  (Frankel Aff., para. 46; Schwarting Tr., 81:24-82:22).  Espy failed to detect anything about a meter mis-tagging.  (Ex. Q).  Based upon Espy's report LIPA believed the billing problem had been resolved.  (Schwarting, 104:3-17).  In fact, its records show "field investigation complete" as of January 5, 2007.  (Ex. R).  NUS, however, was not so easily convinced.

NUS reviewed the results of LIPA's investigation and determined that the application of the incorrect meter multiplier accounted for only about one-half of the total billing error and ongoing increased charges.  As a result, NUS requested Tiffany to provide a connected load study for the Manhasset Store to aid in its further investigation. (Ex. S, T).  A connected load study very simply indicates the consumption and demand profile of all electrical equipment installed at a particular premises so that an estimate of maximum levels of kW (demand) and kWh (consumption) may be calculated and compared against billed meter readings.  (Frankel Aff., para. 49).  The study confirmed NUS's findings that LIPA's adjustment of the meter multiplier did not resolve the billing error.  In short, even with the adjusted meter multiplier the combined load for the premises as indicated by the connected load study were significantly below the adjusted kW and kWh billing figures. (Amundsen Tr., 217:18-223:15).

NUS therefore contacted LIPA for further investigation.  As a result of its discussion with LIPA, NUS decided that the next step would be to contact Tiffany's landlord for the Manhasset

---

[9]      The meter multiplier is used to calculate the monthly demand kW and energy kWh used for billing purposes.  (Frankel Aff., para. 47).

Store.  (Frankel Aff., para. 51; Ex. 54; Amundsen Tr., 212:12-15).  On January 12, 2007, Amundsen contacted Tiffany's landlord about the possibility that during recent work at the mall where the store was located (**"Mall"**) there were cross-wired circuits resulting in the overcharges and higher billing to Tiffany; they determined that the next step would be to speak to the Mall's electrical contractor.  (Ex. U).

On January 16, 2007, David Brown ("**Brown**"), a vice president of NUS who filled in for Amundsen because she was ill, contacted Albertson Electric, Inc. ("**Albertson**"), the electrical contractor for the Mall, and advised it of the electric service billing error.  Brown explained the facts which NUS had discovered to date and offered NUS's suggestions as to possible causes of the billing error.  (Ex. V).  Brown also arranged for an inspection of the site by Albertson who, after the inspection, determined that LIPA had "mis-tagged or mis-labeled" the newly installed meters for the Manhasset Store and a neighboring store in the Mall operated by Polo.  As a result, the recorded usage/demand for Tiffany was actually based upon meter readings for Polo's store and *vice versa*.  (Ex. V).

NUS reported to LIPA that the electrical contractor had confirmed the incorrect labeling of the meters and arranged for another site survey to be taken by LIPA.  (Ex. W).  On or about January 19, 2007, LIPA's Espy performed a second site survey together with another utility representative and Albertson's representative.  (Ex. R; Amundsen Tr., 81:3-22; Schwarting Tr., 101:10-102-8).  At that point it was confirmed by LIPA that the meter pans, into which the new meters were placed, were mislabeled.  (Amundsen Tr., 80:9-82:2; Schwarting, 84:3-21).  As a result of the mislabeling, Tiffany was receiving incorrect bills based upon Polo's usage. (Schwarting Tr., 83:21-85:6; 124:8-23).

NUS next confirmed that LIPA would re-bill Tiffany for the bills issued subsequent to September 19, 2006, with interest, and correct future billings so they reflected the lower, and appropriate, demand and usage readings and associated charges. (Ex. X). NUS also contacted Con Ed and arranged for it to correct its invoices and future bills to reflect Tiffany's own meter readings. (Ex. X). All told, Tiffany obtained refunds totaling approximately $67,021.58 for overcharges on its electric service at the Manhasset Store. (Frankel Aff., para 59). Effective with the LIPA and Con Ed invoices dated March 27, 2007 and March 29, 2007, respectively, the ongoing billing error was corrected with respect to Tiffany's electric service at the Manhasset Store. (Exs. CC, LL).

