UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
NATIONAL UTILITY SERVICE, INC.,   : Case No.: 07 CV 3345
                                   : (RJS)(GWG)
          Plaintiff,   :
                                   :
      -against-            : AFFIDAVIT OF
                                   : ARNOLD FRANKEL
TIFFANY & CO. and TIFFANY AND      :
COMPANY,                           :
                                   :
          Defendants.  :
                                   :
-----------------------------------------------------------------X

STATE OF NEW JERSEY  )
                     ) ss:
COUNTY OF BERGEN     )

    ARNOLD FRANKEL, being duly sworn, states as follows:

    1.    I am Executive Vice President of the plaintiff, National Utility Service, Inc. ("**NUS**"). As such, I am fully familiar with the material facts pertaining to NUS's claim against defendants, Tiffany & Co. and Tiffany and Company (collectively, "**Tiffany**" or "**Defendants**") for payment under the parties' utility cost consulting contract. I submit this affidavit in opposition to Defendants' motion for summary judgment and in support of NUS's cross-motion for summary judgment. I make this affidavit based upon personal knowledge and documents in the possession of NUS, including its files relating to its business relationship with Defendants, with which I am familiar.

    2.    I have held the position of Executive Vice President since 1997 and have been employed by NUS since 1972, for 36 consecutive years. As such, I am familiar with NUS's business practices and its relationship with Defendants.

A.   **Parties**

   1.   ***National Utility Service, Inc.***

3.   NUS is a New Jersey corporation that has been providing energy cost consulting services for 75 years. NUS maintains offices in 11 countries, employs 450 professionals and provides services to approximately 20,000 utility intensive businesses around the world.

4.   At all times relevant hereto, NUS was, and continues to be, in the business of providing audit, analysis, procurement, data management and consulting services with regard to electricity, gas, oil and petroleum products, water, sewerage, steam and telecommunications expenditures for industrial and commercial organizations.

5.   As part of its business, NUS identifies opportunities for savings and refunds on energy and telecommunications expenditures for such industrial and commercial organizations.

   2.   ***The Defendants.***

6.   Tiffany & Co. is a corporation organized and existing under the laws of the State of Delaware. (Exs. C, D, Complaint and Answer, para. 5).[1] Tiffany and Company is a corporation organized and existing under the laws of the State of New York. (Exs. C, D, Complaint and Answer, para. 6).

5.   Tiffany & Co. and Tiffany and Company both maintain their principal place of business at 727 Fifth Avenue, New York, New York 10022. (Exs. C, D, Complaint and Answer, para. 7).

6.   At all times relevant hereto, Tiffany and Company was, and continues to be, a subsidiary of Tiffany & Co. (Ex. C, D, Complaint and Answer, para. 9).

---

[1]   All references to exhibits are to the exhibits annexed to the Declaration of Peter G. Goodman, dated September 4, 2008, and filed concurrently herewith.

2

**B.    The Utility Cost Consulting Contract**

7.    On or about April 7, 1992, Dale Strohl ("**Strohl**") signed a utility cost consulting contract with NUS which was dated April 7, 1992 (the "**Contract**"). (Ex. A). On or about April 13, 1992, on behalf of NUS I signed the "Accepted By:" portion of the Contract.

8.    At the time I signed the Contract I was a Vice President of NUS.

9.    Pursuant to the Contract, Tiffany authorized NUS to analyze Tiffany's costs for electricity, gas, oil and petroleum products, water, sewerage, steam and telecommunications. (Ex. A, paras. 1-3). Tiffany also authorized NUS to submit recommendations for possible savings and refunds on its utility costs, including electric costs. (Ex. A, paras. 1-3).

10.    The Contract contained no limitation as to the type of recommendation NUS was authorized to make with respect any of the covered utilities, including Tiffany's electric costs. (Ex. A).

11.    Pursuant to the Contract, Tiffany paid NUS a service fee in the amount of $12,000 ("**Service Fee**"), which was to be recaptured by Tiffany, in full, from the first gross savings and refunds realized. (Ex. A, para. 5; Exs. C, D, Complaint and Answer, paras. 20 and 9, respectively).

12.    Prior to its receipt of the recommendation which is the subject of this action, Tiffany recaptured the Service Fee in full.

13.    Pursuant to the Contract, Tiffany agreed to pay NUS "(i) fifty (50%) percent of each refund realized; [and] (ii) fifty (50%) percent of each savings realized for a period of sixty (60) months" as a result of the implementation of any course of action recommended by NUS. Ex. A, paras. 3, 5.

