# EXHIBIT KK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ALLIED SUPERMARKETS, INC.,                    )
                                              )
                    Plaintiff,                )
                                              )        CIVIL ACTION NO. 32336
          -vs-                                )
                                              )
NATIONAL UTILITY SERVICE, INC.,               )
                                              )
                    Defendant.                )

MEMORANDUM OPINION

        Allied Supermarkets, Inc., ("Allied") is a corporation

engaged primarily in the retail sale of food products, including

the operation of the Wrigley Supermarkets in the Detroit Metropolitan

area.  It is a Delaware corporation, and its principal place of

business is in Michigan.

        National Utility Service ("NUS"), a New York corporation

having its principal place of business in that state, is a utility

rate consultant.  It performs services related to obtaining reduc-

tions of the amounts its clients or customers pay for electricity,

gas, steam and water.  With the exception of nominal initial retainer

fees, its total compensation from its clients or customers is

contingent upon the results it obtains for them.

        In May, 1962, at the request of Allied, a NUS salesman

called upon Allied, discussed the services NUS was prepared to

perform and left a copy of the NUS printed form contract.

        At the time of this discussion, NUS knew that supermarkets

in the Detroit area, if not on the primary electric rate schedule,

could, if they had sufficient monthly consumption of and demand for

electricity, obtain cost savings by transferring to the primary rate schedule, a change which would require a capital investment to purchase and install transformers. Based upon previous dealings with another Detroit area supermarket chain, NUS had every reason to believe that such a recommendation would be made. The NUS salesman did not disclose to Allied in the course of precontract discussions either that NUS might make recommendations concerning the primary rate schedule or that NUS might make recommendations that would require capital investments by Allied.

The contract between the parties is dated June 1, 1962, and is drafted as a purported letter to NUS from the customer and contains a place for acceptance by NUS at the bottom. The printed form was offered and executed without additions or deletions to the text. The contract, as executed by the parties herein, provided that, in addition to a retainer fee of One Thousand Dollars ($1,000.00), NUS was to be paid:

> "(1)  Fifty percent (50%) of all savings you secure for us for a period of sixty (60) months from the date each such saving appears on our bills.
>
> (2)  Fifty percent (50%) of any refunds secured by you."

The contract further provided that "any recommendation you [NUS] make is subject to our approval, and we will pay you only for savings which actually become effective on our bills," and, further, that "you [NUS] will not share in reductions or savings effected solely by the lowering of rate schedules of any public utilities corporation and which they voluntarily apply to our bills."

After the contract was signed, Allied sent one year's back utility bills to NUS. NUS checked these utility bills for

- 2 -

mathematical accuracy and to determine whether the rate schedules
applicable to the various locations were being applied properly.
NUS discovered that most of Allied's stores were presently on the
secondary electric rates and would have lower electrical costs were
they to receive their electricity on the primary rate schedule.  NUS,
therefore, recommended that Allied change some eighty stores to the
primary rate schedule, indicating that in order to make this change
Allied would have to purchase and install the necessary transformers.

Allied then inquired as to how NUS' fifty percent fee was
to be determined, in light of the necessity of making capital invest-
ments, and whether the capital expenditure to be made by Allied would
be "deducted from the total savings to arrive at a net savings figure
that is subject to the fifty percent that is paid to your organiza-
tion?"  Various proposed amendments were considered by the parties,
and during these discussions, Allied benefited from the advice of
counsel.

The contract was finally amended by a letter agreement
dated October 3, 1962.  That amendment provides that if capital
expenditure is required on the part of Allied to effectuate any
reduction in utility costs, Allied is entitled to "recover its
investment" from "savings" prior to any sharing with NUS.  NUS,
however, would thereafter still be entitled to sixty months of
participation.

The evidence establishes that Allied fully understood
that the effect of the amendment was to delay the time when it would
be obligated to make payments to NUS, not to reduce the amount of
those payments.

It is clear that for some of the stores at which NUS

recommended a change from secondary to primary power, such a change was not economically feasible. As to these stores, no changes were made, for Allied was not obligated to put into effect every recommendation made by NUS but rather only those recommendations which Allied considered appropriate.

