# FRANKEL DEPOSITION

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -x

NATIONAL UTILITY SERVICE, INC.,            :

            Plaintiff,                 :

                         :

        -against-                  :

TIFFANY & CO. and
TIFFANY AND COMPANY,                        :

           Defendants.                :

- - - - - - - - - - - - - - - - - -x


        DEPOSITION of Plaintiff National Utility

Service, by ARNOLD FRANKEL, taken by Defendants at

the offices of Dreier LLP, 499 Park Avenue, New York,

New York on Friday, April 11, 2008, commencing at

10:10 a.m., before Elizabeth Santamaria, a Certified

Shorthand (Stenotype) Reporter and Notary Public

within and for the State of New York.

Page 18

Frankel

1    contract.
2        Q.    Is the contract completely
3    rewritten?
4        A.    It's -- there are numerous changes.
5    Are there any words left that were in this?  I
6    believe it has pretty much the same coverage as
7    what you would see here but it's rewritten, yes.
8        Q.    Did you discuss with him his purpose
9    in wanting to provide a definition for the term
10   "savings"?
11       A.    I'm sure we talked about it, yes.
12       Q.    Do you recall what those discussions
13   were?
14       A.    Again, most of the changes were
15   because Richard believed that he felt that that
16   was the way the contract should be written.
17       Q.    The 1992 contract that's at issue in
18   this case does not have a definition of the term
19   "savings" right?
20       A.    The contract I'm looking at?
21       Q.    Yes.
22       A.    No.
23       Q.    No?
24       A.    No.

Page 19

Frankel

1        Q.    Exhibit 1 for identification
2    provides in part for a fee structure for NUS,
3    right?
4        A.    That's correct, yes.
5        Q.    And the contract says in Paragraph 5
6    that as a fee NUS receives 50 percent of any
7    refund, right?
8        A.    Correct.
9        Q.    And then 50 percent of any savings
10   realized for a period of 60 months, correct?
11       A.    Correct.
12       Q.    In every case where there is a
13   refund is there always a savings?
14       A.    No.
15       Q.    Can you give me an instance of where
16   there would be, in your business, a refund but no
17   savings?
18       A.    Yes.  Client signs up with us, they
19   send us in their bills.  We find an overcharge on
20   a prior bill but subsequent to that there were no
21   errors on the bill.  Based upon that, it would be
22   a refund only.
23       Q.    Any other things you can think of?
24       A.    Nothing that jumps out at me, no.

Page 20

Frankel

1        Q.    Can you explain to me from the
2    perspective of NUS the theory behind the shared
3    savings component of the fee?
4        A.    I'm not sure I follow you when you
5    say theory.
6            MR. GOODMAN:  Objection.
7        Q.    Well, you have two components of a
8    fee.  One would be 50 percent of any refund,
9    right?
10       A.    Correct.
11       Q.    Why does NUS look to also recover
12   50 percent of any amount realized as a savings by
13   the customer for a 60-month period?
14       A.    Because we are a primarily
15   contingency fee oriented firm and that's how we
16   earn our income.
17       Q.    Is there any magic to 60 months?
18       A.    It was a period of time that was
19   determined by senior management at the time that
20   it was put into place.
21       Q.    And what is the shared savings
22   component intended to compensate NUS for?
23       A.    For the expertise that it brings to
24   the table in uncovering opportunities to benefit

Page 21

Frankel

1    the client.
2        Q.    Now, in a shared savings situation
3    where the customer is paying 50 percent of the
4    savings for a 60-month period, isn't it true that
5    the customer is still paying less for its utility
6    usage than it was paying before the savings was
7    recommended by NUS and implemented?
8            MR. GOODMAN:  Objection.
9        A.    Could you read that back?
10           MR. MITCHELL:  Let me see if I
11       can take it in pieces.
12       Q.    I want to get to the -- I want to
13   understand where it works, so my questions are
14   focused on the mechanics of the 50 percent shared
15   savings component of your fee both from NUS's
16   perspective and then how it works for the
17   customer.
18       A.    Okay.
19       Q.    First of all, with respect to the
20   shared savings component, is it true that it is
21   paid to NUS on whatever periodic basis the utility
22   is billing the customer?
23       A.    That is correct.
24       Q.    So the customer only pays a portion

Page 22

Frankel

1
2 of the fee every utility billing period, correct?
3      A.   That is correct.
4      Q.   Now, the customer has an amount
5 prior to implementation of some savings
6 recommendation that it is paying as a general rate
7 or amount for its utility service, right?
8           MR. GOODMAN:  Objection.
9           MR. MITCHELL:  I will try to
10          rephrase that.
11     Q.   There is a general monthly amount
12 that the customer is paying for a utility based
13 upon a particular usage, right?
14     A.   At the time that we made our
15 recommendation?
16     Q.   Yes.
17     A.   Correct, yes.
18     Q.   And then NUS would make a
19 recommendation on how a savings could be achieved,
20 right?
21     A.   Correct.
22     Q.   So after implementation of that
23 recommendation the amount being paid for the same
24 utility usage by the customer is less, right?
25     A.   Correct.

Page 23

Frankel

1
2      Q.   And that would be a savings?
3      A.   Correct.
4      Q.   And NUS would receive as a fee for
5 60 months the amount by which the charges to the
6 customer for that usage were reduced, correct?
7      A.   Correct.
8      Q.   And the customer would be paying
9 less for its utility usage, right?
10     A.   Than?
11     Q.   Than it was paying before.
12     A.   Yes.
13     Q.   And even though it was paying half
14 of the savings for a 60-month period to NUS, the
15 customer was still paying, at least for that
16 60-month period, less for its overall utility
17 usage because it's getting the benefit of the
18 other 50 percent, right?
19          MR. GOODMAN:  Objection.
20     A.   Correct.
21     Q.   And then after 60 months the
22 customer realizes 100 percent of the savings?
23     A.   Correct.
24     Q.   Would you give me examples of
25 typical types of things that NUS recommends to

Page 24

Frankel

1
2 customers to achieve a savings in utility charges.
3      A.   Okay.  Starting from a rate change,
4 power factor improvement, tax exemptions or
5 reductions, application of wrong meter
6 multipliers, high demands, primary service,
7 changing to a time of use rate, changing to an
8 interruptible rate, moving to what we call a
9 third-party supplier, shortening the term of a
10 contract, reduction of contract capacity.
11     I mean that's --
12     Q.   I want to focus on what you said,
13 application of the wrong meter multiplier.  What
14 are you talking about there?
15     A.   Well, I remember one specific case
16 where instead of using the actual demands for the
17 client there was a meter multiplier which I
18 believe was 600, 900, whatever it was.  Instead of
19 using the actual billing demands they were using
20 the 600 or 900 meter multiplier as the customer's
21 demand.  We discovered that, we investigated it,
22 we had the utility corrected to what it should be
23 and it resulted in a refund and a savings for that
24 client.
25     Q.   If I understand the concept, and

Page 25

Frankel

1
2 correct me if I'm wrong, if I understand the meter
3 multiplier concept that's a mechanical application
4 of a formula for how a meter reads out usage.  Is
5 that right?
6      A.   That's correct.
7      Q.   Many of us know utility meters with
8 the dials that are only readable by utility people
9 but as I understand it, each meter is different.
10 So you take whatever usage is reflected by the
11 dials on a particular meter in a given month and
12 then that meter has a multiplier that applies to
13 those dials on that meter to get a kilowatt hour
14 usage for that period; is that correct?
15     A.   That is correct.
16     Q.   So with respect to the meter
17 multiplier itself, that is a number that is used
18 to calculate actual usage by a customer at a given
19 location, right?
20     A.   That is one part of it, yeah.
21     Q.   Now, what about just a pure mistake
22 by the power company?  The bill is wrong and needs
23 to be corrected.  Is that a savings under the
24 contract, by your interpretation?
25          MR. GOODMAN:  Objection.

Page 26

```
 1              Frankel
 2         MR. MITCHELL:  Let me rephrase
 3      it.
 4      Q.   The power company makes a mistake in
 5   a bill.  Does NUS take the position that a mistake
 6   like that is a savings as well as --
 7         I have to start over again.
 8         Where a power company makes a
 9   mistake in a bill and is notified about a mistake
10   and that mistake is corrected and the power
11   company refunds the amount of the mistake, would
12   that be a savings as well under the NUS contract
13   the way you interpret it?
14      A.   Yes.
15      Q.   Why?
16      A.   Because the nature of the mistake
17   will typically indicate whether we determine it to
18   be a savings or not.
19      Q.   So a computer error, just a computer
20   error, a one-time computer error on a particular
21   bill, the power company is notified and corrects
22   the bill and refunds the overpayment.  Would that
23   be a savings?
24      A.   My answer would be "yes" based upon
25   the fact that if we investigated it, the utility
```

Page 27

```
 1              Frankel
 2   determined that there was something wrong in their
 3   computer program that was determining that, we
 4   would have no reason to believe that that is going
 5   to correct itself other than but through our
 6   investigation.
 7      Q.   So a one-time billing mistake by a
 8   utility can result in not just a refund but NUS
 9   also charging 50 percent of the amount of the
10   refund going forward for a period of 60 months?
11   Is that what you are saying?
12      A.   I'm saying if an error occurs during
13   a month that we look at the bill and based upon
14   the nature of the error, even if it only occurred
15   for that one month by the time we uncovered it, it
16   could be a savings, yes.
17      Q.   So what if it's just a typo?  Just a
18   typo on a bill.  A typographical error.  If you
19   uncover it, the customer pays not just 50 percent
20   of any refund for correcting the typographical
21   error but also 50 percent of the amount of the
22   error going forward for a period of 60 months?
23         MR. GOODMAN:  Objection.
24      A.   You are asking me a question I
25   honestly don't recall ever having that scenario
```

Page 28

```
 1              Frankel
 2   presented to me.  It typically would be a computer
 3   error or something that we could --
 4      Q.   I mean a typographical error?  I'll
 5   be honest.  You are asking me something I've never
 6   dealt with, so I don't know the answer.
 7      Q.   Well, you have never dealt with a
 8   switched meter either, right?
 9      A.   I have dealt with people paying for
10   erroneous usage that did not belong to them, which
11   I consider to be the same thing.
12      Q.   It's not really the same thing,
13   right?  Because that -- withdrawn.
14         That may not be the same thing.
15   Here we have a circumstance where the customer was
16   paying for someone else's usage and someone else
17   was paying for the customer's usage simply because
18   a meter had been changed in September of 2006,
19   right?
20      A.   That's correct.
21      Q.   And in the first full-month bill
22   that the customer received which reflected the
23   usage for the neighboring store as part of the
24   services NUS was providing, Christine Amundsen
25   noticed it and alerted the customer, right?
```

Page 29

```
 1              Frankel
 2         MR. GOODMAN:  Objection.
 3      Q.   That's what happened here.
 4         MR. GOODMAN:  Objection.
 5      A.   Somebody noticed it as well as
 6   Christine and it was --
 7         Can you repeat the question again?
 8      Q.   Yes.
 9         The first full-month bill that
10   reflected the fact that Tiffany was being billed
11   for Polo's usage, within a day or two of the
12   receipt of that bill NUS noticed that there was a
13   spike in usage reflected in the Tiffany bill,
14   right?
15         MR. GOODMAN:  Objection.
16      A.   I don't remember if it was a
17   full-month bill or a partial bill, because I seem
18   to remember there was a period where there might
19   have been a bill for a small period of time.  But
20   based upon a review of something at that point in
21   time, Christine and/or others noticed it and
22   brought it to Tiffany's attention.
23      Q.   We now know sitting here today that
24   the cause of that spike in usage reflected on the
25   bills was that Tiffany's meter was measuring usage
```

Page 30

Frankel

1  Frankel
2  for its neighboring store, Polo Ralph Lauren,
3  right?
4      A.   Correct.
5      Q.   And we also note after the fact that
6  the power authority or power company having --
7  withdrawn.
8          We now know after the fact that the
9  utility, having confirmed that Tiffany was paying
10 for Polo's usage and Polo was paying for Tiffany's
11 usage, they have now gone back in and corrected
12 the billing. Right?
13     A.   Right, as long as we say as a result
14 of what NUS brought to the table on this.
15     Q.   We will get to that. You realize
16 that -- withdrawn.
17        Your contract, Exhibit 1 for
18 identification, contains no definition of the word
19 "refund," right?
20     A.   That is correct.
21     Q.   It also contains no definition of
22 the word "savings," right?
23     A.   That is correct.
24     Q.   And as of April 7, 1992, the
25 circumstance of a switched meter had never come up

Page 31

1  Frankel
2  at NUS under any of its contracts, right?
3      A.   I said not that I'm aware of. We at
4  any point in time can have thousands of contracts
5  with tens of thousands of locations. Could it
6  have happened? Absolutely. I don't know every
7  single one of them.
8      Q.   But you signed this contract in
9  1992, right?
10     A.   That's correct.
11     Q.   As you are sitting here today, you
12 don't recall in 1992 that you were aware of NUS
13 having ever been confronted with the correction of
14 a switched meter situation, right?
15     A.   I have no specific recollection of
16 that, no.
17     Q.   So whether in fact the idea that a
18 switched meter correction fell within the
19 definition of "savings" under Exhibit 1 for
20 identification was not in your mind at the time,
21 right?
22     A.   Obviously having said that I'm not
23 aware of recollecting that specific thing, my
24 answer would be "yes."
25     Q.   It was not in your mind?

Page 32

1  Frankel
2      A.   Correct.
3      Q.   And obviously you did not discuss
4  that idea of a switched meter situation falling
5  within the definition of "savings" with Tiffany in
6  1992, right?
7      A.   I'm not aware of discussing anything
8  with Tiffany in 1992.
9      Q.   And subsequent to 1992 through the
10 period of time that this dispute arose, at no time
11 in any of the services that NUS provided for
12 Tiffany did it ever correct a switched meter at
13 some other location, correct?
14     A.   Not that I'm aware of, no.
15     Q.   So during the life of the contract
16 with Tiffany there was also never another
17 circumstance in which the situation that is
18 present in this case, correction of the switched
19 meter, had happened during the life of the
20 Tiffany/NUS contractual relationship?
21     A.   Not that I'm aware of.
22     Q.   This 1992 contract, Exhibit 1 for
23 identification, was in effect from 1992 until
24 February 2007, right?
25     A.   I have no idea.

Page 33

1  Frankel
2      Q.   Well, you are aware that the
3  contract was terminated -- I'm sorry.
4          Tiffany terminated the contract with
5  NUS, Exhibit 1, after NUS made its demand for a
6  fee of approximately $1 million in connection with
7  correcting the switched meter, right?
8      A.   Correct.
9      Q.   And that was -- the termination was
10 in approximately February 2007, right?
11     A.   I believe so, yes.
12     Q.   And until that time, from the time
13 Exhibit 1 for identification was signed, until
14 then there was in place this contract which is
15 Exhibit 1 for identification, right?
16     A.   That's correct.
17     Q.   And during the life of the contract
18 NUS made recommendations to Tiffany on occasion
19 about the potential savings that could be realized
20 in certain utility charges, right?
21     A.   Correct.
22     Q.   And when implemented by Tiffany in
23 every circumstance-- withdrawn.
24         And every time Tiffany implemented a
25 recommendation NUS was paid a fee, right?

