UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————

№ 07 Civ. 3345 (RJS)

———————————

NATIONAL UTILITY SERVICE, INC.,

Plaintiff,

VERSUS

TIFFANY & CO. and TIFFANY AND COMPANY,

Defendants.

———————————

MEMORANDUM AND ORDER
March 20, 2009

———————————

RICHARD J. SULLIVAN, District Judge:

Plaintiff National Utility Service, Inc. ("NUS") brings this diversity action alleging breach of contract, quantum meruit, and unjust enrichment, and seeks damages, specific performance, and declaratory relief. Specifically, NUS alleges that Defendants Tiffany & Co. and Tiffany and Company (collectively, "Tiffany") failed to adhere to the terms of a utility cost consulting agreement.[1] Tiffany counterclaims for identical causes of action.

Before the Court are the Parties' respective cross-motions for summary judgment. For the reasons that follow, both motions are denied in part and granted in part.

———————————

[1] Tiffany and Company is a subsidiary of Tiffany & Co. (*See* Pl.'s 56.1 ¶ 8.)

I. BACKGROUND

A. Facts[2]

NUS is an "energy cost consulting service." (Pl.'s 56.1 ¶ 2.) NUS provides consulting services with regard to reducing its clients' expenditures for energy and utility costs. (*See* Defs.' 56.1 ¶ 1; Pl.'s 56.1 ¶¶ 2-4.) Tiffany retained NUS by a written contract (the "contract") signed in April 1992. (Defs.' 56.1 ¶ 2; *see also* Mitchell Decl. Ex. 1 (the contract).) The contract, in relevant part, provides that:

> 1. We [Tiffany] hereby authorize you [NUS] to submit recommendations for savings and refunds on our costs of electricity, gas, oil and petroleum products, water, sewerage, steam and telecommunications. You will analyze our costs and advise where refunds and reductions can be obtained.
>
> 2. Your initial analysis will cover our most recent twelve (12) months' bills. Where applicable, you will review old bills as far back as possible for refunds. Your continuing analysis will cover our current bills, which we will send to you each month during the term of this agreement.
>
> 3. Any recommendation you make will be considered by us and shall be subject to our approval. If any recommendation made by you is subsequently implemented, we will pay you as outlined below after such savings and refunds are achieved. . . .
>
> 5. We agree to pay you as follows:
>
>> a. A service fee of $12,000.00 is due to you on acceptance of this agreement, and is payable only once for the term of this agreement and all consecutive renewals.
>>
>> b. A performance fee of: (i) fifty (50%) percent of each refund realized; (ii) fifty (50%) percent of each savings realized for a period of sixty (60) months after which the entire savings will be ours.
>>
>> c. Payment will be made upon receipt of your invoice showing computation of savings and/or refunds.

(Mitchell Decl. Ex. 1.)

For fifteen years, no dispute arose under the contract. (Defs.' 56.1 ¶ 5.) During that time, Tiffany paid NUS fees for the various services performed. (*See id.*; *see also* Mitchell Decl. Ex. 13 (providing a spreadsheet setting forth the history of recommendations made by NUS to Tiffany).) In total, NUS made approximately ninety-six recommendations for Tiffany's various facilities during the course of the Parties' relationship. (Pl.'s 56.1 ¶ 33.)

---

[2] The following facts are recited for purposes of background with respect to the summary judgment motions only, and are taken from the pleadings, the Parties' respective Local Rule 56.1 statements, and affidavits and exhibits submitted by the Parties. The facts are undisputed unless otherwise noted. Where only one Party's 56.1 Statement is cited, the facts are taken from that Party's statement, and the other Party does not dispute the fact asserted or has offered no admissible evidence to refute that fact.

One of Tiffany's facilities is located at the Americana shopping center (the "mall") in Manhasset, New York (the "Manhasset store"). (Defs.' 56.1 ¶ 18.) In the "fall of 2006," new electric meters were installed during a renovation project in a common area at the mall. (*Id.*) Tiffany was not aware of the installation of these new meters. (*Id.*) The current dispute revolves around a "switched meter error" that occurred between Tiffany's Manhasset store and the neighboring Ralph Lauren store (the "Ralph Lauren store") during this renovation and installation of meters.