## Argument

## POINT I

**SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF NUS AND AGAINST TIFFANY BECAUSE NO GENUINE ISSUE OF FACT EXISTS AS TO ANY ELEMENT OF NUS'S CLAIM FOR BREACH OF CONTRACT**

**A.    The Legal Principles.**

**1.    The disputed issues on summary judgment.**

To prevail on summary judgment, NUS is required to establish that there is no genuine issue of material fact with respect to each of the following elements of its claim: (1) the existence of a contract; (2) the performance by NUS of consulting services by submitting a recommendation for utility cost savings and/or refunds; (3) Tiffany's acceptance and implementation of the recommendation; (4) Tiffany's realization of cost savings and refunds,

and (5) Tiffany's breach of its obligation under the contract to pay NUS its performance fee, resulting in NUS sustaining damages.[10]

Because there is no dispute that the Contract was valid and binding and that Tiffany implemented the course of action suggested in the Report, these points will not be addressed in this brief.  (Tiffany Rule 56.1 Statement, paras. 2, 38).  However, in its motion Tiffany argues that (i) the recommendation contained in the Report was nothing more than a "general suggestion" without "a specific course of action likely to achieve resolution"; (ii) the funds recovered and ongoing cost reductions it received after the implementation of the recommendation were not "refunds" and "savings" as contemplated under the Contract, and (iii) NUS's damages are improperly speculative.  Each of these arguments corresponds with an element of NUS's *prima facie case* and will be addressed separately.

## 2.     Principles of contract interpretation.

As the court observed in *Ananta Group, Ltd. v. Jones Apparel Group, Inc.*,  2001 WL 648926 * 4 (S.D.N.Y. June 11, 2001):

> Generally, summary judgment is appropriate in a contractual dispute only when the language of the contract is "wholly unambiguous." *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.,* 232 F.3d 153, 157 (2d Cir.2000). Contract language is unambiguous if it has "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference in opinion." *Seiden Assoc. Inc. v. ANC Holdings, Inc.,* 959 F.2d 425, 428 (2d Cir.1992) (citation omitted) (brackets in original). "Contract language is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Sayers v. Rochester Tel. Corp. Supplemental Management Pension Plan,* 7 F.3d 1091, 1095 (2d Cir.1993) (citation omitted). Whether contract language is ambiguous is a question of law to be decided by the court. *Compagnie Financiere,* 232 F.3d at 157.

---

[10]     *See*, *Klagsbrun v. Ross,* 1995 WL 43664 (S.D.N.Y. February 3, 1995) ("The elements essential to a breach of contract claim are (1) a contract; (2) due performance by plaintiff; (3) breach of the contract by defendant; and (4) damages resulting from the breach.")

NUS contends that the Contract is unambiguous; Tiffany has denied this allegation.

(Exs. C, D, Complaint, para. 31, Answer para. 12).  Even if the court finds the Contract to be

ambiguous, it can and should find in favor of NUS.[11]

> Although ambiguous contractual language must usually be interpreted by a
> factfinder, a court can determine the meaning of *ambiguous* contract language as
> a matter of law "if there is no extrinsic evidence to support one party's
> interpretation of the ambiguous language or if the extrinsic evidence is so one
> sided that no reasonable factfinder could decide contrary to one party's
> interpretation." *Id.* at 159. A court can also determine the meaning of ambiguous
> contract language as a matter of law "when the language is ambiguous and there
> is relevant extrinsic evidence, but the extrinsic evidence creates no genuine issue
> of material fact." *Id.* at 158 (quoting *Shepley v. New Coleman Holdings Inc.,* 174
> F.3d 65, 72 n. 5 (2d Cir.1999) (citation omitted)).

*Ananta Group, Ltd. v. Jones Apparel Group, Inc.*, 2001 WL 648926 at *5.

Finally, the general rule cited by Tiffany that the court may construe an ambiguity against

the drafter is "applied by New York courts only as a matter of last resort after all aids to

construction have been employed without a satisfactory result."  *Porter v. Property Damage

Control Group, Inc.*, 2007 WL 2907403 *5 (Sept. 28, 2007 E.D.N.Y.) (internal quotations and

citations omitted).