14. The term of the Contract was "five (5) years from the date of [NUS's] acceptance, and shall continue thereafter ... for consecutive five (5) year terms unless cancelled by written notice at least thirty (30) days prior to the beginning of any new term." (Ex. A, para. 7).

15. Tiffany had not provided any written notice of cancellation of the Contract until February 23, 2007. (Exs. C, D, Complaint and Answer, paras. 29 and 11, respectively).

16. Pursuant to the Contract, if a savings is in effect at the expiration of the Contract, Tiffany agreed to share the savings with NUS until the sixty (60) month shared savings period is completed, pay NUS as outlined in the Contract and send NUS information and invoices covering the location where savings are in effect. (Ex. A, para. 6).

    C.    **The Data Management Service Contract.**

17. On March 7, 2006, NUS and Tiffany entered into a separate contract entitled Data Management Service Agreement (the "**Data Management Agreement**"), pursuant to which NUS provided Tiffany with a license to use its web-based utility data management system called "NUSdirect." I was involved in negotiating the Data Management Agreement with Tiffany.

18. During the negotiations of the Data Management Agreement, Tiffany did not seek to re-negotiate the Contract with respect to any term, including the Performance Fee.

19. The Data Management Contract was not intended to compensate NUS for any recommendations it made for utility cost savings and refunds. NUS was not compensated for any part of its claim in this case by any payment received pursuant to the Data Management Contract.

    D.    **NUS and Tiffany Performed Under the Contract for Almost 15 Years.**

20. During the period from 1992 through early 2007, NUS and Tiffany performed under the Contract by Tiffany's submission of utility bills and NUS's providing analysis, advice and recommendations with respect to Tiffany's utility costs.

4

21.     During this period I attended meetings at Tiffany's offices and I was generally aware of ongoing activities with the Tiffany account.

22.     During the term of the Contract NUS made approximately 96 recommendations for utility cost savings for Tiffany's various facilities. Exhibit Z is a spreadsheet generated by NUS which sets forth a history of recommendations made by NUS to Tiffany during the parties' relationship by location, utility and other information pertaining to each recommendation.

23.     The recommendations made by NUS during the term of the Contract were for gas and electric utilities, and suggested a variety of actions including "wheeling," meter combination, adoption of a special rider, rate changes, "direct purchase," correcting erroneous demand, participation in an energy efficiency program, tax elimination and refund, negotiation of electric contracts with NUS acting as a broker, and the investigation and correction of an ongoing electric billing overcharge (together with obtaining a refund of erroneous payments).

24.     Tiffany never objected to or rejected any of these recommendations upon the grounds of being outside the scope of the Contract.

25.     The recommendation for a tax elimination and refund was analogous to the recommendation in this case because it involved obtaining a refund in connection with an ongoing erroneous tax assessment together with the elimination of the assessment.

**E.      NUS's Recommendation for the Manhasset Store.**

26.     During the period involved in this case, Tiffany purchased the commodity portion of its electricity supply for its store located in Manhasset, New York ("**Manhasset Store**") from Con Edison Solutions ("**Con Ed**") and also incurred charges from Long Island Power Authority ("**LIPA**") for the transmission and distribution portion of its electricity supply to the Manhasset Store. (Exs. C, D, Complaint, paras. 35-36; Answer, para. 14).

5

27. Pursuant to the Contract, Tiffany furnished NUS with certain data relating to the costs of electric supply, transmission and distribution purchased from Con Ed and LIPA for the Manhasset Store (the "**Manhasset Electric Data**"). (Exs. C, D, Complaint, para. 37; Answer, para. 15).

28. Tiffany furnished the Manhasset Electric Data to NUS to enable NUS to audit and analyze the data and submit recommendations authorized by the Contract regarding refunds and savings at its Manhasset Store. (Exs. C, D, Complaint, para. 38; Answer, para. 15).

29. On November 15, 2006, Christine Amundsen ("**Amundsen**") was a Senior Consultant for NUS who was assigned to the Tiffany account. Bruce Mogel ("**Mogel**") was a Director Retail Facilities for Tiffany, and was Tiffany's contact person with NUS.

30. On November 15, 2006, Amundsen sent Mogel an email advising that NUS had reviewed the electric bills for the Manhasset Store and noted "an unusual usage pattern for last August and September." In an attempt to eliminate one of the possible explanations for this anomaly, Amundsen inquired as to whether Mogel was aware of anything which might account for the unusual increase in consumption. (Ex. F).