With respect to some sixteen store locations, however, Allied did follow through with the NUS recommended change, and at each such location purchased the electrical transformer required for the change. Prior to making these changes, Allied had been advised by Detroit Edison that it would incur certain additional expenses such as maintenance and property taxes because of its ownership of the transformers.

For each location at which Allied transferred to the primary rate schedule, NUS sent Allied monthly statements showing the amount of Allied's original capital investment and the monthly reduction in or "recovery of" this amount out of "savings". In each and every instance involving an estimate, statement or invoice for "savings", the method of computing "savings" was the same. "Savings" for a particular month was measured by subtracting Allied's actual billed cost of electricity for that month from what Allied's cost would have been had it not changed rate schedules. When, at a given location, the total of these accrued "savings" equalled the original capital investment, NUS commenced sending monthly invoices to Allied claiming payment of one half of the "savings".

On December 1, 1965, Detroit Edison Company revised its primary rate schedule downward without making a parallel change in its general service rate. By that time, several Allied stores had

been converted to the primary rate schedule as a result of recommendations by NUS. The effect of the change in the primary rate schedule was to increase the "savings" as computed by NUS from Allied's electrical bills.

In response to this development, Allied wrote NUS and stated that according to its interpretation of the contract, "savings" should not include reductions resulting from the December, 1965, primary rate schedule revision made by Detroit Edison. NUS answered this letter stating its position to the contrary. In 1967, Allied again raised this question with NUS, but the latter's position remained unchanged.

Through August, 1968, the parties operated under the contract, and Allied paid the amounts due under the agreement. In all cases, the "savings" upon which NUS' fee was based on the difference between the actual billing and what the billing would have been, but for the change to primary power. With respect to certain stores, this also included the difference attributable to the electrical companies' voluntary and unilateral rate change.

I.

Plaintiff seeks to have the contract set aside on the grounds that it was procured by fraud and deceit. The elements necessary to establish a prima facie case for the common law tort of deceit are well settled:

(1) Defendant knowingly and intentionally falsely represented a material fact;

(2) Defendant intended to induce the plaintiff to act on the false representation;

(3) The plaintiff rightfully relied on these misrepresentations;

(4) In reliance on false representations, the plaintiff acted to its injury.

With respect to any intentional misrepresentations, the record herein will simply not support such a finding. It is further contended, however, that there were fraudulent nondisclosures on the part of NUS prior to the execution of the agreement. In a proper case, non-disclosure can be actionable. <u>Strand Engineering Co. v. Librascope, Inc.</u>, 197 F. Supp. 743 (D.C. Mich. 1961); <u>Ainscougin v. O'Shaugnhessey</u>, 346 Mich. 307 (1946). Plaintiff contends that the defendant should have disclosed two things: the great majority of the recommendations would deal with the change from secondary to primary power, and that such changes would require a significant capital investment to effectuate. It is clear that these matters were not discussed prior to the execution of the agreement, but mere nondisclosure does not rise to the level of fraud.

For such a nondisclosure to constitute fraud, it must be material. <u>Candler v. Heigho</u>, 208 Mich. 115 (1919); <u>Hyma v. Lee</u>,

338 Mich. 31 (1953); <u>Lebeis v. Rutzen</u>, 289 Mich. 1 (1939).  In

<u>Lebeis</u>, the Court said:

> ". . . False representations, we have often
> held no matter how they are acted upon, are
> insufficient to invalidate an otherwise valid
> agreement unless they are material."  289
> Mich. at 12.