Page 42

Frankel

1     Frankel
2  2006, in a position to owe NUS the same amount of
3  money essentially that NUS claimed as a fee in
4  January of 2007, right?
5         MR. GOODMAN: Objection.
6         A.   You asked me if NUS contacted the
7  utility -- and I'm paraphrasing -- and as a result
8  of that they corrected an error, would be entitled
9  to a savings and I'm saying "yes." Is it the
10 exact same amount here than it would have been in
11 January? I don't know, but it's something along
12 those lines, yes.
13        Q.   The bulk of the fee being sought
14 here is for the shared savings component, right?
15        A.   Correct.
16        Q.   And the shared savings component
17 portion that NUS is seeking a fee for is
18 approximately $1 million, right?
19        A.   Correct.
20        Q.   So by virtue of this e-mail on
21 November 15, 2006, simply because NUS found it
22 first, Tiffany would owe NUS the shared savings
23 component of the contract if NUS corrected the
24 problem?
25        MR. GOODMAN: Objection to the

Page 43

Frankel

1     Frankel
2  form.
3         Q.   That's your testimony, right?
4         A.   If NUS uncovers a problem and the
5  problem is corrected subsequent to our uncovering
6  of it, the answer is "yes."
7         Q.   Refund and savings?
8         A.   If there is a refund involved, yes
9  and a savings, yes.
10        Q.   Did Ms. Amundsen come speak with you
11 about this on November 15, 2006?
12        A.   I have no idea.
13        Q.   When is the first time you became
14 aware of the issue at the Manhasset store?
15        A.   I have no date involved, but I could
16 tell you I was aware of it early on.
17        Q.   What does that mean, "early on"?
18 Give me a time frame.
19        A.   Probably -- well, it could --
20        I don't know a date. It could have
21 been here, it could have been when I know there
22 was a document which was written I think in
23 December. I was aware of it back at its infancy
24 stages.
25        Q.   Did you participate in the

Page 44

Frankel

1     Frankel
2  preparation of the document called "Report and
3  Recommendation"?
4         Q.   Could you show it to me?
5         Q.   I show you has been previously
6  marked as Exhibit 2 for identification. It's
7  called "Cost Analysis Report." Do you see that?
8         A.   Yeah. I've seen this. I don't
9  remember whether I was actually involved in
10 developing it.
11        Q.   Were you involved in the issues
12 surrounding the Manhasset store before the
13 creation of the cost analysis report?
14        A.   I have no recollection one way or
15 the other.
16        Q.   How did you first become aware about
17 the situation at the Manhasset store?
18        A.   It was brought to my attention by --
19 could be Christine, could be Dave. It could be
20 anybody.
21        Q.   What did you remember being told?
22        A.   I was aware that there was a
23 recommendation pending, that it was large. I
24 remember specifically a situation which came about
25 when the utility came back with their initial

Page 45

Frankel

1     Frankel
2  response on the error and what we did as a result
3  of that.
4         Q.   I want to go to the beginning. I
5  want to go further on.
6         There is no recommendation pending
7  obviously as of November 15, 2006, the date of
8  Exhibit 4 for identification, right?
9         MR. GOODMAN: Objection.
10        Q.   I'm trying to refresh your
11 recollection on dates here, Mr. Frankel. I had
12 asked you if you had been involved in the creation
13 of the document that's part of Exhibit 2 for
14 identification and you don't think you recall,
15 right?
16        A.   If I was involved in developing
17 this? I don't recall.
18        Q.   And we have Ms. Amundsen's e-mail
19 dated November 15, 2006, where Bruce Mogel is
20 alerted to the -- what she calls "an unusual usage
21 pattern" at the Manhasset store, right?
22        A.   That's correct.
23        Q.   If we take November 15, 2006 as the
24 first day that NUS notifies Tiffany about its
25 observations of usage at the Manhasset store --

Page 46

Frankel

1
2      A.   Correct.
3      Q.   -- and December 20, 2006, the date
4  of the cost analysis report, which is Plaintiff's
5  Exhibit 2, in that time period did you become
6  aware of the situation at the Manhasset store
7  during that time period?
8      A.   I have no recollection one way or
9  the other.
10     Q.   Do you have any recollection of
11 having done anything during the period
12 November 15, 2006 to December 20, 2006 in
13 connection with Tiffany's Manhasset store?
14     A.   Not that I can sit here today and
15 tell you, no.
16     Q.   And do you recall any conversations
17 you had with anyone during that time period about
18 Tiffany's Manhasset store?
19     A.   Other than I remember being aware of
20 it, no.
21     Q.   How would you know it would be a
22 potentially big fee?  Why would you know that
23 right from the beginning?
24     A.   Because I was made aware of the
25 numbers that were included in this report.

Page 47

Frankel

1
2      Q.   At the beginning you don't know what
3  the problem is, right?
4      A.   I knew there was, as it's termed
5  there, an unusual usage pattern.  That's a
6  starting point when we start the investigation.
7      Q.   If you look at the attachment --
8           You were obviously in this field so
9  you can read these things.
10     A.   Uh-huh.
11     Q.   Look at the attachment to
12 Ms. Amundsen's e-mail, which is the second page of
13 Exhibit 4, Bates stamped T1128.
14     A.   Uh-huh.
15     Q.   You see that it shows for July 26,
16 2006 through August 28, 2006 thirty-three days of
17 usage, right?
18     A.   Uh-huh.
19     Q.   Yes?
20     A.   Yes.
21     Q.   54,720 hours or -- 54,720
22 kilowatt-hours of usage during that period, right?
23     A.   Correct.
24     Q.   In your experience, there are summer
25 rates and winter rates for electric usage?

Page 48

Frankel

1
2      A.   Some utilities have them, others
3  don't.
4      Q.   In addition, summer is a high demand
5  period because air conditioning runs, especially
6  in the Northeast?
7      A.   It can be if the air conditioning is
8  on that specific meter.
9      Q.   Your assumption would be, wouldn't
10 it, that in Manhasset, Long Island between
11 July 26th and August 28th that air conditioning
12 would be running fairly regularly during those
13 days, right?
14     A.   I would assume it was.  But, again,
15 I just want to clarify that whether the air
16 conditioning is part of that meter or is part of a
17 general charge that is issued by a landlord can
18 differ.
19     Q.   Okay.  But that would give you, in
20 your expertise, some baseline for looking at that?
21     A.   Correct.
22     Q.   Then you have another period,
23 August 28, 2006 to September 19, 2006, twenty-two
24 days of usage and 27,180 kilowatt-hours, right?
25     A.   Correct.

Page 49

Frankel

1
2      Q.   So that would be in line with the
3  usage shown during the month July 26th to
4  August 28th, 2006, right?
5      A.   Somewhat, yeah.
6      Q.   A little lower even, right?
7      A.   Uh-huh.
8      Q.   Yes?
9      A.   Yes.
10     Q.   So now you would see -- so that
11 would probably show you that the usage was a
12 little higher in the July-August period, right?
13     A.   Correct.
14     Q.   September a little cooler maybe?
15 Not as much.  That would kind of show you that the
16 usage was a little lower but not out of line,
17 right?
18     A.   Correct.
19     Q.   Then you have a period September 19,
20 2006 to September 27, 2006, just eight days,
21 showing you 61,920 kilowatt-hours of usage, right?
22     A.   Correct.
23     Q.   Now, NUS holds itself out as an
24 expert in utility analysis, right?
25     A.   Correct.

Page 66

```
 1              Frankel
 2      Q.   Let's assume that comes back
 3   negative as well.
 4      A.   I would then launch the query with
 5   the utility company.
 6      Q.   And would you start with any basic
 7   assumptions what the source of the problem might
 8   be?
 9      A.   Having no other information
10   available to me?
11      Q.   Correct.
12      A.   I might think it was a metering
13   error.  I might think somebody tapped into the
14   service.  Those are the two things that jump out
15   at me.  A broken meter, computer error.
16      Q.   Now, depending on what it was --
17      Assume it later turns out to have
18   been an error, just a mistake.  Depending on what
19   the error was would impact upon what the fee would
20   be to NUS, right?
21      A.   I'm not sure I'm following this.
22      Q.   There are circumstances where NUS
23   only shares in the refund, right?
24      A.   Correct.  And I explained to you
25   what I could think of earlier.
```

Page 67

```
 1              Frankel
 2      Q.   Right.  I understand.
 3      So since you don't know what the
 4   error is yet because the investigation is not
 5   concluded, as you begin searching for the source
 6   of the error you don't yet know what the fee will
 7   be, right?
 8      A.   Again, since at this point I'm not
 9   aware whether the error has already corrected
10   itself, I guess the answer would be "Yes."
11      Q.   You could only tell what the fee is
12   going to be once you know what the problem is and
13   it's solved, right?
14      A.   Correct.
15      Q.   So as of November 16, 2006, when
16   Tiffany asks NUS to investigate, at that point
17   what the fee will be for the service is unknown,
18   right?
19      A.   Correct.
20      Q.   Could be zero, right?
21      A.   I don't think it would be zero.
22      Q.   Well, if it was right -- if the bill
23   was right --
24      A.   Okay.  I stand corrected.  If the
25   bill was right, it could be zero.
```

Page 68

```
 1              Frankel
 2      Q.   So NUS could provide services in
 3   investigating this usage pattern and find that the
 4   authority was absolutely correct and then whatever
 5   work it performed to investigate would not result
 6   in any fee, right?
 7      A.   Correct.
 8      Q.   And that's part of working on the
 9   "contingency"?
10      A.   That is correct.
11      Q.   So you understand that going in?
12      A.   Yes.
13      Q.   Now, turning you to Exhibit 2 for
14   identification, I would like to start on the
15   second page, which is the cost analysis report
16   that was prepared by NUS and forwarded by
17   Ms. Amundsen to Mr. Mogel on December 20, 2006.
18   You said you don't recall if you were involved in
19   the preparation of this document, right?
20      A.   Well, I want to clarify that.  There
21   was a point in time where I was involved in
22   creating portions of this type of document, which
23   are then used as a starting point for people in
24   the company.  So the answer is I was involved in
25   some of this stuff that's on here.
```

Page 69

```
 1              Frankel
 2      Q.   So the cost analysis report is a
 3   form that is used at NUS to make recommendations
 4   to customers; is that right?
 5      A.   It's a form which is used to
 6   initiate the process of creating a recommendation.
 7      Q.   When you say you were involved in
 8   the process of creating the underlying documents,
 9   what portions of this are you speaking of?
10      A.   I couldn't -- I mean I couldn't tell
11   you.
12      At a point in time, whether it was
13   several years back, we decided that it would be a
14   useful thing to take what we consider to be the
15   good basic steps of formatting recommendations and
16   putting that into a template that the analysts and
17   consultants could then use to sort of start the
18   ball rolling and not have to put everything
19   generically into or generally into a document.  So
20   "Our review of your invoices for the
21   above-referenced location," why do I need to have
22   somebody put that type of stuff into it?  So that
23   type of stuff we created and then the specifics as
24   to the situation are added by the analyst or the
25   consultant.
```

Page 70

Frankel

1
2      So I just want to clarify when I
3  said I didn't have anything to do with this, I
4  guess in essence I did for that part.
5      Q.   So there is some generic language
6  that appears in the cost analysis report which is
7  part of Exhibit 2 for identification that NUS uses
8  in all similar documents created for other of its
9  accounts.  Is that what you're saying?
10     A.   Similar documents with the
11 understanding that there are different documents
12 created for different type situations,
13 recommendations.
14     Q.   As a template, is it that you have
15 blank spaces in a form that are then filled in?
16     A.   Correct.
17     Q.   And there exists on your system the
18 template that the person who creates these reports
19 completes the blank spaces to make it specific to
20 a particular account; is that what you're saying?
21     A.   A particular account and idea or
22 recommendation, yes.
23     Q.   And you have no recollection of
24 having participated at all in the customization
25 portion of preparing the cost analysis report for

Page 71

Frankel

1
2  Tiffany in this case, right?
3      A.   Not that I'm aware of, no.
4      Q.   So to the extent you were involved
5  at all, your involvement would be in some of the
6  generic language that's here that you have seen
7  carried over from report to report for different
8  customers, right?
9      A.   Correct.
10     Q.   And one of the phrases that you
11 recall being generic is "our review of your
12 invoices for the above-referenced location
13 indicates"?
14     A.   Yes, things along those lines.
15     Q.   Is there a name for this template on
16 your system?
17     A.   I guess it would be called "cost
18 analysis report."
19 RQ       MR. MITCHELL:  I think we
20      asked for the production of all
21      drafts.  I would think that would
22      qualify as a draft, the template.  I
23      think we should have been provided
24      with that, because that appears to be
25      a draft.

Page 72

Frankel

1
2      MR. GOODMAN:  Well, I don't
3  know if I agree that that's a draft,
4  but if you're asking for the template
5  I will take that request under
6  advisement.
7      MR. MITCHELL:  I am, and thank
8  you.
9      Q.   Is it also PART of the template that
10 you have "As part of our analysis, we have
11 compared your consumption and load profile (which
12 we compiled from your electric invoices) against
13 other available rate options currently being
14 offered by the provider"?
15     A.   It may be, yes.
16     Q.   That looks to you like something you
17 have seen in your template?
18     A.   I believe so, yes.
19     Q.   Another one says, "Our analysis,
20 based upon your recent consumption patterns and
21 load profile, reveals that while your present rate
22 is the most cost-effective."  Is that also in the
23 template?
24     A.   Once we get beyond where I am, I
25 don't know anymore.  I think that may be specific

Page 73

Frankel

1
2  to the recommendation.
3      Q.   Is the cost analysis report the
4  first thing NUS does before it begins work on a
5  particular situation?
6      Let me be a little more specific, if
7  I can.  Where in the timeline of services NUS
8  provides to a customer in connection with a
9  particular situation does the cost analysis report
10 fall?
11     A.   Well, we would get the bills in, we
12 would do a review of the bills and if something
13 was uncovered during the review process, we would
14 then create a cost analysis report.
15     Q.   And do you prepare the cost analysis
16 report before you proceed further?
17     A.   Typically the answer is "yes."
18     Q.   And that's because the contract that
19 you have with your customers requires you to make
20 a recommendation and then the customer to
21 implement your recommendation, right?
22     A.   Correct.
23     Q.   And the recommendation that you make
24 to the customer is contained in the cost analysis
25 report, right?

# MOGEL
# DEPOSITION

NATIONAL UTILITY SERVICE VS TIFFANY & CO

BRUCE MOGEL - 2/26/08

CONCORDANCE AND CONDENSED TRANSCRIPT
PREPARED BY:



*Ellen Grauer*
COURT REPORTING Co. LLC

TOWER 56, 126 EAST 56TH STREET, FIFTH FLOOR, NEW YORK, NEW YORK 10022
PHONE: (212) 750-6434    FAX: (212) 750-1097
WWW.ELLENGRAUER.COM

Page 17

(1)
(2)    Q.    During 2006 and 2007 when you were
(3) the director of retail facilities, did you have
(4) anyone report to you?
(5)    A.    Yes.
(6)    Q.    Who?
(7)    A.    I had three managers.
(8)    Q.    What were their names?
(9)    A.    Alexis Bairan, Sandra Lutz, Robert
(10) Delfagauw.
(11)    Q.    What were each of these managers
(12) responsible for?
(13)    A.    They were responsible for various
(14) stores that are split up by geographical
(15) region.
(16)    Q.    So, is it fair to say that they
(17) were responsible for multiple stores within a
(18) region?
(19)    A.    Yes.
(20)    Q.    Describe more specifically your
(21) role with respect to interacting with NUS back
(22) in 2006.
(23)    MR. MITCHELL: Object to the form
(24)    of the question.
(25)    Can you be more specific?