During the relevant time period, pursuant to the terms of the contract, Tiffany furnished NUS with certain data relating to the energy costs it incurred from both Con Edison Solutions ("Con Ed") and the Long Island Power Authority ("LIPA"). (*See* Pl.'s 56.1 ¶¶ 37-38.)[3]  On November 15, 2006, Christine Amundsen ("Amundsen"), a senior consultant for NUS assigned to the Tiffany account, sent an email to Bruce Mogel ("Mogel"), Tiffany's "contact person" with NUS. (*See* Pl.'s 56.1 ¶¶ 40-42.) Amundsen's email advised Mogel that NUS had reviewed the recent electric bills for the Manhasset Store and had observed "an unusual usage pattern for last August and September." (*Id.* ¶ 42.) Prior to Amundsen's email, Mogel had been unaware of any irregularities in Tiffany's electric bills. (*Id.* ¶ 43.) After further investigation, Mogel concluded that "nothing different was being done" at the Manhasset store to explain the unusual usage pattern. (*Id.* ¶¶ 44-45.)

On November 16, 2006, Mogel sent an email to Amundsen instructing her to proceed with an investigation of the electric problem at the Manhasset store and to advise him if anything needed "to happen at the site." (*Id.* ¶ 46.) Amundsen then "asked the rate department manager [at NUS] to assign it to someone so that if it was a recommendation and report we need to get to the client, it would [be] prepared by the specific analysts." (Amundsen Dep. Tr. at 75:4-8.)

On December 20, 2006, Amundsen sent an email to Mogel, with an attached "Cost Analysis Report" (the "Report"). (*See* Goodman Decl. Ex. B (the Report).)  The Report contained the following language:

> As part of our analysis, we have compared your consumption and load profile (which we compiled from your electricity invoices) against other available rate options currently being offered . . . .  Our analysis, based upon your recent consumption patterns and load profile, reveals that while your present rate is the most cost effective, a billing error which appears to be ongoing in nature, is resulting in monthly overcharges of approximately $31,000.  Therefore, in addition to a refund of approximately $93,000 for past overcharges, we project a correction of this ongoing overcharge on your account will result in annual savings of approximately $372,000.

---

[3] Specifically, Tiffany purchased the commodity portion of its electricity supply for the Manhasset store from Con Ed, and incurred charges for the transmission and distribution portion of its electricity supply for the Manhasset store from LIPA. (*See* Pl.'s 56.1 ¶¶ 35-36.)

3

(*Id.* (emphasis omitted).) The Report specifically noted that the error "may be the result of an error by the Provider (*e.g.*, meter reading error, meter malfunction, computer error, administrative error, *etc.*)." (*Id.*) The Report also contained the following language under a subsection entitled "Recommendation": "NUS Consulting Group recommends investigating this potential ongoing overcharge. As detailed above, we estimate that in addition to a refund of approximately $93,000 for past overcharges, a correction of this ongoing overcharge will result in annual savings of approximately $372,000." (*Id.* (emphasis omitted).) Under a final subheading entitled "Suggested Action," the Report provides that "NUS will initiate action to investigate potential overcharge as detailed above. We will initially approach the Provider to review this matter and correct your billings. We will then also contact your Marketer to adjust their invoices and rebill you based on the corrected usage as well." (*Id.*)

On December 22, 2006, Mogel and Amundsen discussed the Report during a telephone conversation. (Pl.'s 56.1 ¶ 64; Goodman Decl. Ex. I.) During this conversation, Mogel commented that the recommendation was a "great catch," but questioned the significantly large estimated savings of $372,000. (Pl.'s 56.1 ¶ 64; Goodman Decl. Ex. I.) Despite this reservation, Mogel "did not want [NUS] to delay contacting the utility suppliers and getting the problem corrected." (Goodman Decl. Ex. I; *see also* Pl.'s 56.1 ¶¶ 64-65.) Mogel subsequently signed a letter written on Tiffany's letterhead, which was to be submitted to the utility companies for the purpose of giving them permission to work with NUS on Tiffany's behalf. (Pl.'s 56.1 ¶ 72; Goodman Decl. Ex. P.) NUS was authorized to use the letter in connection with its efforts to correct the electric service billing error at the Manhasset store. (Pl.'s 56.1 ¶ 73.)