**B.    There is no genuine issue of fact whether NUS's
       recommendation qualified for payment under the Contract.**

Tiffany's claim that the recommendation contained in the Report was "generic" is

disingenuous.  If this were the case, why would Mogel, after receiving the Report both

compliment Amundsen directly for a "great catch," and later send an e-mail to Brown

(Amundsen's superior) that the "level of service we have received from NUS and Christine

[Amundsen] in particular, regarding this situation is outstanding and much appreciated"?  (Ex. I).

---

[11]    Alternatively, if the court declines to grant summary judgment in favor of NUS, the court should deny
Tiffany's motion and find that fact issues exist with regard to the disputed matters.

Moreover, the emails exchanged between Palfini and Mogel at the time of the submission of the Report establish that the substance and specificity of the recommendation were not at issue, and that both officials understood the recommendation and the specific course of action suggested by NUS. The emails focus exclusively on Tiffany's potential liability arising from the implementation of the recommendation and the possibility of negotiating NUS's compensation at some time in the future. There is no evidence that before the claim was filed Tiffany believed the recommendation was deficient in any way. In fact, at the time of the Report and the implementation of the recommendation it appears that Tiffany's strategy was to allow NUS to do the work and subsequently haggle over the amount of NUS's compensation. Only after negotiations were unsuccessful did Tiffany raise this issue. (Frankel Aff., para. 64).

In an attempt to recast NUS's recommendation, Tiffany takes the position that the recommendation was merely to investigate. However, *by Tiffany's own admission the recommendation included the correction of the billing error as well as securing a refund and ongoing cost reduction*. (Mogel Tr., 109:4-11). Despite these admissions, at Amundsen's deposition Tiffany's counsel tried in vain to have her admit that the recommendation was simply to "investigate." But Amundsen testified consistent with the clear language of the Report; the recommendation was to *investigate the overcharge, obtain a refund and correct the ongoing overcharge*. (Amundsen Tr., 121:7-122:4).

Tiffany relies exclusively on *Utility Audit, Inc. v. Horace Mann Service Corporation*, 383 F.3d 683 (7th Cir. 2004) ("*Utility Audit*"), a case involving a claim by a utility auditor for payment of a contingent fee with respect to savings realized by its customer's switch of long-distance carriers. While factually distinguishable, *Utility Audit* is instructive with respect to its interpretation of the contract term "recommendation."

14

The customer contracted with Global Crossing, and therefore did not follow either of the auditor's particular recommendations to re-sign with its current long distance carrier (MCI) or accept a proposal from other specifically identified carriers.  The auditor therefore urged the court to apply the broad definition of "any [`]advice or counsel,[']" and find that its advice "to remain with MCI unless it found cheaper rates elsewhere" was sufficient to constitute a recommendation under the contract.  *Id.*  The court found that this "advice was so broad that it included the entire universe of options available" to the customer and therefore rejected the auditor's interpretation because it would lead to an "irrational result."  *Id.*

In this case, NUS's Report identified a specific ongoing billing error and its approximate amount, explained the date of the onset of the apparent error and correlated it with the date of the replacement of the meter, provided historic detailed usage, consumption, demand profile and charges applicable to the electric service and contrasted the data with the erroneous bills, hypothesized possible causes of the error (one of which proved to be accurate[12]), projected the amount of the expected refund and savings, and *advised Tiffany to investigate the overcharge, obtain a refund and correct the ongoing overcharge*.  NUS indisputably provided specific information, analysis and advice tailored to Tiffany's electric service at the Manhasset Store and then proceeded to conduct the investigation and obtain the refund and savings on behalf of Tiffany.