31. After inquiring of Tiffany's personnel regarding the unusual usage pattern, on November 16, 2006, Mogel sent an email to Amundsen instructing her to proceed with an investigation of the electric problem at the Manhasset Store and to advise him if anything needed "to happen at the site." (Ex. H).

32. Amundsen's main responsibility was serving as the primary liaison with her clients for the purpose of implementing recommendations. Thus, she forwarded the file to an Analyst for further review and preparation of a detailed analysis report.

33. As part of its analysis, NUS extracted vital billing data (i.e., kW demand, kWh consumption) from Tiffany's monthly electric bills included with the Manhasset Electric Data. (Ex. B).

34. NUS also examined Tiffany's current electric consumption and load profile and undertook a comparison of the current information to Tiffany's historical usage for a period of at least 12 months. (Ex. B).

35. As a result of NUS' analysis, it identified overcharges as well as an ongoing billing error that were being billed to Tiffany for the period after September 19, 2006, when the Manhasset Electric Data reflected consumption and demand usage far in excess of previous levels. NUS' review of the Manhasset Electric Data also identified that the usage surge occurred when the electric meter for the Manhasset Store was replaced. (Ex. B).

36. On December 20, 2006, NUS sent to Tiffany a Cost Analysis Report ("**Report**") by email. (Ex. B). Mogel received the Report as he was authorized by Tiffany to receive such recommendations and related communications from NUS. (Exs. C, D, Complaint, para. 46; Answer, para. 18; Mogel Tr., pp. 41-43).

37. The Report advised Tiffany of NUS's analysis and conclusions, including that the electric invoices reflected consumption and demand usage far in excess of previous levels and that an ongoing billing error in Tiffany's electric service bills at the Manhasset Store had resulted in monthly overcharges of approximately $31,000. The Report also provided possible explanations such as a "meter reading error, meter malfunction, computer error, administrative error, *etc*." (Ex. B).

38. During the period from Amundsen's initial contact with Mogel in mid-November 2006 and the date of the Report on December 20, 2006, Amundsen, as all NUS consultants, managed multiple accounts.

### F. Tiffany's Approval and Implementation of NUS's Recommendation.

39. During a telephone conversation on December 22, 2006, Mogel commented to Amundsen that the recommendation contained in the Report was a "great catch," and instructed Amundsen to investigate the billing error by contacting the utility suppliers. (Ex. I).

40. Mogel signed a letter written on Tiffany's letterhead which was to be submitted to the utility companies for the purpose of giving the utilities permission to work with NUS on Tiffany's behalf. (Ex. P). NUS was authorized to use the letter in connection with its efforts to correct the electric service billing at the Manhasset Store. (Ex. P).

41. Mogel approved the recommendation contained in the Report. (Exs. I, J, P).

42. On December 22, 2006, Amundsen sent a letter to LIPA by facsimile in which she informed LIPA of the elevated consumption and demand readings on Tiffany's account and requested that LIPA investigate whether an error had occurred, correct the meter so that it properly records all future usage and credit the account for all past overcharges. Amundsen also included a copy of the Letter of Authorization signed by Mogel. (Exs. L, M).

43. Amundsen attempted to contact LIPA on December 22, 2006, but it was closed for the Christmas holiday.

44. On December 26, 2006, Amundsen spoke with LIPA's Billing Supervisor, Kathleen Schwarting ("**Schwarting**"), about the potential overcharge and cost savings. As a result, Schwarting put a hold on all billing for Tiffany's account, put in a rush request for a field investigation and designated Lisa Quinn ("**Quinn**") as an individual at LIPA who would be

working on the matter. (Exs. N, O). At that time, the investigation was in its early stages and neither NUS nor LIPA knew the true cause of the billing error.

45. Shortly thereafter Amundsen contacted Con Ed to advise it of the LIPA billing error and began discussions regarding the correction of Con Ed's billing.

46. On January 3, 2007, LIPA's investigator, James Espy ("**Espy**"), performed a field investigation and concluded that the high electric bill at Tiffany's Manhasset Store was caused by the application of an incorrect meter multiplier. Espy reported that the meter multiplier for Tiffany was 180 and stated that the correct multiplier is 80. (Ex. Q). But Espy was wrong because Tiffany's correct multiplier was later determined to be 120, as reflected on Tiffany's corrected electric bills from LIPA. (Ex. CC (p. T1028)). Espy failed to detect anything about a meter mis-tagging. (Ex. Q).