Plaintiff has not met this burden.  The items, which were undisclosed
prior to the contract, were fully disclosed very shortly thereafter
and before Allied had materially changed its position.  Allied's
reaction upon learning of NUS' recommendation was not that of one
who had been materially misled; its only response was to request a
clarification of the billing procedure.  If Allied had been materially
misled, it would have known it in 1962, for the nature and extent of
the recommendations were fully known at that time.  Rather than
emitting an anguished outcry of "foul", Allied merely requested a
billing clarification.  From that point in time until August of 1968,
the parties carried on in relative harmony, and Allied never questioned
the essential validity of the contract.  In light of such behavior,
plaintiff can hardly assert that the nondisclosures were material.
See <u>Doukas v. Gregory</u>, 231 Mich. 631 (1925); <u>Dennis v. Leaton</u>, 72
Mich. 586 (1888); <u>LeRoy Construction Co. v. McCann</u>, 356 Mich. 305
(1959).

It is also palpable that the plaintiff did not act in
reliance on the undisclosed information.  Allied was, of necessity,
fully apprised of the nature of the recommendations before it acted
upon them.  The Court is hesitant to point out so obvious a conclusion.
Along the same lines, the plaintiff herein would be hard-pressed to
demonstrate any damage it has suffered as the result of the two
nondisclosures which it has alleged.  The Court notes that it has

been neither alleged nor proved that Allied has in any way been
financially injured as the result of its dealings with NUS, much
less that the injury (if there was any) was the result of non-
disclosure.

In conclusion, the allegation of fraud is a wholly specious
one and without merit.

There are also suggestions that the contract is an
unconscionable one, for various related but unelaborated reasons:
NUS knew ahead of time what recommendation it was going to make;
NUS has not done any work to justify its fee; and the contingent
nature of its fee shocks the conscience.

It is not disputed that Allied had had previous experience
with Detroit area supermarkets and, as a result, was fairly confident
that a certain type recommendation could be made.  This is hardly an
indicia of overreaching or commercial unfairness, however, but merely
indicates that NUS had acquired a certain expertise in the area.  It was
not unfair that NUS sought to profit from their experience, for this is
a factor which enhances the desirability of its services.  It does not,
as plaintiff contends, render the agreement fraudulent.

There has been much discussion of the extent of the actual
physical "work" done by NUS.  Allied contends that practically no
work was required to generate the recommendations and check the
billings.  NUS, on the other hand, points to the voluminous work
files adduced at trial as tangible evidence that substantial work
was done on Allied's behalf.  The Court feels that the truth lies
somewhere between these two positions.  More importantly, the agree-
ment is not the type which ties compensation to the hours worked.
Allied contracted for results, and NUS was to be compensated to the

extent that they were produced. Even if no physical work was done by NUS, which was not the case, it could be said that NUS was the vendor of ideas, information and techniques. Such things can be bought and sold, and by voluntarily acting upon the recommendations, Allied obligated itself to pay for them.

NUS offered its ideas for sale, and Allied, after due consideration and in the absence of any duress or contractual obligation, decided to purchase them. Allied cannot now contend that the recommendations are unsupported by sufficient "work".

With respect to the contingent nature of the compensation, no authority has been presented to the Court which holds this type of agreement to be per se illegal. Moreover, as to this particular contract and these particular facts, there is nothing which shocks the conscience of the Court.

In dealing with the foregoing matters, the Court would be remiss in disregarding some critical facts. First, Allied was under no obligation to act upon any NUS recommendations, but rather possessed unfettered discretion to do as it wished. No financial obligation resulted from those recommendations which were not acted upon. Secondly, with respect to those recommendations which were acted upon, plaintiff does not now contend that they failed to result in economies of operation. Thirdly, all conversions to primary power were made with full knowledge of the economic and practical disadvantages associated with the ownership of electrical transformers. Finally, Allied is a large, commercially sophisticated business enterprise, having ready access to competent legal counsel.

II.

The next matter to be dealt with concerns the definition of "savings", for it is this term which is the basis on which compensation is computed.  It is the NUS position that "savings" is, for a given month, the difference between what Allied actually paid for electricity and what Allied would have paid had it not followed the recommendation of NUS.  This is the equivalent of the billing differential or gross savings.

Allied, on the other hand, claims that "savings" as that term is used in the contract means net savings to Allied and must be determined by deducting from gross savings the imputed cost to Allied of capital expended to effect the savings, the maintenance expense for transformers and the additional annual property tax resulting from reassessment based on installation of transformers. Finally, Allied argues that "savings" having been thus reduced must be further reduced to their after-tax net.