Page 18

(1)
(2)    MR. GOODMAN: Sure.
(3)    Q.    Earlier you testified that you --
(4) that you worked with NUS to review utility
(5) bills and respond to their recommendations;
(6) correct?
(7)    A.    Yes.
(8)    Q.    To what extent did you work with
(9) NUS? Can you describe --
(10)    A.    I made sure that they had the
(11) utility bills or that accounts payable was
(12) sending them utility bills for newly opened
(13) locations. They would -- they, NUS, would send
(14) me recommendations recommending that we maybe
(15) switch suppliers for a better rate and they
(16) would recommend that I sign an agreement with a
(17) new supplier for a rate, for a better rate, and
(18) they would send me basically a form letter and
(19) we'd put that on our letterhead, send that to
(20) the supplier and then we would enjoy a better
(21) rate.
(22)    And I would also receive invoices
(23) from NUS for whatever stores we were getting a
(24) better rate and I would authorize the payment
(25) of those invoices to NUS.

Page 19

(1)
(2)    Q.    Were you responsible for making
(3) sure that NUS had all utility bills for all
(4) locations or was it only utility bills with
(5) respect to newly opened stores?
(6)    A.    I would make sure that they were
(7) getting the utility bills for all of our -- all
(8) of our stores that we were operating and I
(9) would, from time to time, look at -- look to
(10) see if they had a correct list of our operating
(11) stores; maybe if we had closed a store, that
(12) that was off the list.
(13)    Q.    Were you sending NUS bills only for
(14) retail stores or for other types of facilities?
(15)    A.    I wasn't sending any bills. They
(16) came from accounts payable.
(17)    Q.    Okay. So accounts payable was
(18) physically sending the bills to NUS?
(19)    A.    Yes, yes. I would tell accounts
(20) payable to make sure they send the bills for
(21) review of the store to NUS. They forwarded the
(22) bills, I didn't.
(23)    Q.    Who did you direct at accounts
(24) payable to do that?
(25)    A.    Usually Eric Ziegler, manager.

Page 20

(1)
(2)    Q.    Did you tell Eric Ziegler to
(3) forward bills for facilities other than retail
(4) stores?
(5)    A.    No.
(6)    Q.    Do you know whether he was sending
(7) bills other than retail stores?
(8)    A.    I don't know.
(9)    Q.    Did you any responsibility for
(10) approving or not approving the payment of
(11) utility bills for a given location of Tiffany?
(12)    A.    No.
(13)    Q.    Were there times when you did
(14) instruct accounts payable to either pay or not
(15) to pay a bill for a store?
(16)    A.    There may have been.
(17)    Q.    Was there a -- a person or a
(18) department at Tiffany during 2006 who had the
(19) responsibility to monitor utility expenses
(20) other than what you've described?
(21)    MR. MITCHELL: Object to the form
(22)    of the question.
(23)    A.    I don't understand the question.
(24)    Q.    Let me withdraw that and rephrase
(25) it.

NATIONAL UTILITY SERVICE                                        VS TIFFANY & CO
BRUCE MOGEL - 2/26/08

---

Page 21

(1)
(2)        Other than the efforts that you
(3)   described to monitor utility expenses by
(4)   working with NUS, was there anyone else at
(5)   Tiffany who had that function?
(6)        MR. MITCHELL:  Object to the form
(7)        of the question.  Mischaracterizes the
(8)        witness' prior testimony.
(9)        A.   There's other directors of
(10)  facilities.
(11)       Q.   Who was responsible for authorizing
(12)  payment of utility bills?  And let me be
(13)  specific.  I'm talking about the Manhasset
(14)  store located at 1980 Northern Boulevard.
(15)       A.   I believe it was accounts payable.
(16)       Q.   What was the process pursuant to
(17)  which a utility bill was received by Tiffany
(18)  and then paid to the utility?
(19)       A.   I'm not sure.
(20)       Q.   Do you know who received the
(21)  utility bills?
(22)       A.   I believe they went directly to
(23)  accounts payable.
(24)       Q.   Does Tiffany operate in New Jersey?
(25)       A.   What do you mean by "operate"?

---

Page 22

(1)
(2)        Q.   Does it have a store in New Jersey?
(3)        A.   Yes.
(4)        Q.   Does it have a warehouse
(5)   distribution facility in New Jersey?
(6)        A.   Yes.
(7)        Q.   Does it have corporate offices in
(8)   New Jersey?
(9)        A.   Yes.
(10)       Q.   During 2006 and 2007, did you
(11)  personally have any contact with
(12)  representatives from utilities which serviced
(13)  Tiffany's locations?
(14)       A.   I may have.
(15)       Q.   Is there anyone that comes to mind?
(16)       A.   I believe I spoke with a
(17)  representative from Washington Gas out of
(18)  Washington, D.C.
(19)       Q.   Did you have speak with any
(20)  representatives from utilities who provided
(21)  electric service to the Manhasset store?
(22)       A.   Not that I remember.
(23)       Q.   When did you first become aware of
(24)  National Utility Service?
(25)       A.   I would say when I first became the

---

Page 23

(1)
(2)   manager for facilities, 1996, somewhere around
(3)   then.  When I left security and went over to
(4)   facilities.
(5)        Q.   At that time in 1996, was Tiffany
(6)   working with NUS pursuant to an agreement?
(7)        A.   That's what I was told, yes.
(8)        Q.   Who told you that?
(9)        A.   I believe Phil Bottega told me
(10)  that.
(11)       Q.   At that time were you assigned any
(12)  responsibility with respect to the NUS
(13)  relationship?
(14)       A.   Yes.
(15)       Q.   What was the responsibility that
(16)  you were given?
(17)       A.   Make sure that the utility bills
(18)  for new stores are sent to NUS for review.
(19)       Q.   Were you directed to respond to
(20)  NUS's communications?
(21)       A.   No, not specifically, I wasn't
(22)  directed to respond to them.
(23)       Q.   Was it your understanding that you
(24)  were Tiffany's contact person with NUS?
(25)       A.   I took that role on, yeah.

---

Page 24

(1)
(2)        Q.   So your responsibilities entailed
(3)   more than just forwarding or making sure that
(4)   utility bills were forwarded to NUS?
(5)        A.   Yes.
(6)        Q.   So you interfaced with NUS?
(7)        A.   Yes.
(8)        Q.   And did that function continue from
(9)   about 1996 until the contract was terminated in
(10)  2007?
(11)       A.   Yes.
(12)       Q.   Was there anyone else during that
(13)  period who operated in the same capacity?
(14)       A.   Yes.
(15)       Q.   Who was that?
(16)       A.   I believe other directors of
(17)  facilities had some contact with NUS.
(18)       Q.   Would you characterize your
(19)  involvement as being the primary contact with
(20)  NUS?
(21)       MR. MITCHELL:  Object to the form
(22)       of the question.
(23)       A.   I -- I'm not sure what you mean by
(24)  "primary contact."
(25)       Q.   Well, to what extent did the other

---

NATIONAL UTILITY SERVICE

BSA XMAX(10/10)
BRUCE MOGEL - 2/26/08

VS TIFFANY & CO

Page 37

(1)
(2)  and "wherefore" that certain monies were then
(3)  owed to NUS.
(4)      Q.   Okay, let's start at the beginning
(5)  with that recommendation. Did there come a
(6)  time when you learned that there was a billing
(7)  error at the Manhasset store relating to the
(8)  electric service?
(9)      A.   Yes.
(10)     Q.   When was the first time that was
(11) brought to your attention?
(12)     A.   I believe Chris Amundsen called me
(13) and told me about it.
(14)     Q.   What did she say and what did you
(15) say?
(16)     A.   I don't remember exactly what she
(17) said. She said that there was apparently some
(18) issue with the meters and that there would --
(19) you know, that there was some resolution and
(20) that we would owe -- you know, she talked about
(21) the fees and everything and the savings and so
(22) forth and so on.
(23)         MR. MITCHELL:  What period of time
(24)     are we talking about?
(25)         MR. GOODMAN:  That was my next

Page 38

(1)
(2)  question.
(3)         MR. MITCHELL:  I have to say your
(4)     question is so open-ended. I don't know
(5)     if you were talking about at the
(6)     beginning or the end. I didn't object,
(7)     but now that he's answered, I don't think
(8)     you put a timeframe on that.
(9)         MR. GOODMAN:  Well, my question was
(10)    actually pretty specific. I asked him
(11)    when the first time he learned that there
(12)    was a billing error and he said it was in
(13)    a phone conversation and I asked about
(14)    the phone conversation and he gave his
(15)    answer.
(16)        MR. MITCHELL:  I believe the
(17)    problem is in your use of the word
(18)    billing error. So it puts a timeframe
(19)    later in your mind than you anticipated.
(20)     Q.   When was the time of this phone
(21) conversation with Chris Amundsen?
(22)     A.   I don't remember exactly when she
(23) called me. I don't remember.
(24)     Q.   Do you remember receiving a written
(25) recommendation from NUS?

Page 39

(1)
(2)      A.   Yes.
(3)      Q.   Do you remember approximately when
(4)  that took place?
(5)      A.   Early January, maybe.
(6)      Q.   Let me give you a copy of the
(7)  recommendation so we can affix a point of
(8)  reference.
(9)         MR. GOODMAN:  If the court reporter
(10)    can mark as Exhibit 2 -- this also does
(11)    not bear any Bates stamp numbers, but
(12)    it's a four-page document, the first page
(13)    is an e-mail from Christine Amundsen
(14)    dated December 20, 2006. There's a
(15)    three-page attachment.
(16)        (Plaintiff's Exhibit 2, e-mail from
(17)    C. Amundsen dated 12/20/06 with
(18)    attachment, marked for identification.)
(19)     Q.   Did you receive the e-mail and the
(20) attachment that have been marked Exhibit 2?
(21)     A.   Yes.
(22)     Q.   Okay. Did you receive them on
(23) December 20, 2006?
(24)     A.   That's when it was sent. I don't
(25) know exactly when I received it, but that's

Page 40

(1)
(2)  when it was sent or I would say I don't know
(3)  when I read it, but that's when it was sent.
(4)      Q.   Okay. Is your understanding
(5)  that e-mails are received approximately the
(6)  same time or within minutes after they're
(7)  sent?
(8)         MR. MITCHELL:  Object to the form
(9)     of the question.
(10)        He said he didn't know when he read
(11)    it. That's what he said. He didn't say
(12)    he didn't receive it.
(13)        MR. GOODMAN:  I think he also said
(14)    he didn't know when he received it.
(15)     Q.   Did you receive it on or about
(16) December 20, 2006?
(17)     A.   Yes.
(18)     Q.   There come a time when you did read
(19) it?
(20)     A.   Yes.
(21)     Q.   And you don't recall sitting here
(22) today when that was; is that right?
(23)     A.   No, I don't remember exactly when I
(24) read it.
(25)     Q.   Would it have been within a day or

Page 41

(1)
(2) two of receiving it?
(3)     A.   Typically.
(4)     Q.   You don't recall being on vacation
(5) in December 2006 at that time, do you?
(6)     A.   No, I wasn't on vacation.
(7)     Q.   And what do you recognize the
(8) document to be, both the e-mail and the
(9) attachment?
(10)    A.   It's a letter -- it's an e-mail
(11) from Chris with an attachment.  It's pretty
(12) much their standard form of what they sent when
(13) they've found some sort of better rate or want
(14) us to be aware of something.  It's just a form
(15) letter.
(16)    Q.   Okay.  So this is NUS's report with
(17) respect to the Manhasset store; is that
(18) correct?
(19)    A.   Yes.
(20)    Q.   And specifically it deals with
(21) electric service at that store; is that right?
(22)    A.   Yes.
(23)    Q.   Were you authorized to receive this
(24) report by Tiffany?
(25)    A.   What do you mean "authorized"?

Page 42

(1)
(2)     Q.   Well, was it part of your job to
(3) receive this?
(4)     A.   Well, I received them.
(5)     Q.   You received other reports from
(6) NUS?
(7)     A.   Yes.
(8)     Q.   Similar to this one?
(9)     A.   Yes, when they -- yes.
(10)    Q.   And that was part of the function
(11) that Philip Bottega gave you in the mid-1990s
(12) was to receive communications from NUS; is that
(13) right?
(14)    A.   I don't remember if he said I would
(15) be getting communications from them.  They just
(16) came.
(17)    Q.   Did he ever tell you that you
(18) should give those communications to someone
(19) else?
(20)    A.   I don't recall that.  I don't
(21) recall specifically that he said I should give
(22) them to someone else.
(23)    Q.   Did he know that you were receiving
(24) communications from NUS?
(25)    A.   Yes.

Page 43

(1)
(2)     Q.   And he never told you that he
(3) disapproved of you receiving communications
(4) from NUS, did he?
(5)     A.   No.
(6)     Q.   Now, before you received this
(7) report on December 20, 2006, do you recall
(8) having any discussions with anyone from NUS
(9) about electric service at the Manhasset
(10) location?
(11)    A.   Yes.
(12)    Q.   When was the last time before
(13) receiving the report?
(14)    A.   I don't recall the exact time.
(15)    Q.   Okay.  The discussion that you had
(16) with Chris Amundsen which you referred to
(17) before, did that occur before you received the
(18) report?
(19)    A.   I believe so, yes.
(20)    Q.   And other than what you testified
(21) to, is there anything else that you remember
(22) Chris telling you in that conversation?
(23)    A.   Chris mentioned to me in a
(24) conversation that I had with her that there
(25) would be shared savings and that I believe NUS

Page 44

(1)
(2) was entitled to some astronomical figure, a
(3) large figure, she put it.  I don't remember the
(4) exact figure.
(5)     Q.   Was that a conversation that took
(6) place before the report?
(7)     A.   I believe it was before I actually
(8) received a hard copy.
(9)     Q.   And did she say anything else in
(10) that conversation?
(11)    A.   Not that I -- not that I recall
(12) specifically.
(13)    Q.   What did you say to Chris?
(14)    A.   I said that we need to find out
(15) what's going on out there and that as far as
(16) any kind of fees or anything we'd have to talk
(17) about that later.  I wanted them to look into
(18) what the problem was with respect to the bills.
(19)    Q.   Okay.  And did you tell her to take
(20) steps to investigate the problem?
(21)    A.   I believe so, yeah.
(22)    Q.   And did you do that before
(23) receiving the report?
(24)    A.   I believe -- I believe so.  I
(25) believe the report came after that.  I'm not --

Page 49

(2) with the witness.

(3)     **MR. MITCHELL:** You're using the
(4) word "initial" and I don't know if we've
(5) established an initial timeframe and
(6) that's why I'm confused.

(7)     Q. I'll clarify that. Mr. Mogel, you
(8) have in front of you Exhibit 2 which is the
(9) December 20th e-mail and report; correct?

(10)     **A. Yes.**

(11)     Q. And you told us about the
(12) conversation you had on the telephone with
(13) Chris before that report; correct?