On December 22, 2006, Amundsen sent a letter to LIPA by facsimile in which she informed LIPA about the elevated consumption and demand readings on Tiffany's account at the Manhasset store, and requested that LIPA (1) investigate whether an error had occurred, (2) correct the meter so that it properly recorded all future usage, and (3) credit the account for all past overcharges. (Pl.'s 56.1 ¶ 75.) Amundsen also included a copy of the letter of authorization signed by Mogel. (*Id.*). On that same day, Amundsen attempted to contact LIPA, but it was closed for the Christmas holiday. (*Id.* ¶ 76.)

On December 26, 2006, Amundsen spoke with LIPA's billing supervisor, Kathleen Schwarting ("Schwarting"), about the potential error at the Manhasset store. (*Id.* ¶ 77.) During this conversation, Schwarting conveyed that the billing for the Ralph Lauren store, located next to Tiffany's Manhasset store, seemed "unusually low," while the billing for Tiffany's Manhasset store seemed "unusually high." (Goodman Decl. Ex. O.) As a result, Schwarting put a hold on both accounts. (*Id.*) Schwarting also indicated that LIPA would need to verify the information via a field investigation, which she estimated would take two to three weeks to complete. (*Id.*) However, Schwarting put a "rush" on the request, and indicated that LIPA might be able to resolve the problem in one or two weeks. (*Id.*) All of this

4

information was conveyed by Amundsen to her superiors in an email. (*See id.*) Under an entry dated December 26, 2006 in NUS's notes for the Tiffany account, NUS wrote: "correct possible switched meter with R. Lauren Polo account." (Mitchell Decl. Ex. 16.)

Later that same day, on December 26, 2006, Amundsen sent an email to Mogel. (*See* Defs.' 56.1 ¶ 49; Mitchell Decl. Ex. 8.) Amundsen informed Mogel that she spoke to Schwarting, and that Schwarting "definitely saw that a possible billing error exists, but said they would have to do a field investigation in order to get the details." (Mitchell Decl. Ex. 8.) Amundsen further relayed that the results from such an investigation could take one or two weeks to receive, that for the time being a hold was being put on Tiffany's account, and that no further payments should be made. (*Id.*) However, Amundsen did not convey to Mogel the possibility of meter confusion between Tiffany's Manhasset store and the neighboring Ralph Lauren store. (*See* Defs.' 56.1 ¶ 49; Mitchell Decl. Ex. 8.)

On January 2, 2007, Amundsen informed Mogel via email that LIPA was sending an investigator to determine the source of the "problem" with the electric meter for Tiffany's Manhasset store. (*See* Goodman Decl. Ex. OO.) On January 3, 2007, LIPA's investigator, James Espy ("Espy"), performed a field investigation and concluded that the high electric bill at the Manhasset store was the result of an incorrect "meter multiplier."

(Pl.'s 56.1 ¶ 79.)[4] Specifically, Espy noted on his report that the meter multiplier listed on Tiffany's bill history was 180, while the correct multiplier was 80. (*See id.*; *see also* Goodman Decl. Ex. Q.)