Significantly, the court in *Utility Audit* distinguished *National Utility Service, Inc. v. Savannah Foods & Industries, Inc.,* 1994 WL 16182865 (Sept. 9, 1994, D. N.J.), *aff'd in part, vacated in part,* 61 F.3d 895 (3d Cir. 1995), *cert. denied,* 516 U.S. 1047 (1996) (*"**Savannah Foods**"*), where another NUS customer attempted to avoid payment by claiming, among other

---

[12]     The Report suggested that an "administrative error" could be the cause of the overcharge.  Lawrence Affrunti, the electrician from Albertson who performed a site inspection of the meters at the Mall, characterized the cause of the overcharge as a "clerical error."  (Affrunti Tr., 33:17-25).

things, that the recommendation was inadequate within the meaning of a similarly worded NUS

contract.  NUS had submitted a report which suggested that the customer renegotiate its contract

with its natural gas supplier.  If the supplier expressed an unwillingness to renegotiate, the customer

"should **investigate** ways of receiving [its] natural gas from various wellhead producers, depending

on the outcome of" a Federal Energy Regulatory Commission hearing.  *Id.,* at *9-10 (emphasis

added).  The customer faulted the report for failing to include information such as where to find the

gas, and the cost of the gas and the transportation.  The court was not persuaded and found that the

recommendation "suggest[s] a contingent plan … but constitutes a suggested course of conduct

which Savannah ultimately employed successfully."  *Id.* at *10.  Thus, NUS was awarded summary

judgment in the principal amount of almost $3,000,000.[13]

The *Utility Audit* court observed that the *Savannah Foods* recommendation was "specific

and provided guidance based on recent changes in the law, as opposed to Utility Audit's general

suggestion to find cheaper rates."  *Utility Audit*, 383 F.3d at 688.  Here, NUS's recommendation

was even more specific than the one at issue in *Savannah Foods* and, in further contrast, *NUS*

*implemented the recommendation on behalf of Tiffany*.  Also, Tiffany's failure to identify any

additional information or advice which it asserts NUS should have provided, suggests that NUS

provided as much information and advice as possible at that time.[14]

Moreover, Tiffany's argument that the recommendation left it with "no way out" is

incorrect and misleading.  Tiffany asserts that "[t]he spike in usage was also observed separately

---

[13]    Interestingly, the *Savannah Foods* court was influenced by the fact that the customer had begun "to make payments on what it obviously at one time believed to be a manifest obligation resulting from its actions regarding [the] recommendation."  *Savannah Foods*, at *10.  Here, Mogel's unguarded and apparently un-counseled statement that he believed Tiffany owed $945,000, together with the plain language of the Contract and the Report, compel the conclusion that no reasonable jury could find for Tiffany with respect to its assertion that the recommendation "does not offer a specific course of action likely to achieve a resolution."  (Tiff. Br., p. 8).

[14]    Although Tiffany tries to confuse the issue and make NUS look incompetent when it points out that NUS did not know whether the error was ongoing at the time of the Report, it is obvious that no one knew the precise cause or nature of the error until it was investigated (even LIPA was unable to figure out the problem until NUS questioned its initial conclusion that the meter multiplier was the exclusive cause).  (Frankel Aff., para. 44).

a week or two earlier by the Tiffany manager for Manhasset from internal store performance reports." (Tiff. Br., pp. 6-7). Assuming this were true (and resolving the matter was as simple as portrayed by Tiffany) then in response to Amundsen's November 15, 2006 email Tiffany could have stated that it knew of the anomaly and would take the necessary action to correct the situation. In essence, say thanks but no thanks to Amundsen and NUS. But to the contrary, after contacting internal personnel, *including Brian Ensor, the Tiffany official who purportedly observed the spike*, Tiffany's response was to request that NUS undertake the investigation and let it know if anything needed to happen at the site. (Ex. H, Mogel Nov. 16, 2006, 1:01 p.m. and Ensor Nov. 16, 2006, 10:58 a.m.). Tiffany actually had a "way out" early on and opted not to take advantage of it because NUS (not Tiffany) identified the anomaly and had the expertise to resolve the situation.

None of Tiffany's arguments can alter the conclusion that there is no genuine issue of fact that NUS suggested a specific course of action which constituted a "recommendation" under the Contract and which was implemented successfully by NUS on Tiffany's behalf. In the event, however, this court does not accept this conclusion, it should not find in Tiffany's favor as a matter of law, but should find there is an issue of fact whether NUS submitted a "recommendation."