47. The meter multiplier in conjunction with the meter readings is used to calculate the monthly demand kW and energy kWh used for billing purposes.

48. NUS reviewed the results of LIPA's investigation and determined that the application of the incorrect meter multiplier accounted for only about one-half of the total billing error and ongoing increased charges. To continue its investigation NUS also requested Tiffany to provide a connected load study for the Manhasset Store to aid in its further investigation. (Exs. S, T).

49. The connected load study showed the equipment (*i.e.*, lighting, etc.) in the Manhasset Store so that NUS could calculate the maximum levels of kW (demand) and kWh (consumption) that could be created by such equipment and also enabled NUS to confirm that the lower billing data prior to the error was not a potential underbilling that could result in additional charges to Tiffany.

50. The study confirmed NUS's findings that there had been a billing error which resulted in monthly overcharges and that the original findings of LIPA did not correct the problem. Specifically, the connected load study showed that the level of kW and resulting kWh billed to the Manhasset Store could not be reached with the equipment being used by Tiffany.

51. NUS contacted LIPA to further investigate the recovery of past overcharges and correction of ongoing billing errors on future bills and discuss NUS's findings on LIPA's initial conclusions. As a result of its discussion with LIPA, NUS determined that the next step would be to contact the landlord's representative for the mall where the Manhasset Store was located.

52. On January 12, 2007, Amundsen contacted Tiffany's landlord's representative about the possibility that during recent work at the mall where the Manhasset Store was located ("**Mall**") there were cross-wired circuits resulting in the overcharges and higher billing to Tiffany and determined that the next step would be to speak to the Mall's electrical contractor. (Ex. U).

53. On January 15, 2007, David Brown ("**Brown**"), a vice president of NUS who filled in for Amundsen because she was ill, contacted the electrical contractor for the Mall and advised it of the electric service billing error, the facts which NUS had discovered to date and NUS's suggestions as to possible causes of the billing error. (Ex. V).

54. Brown arranged for an inspection of the site by the electrical contractor who determined that LIPA had "mis-tagged or mis-labeled" the newly installed meters for the Manhasset Store and a neighboring store in the Mall so that the recorded usage/demand for Tiffany was actually usage for a neighboring store. (Ex. V).

55. NUS reported to LIPA that the electrical contractor had confirmed the incorrect labeling of the meters and arranged for a second site survey to be taken by LIPA. (Ex. W).

10

56.     On or about January 19, 2007, LIPA's Espy performed a second site survey. At that point it was confirmed by LIPA that there had been a mis-tagging of the newly installed meters. As a result of the mis-tagging, Tiffany was receiving incorrect bills based upon Polo's meter readings. (Ex. R).

57.     NUS next confirmed that LIPA would re-bill Tiffany for the billings issued subsequent to September 19, 2006, with interest, and correct future billings so they reflected the lower, and appropriate, demand and usage readings and associated charges. (Ex. X).

58.     NUS also contacted Con Ed to advise that LIPA would be rebilling the erroneous invoices and that it should expect information from LIPA, which would allow it to correct its invoices and future billings. (Ex. X).

59.     NUS obtained refunds for Tiffany totaling approximately $67,021.58 for overcharges on its electric service at the Manhasset Store.

60.     Effective with the LIPA and Con Ed invoices dated March 27, 2007 and March 29, 2007, respectively, the ongoing billing error was corrected with respect to Tiffany's electric service at the Manhasset Store. (Exs. CC, LL).

61.     As shown by the above actions, on behalf of Tiffany NUS implemented the recommendation contained in the Report, and obtained refunds and savings for Tiffany on its electric costs.

**G.      NUS Requests Payment of its Performance Fee.**

62.     After it completed its work, obtained the refunds and had the electric bills corrected, NUS requested payment from Tiffany of its performance fee under the Contract.

63.     Tiffany refused to pay the fees demanded by NUS and this litigation was commenced.

64. Only after negotiations were unsuccessful did Tiffany raise any issue with the substance or specificity of NUS's recommendation.

*[signature]*
Arnold Frankel

Sworn to before me this
4th day of September, 2008

*[signature]*
Notary Public

MARY E. CATALDO
Notary Public of New Jersey
Bergen County ID # 2359833
Commission Expires May 10, 2012