Read in context and without excising the qualifying adjectives and phrases present in the contract, the meaning of "savings" is clear.  The contract starts out as follows:

> "We [Allied] hereby authorize you [NUS] to secure all possible savings and refunds on our electrical, gas, water and steam rates." (emphasis added)

The next reference to "savings" reads as follows:

> "We agree to pay you compensation as follows:
>
> (1)  Fifty percent (50%) of all savings you secure for us for a period of sixty (60) months from the date each such savings appears on our bills."  (emphasis added)

> \*   \*   \*

> . . . We will pay you only for savings which

actually become effective on our bills."
(emphasis added)

This language makes it clear that "savings" means savings which "appear" on Allied's "bills". The only interpretation consistent with the contract language is the one advanced by NUS. "Net after-tax savings" would hardly appear on Allied's electric bills.

Finally, the agreement provides:

"We [Allied] will pay you within thirty (30) days after bills are paid on which savings are effected." (emphasis added)

Payment could hardly be due within thirty days of electric bill payment if the parties contemplated that a tax and accounting study would have to be made before the amount of NUS' compensation could be determined.

When read in the context of the agreement, the term "savings" is unambiguous and means gross savings as evidenced by the billing differential. Having held that the term is unambiguous, the Court is not required to consider the practical construction given to that term by the parties (discussed infra). It is reassuring to note, however, that during the six years the parties operated under the contract, the amount of "savings" was consistently and without question or exception computed according to the method advocated by NUS. Moreover, Allied accepted this interpretation with full knowledge of those assorted factors, which it now contends must be considered in arriving at savings. In November, 1962, Allied had been advised by Detroit Edison that there would be "service problems" with transformer installations, that maintenance by "skilled attendants" would be required, that there were tax consequences to consider, and that the "net savings" after "capital investment" would be lower than gross savings. Yet Allied never

asked that any of these factors be taken into consideration in
computing "savings" under the contract, much less stated that the
contract required that they be considered.

III.

Another area of constructional disagreement concerns the so-called "voluntary rate reduction" clause.

In December, 1965, at a time when twelve Allied stores had already been transferred to the primary rate schedule as a result of NUS' recommendations, Detroit Edison revised its primary rate schedule downward without changing its secondary schedules. The effect of this revision was to further lower the monthly costs of electricity at each of the twelve stores and, thus, further increase the monthly billing differential. After the rate schedule change, NUS continued to bill Allied for one half of "savings", that is, the difference between the cost of electricity on the now-revised primary rate as it appeared on Allied's bills and the cost of electricity on the secondary rate prevailing at the time. With respect to these stores, then, the billing differential was comprised of two identifiable elements:  the initial billing reduction which was the result of the change from secondary to primary power; and the second, additional reduction which was the result of the change in the primary rate.

The contract contains the following caluse:

"You [NUS] will not share in reductions or savings effected solely by the lowering of rate schedules of any public utilities corporation and which they voluntarily apply to our bills."

In June and July, 1966, and again in early 1967, Allied questioned NUS' computation and asked NUS if the additional increment in savings resulting from the December, 1965, rate revision was part of "savings" as defined under the contract. After some discussion of the subject, Allied accepted NUS' method of computation and paid

its bills.

The Court is of the opinion that the meaning of this provision is clear and unambiguous and that it is applicable to the instant fact situation. A certain portion of the billing reduction, at the stores in question, was effected solely by a voluntary rate reduction. The reduction was made unilaterally and was not the result of any efforts by NUS. To allow NUS to share in that portion of the billing reduction, would give it the benefit of a windfall to which it is not entitled.

NUS contends that Allied's acceptance, albeit a grudging one, of the NUS position in this regard is conclusive as to the meaning of the clause.