(14)     **A. I believe it was before the report,**
(15) **yes. I can't be sure.**

(16)     Q. How -- do you -- how many
(17) conversations do you recall having with Chris
(18) before the date of the report on the phone?

(19)     **A. I don't know. I don't know how**
(20) **many conversations I had with her. I don't**
(21) **remember how many conversations I've had with**
(22) **her.**

(23)     Q. Okay. Now, once you received the
(24) recommendation which is Exhibit 2, did you read
(25) it?

Page 50

(2)     **A. Yes.**

(3)     Q. Okay. Did you think it was a good
(4) recommendation?

(5)     **A. I believe it was a recommendation.**
(6) **It made sense to me. I don't know what you**
(7) **mean by the word "good."**

(8)     Q. Did you think that it could benefit
(9) Tiffany economically?

(10)     **A. Oh, we wouldn't be paying the same**
(11) **meter charge so there would be some sort of**
(12) **benefit.**

(13)     Q. Did you understand that the
(14) recommendation could result in Tiffany
(15) receiving a refund for overcharges it had
(16) previously paid on its electric costs?

(17)     **A. Yes, I knew there would be a**
(18) **refund.**

(19)     Q. Did you understand that the
(20) recommendation could benefit Tiffany
(21) financially by correcting an ongoing billing
(22) error on the electric bills?

(23)     **MR. MITCHELL:** Object to the form
(24) of the question.

(25)     **A. I understood that it would benefit**

Page 51

(2) us financially until they fixed it.

(3)     Q. Until they fixed what?

(4)     **A. The meter.**

(5)     Q. Okay, but at the time you didn't
(6) know that there was a meter problem; correct?

(7)     **A. No, I didn't know if there was a**
(8) **meter problem or what the problem was.**

(9)     Q. Is it your testimony that you
(10) didn't think that there would be a financial
(11) benefit to Tiffany once the billing was
(12) corrected, regardless of what the problem was?

(13)     **MR. MITCHELL:** Object to the form
(14) of the question.

(15)     **A. No, I didn't think that there would**
(16) **be -- I -- I thought that there would be a**
(17) **financial benefit when we fixed the meter and**
(18) **we got a corrected bill from the utility**
(19) **company.**

(20)     Q. If the bill had not been corrected,
(21) Tiffany would have been paying higher bills;
(22) correct?

(23)     **A. Yes.**

(24)     Q. Okay. So, by fixing the bill, it
(25) would be a benefit to Tiffany going forward;

Page 52

(2) correct?

(3)     **MR. MITCHELL:** Object to the form
(4) of the question.

(5)     **A. Yes.**

(6)     Q. Now, National Utility Service under
(7) the agreement was authorized to make
(8) recommendations which could save money for
(9) Tiffany on the cost of electricity; correct?

(10)     **A. On the cost of electricity, yes.**

(11)     Q. And you gave approval to National
(12) Utility Service to proceed with the
(13) investigation of this billing error; is that
(14) right?

(15)     **A. Yes.**

(16)     Q. Do you remember at any time signing
(17) a letter authorizing National Utility Service
(18) to act on Tiffany's behalf?

(19)     **A. I signed letters for National**
(20) **Utility Service to act on our behalf in other**
(21) **locations, yes. It was routine.**

(22)     Q. Do you recall signing a letter
(23) authorizing NUS to act on Tiffany's behalf with
(24) respect to the Manhasset location?

(25)     **A. I don't actually recall that, no.**

NATIONAL UTILITY SERVICE

BSA XMAX(14/14)
BRUCE MOGEL - 2/26/08

VS TIFFANY & CO

---

Page 53

(1)
(2) I don't remember. I'd have -- I don't know.
(3)     Q.   Which locations do you remember
(4) signing letters for?
(5)     A.   Any location where we had to sign
(6) an agreement with a utility for a better rate,
(7) I'd have to sign something as the user that,
(8) yeah, we wanted to enter into this agreement
(9) for a better rate so it would go off to that
(10) utility.
(11)     Q.   Are you referring to a contract
(12) with the utility?
(13)     A.   It's not the utility as much as it
(14) is the -- the provider of the electric. It's
(15) not the distributor. It's the provider, so
(16) there would be agreements with different energy
(17) suppliers in deregulated states. Transmission
(18) was different from the provider.
(19)     Q.   Before the date of the December
(20) 20th report, was Tiffany aware of the billing
(21) error and overcharge?
(22)     A.   If she called me before this, then
(23) I think that's when she told me about the
(24) potential meter problem. I can't remember
(25) exactly what she said, but I don't think

---

Page 54

(1)
(2) anything was resolved with that phone call. I
(3) gave her instructions to proceed to continue
(4) the investigation.
(5)     Q.   Okay. Was the first -- when was
(6) the first time that you learned of the billing
(7) error and overcharge?
(8)     A.   I don't remember the exact time I
(9) learned of it.
(10)     Q.   How did you learn of it?
(11)     A.   I believe she called me and told me
(12) that that's -- it appeared to be what was going
(13) on. I can't remember exactly.
(14)     Q.   Okay. And before you either heard
(15) from Christine in the phone call or received
(16) the written report, you weren't aware of the
(17) overcharge and billing error; is that right?
(18)     A.   Well, yeah, she had called and said
(19) to me, and I don't know when she called, but
(20) she had called and said would I know of any
(21) reasons that we would be paying a lot of money
(22) in Manhasset, you know, and I said I don't know
(23) of any reasons.
(24)         So, I reached out to -- I guess, my
(25) manager, to call the store to see if the store

---

Page 55

(1)
(2) was doing anything weird, leaving the air
(3) conditioning on all night or things like that,
(4) and nothing different was being done.
(5)         And so that's when I first really
(6) realized that there was some sort of problem
(7) with the billing. She had brought it to my
(8) attention and I don't remember when that call
(9) was made.
(10)     Q.   So, it's fair to say that before
(11) Chris brought it to your attention, you or
(12) anyone else from Tiffany didn't take any steps
(13) to correct the billing error; correct?
(14)     A.   I don't know what other people did.
(15) I know I didn't know about it so I didn't take
(16) any steps.
(17)     Q.   Okay. What is the next
(18) communication you recall having with NUS after
(19) you received the report on December 20th?
(20)     A.   I don't recall exactly. I don't
(21) recall exact communications with them after
(22) this. I don't know. There may have been some.
(23) I don't know exact -- if there were any exact
(24) communications or when.
(25)     Q.   Describe for me generally how

---

Page 56

(1)
(2) things proceeded from December 20th until the
(3) billing error was finally corrected and the
(4) refund was received from the utilities.
(5)     A.   From December 20th?
(6)     Q.   Yes.
(7)     A.   I had, at one point, asked Chris to
(8) look into this problem and find out what the
(9) issue was with the meters. They looked into
(10) it. They determined that there was a
(11) problem -- someone determined there was a
(12) problem with the labeling or the connection of
(13) the meters.
(14)         We got -- I'm not quite sure of the
(15) exact sequences but we got this report and she
(16) had mentioned to me that there was, you know,
(17) this shared savings and it was over 60 months
(18) and I said, well, we have to, you know, get to
(19) the bottom of this and things got corrected
(20) with the utility and I believe then I got -- I
(21) may have gotten a hard copy of this in the
(22) mail. I don't know exactly when and that was
(23) that.
(24)         I'm not quite certain of the exact
(25) sequence of events between phone calls and

---

Page 57

(1)
(2) e-mails and letters.
(3)    Q.   From December 20, 2006 until the
(4) correction of the bills and the receipt of the
(5) refunds, did you have conversations with anyone
(6) at Tiffany about the matter taking place at
(7) Manhasset?
(8)    A.   Yes.
(9)    Q.   Okay.  Who did you talk to about
(10) that?
(11)    A.   I talked to Larry Palfini.
(12)    Q.   Anyone else?
(13)    A.   Not that I remember.  Larry is
(14) the -- I don't remember if I talked to anyone
(15) else or not.
(16)    Q.   About how many times did you talk
(17) to Larry about this matter?
(18)    A.   I have no idea.
(19)    Q.   Do you recall specific discussions
(20) you had with him?
(21)    A.   No, nothing specific.  Just
(22) conversations.
(23)    Q.   You don't recall the substance of
(24) any one of those conversations?
(25)    A.   I kept him informed as my boss as

Page 58

(1)
(2) to what was going on.  I don't remember exact
(3) details.  You'd have to be more specific.
(4)    Q.   Did you send him a copy of NUS's
(5) report?
(6)    A.   I may have forwarded it.  I don't
(7) remember.  I don't know.
(8)    Q.   Just so we're clear, is it your
(9) testimony that as you sit here today, you don't
(10) have a specific recollection of any one
(11) conversation with Larry Palfini during the
(12) period of December 20, 2006 until mid-February
(13) 2007?
(14)    A.   Do -- repeat that, please.
(15)    MR. GOODMAN:  Could you reread it,
(16) please?
(17)    (Record read.)
(18)    A.   I don't recall specific
(19) conversations.  I have a lot of conversations.
(20) I can't recall a specific conversation.  If I
(21) knew what it was about, maybe I could, but I
(22) don't -- I don't know what you mean by
(23) "specific."
(24)    Q.   Do you remember anything that
(25) Mr. Palfini told you about NUS and the efforts

Page 59

(1)
(2) to address the electric service situation at
(3) Manhasset during the period from December 20,
(4) '06 through mid-February '07?
(5)    A.   Repeat that, please.
(6)    MR. GOODMAN:  Please.
(7)    (Record read.)
(8)    A.   Well, Larry talked to me about
(9) basically the interpretation of savings and
(10) things to that effect.  I don't know exactly
(11) when, but I recall that we had conversations
(12) about definitions and our positions and things
(13) and so forth.
(14)    That's -- but I don't remember any
(15) specific conversations.  I've had many
(16) conversations with Larry.  Nothing stands out
(17) in my mind.
(18)    Q.   Does anything stand out in your
(19) mind as to what you told Larry during that
(20) period?
(21)    A.   Nothing stands out in my mind that
(22) I can recall.  I've had -- as I mentioned, I've
(23) had many conversations and my recollection is
(24) what it is.  I don't recall anything specific.
(25) If you would be more detailed, I would be glad

Page 60

(1)
(2) to answer you.
(3)    MR. GOODMAN:  Do you want to take
(4) five minutes?
(5)    MR. MITCHELL:  Sure.
(6)    (Recess taken.)
(7)    Q.   During the period from December 20,
(8) 2006 until mid-February 2007, did you have any
(9) discussions with Larry Palfini as to whether
(10) Tiffany might owe NUS money under their
(11) agreement with respect to the electric service
(12) billing issue at Manhasset?
(13)    A.   Conversations?  Probably, yes, yes.
(14)    Q.   How many conversations do you
(15) recall?
(16)    A.   I don't have any idea how many.
(17)    Q.   What is the first conversation you
(18) recall?  Let me clarify that.  I'm talking
(19) about conversations either in person or by
(20) telephone.  I'm not talking about any e-mail
(21) communications.
(22)    A.   I don't remember exactly when the
(23) first conversation took place, but I know we
(24) discussed it.
(25)    Q.   What did you say and what did he

BSA XMAX(17/17)

NATIONAL UTILITY SERVICE

BRUCE MOGEL - 2/26/08

VS TIFFANY & CO

---

Page 65

(1)
(2)       So at least to the extent you would
(3)   be showing the witness e-mails that are
(4)   contained as part of a string, to the
(5)   extent there is a document that contains
(6)   the entire string, I would have a
(7)   standing objection to not including the
(8)   entire string if it's your intention to
(9)   use the last e-mail to get the whole
(10)  string, that would be ideal.
(11)      But I would interpose, at least at
(12)  this point as we go forward, a standing
(13)  objection to the extent you don't use the
(14)  entire string because these go back and
(15)  forth and the way these documents were
(16)  produced, I believe by both sides,
(17)  because of the way e-mails get captured
(18)  off of different computers, you wouldn't
(19)  necessarily get the completion of the
(20)  string.
(21)      So I don't know what your intention
(22)  is, but at least so I don't lose that
(23)  standing objection.
(24)      MR. GOODMAN:  No, I understand your
(25)  objection.  I actually don't think that

---

Page 66

(1)
(2)   it relates to this particular exhibit
(3)   because the thing that's missing from
(4)   this is not another e-mail.  It's an
(5)   attachment to the e-mail.
(6)       MR. MITCHELL:  It was an attachment
(7)   to what was the original in the string so
(8)   by -- we need to capture the entire
(9)   string and whether that's by doing a
(10)  packet or whether that's by --
(11)      MR. GOODMAN:  I have it.  We can
(12)  deal it by e-mail or e-mail by exhibit.
(13)  I have that e-mail and I will mark it
(14)  separately with the attachment.  Why
(15)  don't we just do that now since we're
(16)  talking about this particular e-mail.
(17)      MR. MITCHELL:  That's great.
(18)      MR. GOODMAN:  So I ask the court
(19)  reporter to mark as Exhibit 4 an e-mail
(20)  with an attachment and the e-mail is from
(21)  Christine Amundsen to Bruce Mogel dated
(22)  November 15, 2006 Bates stamp numbers T
(23)  1127 and T 1128.
(24)      (Plaintiff's Exhibit 4, document
(25)  Bates stamped T 1127 and T 1128, marked

---

Page 67

(1)
(2)   for identification.)
(3)       MR. MITCHELL:  I assume we would
(4)   agree with each other that however the
(5)   strings end, they end.  We would agree
(6)   with each other that if it is a complete
(7)   string it ends where the string ends, not
(8)   somewhere before that.
(9)       MR. GOODMAN:  I'm not sure I know
(10)  what that means.  I can tell you what I
(11)  tried to do which was to use as an
(12)  exhibit a string of e-mails that was as
(13)  inclusive as possible.
(14)      MR. MITCHELL:  Okay, thank you.
(15)      MR. GOODMAN:  That being said,
(16)  sometimes we have to use more than one
(17)  string because they radiate in different
(18)  directions.
(19)      MR. MITCHELL:  That's the nature of
(20)  electronic discovery.
(21)      MR. GOODMAN:  It's a new world.
(22)  Q.   Okay, Mr. Mogel, you have now in
(23)  front of you Exhibits 3 and 4; correct?
(24)  A.   Yes.
(25)  Q.   Now, with respect to Exhibit 4,

---

Page 68

(1)
(2)   that's the two-page exhibit.
(3)   A.   Yes.
(4)   Q.   Did you receive this November 15,
(5)   2006 e-mail from Christine Amundsen?
(6)   A.   Yes.
(7)   Q.   And you received it on or about
(8)   November 15, 2006?
(9)   A.   Yes.
(10)  Q.   And if you look at the second page
(11)  of that e-mail, is that an attachment to the
(12)  e-mail?
(13)  A.   Yes.
(14)  Q.   And did you receive the attachment
(15)  at or about the -- or at the same time that you
(16)  received the e-mail?
(17)  A.   Yes.
(18)  Q.   You could put Exhibit 4 aside for
(19)  now.  Now, if you turn to Exhibit 3 -- on the
(20)  second page of Exhibit 3, I'm referring to that
(21)  same November 15, 2006 e-mail.  Do you see it?
(22)  A.   Yes.
(23)  Q.   The e-mail above it also November
(24)  15, 2006 from Bruce Mogel to Sandy Lutz.  Do
(25)  you see that one?