On January 11, 2007, Amundsen sent Mogel an email regarding Espy's field investigation. (*See* Goodman Decl. Ex. S.) The email stated that the "investigation of the meter issue revealed that the wrong meter constant was being applied to the calculation of the bill each month, subsequent to the installation of the new meter in September." (*Id.*) Amundsen also represented that NUS was "not yet convinced that the matter has been totally resolved. Specifically, although there will be a significant reduction in the charges as a result of the initial investigation, based on your bills prior to the changeover, the readings (*i.e.*, kWh and KW) still seem high." (*Id.*) Amundsen asked for Tiffany to send her the "load data" from the Manhasset store, which Mogel faxed to Amundsen later that same day. (*See id.*; *see also id.* Ex. T.)

On January 12, 2007, Amundsen sent an email to Diane Hoffman ("Hoffman"), Tiffany's landlord's representative for the Manhasset store. (*See* Pl.'s 56.1 ¶ 86; *see also* Goodman Decl. Ex. U.) Amundsen informed Hoffman of the potential billing error, and that "LIPA's investigation of the meter problem revealed that the wrong meter

---

[4] The "meter multiplier" is used in conjunction with the actual meter readings to calculate the monthly demand kW and energy kWh used for billing purposes. (Pl.'s 56.1 ¶ 81.) Specifically, electric meters for commercial customers track energy usage by showing a numeric value for a time period, which is then multiplied by a figure (the "meter multiplier") unique to that particular meter. (Defs.' 56.1 ¶ 53.)

5

constant was being applied to the calculation of the bills each month." (Goodman Decl. Ex. U.) The email also stated that "in addition to the billing errors, there appears to also be a meter wiring error," and that NUS wanted "to insure [sic] that Tiffany and Co. is wired for their usage only and not being charged for any usage of their neighboring stores. (LIPA advised that the usage for the Ralph Lauren store was lower than usual for the same time periods in question.)" (*Id.*)

In an email dated January 16, 2007, David Brown ("Brown"), a vice president of NUS who temporarily took over Amundsen's responsibilities, sent an email to Mogel. (Goodman Decl. Ex. V.) In that email, Brown conveyed the substance of a telephone conversation that he had with a representative of the electrical contractor for the mall (the "contractor") the previous day, on January 15, 2007. (*See* Pl.'s 56.1 ¶ 87; *see also* Goodman Decl. Ex. V.) Specifically, the contractor "indicated that it appeared that LIPA had 'mis-tagged or mis-labeled' the newly installed electricity meters for [Tiffany's Manhasset] store and the neighboring [Ralph Lauren] store," and that "[a]ccordingly, the recorded usage/demand for Polo had been placed on the Tiffany bills and vice versa." (*Id.*)

On January 16, 2007, Brown called LIPA and provided the billing supervisor with the name and telephone number of the electrical contractor for the mall. (*See* Goodman Decl. Ex. W.) The billing supervisor indicated that LIPA's investigator, Espy, would contact the contractor and arrange a day and time for the inspection. (*See id.*) On January 19, 2007, Espy performed another field inspection, together with the contractor. (Schwarting Dep. Tr. at 101:5-102:8.) During this inspection, Espy discovered that, although the meters for Tiffany's Manhasset store and the neighboring Ralph Lauren store were wired correctly on location, the meters were switched in LIPA's computer system. (*See* Goodman Decl. Ex. R; *see also* Schwarting Dep. Tr. at 83:21-85:6.)[5] LIPA subsequently fixed the error in its computer system, and, as a result, Tiffany's utility bills were accurate after March 27, 2007. (*See* Pl.'s 56.1 ¶ 94.)

In February 2007, NUS made its demand for a fee of approximately $1 million in connection with correcting the switched meter error. (*See* Frankel Dep. Tr. at 33:4-11.) In response, Tiffany terminated the contract with NUS. (*See id.*)

B. Procedural History

Shortly thereafter, on April 26, 2007, NUS filed its Complaint in this action. Tiffany field its Answer with counterclaims on June 6, 2007. On September 4, 2007, the case was reassigned to the undersigned from the Honorable Kenneth M. Karas, District Judge. Following discovery, on July 31, 2008, Tiffany filed its motion for summary judgment and an accompanying memorandum of law. On September 5, 2008, NUS filed a cross-motion for summary judgment, and a memorandum of law in support of its motion and in opposition to Tiffany's. On September 25, 2008, Tiffany

---

[5] Specifically, when the meters were installed, they were put into a "meter pan," which signifies the meter that services each store. There was apparently a "mis-labeling," resulting in the meter for Tiffany's Manhasset store being associated with the Ralph Lauren store, and vice versa. (*See* Schwarting Dep. Tr. at 83:21-85:6.)

filed a reply memorandum, in further support of its motion and in opposition to NUS's motion. Finally, on October 16, 2008, NUS filed its reply memorandum.