**C.    There is no genuine issue of fact that Tiffany realized a "savings" as contemplated by the Contract.**

Tiffany claims that the ongoing reduction in its electricity invoices resulting from the correction of a mistake (*i.e.*, the mis-tagging of meters) does not constitute a "refund" or "savings" under the terms of the Contract. It is telling that Tiffany fails to set forth clearly its understanding of the definition of "savings" under the Contract. Instead, Tiffany's approach is "we know one when we see one" but otherwise we cannot explain it to you.

17

The dictionary definition of "saving" is "[t]he action of saving or economizing in expenditure (of money, time, labour, etc.); **an instance of this, a reduction in expenditure**." (Oxford English Dictionary, Second Edition, Volume Fourteen, Reference 423 O, pp. 529-530 (emphasis added)).  There is no qualification or limitation to the term "savings" in either the dictionary or the Contract and the court should not limit it, as urged by Tiffany, to exclude a "billing mistake by a utility."  (Tiff. Br., p. 5).  There is no justification for the court to depart from this simple, unambiguous Contract terms.  *JA Apparel Corp. v Abboud*, 2008 WL 2929533*6 (S.D.N.Y. June 5, 2008) *quoting Innophos Inc. v. Rhodia, S.A.,* 882 N.Y.3d 25, 29 (2008) ("Courts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include" … accordingly "courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing.")

Tiffany also contends that the electric costs mistakenly billed to it by LIPA were not Tiffany's costs but were Polo's costs.  Because the Contract refers to the analysis and submission of recommendations on "our costs" (*i.e.,* Tiffany's costs), Tiffany concludes that the electric cost reductions it realized are not "savings" under the Contract.  (Ex. A, para. 1).

Although the Contract uses the term "our costs," by its plain terms it also authorizes the submission of recommendations based upon NUS's review of Tiffany's bills.  (Ex. A, para. 2 "our most recent (12) months' bills[,]" "you will review old bills[,]" "continuing analysis will cover our current bills").  When all of the terms of the Contract are considered, it cannot be reasonably disputed that the reference to "our costs" must mean the costs **as they appear on Tiffany's bills**.  *Ten Seventy One Home Corp. v. Liberty Mut. Fire Ins. Co.*, 2008 WL 2464187 (S.D.N.Y., June 18, 2008) *quoting, Shaw Group Inc. v. Triplefine Int'l Corp,* 322 F.3d 115, 121

(2d Cir. 2003) (internal quotations omitted) ("the contract should be construed so as to give full meaning and effect to all of its provisions").  To hold otherwise would lead to the conclusion that NUS is not permitted to make recommendations which involve the correction of bills that are based upon another's utility usage.  As in this case, NUS would be handicapped by such an interpretation because, until the error is investigated, it is unknown whether the recommendation is permitted.  Unless NUS chose to forego making the recommendation regarding a perceived billing error (which would be to both parties' detriment), it would be in the position of recommending action at the risk that its recommendation would be found retroactively to be outside of the scope of the Contract.  Certainly the plain terms of the Contract, including the open-ended "recommendation" and "savings" terms, do not support this interpretation.[15]

This limited interpretation is also undercut by the testimony of Strohl and Schwarting. Strohl admitted that he understood that the term costs referred to costs which appeared on Tiffany's bills and it was his intent that the Contract operate in that manner.  (Strohl Tr., 43:8-17).  Schwarting also admitted that the incorrect bills rendered to Tiffany based upon Polo's usage were still considered to be Tiffany's electric service, and if Tiffany had not paid those bills *Tiffany's* service would have been terminated.  (Schwarting Tr., 124:4-125:6).[16]

Next, Tiffany asserts there was no "meeting of the minds" that a "savings" under the Contract encompassed the correction of an improperly tagged meter.  Tiffany emphasizes that a mis-tagged meter situation was not in the contemplation of the parties because NUS had never dealt with this specific situation previously.  But in view of the plain, unambiguous language of the Contract, this point is immaterial.  The Contract does not identify *any* specific type of cost

---

[15]    Had Tiffany wanted to limit the scope of the meaning of the word "savings" or "recommendation" it could and should have done so at the time it signed the Contract.  But Strohl admitted that he did not request any changes to be made.  (Strohl Tr., 25:14-20).