The doctrine of practical construction, however, is applicable only where the contract language is ambiguous. As the Michigan Supreme Court has stated:

> "Plaintiff's contention that the practical
> construction put upon this franchise contract
> by the parties themselves is controlling
> against the strict construction now contended
> for, is necessarily predicated upon the
> proposition that the writing is open to
> construction in the particular claimed, for
> practical interpretation by the parties can
> only be regarded where the contract is of
> doubtful or ambiguous meaning. Extraneous
> evidence is not allowable to interpret a
> writing which has no need of interpretation.
>
> 'If clear and free from ambiguity, the
> intention shown upon its face if written must
> be followed, though contrary to the practical
> interpretation of the parties, and even if
> such practical construction has been acquiesced
> in for a long period of time.' 2 Page on
> Contracts (1905), §1126." Michigan Chandelier
> Co. v. Morse, 297 Mich. 41, 48 (1941).
> (emphasis added)

See also Mt. Pleasant v. Consolidated Gas Co., 325 Mich. 501 (1949);

Wilmarth v. Hartman, 238 Mich. 20 (1927).

Additionally, the behavior of the parties with respect to the voluntary rate reduction issue was notably different than the response to the "net v. gross savings" issue. The latter was never once questioned or discussed for a period of six years. From the time the former became an issue in 1965, however, the disagreement of the parties was apparent.

IV.

Allied contends that NUS has violated MCLA §3?.J.551 and

MCLA §338.552 which provide in pertinent part:

" . . . it shall be unlawful for any person
to practice or offer to practice the pro-
fession of architecture, the profession of
engineering or of land surveying, in this
state, . . . unless such person has been
duly registered or exempted under the pro-
visions of this act." (MCLA §338.551)

"The practice of professional engineering
within the meaning and intent of this act
includes any professional service, such as
consultation, investigation, evaluation,
planning, design, or responsible supervision
of construction in connection with any public
or private utilities, structures, buildings,
machines, equipment, processes, works or
projects, when such professional service
requires the application of engineering
principles and data, except as hereinafter
defined." (MCLA §338.552)

The sum and substance of the evidentiary support for this defense

is contained in the testimony of Donald Maw; an internal NUS

memorandum dated October 12, 1967, and authored by Mr. Kannry,

Vice President of NUS; and a letter dated October 19, 1967, from

Mr. Kannry to Mr. Maw. The NUS memorandum states:

"We had a great deal of discussion in this
regard* and Mr. Maw told me they are
presently having an engineering study and
he wants us to give him 45 days to review
the primary situation once again. In fact,
he asked if we could evaluate the size
transformers to be put into an operation
and I told him if he will give us the
complete connected load of the store with
some semblance of an idea of future expan-
sion then we could indicate to him the size
transformer which should be installed. Mr.
Maw replied that since they had an engineer

*About the size transformers

doing the studies for them now then they
would not deem it necessary to have to send
it on to us and this could be included in
his study on the various operations."

Thus, the entire evidence submitted by Allied in support of this
defense is that on one day in October, 1967, after the contract
had been in force for more than five years, the parties discussed
the possibility that NUS would make a gratuitous suggestion as
to transformer sizes and in the same conversation decided that
NUS would not do so.

Under Michigan law, the effect of a violation of a
licensing statute is to deprive the offending party of the right
to enforce its contract. Such might be the case had NUS actually
suggested certain transformer sizes and thereafter sought compensa-
tion for its advice. It is clear, however, that there was never
any advice given nor agreed to be given, and thus, there is no
contract to be rendered unenforceable. Even had the advice been
given, this isolated incident was merely incidental to the con-
tract in suit and as such does not render that contract
unenforceable. Weatherston's Services v. Minn. Mut. Life Ins.
Co., 257 Minn. 184, 100 N.W.2d 819 (1960); Keller v. Baumgartner,
153 F.2d 474 (C.A.7, 1946).

V.