---

NATIONAL UTILITY SERVICE                                                                    VS TIFFANY & CO

BRUCE MOGEL - 2/26/08

| Page 69 | Page 71 |
|---|---|

**Page 69**

(1)
(2)    A.   Yes.
(3)    Q.   Is that an e-mail that -- that you
(4) prepared?
(5)    A.   Yes.
(6)    Q.   And you prepared that on or about
(7) November 15, 2006?
(8)    A.   Yes.
(9)    Q.   And you sent it to Sandy Lutz;
(10) correct?
(11)    A.   Yes.
(12)    Q.   Who was Sandy Lutz?
(13)    A.   **Sandy Lutz is regional facilities**
(14) **manager.**
(15)    Q.   I ask you to take a look at the
(16) first page of Exhibit 3 and the top two e-mails
(17) where you are identified as a recipient.
(18)    A.   Yes.
(19)    Q.   Do you see them?
(20)    A.   Yes.
(21)    Q.   One is from Brian Ensor and one is
(22) from Bruce Edson; correct?
(23)    A.   Yes.
(24)    Q.   And you received those on or about
(25) November 16, 2006?

**Page 70**

(1)
(2)    A.   Yes.
(3)    Q.   Were Mr. Ensor's or Mr. Edson's
(4) comments ever forwarded on to anyone else?
(5)    A.   **I don't remember. E-mail**
(6) **forwarded?**
(7)    Q.   Yes, were those e-mails forwarded
(8) to anyone else?
(9)    A.   **I -- I don't remember.**
(10)    Q.   Did you ever tell NUS the substance
(11) of what Mr. Ensor or Mr. Edson told you?
(12)    A.   **I told NUS -- I believe I told**
(13) **Chris that there wasn't anything unusual going**
(14) **on in the store that would account for these**
(15) **fluctuations.**
(16)    Q.   Okay.
(17)        MR. GOODMAN:   Now I ask that
(18)    another string of e-mails be marked as
(19)    Exhibit 5 and these bear Bates numbers T
(20)    1139 through T 1141.
(21)        (Plaintiff's Exhibit 5, document
(22)    Bates stamped T 1139 through T 1141,
(23)    marked for identification.)
(24)    Q.   Have you had a chance to look at
(25) Exhibit 5, sir?

**Page 71**

(1)
(2)    A.   Yes.
(3)    Q.   In fact, I see that the answer to
(4) an earlier question is contained here where on
(5) your November 16th the first page of
(6) the exhibit it's the second e-mail down,
(7) November 16th at 1:01 p.m..
(8)    A.   Yes.
(9)    Q.   Is this an e-mail that you prepared
(10) and sent to all of the individuals listed on
(11) the addressee line including Christine
(12) Amundsen?
(13)    A.   Yes.
(14)    Q.   And by sending that e-mail to
(15) Christine, you were asking NUS to investigate
(16) the problem at the Manhasset store with respect
(17) to its electric service?
(18)    A.   Yes.
(19)        MR. MITCHELL:   You made a statement
(20)    that answers one of our questions.
(21)    That's hanging out there as a statement,
(22)    but I figured you were going to ask a
(23)    question.
(24)        MR. GOODMAN:   I'll clarify that.
(25)    Q.   What I was referring to there was

**Page 72**

(1)
(2) in your e-mail on November 16 at 1:01 p.m., did
(3) you forward all of the preceding e-mails in
(4) this chain to Christine, among others?
(5)    A.   I --
(6)    Q.   As best you can tell.
(7)    A.   **I have no way of telling that. I**
(8) **don't e-mail -- e-mail technical things that**
(9) **are unknown to me. I'm not sure if -- if**
(10) **everything preceding that went or not. I can't**
(11) **tell by looking at this. I sent this, but I**
(12) **don't know what else.**
(13)        MR. GOODMAN:   I have another series
(14)    of e-mails that I ask be marked as
(15)    Exhibit 6.   These e-mails do not bear any
(16)    production numbers.   It's a three-page
(17)    string of e-mails.   The first one is on
(18)    the header of Christine Amundsen.   It's
(19)    from Bruce Mogel to Christine Amundsen
(20)    dated December 21, 2006.
(21)        (Plaintiff's Exhibit 6, series of
(22)    e-mails dated 12/20/06 and 12/21/06,
(23)    marked for identification.)
(24)    Q.   Okay, referring to the last e-mail
(25) on this string which is on the first page, this

NATIONAL UTILITY SERVICE

BSA XMAX(19/19)
BRUCE MOGEL - 2/26/08

VS TIFFANY & CO

---

Page 73

(1)
(2)  is the e-mail pursuant to which Chris Amundsen
(3)  sent to you NUS's report; correct?
(4)      A.   Yes.
(5)      Q.   And if you look at the e-mail above
(6)  that which actually starts on the first page of
(7)  the exhibit, that's an e-mail from you to Chris
(8)  dated December 21, 2006?
(9)      A.   Yes.
(10)     Q.   At 9:44 a.m.; correct?
(11)     A.   Yes.
(12)     Q.   Did you prepare and send that
(13)  e-mail to Christine Amundsen?
(14)     A.   Yes.
(15)     Q.   And you did that on or about
(16)  December 21, 2006; correct?
(17)     A.   Yes.
(18)     Q.   Why did you send this e-mail to
(19)  Christine?
(20)     A.   Because I wanted to talk to her
(21)  about the report.
(22)     Q.   Was there anything in particular
(23)  that you were intending to discuss with her?
(24)     A.   Not that I can remember anything
(25)  particular.  I just wanted to talk to her about

---

Page 74

(1)
(2)  the report.
(3)      MR. GOODMAN:  I'm having marked as
(4)  Exhibit 7 a two-page letter dated
(5)  December 22, 2006 bearing production
(6)  numbers T 40 and T 41.  It's from
(7)  National Utility Service to Long Island
(8)  Power Authority.
(9)      (Plaintiff's Exhibit 7, document
(10)  Bates stamped T 40 and T 41, marked for
(11)  identification.)
(12)     Q.   Do you recognize Exhibit 7?
(13)     A.   Yes.
(14)     Q.   Do you recall first seeing this
(15)  letter sometime shortly after December 22,
(16)  2006?  I'm referring now there's a CC
(17)  indication on the second page of the letter.
(18)     A.   Yes, I must have received this.
(19)     Q.   What do you recognize this letter
(20)  to be?
(21)     A.   This is NUS -- a letter to Long
(22)  Island Power, LIPA, known as LIPA letting them
(23)  know that there's some sort of problem out
(24)  there and they wanted -- they wanted LIPA to
(25)  look into it on our behalf.

---

Page 75

(1)
(2)      MR. GOODMAN:  I'll have marked as
(3)  Exhibit 8 a letter from Bruce Mogel on
(4)  Tiffany & Co. letterhead, "To Whom It May
(5)  Concern" and it's production number T 42.
(6)      (Plaintiff's Exhibit 8, document
(7)  Bates stamped T 42, marked for
(8)  identification.)
(9)      MR. GOODMAN:  And for the record,
(10)  it's an undated letter.
(11)     Q.   Is that your signature on the
(12)  bottom of that letter, sir?
(13)     A.   Yes.·
(14)     Q.   Do you recall when you signed that
(15)  letter?
(16)     A.   No.
(17)     Q.   What is this letter?
(18)     A.   It's a form letter that NUS gives
(19)  us to put on our letterhead so they can send it
(20)  to the utility giving the utility, I think it
(21)  looks like, permission to work with them on our
(22)  behalf.
(23)     Q.   Was NUS authorized to use this
(24)  letter in connection with its efforts to
(25)  correct the electric service billing at

---

Page 76

(1)
(2)  Manhasset?
(3)      A.   Yes.
(4)      MR. GOODMAN:  I ask to be marked as
(5)  Exhibit 9 the three-page e-mail string
(6)  bearing production numbers T 43 through T
(7)  45.
(8)      (Plaintiff's Exhibit 9, document
(9)  Bates stamped T 43 through T 45, marked
(10)  for identification.)
(11)     Q.   Let's start with the e-mail on the
(12)  second page of the exhibit.  Is this an e-mail
(13)  that you created an sent to Eric Ziegler with a
(14)  CC to several other individuals on December 22,
(15)  2006 at 12:18 p.m.?
(16)     A.   Yes.
(17)     Q.   And if you look at the
(18)  second-to-last paragraph of that e-mail, what
(19)  were you intending to tell Eric Ziegler?
(20)     A.   The second-to-last paragraph?
(21)     Q.   Right.
(22)     A.   Which one are you talking about?
(23)     Q.   The one that starts, "Again please
(24)  notify me" --
(25)     A.   Okay.

---

---

Page 77

(1)
(2)    Q.   What was your point here?
(3)    A.   That I wanted, he -- if he got any
(4) bills in from Con Ed or LIPA for Manhasset I
(5) was going to let NUS know.  So I wanted to know
(6) so I knew where they were with the situation.
(7) I just wanted to know if he got anything in in
(8) the meantime.
(9)    Q.   Who is Warren Feld?  He's shown as
(10) a CC.
(11)    A.   I think Warren Feld is -- he's
(12) the -- he's in finance.  I think Eric might
(13) report to him.
(14)    Q.   And what about Christopher Fish?
(15)    A.   Chris is our real estate services
(16) finance director.
(17)    Q.   And if you look at the e-mail that
(18) begins on the bottom of the first page of this
(19) exhibit it's from Lawrence Palfini to you dated
(20) December 22, 2006 at 12:21 p.m.
(21)    A.   Yes.
(22)    Q.   Did you receive this e-mail?
(23)    A.   Yes.
(24)    Q.   On or about that date?
(25)    A.   Yes.

---

Page 78

(1)
(2)    Q.   And finally on this exhibit if you
(3) look at the first e-mail which is from you to
(4) Lawrence Palfini dated December 22, 2006 at
(5) 12:27 p.m., did you create and send this e-mail
(6) at that time?
(7)    A.   Yes.
(8)    MR. GOODMAN:  I'd like to have
(9) marked as Exhibit 10 a two-page string of
(10) e-mails bearing production numbers NUS
(11) 00134 to NUS 00135.
(12)    (Plaintiff's Exhibit 10, document
(13) Bates stamped NUS 00134 through NUS
(14) 00135, marked for identification.)
(15)    Q.   Have you had a chance to take a
(16) look at Exhibit 10, sir?
(17)    A.   Yes.
(18)    Q.   Did you receive the e-mail at the
(19) bottom of the first page from Chris Amundsen to
(20) you on December 22, 2006?
(21)    A.   Yes.
(22)    Q.   And then you replied with the
(23) e-mail above 3:37 p.m. on December 22, 2006; is
(24) that right?
(25)    A.   Yes.

---

Page 79

(1)
(2)    Q.   Okay.  You created and sent that
(3) e-mail to Chris Amundsen?
(4)    A.   Yes.
(5)    Q.   Okay.  You refer in the last line
(6) of that e-mail that you faxed the past three
(7) months' bills from LIPA and Con Ed from
(8) Manhasset?
(9)    A.   Yes.
(10)    Q.   Do you know if those bills had been
(11) sent to NUS before the time that you faxed
(12) them?
(13)    A.   I don't know.
(14)    Q.   Why did you send those bills to
(15) NUS?
(16)    A.   I recall I think she asked for
(17) them.
(18)    MR. GOODMAN:  Okay, let's take a
(19) look at a series of documents that we'll
(20) mark as Exhibit 11.  And those marked as
(21) Exhibit 11 are not marked with any
(22) production numbers, but they are faxed
(23) documents with a fax note posted from --
(24) it looks like it says Bruce to Chris
(25) Amundsen and it says 22 pages, but it's

---

Page 80

(1)
(2) only 21.  This is what I have from the
(3) file.
(4)    (Plaintiff's Exhibit 11, fax from
(5) B. Mogel to C. Amundsen, marked for
(6) identification.)
(7)    Q.   Can you identify the documents that
(8) make up this exhibit?
(9)    A.   They appear to be bills from LIPA
(10) and Con Ed Solutions.
(11)    Q.   And if you look at the first page
(12) of the exhibit, there's a posted fax note at
(13) the top.
(14)    A.   Yes.
(15)    Q.   Is any of that handwriting your
(16) handwriting?
(17)    A.   Yes.
(18)    Q.   Is it all of your handwriting?
(19)    A.   Yes.
(20)    Q.   And by this fax note, are you
(21) sending these bills to Chris?
(22)    A.   Yes.
(23)    Q.   Now, with respect to the document
(24) on the first page which is called "Accounts
(25) Payable Voucher Distribution" --

NATIONAL UTILITY SERVICE
BSA XMAX(21/21)
BRUCE MOGEL – 2/26/08
VS TIFFANY & CO

Page 81

(1)
(2)     A.   Yes.
(3)     Q.   – describe what that document is,
(4) what it's used for.
(5)     A.   That document is used -- it's
(6) attached to an invoice, bill, authorizing
(7) accounts payable to process an invoice.
(8)     Q.   Is any of the handwriting on the
(9) accounts payable distribution -- excuse me, the
(10) accounts payable voucher distribution that
(11) we're looking at on the first page your
(12) handwriting?
(13)     A.   No.
(14)     Q.   Do you recognize the initials at
(15) the bottom under the – or next to the line
(16) "Prepared By" or "Approved By"?  Do you
(17) recognize those initials?
(18)     A.   Yes.
(19)     Q.   Whose initials are they?
(20)     A.   Eric Ziegler.
(21)     Q.   Did you have any role in approving
(22) for payment any of the bills that are included
(23) in Exhibit 11?
(24)     A.   It doesn't appear so.
(25)     MR. GOODMAN:  I ask that another

Page 82

(1)
(2)     series of e-mails be marked as Exhibit
(3)     12.  These bear production numbers T 46
(4)     and T 47.
(5)     (Plaintiff's Exhibit 12, document
(6)     Bates stamped T 46 through T 47, marked
(7)     for identification.)
(8)     Q.   Referring first to the e-mail that
(9) begins at the bottom of the first page, it's
(10) from Christine Amundsen to you on November 26,
(11) 2006 at 4:39 p.m.
(12)     Did you receive this from Christine
(13) on or about that time?
(14)     A.   Yes.
(15)     Q.   And if you take a look at second
(16) page the last line of the second-to-last
(17) paragraph which starts with, "Thus, if the next
(18) bill," do you see that?
(19)     A.   Yes.
(20)     Q.   Did you understand Christine to be
(21) advising you not to make another bill payment
(22) to LIPA until resolution of the problem in
(23) Manhasset?
(24)     A.   Yes.
(25)     Q.   And then if you take a look at the

Page 83

(1)
(2)     first e-mail of this exhibit on December 26,
(3) 2006 at 4:43 p.m. –
(4)     A.   Yes.
(5)     Q.   -- did you create and send this
(6) e-mail to Eric Ziegler and other CC recipients?
(7)     A.   Yes.
(8)     Q.   And you did that on or about
(9) that -- the time indicated?
(10)     A.   Yes.
(11)     Q.   And was your purpose of sending
(12) that e-mail simply to put them on notice of
(13) NUS's efforts?
(14)     A.   It was to advise Eric that if the
(15) next bill arrived before resolution is achieved
(16) not to pay it based on Chris's recommendation.
(17)     MR. GOODMAN:  Okay, another string
(18) of e-mails related to that one bearing
(19) production numbers NUS 00157 through
(20) 00158, and that will be Exhibit 13.
(21)     (Plaintiff's Exhibit 13, document
(22)     Bates stamped NUS 00157 through NUS
(23)     00158, marked for identification.)
(24)     Q.   If you take a look at the second
(25) page of this exhibit you'll see that it's the

Page 84

(1)
(2)     same e-mail that we talked about a minute ago
(3) from Christine to you on December 26th telling
(4) you about the LIPA bills; correct?
(5)     A.   Yes.
(6)     Q.   Okay.  And then the next e-mail was
(7) a response from you to Christine where you're
(8) asking about bills from Con Ed; is that
(9) correct?
(10)     A.   Yes.
(11)     Q.   And you created and sent this
(12) e-mail on or about December 26, '06 at 4:41
(13) p.m.?
(14)     A.   Yes.
(15)     Q.   And then on the top there's an
(16) e-mail exchange between you and Christine dated
(17) December 27th at 5:43; is that right?
(18)     A.   Yes.
(19)     Q.   Did you receive the e-mail from
(20) Christine and send an e-mail to her on or about
(21) that date, December 27th?  This one is a little
(22) confusing, there's no header on Christine's
(23) e-mail to you, but there's a header on your
(24) response to her.  I can't explain that.
(25)     A.   Neither can I.