## II. DISCUSSION

The standards for summary judgment are well settled. The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). Pursuant to Rule 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Matican v. City of New York*, 524 F.3d 151, 154 (2d Cir. 2008). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. County of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008) (quoting *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir. 2007)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (noting that summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

### A. Breach of Contract Claim

#### 1. Legal Standard

There are four elements to a claim for breach of contract under New York state law: "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996).[6]

In determining a party's obligations under a contract, "the initial interpretation of a contract 'is a matter of law for the court to decide.'" *K. Bell & Assocs., Inc. v. Lloyd's Underwriters*, 97 F.3d 632, 637 (2d Cir. 1996) (quoting *Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295, 299 (2d Cir. 1996)). "Included in this initial interpretation is the threshold question of whether the terms of the contract are ambiguous." *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London*, 136 F.3d 82, 86 (2d Cir. 1998). "[T]he presence or absence of ambiguity is determined by looking within the four corners of the document, without reference to extrinsic evidence." *Chapman v. New York State Div. for Youth*, 546 F.3d 230, 236 (2d Cir. 2008) (citing *Kass v. Kass*, 91 N.Y.2d 554 (N.Y. 1998)). "Ambiguity in a contract is the inadequacy of the wording to classify or characterize something that has potential significance." *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of New York*, 375 F.3d 168, 178 (2d Cir. 2004). "Ambiguity with respect to the meaning of contract terms can arise either from the language itself or from inferences that can be drawn from this language." *Alexander & Alexander*, 136 F.3d at 86.

"Summary judgment is generally proper in a contract dispute only if the language of

---

[6] "The parties' briefs assume that New York law controls, and such 'implied consent . . . is sufficient to establish choice of law.'" *Krumme v. WestPoint Stevens, Inc.*, 238 F.3d 133, 138 (2d Cir. 2000) (quoting *Tehran-Berkeley Civil & Envt'l Eng'rs v. Tippetts-Abbett-McCarthy-Stratton*, 888 F.2d 239, 242 (2d Cir. 1989)) (alteration in original).

7

the contract is wholly unambiguous." *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 157-58 (2d Cir. 2000) (citing *Mellon Bank, N.A. v. United Bank Corp. of New York*, 31 F.3d 113, 115 (2d Cir. 1994)). However, "[w]here the resolution of the ambiguity hinges on such extrinsic matters as the credibility of witnesses or documents or upon choosing one among several reasonable inferences that may be drawn from such extrinsic evidence, a jury, and not a court, should decide what meaning is to be ascribed to the contract." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 148-49 (2d Cir. 1993) (citations omitted).

### 2. Analysis

In this case, there is no dispute that a valid contract existed between the Parties. Rather, what is at issue is the proper interpretation of the contract, and, under that interpretation, whether there are any disputed issues of material fact as to the Parties' performance. The Court will therefore consider each of the contested contractual terms, and the Parties' performance as relates to those terms.