[16]    Tiffany also treated the erroneous costs as its own.  Mogel acknowledged that the electric "costs" at issue here were reflected in the Manhasset Store's expenses for the year.  (Ex. MM; Mogel Tr., 98:20-100:8).

savings recommendation, but is entirely open-ended. Strohl admitted there is no limitation in the type of recommendation NUS was authorized to make under the Contract.[17] (Strohl, 27:4-28:16). Moreover, the performance of the parties under the Contract evidences NUS's open-ended mandate in that it submitted recommendations for a broad array of cost savings opportunities, including an analogous tax refund and elimination recommendation, which were never objected to or rejected upon the grounds of being outside the scope of the Contract. (Tiff. Br., p. 5; Ex. Z; Frankel Aff., paras. 23, 24).

Finally, despite its admission that the case is "not controlling", Tiffany argues that its position is bolstered by *Wis-Pak, Inc. v. National Utility Service, Inc.,* 2002 WL 32341818 (W.D. Wis. Sept. 16, 2002), *aff'd* 65 Fed. Appx. 84, 2003 WL 21130017 (7th Cir. 2003) ("*Wis-Pak*"). *Wis-Pak*, however, actually supports NUS's claim because the court found that (1) the client had achieved savings from the correction of an erroneous utility bill and (2) NUS could recover if it showed that the customer took action consistent with specific recommendations made by NUS. Both facts are present here. Tiffany's reliance on *Wis-Pak* is entirely misplaced.

First, Tiffany misstates that the court in *Wis-Pak* "did not view the correction of an erroneous utility bill as falling within the contract's scope." (Tiff. Br., p. 21). In fact, the District Court nowhere reached that conclusion. In *Wis-Pak*, NUS identified an error that had escaped the attention of Wis-Pak's employees – *i.e.*, the City was billing Wis-Pak for sewer charges in excess of the correct amount. According to the court, NUS made two recommendations to correct the error: (1) install an outflow meter to measure the actual amount of water being released into the sewer; or (2) make a determination of the amount of water "lost in the course of

---

[17]    Tiffany tries to use Strohl's testimony to show that the purpose of the Contract was to obtain a reduction of costs "by reduction of rates or better usage." (Tiff. Br., p. 5). This testimony is inadmissible parol evidence because it is being used to contradict the terms of a fully integrated, unambiguous contract. *Wells Fargo Bank Minnesota v. Brooks America Mortgage Corp.*, 2004 WL 2072358 (S.D.N.Y. Sept. 14, 2004).

its operations." *Wis-Pak, Inc.,* 2002 WL 32341818 at * 5.  The court, however, found that "these two recommendations had been effectuated before the defendant [NUS] sent its report. … obviously, neither one led to the ***savings*** plaintiff [Wis-Pak] achieved. … In the end, the ***savings*** plaintiff [Wis-Pak] achieved did not come from" Wis-Pak's following a course of conduct recommended by NUS.  *Id.* (emphasis added).  It is clear from this passage that the *Wis-Pak* court recognized that the correction of a mistake does result in a savings under a similarly worded NUS contract.

Second, the court based its decision on its finding that Wis-Pak "did not implement any of [NUS's] recommendations."  *Wis-Pak, Inc.,* 2002 WL 32341818 at * 1.  Because the court stated that NUS could recover if it showed that the customer took action consistent with specific recommendations made by NUS, the case actually supports NUS's claim here.  *Id.*, at *6.  In this case there is no fact issue whether NUS's recommendation was implemented because, unlike in *Wis-Pak*, NUS actually implemented recommendation and corrected the identified error on behalf of Tiffany.

**D.    NUS is entitled to recover its share of all the refunds received by Tiffany.**

Tiffany's assertion that NUS is limited to sharing in refunds generated by the "initial review of bills that predated the 1992 Contract" has no merit.  (Tiff. Br., p. 24).  Paragraph 2 of the Contract refers to NUS's "continuing analysis" of "current bills, which [Tiffany] will send" to NUS.  (Ex. A).  Critically, Paragraph 3 provides that NUS will be paid its fee for "**any** recommendation … subsequently implemented" and Paragraph 5b. states that Tiffany agrees to pay NUS "[a] performance fee of (i) fifty (50%) percent of **each** refund realized."  *Id.* (emphasis added).  No reasonable jury could find in favor of Tiffany's narrow interpretation of the refund provisions of the Contract.