In addition to the general areas of disagreement between the parties, there are several areas where the dispute is more particularized. One such dispute concerns the Harrington Warehouse. This facility is apparently operated by the Abner Wolf Division of Allied Supermarkets, a division distinct and separate from the Wrigley Supermarkets. Among the utility bills which Allied originally sent to NUS for its initial analysis was an electrical bill for the Harrington Warehouse. This location was later included among those for which NUS recommended a change to primary power. The one bill sent in the first instance was the only one submitted. Sometime later, the Harrington location was changed to primary power. NUS contends that they are thus entitled to contractual compensation with respect to this location. Allied, on the other hand, argues that the submission of the one electrical bill was entirely inadvertent, and that the agreement never contemplated the Harrington Warehouse.

There is, quite frankly, a dearth of probative evidence in this regard, and the contract itself provides the only means of resolving the issue. Quite simply, the party named in the NUS form contract is "Wrigley Supermarkets, a division of Allied Supermarkets, Inc." The terms of the contract do not, therefore, include the Harrington Warehouse, an operation separate and distinct from the Wrigley Supermarket Division. The record, moreover, will not support a finding to the contrary. The Court, therefore, feels that NUS is not entitled to share in any "savings" that may have been realized at the Harrington Warehouse.

VI.

Allied's Store No. I is also the subject of . more
particularized dispute.  Pursuant to NUS' initial recommendation,
this facility was converted to primary power upon the purchase
and installation of the requisite transformer.  The change was
effected in September, 1963.

Under the amendment, NUS did not share in savings
until October 29, 1965, by which time Allied had recovered in
the form of saved electric costs its full capital investment
of $6,400.00.  NUS' contractual compensation then began and
continued until August 31, 1967, when the store reverted to
the large general service secondary voltage rate.  NUS, there-
fore, shared in "savings" for only twenty-one months.  The
change back to the secondary rate occurred when Allied removed
the transformers and placed them in a warehouse where, so far
as is known, they remain to this date.  No explanation was
offered for this change.

It is NUS' position that under the amendment, in
return for the deferral of NUS' compensation until Allied
recovered its capital investment, Allied was obligated to keep
the transformers in operation and not transfer back to the
secondary rate schedule without good cause until NUS had
received its sixty months of contractual compensation.

The Court has carefully examined the contract and
the amendment, both of which were drafted by NUS, and is unable
to discover any language to support the contention of NUS.  The
claim, therefore, must fail.

VII.

The contract provides in part:

"In the event a recommendation submitted by
you is still pending at the expiration of this
agreement, then our liability to you is auto-
matically extended until same is complete and
we will pay you as outlined above;"

This provision gives rise to the question of Allied's liability

to NUS for secondary to primary power conversions made either

after commencement of the lawsuit or to be made at some time in

the future.  The present record, however, is inadequate for the

resolution of this issue.  In the first place, it is not clear

that Allied presently intends to make additional power conversions.

As to those stores for which such an intent can be demonstrated,

each would have to be considered on an individual basis.  Rele-

vant factors for consideration would include the economic

feasibility of the recommendation when first made, any subsequent

change in circumstances affecting the viability of the recommenda-

tion, and the length of time between the recommendation and when

it was or will be put into effect.[1]  Because of the present lack

of evidence on these points, the Court declines to decide the

issue.

---

[1] In the absence of a specific time provision, the concept of "a
reasonable time" would be germane.  Duke v. Miller, 355 Mich.
540 (1959).  Although not on its terms applicable to the
present transaction, the Uniform Commercial Code adopts the

VIII.

In summary, then, the Court feels that plaintiff came
to believe it had made a "bad deal" at a time when it was far
too late to cry "foul".  Similarly, the Court is not aware of
any authority which prohibits a contingent fee agreement in a
commercial setting.  It would not be fair to infer from this
opinion, however, that the agreement herein was a "good deal"
for both parties or that the defendant provided an indispensable
or particularly valuable service.  Suffice it to say that the
agreement was made by two commercially sophisticated companies,
and there is no evidence of fraud, overreaching, or unconsciona-
bility.

It has been determined that the trial of this matter
was to be bifurcated, and this opinion concludes the liability
portion thereof.  The parties may now address their thoughts to
the question of damages.  The Court will provide a trial date
if the parties are unable to resolve the damages issue in a
timely fashion.

Fred W. Kaess
Chief United States District Judge

AUG 15 1974