NATIONAL UTILITY SERVICE                          VS TIFFANY & CO
BRUCE MOGEL - 2/26/08

---

Page 105

(1)
(2)      Q.   If you look now at the e-mail on
(3)  page T 93 which you sent on January 16th at
(4)  1:25 p.m. --
(5)      A.   Yes.
(6)      Q.   -- had you looked at the
(7)  NUS/Tiffany agreement at the time that you
(8)  wrote this e-mail?
(9)      A.   That's the e-mail of January 16th
(10)  at 1:25?
(11)     Q.   Yes, it is.
(12)     A.   I don't recall looking at it
(13)  because I said I'll look at the contract
(14)  language. I didn't have a copy of the contract
(15)  so I don't know how I could look at it.
(16)     Q.   Do you recall earlier that you
(17)  testified that you had a copy of the contract
(18)  in the file that you kept for NUS?
(19)     A.   Yes.
(20)     Q.   Do you remember when you first came
(21)  into possession of that contract?
(22)     A.   No, I don't remember the exact date
(23)  that I came into possession of the contract.
(24)     Q.   If you look at the e-mail on the
(25)  first page of the Exhibit T 90, this is your

---

Page 106

(1)
(2)  e-mail to Palfini on January 16 at 3:28.
(3)      A.   Yes.
(4)      Q.   And you're talking about Chris and
(5)  you say she mentioned a year -- the contract
(6)  refers to five years.
(7)      A.   Yes.
(8)      Q.   Independent of what you read here
(9)  on your e-mail, do you recall anything about a
(10)  conversation with Chris where this subject was
(11)  discussed?
(12)     A.   Not exactly, no. No specific
(13)  conversation. I had a number of conversations
(14)  with her.
(15)     Q.   Well, other than what you've
(16)  already testified about today regarding the
(17)  conversation you had relating to the NUS fee,
(18)  do you remember anything else right now?
(19)     MR. MITCHELL:  About what?
(20)     Q.   Let me withdraw the question.
(21)     In this e-mail you're describing a
(22)  conversation you had with Chris regarding the
(23)  NUS fee; correct?
(24)     A.   Yes.
(25)     Q.   And you say in your e-mail that,

---

Page 107

(1)
(2)  "She mentioned a year. The contract refers to
(3)  five years."
(4)      A.   Yes.
(5)      Q.   Do you remember the conversation
(6)  when she said that to you?
(7)      A.   I don't recall the specific
(8)  conversation.
(9)      Q.   Now, if you turn to page T 92,
(10)  we're referring to the e-mail in the middle of
(11)  the page from you to Lawrence Palfini on
(12)  January 16, 2007 at 1:55 p.m.
(13)     Did you create and send this e-mail
(14)  to Mr. Palfini on that date and time?
(15)     A.   Yes.
(16)     Q.   You can set that aside now.
(17)     MR. GOODMAN:  This next series of
(18)  e-mails bear production numbers T 184 to
(19)  T 185 and that is Exhibit 24.
(20)     (Plaintiff's Exhibit 24, document
(21)  Bates stamped T 184 through T 185, marked
(22)  for identification.)
(23)     Q.   Starting with the e-mail at the
(24)  bottom of the first page, did you receive this
(25)  e-mail from Chris Amundsen on or about January

---

Page 108

(1)
(2)  22nd at 5:08 p.m.?
(3)      A.   Yes.
(4)      Q.   And in this e-mail Christine is
(5)  giving you a status report on the Manhasset
(6)  electric situation; correct?
(7)      A.   Yes.
(8)      Q.   And it appears from this e-mail
(9)  that NUS had arranged for the refund to be
(10)  generated and for the bills to be corrected
(11)  going forward; correct?
(12)     A.   Yes.
(13)     Q.   And is that the same thing NUS had
(14)  recommended to be done in its report?
(15)     A.   Which report?
(16)     Q.   The original report from December
(17)  20, 2006.
(18)     A.   I'd have to look at it again.
(19)     Q.   Please do. It's in that pile.
(20)     MR. MITCHELL:  Could I have the
(21)  question again, please?
(22)     (Record read.)
(23)     MR. MITCHELL:  Object to the form
(24)  of the question. What are you referring
(25)  to, specifically?

---

NATIONAL UTILITY SERVICE

BSA XMAX(40/40)

BRUCE MOGEL - 2/26/08

VS TIFFANY & CO

Page 157

(1)
(2)      **MR. GOODMAN:** Objection.
(3)      **A.  No.**
(4)      **Q.**   Okay.  And that would be a million
(5)  dollars for 13 business days to get Tiffany the
(6)  bill which it should have been receiving all
(7)  along; correct?
(8)      **MR. GOODMAN:** Objection.
(9)      **A.  That's correct, yes.**
(10)     **Q.**   Now, between -- between November
(11)  15, 2006 and December 20, 2006, there were --
(12)  were you aware of NUS performing any services
(13)  to find out what the problem was?
(14)     **A.  I don't know what specifics they**
(15)  **were doing.  There was a lot of e-mails going**
(16)  **back and forth.  I'm not sure exactly what they**
(17)  **were doing.**
(18)     **Q.**   The report that they provided on
(19)  December 20, 2006 does not identify the source
(20)  of the billing problem; correct?  That's
(21)  Exhibit 2 for identification.
(22)     **A.  I don't believe so, no.**
(23)     **Q.**   It just gives a lot of
(24)  possibilities; right?
(25)     **A.  Yes.**

Page 158

(1)
(2)      **Q.**   And subsequent to December 20,
(3)  2006, NUS reported that they continued to look
(4)  into what the problem was; correct?
(5)      **A.  Yes, I believe so, yes.**
(6)      **Q.**   So between December -- it was your
(7)  understanding between November 15, 2006 and
(8)  December 20, 2006 that NUS had not identified
(9)  what the problem was; correct?
(10)     **A.  That's my understanding, yes.**
(11)     **Q.**   And prior to December 20, 2006, you
(12)  had not received any proposal or cost analysis
(13)  report or similar document from NUS; correct?
(14)     **MR. GOODMAN:** Objection.
(15)     **A.  Not for Manhasset, no.**
(16)     **Q.**   Now this other contract that you
(17)  had with NUS, what was that contract called?
(18)     **A.  Something with NUS, what they**
(19)  **called NUS Direct, I think.**
(20)     **Q.**   What was the purpose of that
(21)  contract?
(22)     **A.  They had offered us a data**
(23)  **collection service.  They had all of this data**
(24)  **so they would put it on a computer and we could**
(25)  **access the website and pull up various utility**

Page 159

(1)
(2)      **costs and usage and comparisons,**
(3)  **store-by-store, by region, by area and it was a**
(4)  **data -- really a data collection tool.**
(5)      **Q.**   And as part of that data collection
(6)  tool, would NUS input into its computer system
(7)  so it would be available to Tiffany personnel,
(8)  usage data in connection with various Tiffany
(9)  locations?
(10)     **A.  I believe so.  That was part of it.**
(11)     **Q.**   All right.  So when Ms. Amundsen
(12)  identified on Exhibit 4 for identification a
(13)  spike in usage that had been reflected for the
(14)  Manhasset store, that would have been
(15)  consistent with the services that were being
(16)  provided by NUS for Tiffany pursuant to this
(17)  other agreement; isn't that right?
(18)     **MR. GOODMAN:** Objection.
(19)     **A.  Yeah, I supposed we would have seen**
(20)  **that, yes.**
(21)     **Q.**   So NUS -- and NUS was separately
(22)  being paid for their services under this other
(23)  agreement; isn't that right?
(24)     **A.  I believe so.**
(25)     **Q.**   Okay.  So part of the services

Page 160

(1)
(2)  being provided by NUS was to monitor and report
(3)  on usage at the various locations pursuant to
(4)  this separate contract?
(5)      **A.  I believe that was the purposes of**
(6)  **that NUS Direct agreement, yes.**
(7)      **MR. GOODMAN:** Objection to the
(8)  form.
(9)      **Q.**   Let me show you what's been marked
(10)  as Exhibit 7 for identification.  It's a letter
(11)  on the letterhead of NUS dated December 22,
(12)  2006.  Do you see that?
(13)     **A.  Yes.**
(14)     **Q.**   Who is that letter to?
(15)     **A.  That's to Long Island Power**
(16)  **Authority, LIPA.**
(17)     **Q.**   Okay.  So, is any individual named
(18)  on that document?
(19)     **A.  No, just "Sir or Madam."**
(20)     **Q.**   "Sir or Madam" to a P.O. Box;
(21)  correct?
(22)     **A.  Yes.**
(23)     **Q.**   Any reason Tiffany could not have
(24)  sent a letter to a P.O. Box at LIPA?
(25)     **MR. GOODMAN:** Objection.

# PALFINI
# DEPOSITION

NATIONAL UTILITY SERVICE VS TIFFANY & CO

LAWRENCE PALFINI - 2/27/08

CONCORDANCE AND CONDENSED TRANSCRIPT
PREPARED BY:



*Ellen Grauer*
COURT REPORTING Co. LLC

TOWER 56, 126 EAST 56TH STREET, FIFTH FLOOR, NEW YORK, NEW YORK 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
WWW.ELLENGRAUER.COM

## Page 9

(1)
(2) **Pratt University.**
(3)     Q.   How many credits have you taken?
(4)     A.   **I believe it's 14.**
(5)     Q.   What was the general subject matter
(6) of those credits?
(7)     A.   **Facilities and property management,**
(8) **construction management.**
(9)     Q.   Was the subject of utility
(10) purchases included in any of those courses?
(11)    A.   **No.**
(12)    Q.   What's your current position at
(13) Tiffany?
(14)    A.   **Vice president of global**
(15) **construction and property management for**
(16) **Tiffany and Company.**
(17)    Q.   How long have you held that
(18) position?
(19)    A.   **Since January 2007.**
(20)    Q.   What are your responsibilities?
(21)    A.   **Responsible for the global**
(22) **portfolio of Tiffany properties throughout the**
(23) **world which is approximately 200 locations, 2**
(24) **million square feet; responsible for all of the**
(25) **construction programs and expansion programs**

## Page 10

(1)
(2) **within the company and property management**
(3) **programs in support of those locations**
(4) **worldwide.**
(5)     Q.   Do you have a staff?
(6)     A.   **Yes.**
(7)     Q.   How large is your staff?
(8)     A.   **The staff consists of a team of**
(9) **directors and managers approximately 85 to 90**
(10) **positions in total.**
(11)    Q.   Is Bruce Mogel a member of your
(12) staff?
(13)    A.   **Bruce Mogel is a member of my**
(14) **staff, yes.**
(15)    Q.   Does he report directly to you?
(16)    A.   **No.**
(17)    Q.   He reports to somebody in between?
(18)    A.   **Yes.  He reports into Alfred**
(19) **Maierly currently who is our director of global**
(20) **property management.**
(21)    Q.   Is there anyone else in between
(22) Bruce Mogel and you?
(23)    A.   **Between Bruce Mogel and me, no.**
(24)    Q.   In your current position, to what
(25) extent are you involved in Tiffany's purchase

## Page 11

(1)
(2) of utility commodities?
(3)     A.   **I have a staff member, Alfred**
(4) **Maierly, and a team of directors that get**
(5) **involved with energy management for all of our**
(6) **retail and nonretail locations, oversee the**
(7) **responsibility for finding consultants to**
(8) **support us in that endeavor.**
(9)     Q.   How many people are on the energy
(10) management staff?
(11)    A.   **There's no specific staff that are**
(12) **dedicated to energy management.  It's part of**
(13) **their overall responsibility.  The answer to**
(14) **that question would be three -- three, three**
(15) **directors.**
(16)    Q.   Let me see if I understand this.
(17) Are there dedicated -- are there people who are
(18) dedicated to utility management?
(19)    A.   **No.**
(20)    Q.   So, the three people who you were
(21) referring to --
(22)    A.   **Have it as part of their overall**
(23) **responsibilities, as part of a component of**
(24) **their job description.**
(25)    Q.   Who are those three people?

## Page 12

(1)
(2)     A.   **Al Maierly, Bruce Mogel and Bill**
(3) **Sanmartin.**
(4)     Q.   Now, let's turn to the year before
(5) you became vice president of global
(6) construction and property management and that
(7) would be calendar year 2006; correct?
(8)     A.   **Yes.**
(9)     Q.   Now, during 2006, what was your
(10) position?
(11)    A.   **Group director of -- group director**
(12) **of corporate property management.  Group**
(13) **director of corporate real estate services was,**
(14) **I think, the exact title.**
(15)    Q.   For how long did you hold that
(16) position?
(17)    A.   **I believe since 2003.**
(18)    Q.   And you held that position
(19) continuously from 2003 until January 2007?
(20)    A.   **Correct.**
(21)    Q.   What were your responsibilities as
(22) group director?
(23)    A.   **As group director, I was**
(24) **responsible for all of our corporate locations**
(25) **at that point in time which included**

---

Page 21

(1)
(2) year.
(3)    **Q.** What were you responsible for
(4) purchasing?
(5)    **A. Purchasing of all of our packaging**
(6) **supplies, office furniture and equipment,**
(7) **office supplies.**
(8)    **Q.** Were you responsible for purchasing
(9) utilities?
(10)    **A. No, not at that point.**
(11)    **Q.** Were you responsible for purchasing
(12) utilities when you were the director of
(13) facilities management of the New Jersey
(14) properties?
(15)    **A. For those specific locations, yes.**
(16)    **Q.** Which utilities were you
(17) responsible for purchasing?
(18)    **A. Electricity, gas and water.**
(19)    **Q.** How many properties did Tiffany
(20) maintain in New Jersey during the period that
(21) you were a director?
(22)    **A. Three.**
(23)    **Q.** Were they retail properties,
(24) warehouse?
(25)    **A. They were a combination,**

---

Page 22

(1)
(2) distribution, finance center. They were two of
(3) our largest properties in our portfolio, both
(4) of which I was involved with design and
(5) construction.
(6)    **Q.** Okay. And before you were the
(7) director of purchasing, what position did you
(8) hold, if any?
(9)    **A. I was the manager of facilities in**
(10) **our New York flagship location.**
(11)    **Q.** For how long?
(12)    **A. Approximately two years.**
(13)    **Q.** Any other positions before manager
(14) of facilities with Tiffany?
(15)    **A. I was a supervisor of retail**
(16) **operations. That was my first position with**
(17) **Tiffany and Company which began in December**
(18) **1989.**
(19)    **Q.** During 2006 and 2007, what is the
(20) process that is undertaken with respect to
(21) Tiffany's payment of utility bills?
(22)    **A. The bills are directed to our**
(23) **accounts payable department. Eric Ziegler, who**
(24) **is the manager of our accounts payable**
(25) **department, has authorization to process for**

---

Page 23

(1)
(2) payment to avoid potential interruption in
(3) utilities. Once the invoices are paid, copies
(4) are then sent to NUS prior to termination of
(5) our agreement, for post audit review.
(6)    **Q.** Did the energy management staff
(7) receive copies of the bills?
(8)    **A. No.**
(9)    **Q.** Did the energy management staff
(10) receive any data with respect to the amount of
(11) the bills?
(12)    **A. In a subsequent agreement with NUS,**
(13) **we had access to a data services agreement, an**
(14) **online system, which I believe was executed in**
(15) **the spring of 2006.**
(16)    **So from the period of that point of**
(17) **execution of the agreement which could have**
(18) **been March/April timeframe until the time that**
(19) **we -- to the time we terminated our agreement,**
(20) **that information was being posted by NUS under**
(21) **the terms and conditions of that agreement into**
(22) **the system and we had electronic access to it.**
(23) **It was an internet portal.**
(24)    **Q.** Did the energy management staff
(25) have access to that portal?