#### i. NUS's "Recommendation"

Tiffany first argues that NUS failed to adequately perform under the terms of the contract, as the recommendation provided by NUS "is simply not the kind of recommendation contemplated by the Contract because it is far too generic to have any meaning." (Defs.' Mem. at 22.) The Court finds no merit in this argument. The plain and unambiguous meaning of the word "recommend" undoubtedly encapsulates the "recommendation" made by NUS in this case. *See Webster's Third New Int'l Dictionary* 1897 (2002) (defining "recommend" as "to mention or introduce as being worthy of acceptance, use, or trial"). Here, Tiffany admits that the recommendation contained in the Report "was to investigate, obtain a refund for, and correct the error" identified by NUS in the December 20, 2006 Report. (*See* Defs.' Response to Pl.'s 56.1 ¶ 54.) The Court finds that this language constituted a valid "recommendation" under the contract. The Court further finds that Tiffany "approved" the recommendation as contemplated by the contract, by *inter alia*, telling NUS that it should not "delay contacting the utility suppliers and getting the problem corrected," and by signing a letter written on Tiffany's letterhead giving utility companies permission to work with NUS on Tiffany's behalf.

#### ii. Tiffany's "Costs"

It is undisputed that Tiffany terminated the contract in February 2007 when NUS made its demand for a fee of approximately $1 million in connection with correcting the switched meter. (*See* Frankel Dep. Tr. at 33:4-11.) However, Tiffany argues that, when so doing, it was not in breach of the contract because NUS did not save Tiffany any "costs" under the contract. Specifically, Tiffany argues that:

> As it turned out, the "costs" for electricity . . . were not "our costs," as contemplated by the Contract, but rather, were the costs of neighbor Polo Ralph Lauren. Providing assistance to long-time client Tiffany by notifying LIPA of this obvious mistake, and assuring that the utility

8

made the necessary corrections, did not reduce for Tiffany any of its own costs, the only "savings" contemplated by the Contract.

(Defs.' Mem. at 20.)

The Court rejects Tiffany's proffered interpretation of the word "costs" as used in the contract. Applying the plain meaning of the word, the Court finds no ambiguity with regard to the term's usage in the contract. The word "cost" is broadly defined in the dictionary as "the amount or equivalent paid or given or charged or engaged to be paid or given for anything bought or taken in barter or for services rendered." *Webster's Third New Int'l Dictionary* 515 (2002). The contract, considered as a whole, affirms this broad definition. The contract clearly contemplates that NUS will save Tiffany two types of "costs": savings *and* refunds.[7] The contract's explicit inclusion of *refunds* into the contract's contemplation of *costs* belies Tiffany's linguistic argument here. By definition, any *refund* received by Tiffany due to an action taken by NUS would involve a returning of a "cost" that was not, in some sense, Tiffany's own. Thus, Tiffany's argument that the plain meaning of the word costs requires a determination of *whose* "costs" are involved is contradicted *both* by the plain meaning of the word, *and* by consideration of the contract as a whole. Accordingly, the Court finds that there is no ambiguity in the term "costs," and that the "recommendation" made by NUS did not, solely by virtue of involving the alleged costs of the Ralph Lauren store, involve "costs" that were outside of the scope of that term as contemplated by the contract.

### iii. "Savings" and "Refunds"

This finding brings the Court to the crux of the dispute between NUS and Tiffany. As noted, the contract contemplates two types of costs: *refunds* and *savings*. The issue presented by this case is whether NUS's recommendation resulted in a refund, a savings, or both. NUS argues that, under the terms of the contract, by correcting the switched meter error, it is entitled not only to fifty percent of any "refund" received by Tiffany, but also to Tiffany's projected "savings" for the next sixty months. NUS argues that the latter amount should be calculated by computing the difference between (1) the bills Tiffany *actually* receives, paying for the proper meter, and (2) the bills that Tiffany *would have* received, had the meter error persisted.[8]

The Court agrees with NUS that by investigating and identifying the overcharge in question, NUS is entitled to half of the amount actually returned to Tiffany. Such returned funds constitute a "refund" as unambiguously used in the contract, and as

---

[7] As noted, the contract authorizes NUS to "submit recommendations for savings *and* refunds." (Mitchell Decl. Ex. 1. (emphasis added).) The "performance fee" due to NUS distinguishes between *refunds* and *savings*: "A performance fee of: (i) fifty (50%) percent of each *refund* realized; (ii) fifty (50%) percent of each *savings* realized for a period of sixty (60) months after which the entire savings will be ours." (*Id.* (emphasis added).) And further: "Payment will be made upon receipt of your invoice showing computation of *savings and/or refunds*. (*Id.* (emphasis added).)