Tiffany claims that the time between Amundsen's original email to Mogel and the date of the Report (approximately five weeks) benefited NUS by increasing the amount of the refund. In light of the fact that this period included numerous holidays, and that NUS consultants manage multiple accounts, it was neither excessive nor unreasonable. (Frankel Aff., para. 38). Moreover, Tiffany cannot show that these five weeks caused it any harm.[18]

**E.     NUS's damage calculations are not speculative and are based on the Contract.**

Tiffany correctly points out that the Contract specifies that NUS's fee is payable "after such savings … are achieved." But NUS is entitled to recover as damages its entire fee, including the portion which has not yet accrued, as a result of Tiffany's anticipatory repudiation of the Contract. *Aniero Concrete Co. Inc. v. New York City Construction Authority*, 1997 WL 3268 (S.D.N.Y. January 3, 1997).

NUS's fee or damage calculations were prepared by its personnel under the supervision of NUS's Vice President in charge of operations, David Brown ("**Brown**"), who also testified at deposition as NUS's designated expert on damages.[19] Tiffany's quibble with the format and timing of the calculations is immaterial and elevates form over substance, and it is unfairly prejudicial to mischaracterize the bills as "fictional." The format of "Statement of Account" and "Invoice" is the same as that used by NUS when it renders invoices to its customers for its share of realized refunds and savings. (Brown Aff., para. 10). As for timing, the invoices were prepared late in the discovery period, after NUS received electric service bills from the utilities, all of which were required for NUS to compute its fee. (Brown Aff., para. 11). These invoices

---

[18]     The five weeks at issue had no impact on the savings. Its only potential effect on the savings would accelerate the date upon which savings is initiated.

[19]     Brown was been accepted as an expert witness on damages in *National Utility Service, Inc. v. Cambridge Lee Industries, Inc.*, Civil Action No. 02-3294 (D. N.J.). (Brown Aff., para. 8).

are not fictional but are good faith computations of damages rooted in a sound methodology that

NUS has employed for 75 years.

The methodology used to compute the fee is the same as that utilized by the court in

*Savannah Foods*.  Specifically, NUS computed the "difference between the actual billing and

what the billing would have been, but for the change" in the electric bills received by Tiffany.

(*See Allied Supermarkets, Inc. v. National Utility Service, Inc.,* Civil Action No. 32336 (E.D.

Mich. 1974)" *Savannah Foods*, 1994 WL 16182865 at *11.[20]  Thus, for each month of the sixty

month savings participation period, commencing with the first correctly rendered bill after the

implementation of NUS's recommendation (the billing period December 27, 2006 to January 25,

2007), the costs paid for electric service at the Manhasset Store ("**Present Costs**") were

subtracted from the costs that Tiffany would have paid had the electric service bills of LIPA and

Con Ed not been corrected as recommended by NUS ("**Former Costs**").[21]  (Brown Aff., para.

14).

Based upon actual billing and usage data for the first fourteen months of the sixty month

savings participation period (December 27, 2006 to February 26, 2008) the total amount of

savings realized by Tiffany is $432,586.48, and NUS's fee based thereon is **$216,293.24**.

(Brown Aff., para. 15).  Because NUS was able to obtain the utility bills for only the first

fourteen months, it projected the monthly savings, and its fee thereon, for the remainder of the

sixty month period based upon an average savings and fee for the first fourteen months.  (Brown

Aff., para. 16).  Based upon an average monthly savings during such fourteen month period of

$30,899.04, and NUS's average monthly fee during such period of $15,449.52, NUS projected

---

[20]    The court's Opinion in *Allied Supermarkets* is annexed to the Goodman Decl. as Exhibit "KK."