---

Page 24

(1)
(2)    **A. Yes.**
(3)    **Q.** That would have included Bruce
(4) Mogel?
(5)    **A. Yes.**
(6)    **Q.** Did you have access to it?
(7)    **A. Yes.**
(8)    **Q.** Do you recall during 2006 accessing
(9) the data management portal that NUS was
(10) maintaining?
(11)    **A. On a few occasions, yes.**
(12)    **Q.** And for what purpose?
(13)    **A. To see the historical data that was**
(14) **published, to see the progress of building of**
(15) **the database that was under the agreement with**
(16) **NUS.**
(17)    **Q.** Do you recall ever checking the
(18) database specifically with respect to charges
(19) at the Manhasset store?
(20)    **A. No.**
(21)    **Q.** Did you ever have any discussions
(22) with Bruce Mogel during 2006 or 2007 about that
(23) database?
(24)    **A. No.**
(25)    **MR. GOODMAN:** I'd like to have

---

Page 25

(1)
(2)      marked as Exhibit 41 a document bearing
(3)      production numbers T 151 through T 164
(4)      which consists of a fax cover sheet from
(5)      Lawrence to Arnold Frankel which is
(6)      spelled incorrectly, F-R-E-N-K-E-L, on
(7)      the document and a couple of enclosures.
(8)          **(Plaintiff's Exhibit 41, document**
(9)          **Bates stamped T 151 through T 164, marked**
(10)         **for identification.)**
(11)         Q.   And the fax cover sheet is dated
(12)     March 9, 2006.  Would you take a look at that
(13)     document, please, sir?
(14)         A.   (Reviewing.)
(15)         Q.   Can you identify the first page of
(16)     this exhibit?
(17)         A.   Yes.
(18)         Q.   What is it?
(19)         A.   **It's a fax cover sheet that I**
(20)     **generated to NUS.**
(21)         Q.   And you generated this fax cover
(22)     sheet on March 9, 2006?
(23)         A.   **Yes, as indicated.**
(24)         Q.   And is that your signature at the
(25)     bottom?

Page 26

(1)
(2)          A.   **Yes, it is.**
(3)          Q.   What was the purpose of your
(4)      generating this fax cover sheet?
(5)          A.   **This was to formalize our agreement**
(6)      **between NUS and Tiffany and Company for an**
(7)      **addendum to our existing agreement for data**
(8)      **management services.**
(9)          Q.   I may not have heard you correctly.
(10)     Can you just repeat what you just said?
(11)         MR. MITCHELL:  Why don't we just
(12)     read it back.
(13)         MR. GOODMAN:  Would you read it
(14)     back, please?
(15)         (Record read.)
(16)         Q.   And did you send or cause to be
(17)     sent this fax cover sheet together with the
(18)     attachments?
(19)         A.   Yes.
(20)         Q.   And you had that sent to National
(21)     Utility Service; correct?
(22)         A.   Correct.
(23)         Q.   If you look at the next series of
(24)     pages, T 152 through T 154, which is a March 6,
(25)     2006 letter from Arnold Frankel to Lawrence

Page 27

(1)
(2)      Palfini, do you see that?
(3)          A.   Yes.
(4)          Q.   Is that your signature at the
(5)      bottom of page T 154?
(6)          A.   Yes.
(7)          Q.   And this three-page document is
(8)      entitled, "Addendum to April 7, 1992 Energy and
(9)      Telecommunications Cost Control Agreement";
(10)     correct?
(11)         A.   Correct.
(12)         Q.   And this is one of the documents
(13)     that you were sending to Mr. Frankel?
(14)         A.   Yes.
(15)         Q.   And the second document that you
(16)     sent to Mr. Frankel follows with pages 155
(17)     through T 164; is that right?
(18)         A.   No.
(19)         Q.   Were any of the pages that follow
(20)     sent to Mr. Frankel?
(21)         A.   **Pages T 155 through T 159, not 154.**
(22)         Q.   Were any of the schedules that are
(23)     attached at the end of this exhibit sent to
(24)     Mr. Frankel in March of 2006?
(25)         A.   Yes.

Page 28

(1)
(2)          Q.   Okay.  They were sent separately
(3)      from this fax?
(4)          A.   **Well, the fax indicates a total of**
(5)      **14 pages.  I didn't count them.**
(6)          Q.   Well, the exhibit is 14 pages.
(7)          A.   Yes.
(8)          Q.   So, you sent —
(9)          A.   **Including the cover sheet 14 pages,**
(10)     **yes.**
(11)         Q.   And you sent as part of that fax
(12)     T 155 through T 164; correct?
(13)         A.   Correct.
(14)         Q.   And the document that begins at
(15)     T 155 is entitled "Data Management Service
(16)     Agreement"; correct?
(17)         A.   **That's what it says, yes.**
(18)         Q.   And if you look at T 159, there's a
(19)     signature on the left-hand side in the middle.
(20)     Is that your signature?
(21)         A.   Yes.
(22)         Q.   And did you sign this on behalf of
(23)     Tiffany on March 7, 2006?
(24)         A.   Yes.
(25)         Q.   I apologize for jumping around.  I

## Page 29

(1)
(2) should go back to page 54. Did you sign page
(3) 154 which is the addendum on behalf of Tiffany
(4) on March 7, 2006?
(5)     A.   Yes.
(6)     Q.   Now, the Data Management Service
(7) Agreement that begins on T 155, is that the
(8) agreement that you were referring to a couple
(9) of minutes ago?
(10)     A.   Can you please repeat that?
(11)     Q.   Do you recall a few minutes ago we
(12) discussed -- you were discussing NUS's
(13) compiling utility data for an internet portal.
(14)     A.   Yes.
(15)     Q.   And you referred to an agreement
(16) pursuant to which NUS was handling that;
(17) correct?
(18)     A.   Correct.
(19)     Q.   Is this the agreement?
(20)     A.   Yes.
(21)     Q.   Now, before you signed the
(22) agreement, you read it; correct?
(23)     A.   Yes.
(24)     Q.   And you were familiar with its
(25) terms?

## Page 30

(1)
(2)     A.   Yes.
(3)     Q.   Are you familiar with its terms
(4) now?
(5)     A.   No.
(6)     Q.   Okay. Well, if you need to read it
(7) feel free to do so, but my question is, is
(8) there anything in the Data Management Service
(9) Agreement that provides for a utility audit and
(10) recommendation function by NUS?
(11)     MR. MITCHELL: We're going to take
(12)   the time to go through this whole
(13)   document?
(14)     MR. GOODMAN: If he needs to. He
(15)   testified that he has been familiar with
(16)   it at some point. He's read it.
(17)     MR. MITCHELL: Your question is now
(18)   does it say -- what do you want to do
(19)   because I want to make sure we give you
(20)   what you're looking for.
(21)     MR. GOODMAN: I want to know
(22)   whether this witness believes that this
(23)   agreement includes any function for NUS
(24)   or any obligation by NUS to audit utility
(25)   bills and make recommendations for

## Page 31

(1)
(2) refunds or savings.
(3)     MR. MITCHELL: You know, what his
(4)   belief is now -- the documents say what
(5)   they say. I'm going to ask him to take
(6)   some time and read the whole document.
(7) Can we -- if you want to do that, can we
(8)   defer this until later or do you want to
(9)   take the break now because I think at the
(10)   end of the day the court will decide
(11)   whatever the agreements provide.
(12)     So whether this witness believes it
(13)   says it or not -- unless you're claiming
(14)   ambiguity in your own contract, the
(15)   document speaks for itself.
(16)     MR. GOODMAN: No, it's a legitimate
(17)   question. It goes to issues that you've
(18)   raised in this case through other
(19)   witnesses. I want to know, and this is a
(20)   30(b)(6) witness, I want to whether
(21)   Tiffany is taking the position that this
(22)   Data Management Service Agreement imposes
(23)   an obligation to NUS to audit utility
(24)   bills and make recommendations for
(25)   savings or refunds.

## Page 32

(1)
(2)     MR. MITCHELL: Well, I will
(3)   allow --
(4)     MR. GOODMAN: If you have to read
(5)   it, that's fine.
(6)     MR. MITCHELL: The witness'
(7)   testimony regardless will be limited as a
(8)   fact witness to facts and what he knows
(9)   about the facts. The contracts and the
(10)   contractual requirements are legal
(11)   conclusions that will be drawn from the
(12)   documents.
(13)     So I have no problem with him
(14)   testifying as a fact witness what he
(15)   understood the relationship to be. I
(16)   don't know that we have to read the
(17)   document to do that.
(18)     And if you can answer questions in
(19)   that fashion, I'm perfectly satisfied to
(20)   do that. I do not believe it would be
(21)   appropriate for him to provide legal
(22)   interpretations of the document. But his
(23)   understanding of how the relationship
(24)   worked is fine with me.
(25)     MR. GOODMAN: I think you're going

NATIONAL UTILITY SERVICE

VS TIFFANY & CO

## Page 33

(2) beyond the point that you need to. If
(3) you're objecting on the basis that the
(4) question calls for a legal conclusion you
(5) can just say that.
(6)     MR. MITCHELL: I want to determine
(7) whether we have to now take a long break
(8) so that this witness goes out and studies
(9) this document before he comes back and
(10) answers questions about it.
(11)     And I'm saying to you, I have no
(12) problem with him providing you his
(13) factual understanding, not grounded in
(14) the document, but his understanding of
(15) the relationship of the parties, how he
(16) understood this worked.
(17)     Whether, in fact, the document
(18) sales it as -- whether the contractual
(19) obligation is there or not, if that's the
(20) way you want to do this, he'll have to
(21) read the document in great detail right
(22) now to make sure he understands what all
(23) the document says.
(24)     I'm asking you if you want to take
(25) the time right now because, in all

## Page 34

(2) candor, I don't think it's the
(3) appropriate use of the witness' time.
(4) He's here to testify to facts.
(5)     I'm also suggesting to you, if you
(6) insist on doing that, we defer that until
(7) the end so that we see how far we get in
(8) the deposition and then we'll see where
(9) we are rather than take a chunk of time
(10) at 3 o'clock in the afternoon. If you
(11) want to do that, I leave it to you.
(12)     MR. GOODMAN: Let me ask him a
(13) couple of questions.
(14)     Q.   Is it your understanding currently
(15) based on your recollection of the Data
(16) Management Service Agreement that that
(17) agreement required NUS to audit utility bills
(18) of Tiffany and/or make recommendations for
(19) utility cost savings or refunds?
(20)     A.   Okay. My understanding is that
(21) this was an addendum to our original agreement
(22) which covered those conditions that you have
(23) just referenced and this was an added service
(24) which allowed them access to data as they
(25) received the invoices to populate our database

## Page 35

(2) so it actually served purposes for NUS to
(3) review the data before they entered it into the
(4) computerized system which gave Tiffany and
(5) Company personnel access. So it was an
(6) addendum to the original agreement in 1992.
(7)     Q.   And there was a fee associated with
(8) the Data Management Service Agreement?
(9)     A.   There was a one-time setup fee of
(10) $2,750 and $2.75 per invoice for every invoice
(11) that they reviewed and entered into the system.
(12) That's what we paid NUS for that service.
(13)     Q.   Is it -- would you agree that that
(14) fee was not intended to compensate NUS for any
(15) recommendations it made for utility cost
(16) savings or refunds?
(17)     A.   I believe that was covered under
(18) the original agreement in 1992.
(19)     Q.   And that was your belief at the
(20) time in 2006 and 2007 as well; is that correct?
(21)     A.   Correct.
(22)     Q.   During 2006 and 2007, did you
(23) personally have any contact with
(24) representatives from utilities who provided
(25) services to Tiffany's retail locations?

## Page 36

(2)     A.   I don't recall.
(3)     Q.   Do you recall ever having any
(4) direct contact with representatives from Long
(5) Island Power Authority?
(6)     A.   No, I did not.
(7)     Q.   Did you have any direct contact
(8) with any representatives from Con Edison
(9) Solutions?
(10)     A.   I don't recall. I may have.
(11)     Q.   During what year?
(12)     A.   2006 potentially. I'm not sure.
(13)     Q.   Was it in connection with the
(14) Manhasset store?
(15)     A.   No.
(16)     Q.   I show you a document that's
(17) previously been marked as Exhibit 1. I ask you
(18) to take a look at that. Do you recognize
(19) Exhibit 1?
(20)     A.   Yes.
(21)     Q.   What's the document?
(22)     A.   Our original agreement with
(23) National Utility Services dated April 7, 1992.
(24)     Q.   And it's a three-page exhibit;
(25) correct?

NATIONAL UTILITY SERVICE

LAWRENCE PALFINI - 2/27/08

VS TIFFANY & CO

Page 41

(1)
(2)  **Q.**  Do you understand that,
(3)  Mr. Palfini?
(4)      **A.  Yes.**
(5)      **Q.**  And this was actually a two-page
(6)  agreement.  Do you follow that?
(7)      **A.  Yes.**
(8)          **MR. MITCHELL:**  I'm not contesting
(9)      that the language wasn't on the reverse
(10)     because it says, "See reverse."  I just
(11)     want the record to be clear that you said
(12)     "Three pages" and it may only be two
(13)     pieces of paper, so we don't get
(14)     confused.
(15)     **Q.**  So back to this issue of which
(16) entity signed this agreement, you currently
(17) work for, as you put it, Tiffany and Company
(18) with the word "and" spelled out?
(19)     **A.  I believe so, yes.**
(20)     **Q.**  Now that's not the way this is
(21) written on this document; correct?
(22)     **A.  That is correct.**
(23)     **Q.**  So, is it your testimony that you
(24) don't know which Tiffany entity signed this
(25) document?