[8] The total purported damages calculated under this methodology amount to $964,906.29, plus applicable interest. (*See* Brown Aff. ¶ 13) (calculating NUS's alleged damages).)

9

commonly defined and understood. *See Webster's Third New Int'l Dictionary* 1910 (2002) (defining refund as "to return (money) in restitution, repayment, or balancing of accounts").

However, the Court rejects NUS's radical interpretation of the word "savings," and holds that the identification and subsequent elimination of an improper utility overcharge does not constitute a "savings" to Tiffany under the contract. By correcting the switched meter error, NUS effectuated a return of property that was wrongly taken in the first place. To find that such an action yielded a "savings" to Tiffany would actually *perpetuate* an *unwarranted overcharge* for five more years. The fact that the overcharge would be reduced by half, and be payable to NUS instead of to a utility company, is of no moment and does nothing to transform such an overcharge into a "savings." Only in Wonderland could "savings" be so distorted and divested of its plain meaning. *See Newmont Mines Ltd. v. Hanover Ins. Co.*, 784 F.2d 127, 135 (2d Cir. 1986) ("Unless otherwise indicated, words should be given the meanings ordinarily ascribed to them and absurd results should be avoided."); *see also Webster's Third New Int'l Dictionary* 2020 (2002) (defining "savings" as "the excess of income over consumption expenditures"). Put simply, the plain language of the agreement and common sense forbid such a strained construction.

Accordingly, the Court holds that the only "costs" encapsulated by NUS's correction of the switched meter error were the "refunds" that Tiffany received, and not any projected "savings." Thus, the most that Tiffany would owe NUS under the terms of the contract is $33,510.79, or fifty percent of the $67,021.58 in refunds that NUS alleges Tiffany received from LIPA and Con Ed. (*See* Brown Aff. ¶ 17.) However, the Court finds that there are disputed issues of fact that cannot be resolved on summary judgment with regard to whether NUS improperly delayed in correcting the meter error, and, by so doing, violated the covenant of good faith and fair dealing that is implicit in all contracts under New York law. *See Tractebel Energy Mktg, Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 98 (2d Cir. 2007) (citing *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (N.Y. 1995)); *see also Dalton*, 87 N.Y.2d at 389 (noting that the covenant "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."). Although NUS first notified Tiffany of the potential error on November 15, 2006, NUS did not submit a "recommendation" until more than a month later, via the December 20, 2006 Report. There is no apparent explanation for this delay on the record; Amundsen testified at her deposition that she was not aware of any investigation that had been conducted between November 15, 2006 and December 19, 2006 by NUS regarding the potential error at Tiffany's Manhasset store. (*See* Amundsen Dep. Tr. at 114:19-25.) It then took almost another month to actually fix the error identified in the Report. NUS argues, in its motion papers, that "[i]n light of the fact that this period included numerous holidays, and that NUS consultants manage multiple accounts, [this delay] was neither excessive nor unreasonable." (Pl.'s Mem. at 22.) While this may be true, the Court is not able to resolve this disputed issue of material fact on the record currently before it.

10

There are also disputed issues surrounding NUS's delay in conveying the source of the actual error to Tiffany. When Amundsen first spoke to LIPA's billing supervisor Schwarting about the potential overcharge at the Manhasset store on December 26, 2006, she learned that there was potential meter confusion between Tiffany's Manhasset store and the neighboring Ralph Lauren store.[9] Despite this knowledge, Amundsen did not mention the potential switched meter error in the email she sent later that same day to Tiffany's contact person, Mogel. In fact, on the current record, it does not appear that NUS expressly informed Tiffany about the "switched meter error" until Brown sent an email to Mogel on January 16, 2007, notwithstanding the many communications between NUS and Tiffany during that period, which, as detailed above, included a request for "load data."[10] The current record provides no explanation for (1) these delays, (2) the failure to communicate immediately the potential "switched meter error," or (3) the necessity of requesting "load data."