[21]    Tiffany makes the bizarre argument based upon its misconstruing Brown's testimony that the savings stopped once the Tiffany and Polo accounts were corrected.  Tiffany obviously has it backwards – once the accounts were fixed the savings under the Contract *began*.

that it is entitled to an additional **$710,677.92** as its fee for the remaining forty-six months of the savings participation period (fifty (50%) percent of the gross savings of $1,421,355.80 (46 months X $30,899.04)).  (Brown Aff., paras. 16, 20; Exs. FF, GG).

Much of Tiffany's argument on damages attempts to portray NUS's fee calculations as "deceitful" because, when calculating Tiffany's Former Costs, NUS applied a meter multiplier of 180.  This has the effect of driving up the Former Costs, resulting in an increase in the differential between the Former and Present Costs (the "savings") and thereby increasing NUS's fee.  This argument, and Tiffany's illustrations of its alleged extreme results (including its chart submitted as its Exhibit 31), simply miss the mark and show Tiffany's total lack of understanding as to how its billing was actually rendered by LIPA.  NUS employed the methodology previously accepted by other courts which have considered the issue; it calculated its fee as the "difference between the actual billing and **what the billing would have been, but for the change**" in the electric bills received by Tiffany.  *Savannah Foods*, 1994 WL 16182865 at *11 (emphasis added).  In the section of Brown's testimony cited by Tiffany, he explained how he computed the Former Costs.  The consumption (KWH) and demand (KW) are re-created and applied to LIPA's Rate 285 which was in effect during each respective billing period, to arrive at the Former Costs.  (Brown, 6/19/08 Tr. 26:19-27:8; Brown Aff., para. 21).  There is nothing deceitful about this methodology and Tiffany's derogatory criticism of the fee calculations should be disregarded.

NUS's calculations are not based upon conjecture, surmise or speculation.  A substantial portion of the fees for NUS's share of the savings are based upon actual usage data obtained from the utility companies for a 14 month period.  (Exs. FF, GG; Brown, 6/19/08 Tr., 23:10-25:16).  The balance of the fees is comprised of projections based upon the actual data and the

same methodology that was employed by LIPA and Con Ed in calculating their respective bills for Tiffany during the erroneous billing periods.

Furthermore, Tiffany's argument that the fee calculations are based upon the assumption that the billing error would have gone undetected for 60 months absent NUS's intervention is a "red herring." (Tiff. Br., p. 24). The 60-month participation period represents the fee which was bargained for by the parties to compensate NUS for making a recommendation implemented by Tiffany and which results in savings. If Tiffany's argument is adopted by this court, NUS would *never* be able to recover its participation fee because customers would inevitably claim they "would have" or "could have" found the recommended cost savings on their own. Tiffany's argument simply opens the door to "shenanigans" under the Contract. *See, National Utility Service, Inc. v. Callahan Mining Corp.*, 799 F. Supp. 1004, 1005-1006 (N.D. Cal. 1990) (holding that the argument for requiring a causal relationship between NUS's recommendation and the savings achieved was "undercut by the language of the contract" and noting that "[Callahan's] causation theory, if applied as a rule of law in situations such as this would permit a contracting party to engage in ... shenanigans."). Thus, the court should not hold as a matter of law that NUS's 60-month participation fee is *ab initio* speculative.

The court should also reject the argument that the fee calculations are speculative because they assume Polo's usage would have remained the same for the remaining 46 months of the 60-month period. Tiffany has offered no evidence to refute the validity of this assumption or the fees projections.[22] Nevertheless, if the court finds such assumption to be too tenuous, NUS requests that it be granted declaratory relief and specific performance of the Contract (as requested in Count IV of the Complaint).

---

[22] In fact, despite having had the opportunity, Tiffany has offered no alternative method or calculations, whether by expert or lay testimony.

Dated: New York, New York
        September 4, 2008

                                    HARTMAN & CRAVEN LLP


                                    By: s/ Peter G. Goodman
                                        Peter G. Goodman (PG-4210)
                                    488 Madison Avenue
                                    New York, New York 10022
                                    (212) 753-7500

                                    *Attorneys for Plaintiff*
                                    *National Utility Service, Inc.*