Page 42

(1)
(2)      **A.  At the time it was a representation**
(3)  **of Tiffany & Company.  I don't know what the**
(4)  **legal interpretation is.**
(5)      **Q.**  Was it your understanding that the
(6)  Manhasset store was a location covered under
(7)  the NUS/Tiffany agreement?
(8)      **A.  I believe so.**
(9)      **Q.**  And electric costs are also covered
(10) under the agreement?
(11)     **A.  Yes.**
(12)     **Q.**  What is your understanding
(13) generally on how the agreement is supposed to
(14) work in terms of what each party does?
(15)     **A.  Are you talking about the original**
(16) **agreement dated 1992?**
(17)     **Q.**  Yes.  Exhibit 1 in front of you.
(18)     **A.  It's my understanding that NUS was**
(19) **paid a retainer fee and they were to review all**
(20) **of our utility invoices for electricity that**
(21) **were received through our accounts payable**
(22) **process post payment, post audit review, and to**
(23) **determine if there are any billing errors in**
(24) **which they were entitled to 50 percent of a**
(25) **refund and if they found any savings which**

Page 43

(1)
(2)  **would result from market supply changes, that**
(3)  **they can obtain a better rate, that they would**
(4)  **be entitled to 50 percent of any savings**
(5)  **afforded Tiffany and Company by making a**
(6)  **recommendation with our approval and entering**
(7)  **into a new market agreement.**
(8)          **MR. GOODMAN:**  Could you read back
(9)      that last answer?
(10)         **(Record read.)**
(11)     **Q.**  You would agree, wouldn't you, that
(12) NUS's services were not limited to electric
(13) under this agreement; correct?
(14)     **A.  Yes.**
(15)     **Q.**  And, in fact, it covered
(16) electricity, gas, oil and petroleum products,
(17) water, sewerage, steam and telecommunications;
(18) is that right?
(19)     **A.  As referenced, yes.**
(20)     **Q.**  I refer you to the paragraph
(21) numbered one, which states, "We hereby
(22) authorize you to submit recommendations for
(23) savings and refunds on our costs of
(24) electricity, gas, oil and petroleum products,
(25) water, sewerage, steam and telecommunications.

Page 44

(1)
(2)  You will analyze our costs and advise where
(3)  refunds and reductions can be obtained."
(4)          Is there anything in that paragraph
(5)  that limits NUS's role to making
(6)  recommendations with respect to billing errors?
(7)          **MR. MITCHELL:**  Object to the form
(8)      of the question.
(9)      **A.  No.**
(10)     **Q.**  Is there anything in paragraph one
(11) that limits NUS's role under the agreement to
(12) making recommendations with respect to rates?
(13)     **A.  It makes reference to**
(14) **recommendations and savings and refunds on your**
(15) **cost of electricity and the other utilities**
(16) **noted, yes.**
(17)     **Q.**  The agreement talks about costs of
(18) the utilities; correct?
(19)     **A.  It says "makes recommendations for**
(20) **savings," the first line.  Read it.**
(21)     **Q.**  I'm asking you --
(22)     **A.  And I answered your question.**
(23)     **Q.**  Well, I'll ask you another
(24) question.
(25)     **A.  That's fine.**

## Page 45

(1)
(2)     **Q.**   Where does it say in this agreement
(3)  that NUS's role with respect to making
(4)  recommendations is limited to recommendations
(5)  relating to rates?
(6)     **MR. MITCHELL:** The witness is
(7)     testifying here as a fact witness. You
(8)     asked him for his interpretation. He's
(9)     given it to you and now you're asking him
(10)    to say where does it say. He just gave
(11)    you his answer, so that question has been
(12)    answered.
(13)    **MR. GOODMAN:** You can make an
(14)    objection, okay? This is the second time
(15)    this afternoon. You can make an
(16)    objection and the witness is required to
(17)    respond subject to your objection.
(18)    **MR. MITCHELL:** I understand, but
(19)    you're arguing with the witness.
(20)    **MR. GOODMAN:** I'm not arguing with
(21)    the witness.
(22)    **MR. MITCHELL:** I think the record
(23)    will show that.
(24)    **MR. GOODMAN:** I got a response and
(25)    I'm following up on the response.

## Page 46

(1)
(2)     **MR. MITCHELL:** You're asking him
(3)     now again specifically is the word
(4)     "rates" there. If that's the question,
(5)     then that's the question. I don't know
(6)     if that's your question.
(7)     **MR. GOODMAN:** That wasn't my
(8)     question. That wasn't the question that
(9)     you objected to, so let me proceed. If
(10)    you have an objection, state your
(11)    objection. Otherwise you and I will be
(12)    arguing all afternoon.
(13)    **MR. MITCHELL:** I'm not trying to
(14)    argue with you, but the witness told you
(15)    that he answered your question you told
(16)    him, no, you didn't.
(17)    **MR. GOODMAN:** I don't think I said
(18)    that he didn't. Now you're
(19)    mischaracterizing what I said.
(20)    **MR. MITCHELL:** Okay. Let's just go
(21)    back to questions and answers.
(22)    **MR. GOODMAN:** That's fine.
(23)    **Q.**   Is it your testimony that NUS's
(24)  responsibilities under this agreement are
(25)  limited to making recommendations with respect

## Page 47

(1)
(2)  to utility rates?
(3)     **A.**   It's my interpretation, yes.
(4)     **Q.**   Is there a specific language in the
(5)  agreement which you can point me to which you
(6)  base your interpretation on?
(7)     **A.   You indicated line number one where**
(8)  **they're suppose to submit recommendations for**
(9)  **savings and refunds.**
(10)    **Q.**   Okay. Are you finished?
(11)    **A.   Yes.**
(12)    **Q.**   Is there anywhere else in the
(13)  agreement that supports the interpretation that
(14)  you just set out?
(15)    **MR. MITCHELL:** I'd like the record
(16)    to reflect the witness is reading the
(17)    document now.
(18)    Mr. Palfini, if you're just going
(19)    to read the document and give an answer,
(20)    let the record reflect that's what you're
(21)    doing.
(22)    **A.   I will be reading the document and**
(23)  **giving my answer.**
(24)    **MR. MITCHELL:** Note my objection to
(25)    form, please.

## Page 48

(1)
(2)     **A.   Item number four, "All negotiations**
(3)  **with suppliers are to be conducted through as**
(4)  **unless mutually agreed otherwise," which my**
(5)  **interpretation is that they're speaking to**
(6)  **utility suppliers, electrical suppliers on our**
(7)  **behalf and making recommendations on better**
(8)  **rates.**
(9)     **That's how they obtain their**
(10)  **savings and that's how they obtain their**
(11)  **potential revenue based on this contract.**
(12)    **Q.**   Is your interpretation based on
(13)  anything other than this contract?
(14)    **A.   Yes, it's based on some of the**
(15)  **experience that we've had with NUS once we went**
(16)  **into deregulation and some of the work that**
(17)  **they performed with me under the basis of this**
(18)  **broad agreement that was developed in 1992.**
(19)    **Q.**   And what was that prior experience?
(20)    **A.   The prior experience is that's the**
(21)  **process that they followed. They went out on**
(22)  **our behalf and worked in deregulated markets,**
(23)  **made recommendations which we agreed to and**
(24)  **they shared in some of the savings, 50 percent**
(25)  **shared savings, as indicated in the terms and**

Page 49

(1)
(2) conditions of this agreement.
(3)      Q.   Isn't it possible that the
(4) agreement had a broader scope than what you had
(5) experienced?
(6)      MR. MITCHELL:  Object to the form
(7)    of the question.
(8)      Q.   You can answer.
(9)      A.   It could be interpreted that way.
(10)      And you don't see the word "rate"
(11) anywhere in this agreement, do you?
(12)      A.   I didn't look at every word, but if
(13) you're saying that, it could be true.
(14)      Q.   I'm giving you the opportunity to
(15) read it.  I'm not going to testify for you.
(16)      MR. MITCHELL:  Object to the form
(17)    of the question.  I know you can ask
(18)    better questions than that after sitting
(19)    here for a day and a half.
(20)      MR. GOODMAN:  I'm giving you the
(21)    opportunity to read it and I do want to
(22)    know from the witness --
(23)      MR. MITCHELL:  If the word "rate"
(24)    is there, it's there.
(25)      MR. GOODMAN:  Do you want to

Page 50

(1)
(2)    stipulate that it's not there?
(3)      MR. MITCHELL:  Like you, I haven't
(4)    studied it, but I would say if you tell
(5)    me it's not there, I'll accept that it's
(6)    not there.
(7)      A.   I do not see the word "rate."
(8)      Q.   Okay.
(9)      MR. MITCHELL:  I don't see
(10)    "switched meters" here either.
(11)      Q.   You also talked about market supply
(12) changes in your earlier answer.  With respect
(13) to that subject, is it your testimony that
(14) NUS's responsibilities under the agreement are
(15) limited to making recommendations with respect
(16) to market supply changes?
(17)      A.   The answer is no, not limited.
(18) It's part of their overall services provided to
(19) Tiffany and Company as a component.
(20)      Q.   Is it your understanding that prior
(21) to making a recommendation, NUS needs Tiffany's
(22) approval?
(23)      A.   Yes.
(24)      Q.   So, NUS is not permitted under the
(25) agreement to review bills and make a

Page 51

(1)
(2) recommendation unless it gets prior approval
(3) from Tiffany?  Is that your understanding?
(4)      MR. MITCHELL:  Object to the form
(5)    of the question.
(6)      A.   No.  My understanding is that they
(7) need our approval to proceed with any of the
(8) recommendations that they make.
(9)      Q.   So they can make a recommendation
(10) without your approval?
(11)      A.   Yes, yes.
(12)      Q.   And if that recommendation is going
(13) to be implemented by NUS, NUS needs Tiffany's
(14) approval; correct?
(15)      A.   Correct.
(16)      Q.   And under the agreement --
(17)      MR. MITCHELL:  Hold on a second.
(18)    Can I hear the last question -- counsel
(19)    is making statements here, so I don't
(20)    know what --
(21)      MR. GOODMAN:  It was a question.
(22)    I'm not making a statement.
(23)      MR. MITCHELL:  No, you made a
(24)    statement -- can I hear the last
(25)    statement?

Page 52

(1)
(2)      MR. GOODMAN:  It was not a
(3)    statement.
(4)      MR. MITCHELL:  Whatever it was, can
(5)    I hear it?
(6)      (Record read.)
(7)      MR. MITCHELL:  I think you
(8)    misspoke.  The contract says, "If any
(9)    recommendation made by you," referring to
(10)    NUS, "is subsequently implemented, we"
(11)    referring to Tiffany.  I think you
(12)    reversed the parties on that.  You said
(13)    if it's implemented by NUS.
(14)      MR. GOODMAN:  Let me clarify.  I
(15)    don't think I misspoke, but I'll clarify
(16)    it.
(17)      Q.   Mr. Palfini, once NUS makes a
(18) recommendation, Tiffany can accept or reject
(19) the recommendation; correct?
(20)      A.   Correct.
(21)      Q.   If Tiffany accepts the
(22) recommendation, it may implement it itself;
(23) correct?
(24)      A.   I'm not sure.
(25)      Q.   Do you know whether NUS is

## Page 85

(1)
(2) electric service, it arranged for the
(3) correction of the labeling of the meters and
(4) the meter multiplier; correct?
(5)    A.    Yes.
(6)    Q.    Okay.  Had it not done that, the
(7) bills would have been higher; correct?
(8)    A.    Correct.
(9)    Q.    But it did its work and the bills
(10) were lower; correct?
(11)    A.    Refund entitlement, yes.
(12)    Q.    But the bill, other than the
(13) refund, the bill for the next succeeding month
(14) was lower than it would have been if NUS had
(15) not performed its services; correct?
(16)       MR. MITCHELL:  Object to the form
(17) of the question.
(18)    A.    Please repeat.  I lost my train of
(19) thought.
(20)       MR. GOODMAN:  Please.
(21)       (Record read.)
(22)    A.    Correct.
(23)    Q.    Do you recall during any of usual
(24) discussions with NUS using the term "cost
(25) avoidance"?

## Page 86

(1)
(2)    A.    I don't recall.
(3)    Q.    Do you recall using that term in
(4) connection with any of your discussions with
(5) other Tiffany people?
(6)    A.    I don't recall.
(7)    Q.    Let me show you what's previously
(8) been marked as Exhibit 3 which is a series of
(9) e-mails from November of 2006.  Actually, I
(10) will withdraw that exhibit.  My mistake.
(11)       I show you an exhibit that was
(12) previously marked as Exhibit 9, which is a
(13) series of e-mails from December 2006.  Now,
(14) starting with the e-mail on the bottom of the
(15) first page of the exhibit, it's from Lawrence
(16) Palfini to Bruce Mogel dated December 22, 2006,
(17) 12:21 p.m.
(18)       Did you create and send this e-mail
(19) on or about the date and time indicated?
(20)    A.    Yes.
(21)    Q.    And you sent this to Bruce Mogel in
(22) response to his e-mail to you which is on page
(23) two of the exhibit?
(24)    A.    Yes.
(25)    Q.    And you obviously had received

## Page 87

(1)
(2) Bruce Mogel's e-mail; correct?
(3)    A.    Yes.
(4)    Q.    And in his e-mail, Bruce was
(5) telling you about NUS's finding of the
(6) overcharges at the Manhasset store; correct?
(7)    A.    Correct.
(8)    Q.    What did you mean in the first
(9) sentence of your e-mail where you said, "Yet
(10) another example of why A/P should not be
(11) processing utility invoices"?
(12)    A.    My reference was that part of our
(13) relationship with NUS and the goal was to get
(14) our data management services up and running in
(15) 2006 and ultimately with consideration to
(16) expand our program that they would pay invoices
(17) directly and catch these problems prior to
(18) payment so that we wouldn't be paying -- they
(19) would potentially catch any errors prior to
(20) payment being made to the utility companies.
(21)    Q.    And then the first e-mail in the
(22) series is from Bruce Mogel to you also on
(23) December 22, 2006 at 12:27 p.m.
(24)       Did you receive this e-mail from
(25) Bruce on or about the date indicated?

## Page 88

(1)
(2)    A.    Yes.
(3)    Q.    Did you have any further
(4) conversations around the date of December 22nd
(5) with Bruce concerning the contents of his
(6) e-mail?
(7)    A.    I don't recall.  I may have.
(8)    Q.    But as you sit here today you don't
(9) remember?
(10)    A.    I don't recollect, no.
(11)    Q.    Bruce in his second-to-last
(12) paragraph says, "But you may want to look at
(13) the contract again."  Do you see that?
(14)    A.    Yes.
(15)    Q.    Did you look at the contract with
(16) NUS at that time?
(17)    A.    I believe at some point in the near
(18) future I did, yes.
(19)    Q.    I show you an exhibit which has
(20) previously been marked as 12.  It's a series of
(21) e-mails from late December 2006.  If you refer
(22) to the first e-mail in the exhibit it shows you
(23) as a CC recipient.  Do you see that?
(24)    A.    Correct.
(25)    Q.    Did you receive this e-mail on or