"'[W]hether particular conduct violates or is consistent with the duty of good faith and fair dealing necessarily depends upon the facts of the particular case, and is ordinarily a question of fact to be determined by the jury or other finder of fact.'" *Tractebel Energy Mktg.*, 487 F.3d at 98 (quoting 23 Williston on Contracts § 63:22 (4th ed. 2006)). The Court finds that in this case, there are disputed issues of material fact as to whether NUS's performance under the contract violated the duty of good faith and fair dealing, and accordingly, whether NUS is entitled to fifty percent of any "refund" received by Tiffany.[11] Accordingly, both Parties' motions for summary judgment on their respective breach of contract claims are denied. The Court likewise denies both Parties' motions for summary judgment on their respective claims for declaratory judgment and specific performance.

### B. Unjust Enrichment and Quantum Meruit Claims

Under New York law, quantum meruit and unjust enrichment claims are analyzed together as a single quasi-contract claim. *See Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005). In this case, the undisputed existence of a valid contract precludes any claims under these quasi contractual theories. *See, e.g., Clark Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388 (N.Y.

---

[9] As noted, Schwarting conveyed to Amundsen that the billing for the neighboring Ralph Lauren store seemed "unusually low," while the billing for Tiffany's Manhasset store seemed "unusually high." (Goodman Decl. Ex. O.) Further, under an entry dated December 26, 2006 in NUS's account notes for Tiffany, NUS wrote: "correct possible switched meter with R. Lauren Polo account." (Mitchell Decl. Ex. 16.)

[10] Mogel was also sent a copy of the email from Amundsen to Hoffman on January 12, 2007, which makes reference to the possibility of a "meter wiring error" between the Ralph Lauren store and Tiffany's Manhasset store.

[11] NUS argues that, since Tiffany received $67,021.58 in "refunds," it is owed fifty percent of that amount, or $33,510.79, under the contract. (*See* Brown Aff. ¶ 17.) Tiffany responds that, "[a]t most, NUS could possibly claim entitlement to whatever refund was due for the 9 day period reflected on the first erroneous bill, which it identified to Tiffany on November 16, 2006." (Defs.' Mem. at 23-34.). The resolution of this dispute requires a determination by the fact finder as to whether NUS properly performed under the contract in identifying and correcting the switched meter error.

11

1987) ("The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter."); *see also, e.g., Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 586 (2d Cir. 2006) (following *Clark*); *Goldman v. Metropolitan Life Ins. Co.*, 5 N.Y.3d 561, 572 (N.Y. 2005) ("The theory of unjust enrichment lies as a quasi-contract claim. It is an obligation the law creates in the absence of any agreement." (internal citations omitted)). Accordingly, the Court grants summary judgment with respect to both Parties' claims for unjust enrichment and quantum meruit.

### III. CONCLUSION

For the reasons set forth above, the Court denies in part and grants in part both Parties' motions for summary judgment. Specifically, the Court grants summary judgment on the unjust enrichment and quantum meruit claims, and denies summary judgment on the breach of contract claims. The Parties are hereby ordered to appear for a pre-trial conference on Friday, April 17, 2009 at 3:30 p.m. in Courtroom 21C, United States District Court, 500 Pearl Street, New York, New York. The Clerk of the Court is respectfully directed to terminate the motions located at docket numbers 24 and 35.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated: March 20, 2009
New York, New York

\* \* \*

Plaintiff National Utility Service, Inc. is represented in this matter by Peter Greg Goodman, Hartman & Carven, LLP, 488 Madison Avenue, New York, New York 10022. Defendants Tiffany & Co. and Tiffany and Company are represented by Jeffrey A. Mitchell and Don Abraham, Gibbons P.C., One Pennsylvania Plaza, 37th Floor, New York, New York 10119.